**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **JOHN E. MOORE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | CASE NO. 1:07-CV-00107 (RMC) |
| | ) | |
| **GEORGE W. BUSH, ET AL.,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**DEFENDANT VOLUSIA COUNTY SHERIFF DEPARTMENT'S**
**OPPOSITION TO PLAINTIFF'S REQUEST FOR HEARING**

Comes now Defendant Volusia County Sheriff Department ("VCSD") and respectfully files its Opposition to "Plaintiff John E. Moore Motion Request for Oral Hearing" ("Request for Hearing").

In his Request for Hearing, Plaintiff seeks "permission by this Court to be heard and to produce proof of my claims of Brainwave Technology. . . . [and to] provide a more vivid perspective to this case." Request for Hearing at 2. Plaintiff apparently seeks to amend his Complaint via an evidentiary hearing on the validity of the alleged Brainwave Technology. Such a hearing is not necessary at this stage; indeed, it is well-established that in a motion to dismiss, the Court accepts the facts alleged by the complaint as true and accords the plaintiff the benefit of all inferences that can be derived from the facts *as alleged. Kowal v. MCI Communications Corp*., 16 F.3d 1271, 1276 (D.C. Cir. 1994).

Local Rule 7(f) grants the Court complete discretion to permit or deny an oral hearing. There is no need for additional factual elaboration at this time; Plaintiff's Complaint stands or fall on the allegations pled therein. The Court should exercise its discretion to deny the Request for Hearing.

DATED: June 22, 2007

Respectfully submitted,

_____/s/ Joseph E. Hartman_____
Joseph E. Hartman
D.C. Bar No. 467054
FULBRIGHT & JAWORSKI L.L.P.
801 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2623
Telephone:  (202) 662-0200
Facsimile:  (202) 662-4643 \

ATTORNEYS FOR DEFENDANT
VOLUSIA COUNTY SHERIFF'S
DEPARTMENT

OF COUNSEL:
Richard N. Staten
Assistant County Attorney, Volusia County
123 West Indiana Avenue
Deland, Florida 32720
Phone: (386) 736-5950
Fax; (386) 736-5990

John E. Moore
9 Pleasant View cir
Daytona beach, FL.
32118-5511
386-761-8193

December 13, 2005

ACLU Volusia/Flagler Chapter:
Mr. George Griffin,
P.O. Box 1824,
Ormond Beach, FL.
32175-1824

Subject: Return of Independent Reports.

Reference: Brainwave Technology Independent Report.
             Pro Se Litigation Guidelines Independent Report.

Dear Mr. Griffin,

   I am requesting once again the return of my Independent Report Documents. As I
stated in my voice mail message, that I provided you these two reports for your advice
and help on these two important matters, which none was provided by you.

   Please return the referenced Independent Reports as soon as possible to my home
address, C.O.D.

Cc: American Civil Liberties Union.

                          Thank You,


                          John E Moore

09-26-06

This document that was mailed to Mr. G. Griffin of ACLU Volusia/Flagler Chapter, was mailed by yours truly J. E. Moore on Dec. 15, 2005. It was not delivered by the U.S. Postal Service, and returned to me on Dec. 28, 2005. Today I went to the Post Office (central) on Speedway Boulevard and spoke with clerk at counter, he said these are not postal type code indicators on this envelope,  The clerk also called Ormond Beach Post Office and confirmed the address was at the time active and still is.


S A M P L E

John E. Moore
9 Pleasant View Cir.
Daytona Beach, FL.
32116-5511

ACLU Volusia/Flagler Chapter:
Mr. George Griffin
P.O. Box 1824
Ormond Beach, FL
32175-1824

**Express**

US Airbill

FedEx Tracking Number: **8532 0606 3703**

Form
Date: 12-15-05

Sender's FedEx Account Number

Sender's Name: John E. Moore

Phone ( 386 ) 761-8193

Company

Address: 9 Pleasant View Cir.

Daytona Beach
State FL   ZIP 32118-5511

Your Internal Billing Reference

Recipient's Name: A C L U

Phone ( 888 ) 567-2258

Company: Office of the President

Address: 125 Broad Street, 18th Floor

New York
State NY   ZIP 10004-2400

By using this Airbill you agree to the service conditions on the back of this Airbill and in our current Service Guide, including terms that limit our liability.
**Questions? Visit our Web site at fedex.com**
or call 1.800.GoFedEx 1.800.463.3339.

4a Express Package Service   *Packages up to 150 lbs.*

- [ ] FedEx Priority Overnight
- [ ] FedEx Standard Overnight
- [ ] FedEx First Overnight

- [ ] FedEx 2Day
- [X] FedEx Express Saver

4b Express Freight Service   *Packages over 150 lbs.*

- [ ] FedEx 1Day Freight
- [ ] FedEx 2Day Freight
- [ ] FedEx 3Day Freight

5 Packaging
- [X] FedEx Envelope
- [ ] FedEx Pak
- [ ] FedEx Box
- [ ] FedEx Tube
- [ ] Other

6 Special Handling
- [ ] SATURDAY Delivery
- [ ] HOLD Weekday at FedEx Location
- [ ] HOLD Saturday at FedEx Location

Does this shipment contain dangerous goods?
- [X] No
- [ ] Yes
- [ ] Yes
- [ ] Dry Ice
- [ ] Cargo Aircraft Only

7 Payment   Bill to:
- [ ] Sender
- [ ] Recipient
- [ ] Third Party
- [ ] Credit Card
- [ ] Cash/Check

Total Packages   Total Weight   Total Declared Value
$             .00

8 Sign to Authorize Delivery Without a Signature

By signing you authorize us to deliver this shipment without obtaining a signature and agree to indemnify and hold us harmless from any resulting claims.

Rev. Date 11/04 • Part #158081 • ©1994–2003 FedEx • PRINTED IN U.S.A.   SRF 01/05

0200

467

FedEx Use Only

RETAIN THIS COPY FOR YOUR RECORDS.

GIF89a>  Ä  2W⅀ApÂÍÚNn'ÑÕÚˆ  ¸´ÄÓÈÓÞ×áé !XöøúDe‹çìð¤·Ê〗°Ääñ÷p⟳©áçíVv¯|–
±çõúîñõhf¢$Hs»»»ééé–4f"6M"§½  ê÷üÿÿÿ!ù⌐      ,    >   |ÿ
×pdi〗hª®,YXCáÍtmßx®Ï6P|À pH,→〗ÈáÅò¹=〗P〗

June 18, 2007.

Here is the complete data presentation of John St-Clair Akwei,  titled

"Covert Operations of the U.S, National Security Agency."

From An article in Nexes Magazine April/May 1996.

As presented on my personnel computer.

LEGAL DEPARTMENT
TECHNOLOGY AND
LIBERTY PROGRAM



AMERICAN CIVIL LIBERTIES UNION

FOUNDATION

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
TECHNOLOGY AND
LIBERTY PROGRAM
NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2559
F/212.549.2629
WWW.ACLU.ORG

OFFICERS AND DIRECTORS
NADINE STROSSEN
PRESIDENT

ANTHONY D. ROMERO
EXECUTIVE DIRECTOR

KENNETH B. CLARK
CHAIR, NATIONAL
ADVISORY COUNCIL

RICHARD ZACKS
TREASURER

June 26, 2006

Transmitted Via Facsimile, First Class Mail and Electronic Mail

Department of Defense
Office of Freedom of Information
1155 Defense Pentagon
Washington, D.C. 20301-1155
VIA FACSIMILE: (703) 696-4506
VIA E-MAIL: foia@whs.mil

Defense Intelligence Agency
ATTN: DAN-1A
Washington, DC 20340-5100
VIA FACSIMILE: (202) 231-3909
VIA ELECTRONIC MAIL: foia@dia.mil

National Security Agency
Central Security Service
FOIA/PA Services
DC34
9800 Savage Road STE 6248
Ft. George G. Meade, MD 20755-6248
VIA FACSIMILE: (301) 688-6198

Information and Privacy Coordinator
Central Intelligence Agency
Washington, D.C. 20505
VIA FACSIMILE: (703) 613-3007

Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Department of Justice
935 Pennsylvania Avenue, N.W.
Washington, DC 20535-0001
VIA FACSIMILE: (202) 324-3752

Maureen Cooney
Chief FOIA Officer
U.S. Department of Homeland Security
Arlington, VA 22202
VIA FACSIMILE: 571-227-1125
VIA ELECTRONIC MAIL: foia@hq.dhs.gov

Cynthia Christian
FOIA Public Liaison
Under Secretary for Science & Technology
Department of Homeland Security
VIA FACSIMILE: 202-254-6178
VIA ELECTRONIC MAIL: stfoia@dhs.gov

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Re:    Freedom of Information Act Request

Attention:

      This is a request pursuant to the Freedom of Information Act (5
U.S.C. § 552) for all agency records[1] held by the Department of Defense[2],
the National Security Agency, the Central Intelligence Agency, the
Federal Bureau of Investigation and the Department of Homeland Security
on the use of functional magnetic resonance imaging (fMRI),
electroencephalography (EEG), infrared spectroscopy, or other scanning
or measurement technologies of the brain that seek to detect truth,
deception, guilty knowledge, accurate recollections or recognition, or to
otherwise assist in or support interrogation or to identify individuals for
follow-up questioning.  Specifically, we seek all records including but not
limited to the study, development or use of such technologies for foreign
or domestic use and all records of the agency's efforts to contract with any
other entity to study, develop or use such technologies for foreign or
domestic use.  Individual requests have been sent to each of the agencies
addressed above.

      Requester American Civil Liberties Union is a non-profit, non-
partisan, 501(c)(4) membership organization that educates the public
about the civil liberties implications of pending and proposed state and
federal legislation, provides analyses of such legislation, and lobbies
legislators directly and through its members concerning such legislation.
Requester American Civil Liberties Union Foundation is a separate
501(c)(3) organization that provides legal representation free of charge to

---

[1] The term records includes but is not limited to letters, correspondence, tape recordings, notes, data,
memoranda, reports, email, computer source and object code, technical manuals, technical specifications,
or any other materials.
[2] This request includes all subdivisions of these enumerated agencies.

individuals and organizations in civil rights and civil liberties cases and educates the public about civil rights and civil liberties issues.

## I.    LIMITATION OF PROCESSING FEES

The ACLU requests a limitation of processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by ... a representative of the news media ...").

The ACLU is a "representative of the news media" within the meaning of the statute because it is "an entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience." *National Security Archive v. Dep't of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989); *Electronic Privacy Information Ctr. v. Dep't of Defense*, 241 F.Supp.2d 5, 10-15 (D.D.C. 2003) (finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the news media"); *cf. ACLU v. Dep't of Justice*, 321 F. Supp. 2d 24, 30 n.5 (D.D.C. 2004) (finding non-profit public interest group "primarily engaged in disseminating information").

Dissemination of information to the public is a critical and substantial component of the ACLU's mission and work. The ACLU publishes newsletters, news briefings, right-to-know documents, and other educational and informational materials. Through the ACLU's public education department, such material is made available to everyone, including to individuals, tax-exempt organizations, not-for-profit groups, law students and faculty, for no cost or for a nominal fee. The ACLU also disseminates information through its heavily visited web site: http://www.aclu.org. The web site addresses civil rights and civil liberties issues in depth and contains many thousands of documents relating to these issues. The website includes features on information obtained through the FOIA. The ACLU also publishes an electronic newsletter, which is distributed to subscribers by e-mail.

In addition to the national ACLU offices in New York and Washington, D.C., there are 53 ACLU affiliate and national chapter offices located throughout the United States and Puerto Rico. These offices further disseminate ACLU material through a variety of means including their own websites, publications, and newsletters. In addition, the ACLU makes archived material available at the American Civil Liberties Union Archives at Princeton University.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

The ACLU intends to disseminate the information gathered by this Request through these channels.[3]

## II.    WAIVER OF PROCESSING FEES

The ACLU additionally requests a waiver of processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."). Disclosure in this case meets the statutory criteria and a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers for noncommercial requesters.'"). Because the ACLU meets the test for a fee waiver, fees associated with responding to FOIA requests are regularly waived for the ACLU.[4]

Disclosure of the requested information is in the public interest because it will contribute significantly to public understanding of government conduct. fMRI lie detection is potentially a very powerful and invasive technology that attempts to detect a subject's decision to lie. It could be used to affirmatively extract information from a person whether they actively provide an answer to a question or not. Similarly, studies have shown that fMRI could be used to decipher whether a subject recognizes an image that is shown to them – in effect, identifying "guilty knowledge." In this sense, fMRI goes well beyond lie detection, and presents us with something far closer to the concept of "mind reading." All of these applications make fMRI of immense interest to government agencies interested in determining the accuracy of an individual's statements. Several government entities including the Department of Defense Polygraph Institute, the Department of Homeland Security and the Defense Advanced Research Projects Agency, are already funding research in this area. Malcolm Ritter, *Brain Scans May Be Used As Lie*

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[3] The ACLU does not seek disclosure to further a commercial interest. The ACLU is a "non-profit, non-partisan, public interest organization." *See Judicial Watch Inc. v. Rossotti*, 326 F.3d 1309, 1310 (D.C. Cir. 2003). Any information disclosed by the ACLU as a result of this FOIA will be available to the public at no cost.

[4] For example, three separate components of DOJ – the Federal Bureau of Investigation, the Office of Intelligence Policy and Review, and the Office of Information and Privacy in the Department of Justice – did not charge fees for a FOIA request submitted in August 2002 for records concerning the FBI's use of the Patriot Act's surveillance provisions. Neither the DOJ nor DOS charged fees for FOIA requests submitted in October 2003 and June 2004 for records concerning the treatment of detainees held by the U.S. in Iraq, Afghanistan, and at Guantanamo Naval Base.

*Detectors*, ASSOCIATED PRESS, Jan 29, 2006; Robin Marantz Henig, *Looking for the Lie*, NEW YORK TIMES, February 5, 2006.

As a nonprofit 501(c)(3) organization and "representative of the news media", the ACLU is well-situated to disseminate information it gains from this Request. As discussed in Section I, the ACLU has played an active role in educating the public about civil liberties issues by disseminating the information it obtains through the FOIA. The ACLU, has also played a pivotal role in disseminating information about the civil liberties implications of post-September 11th policies.[5]

Please furnish all applicable records to:

Christopher Calabrese
Counsel, Technology & Liberty Program
American Civil Liberties Union
125 Broad Street, 17th Floor
New York, NY 10004
Ccalabrese@aclu.org

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Thank you for your prompt attention to this matter.

Sincerely,

Christopher Calabrese
Counsel, Technology and Liberty Program

Barry Steinhardt
Director, Technology and Liberty Program

---

[5] As discussed in footnote 3, the records requested are not sought for commercial use, and the requesters plan to disseminate the information disclosed as a result of this FOIA request through the channels described in Section II. Once again, the ACLU will make any information disclosed as a result of this FOIA available to the public at no cost.

# PRO SE LITIGATION GUIDELINES



# INDEPENDENT

# REPORT

# Table of Contents

Introduction…………………………………………………………………..……i,ii
Purpose of Report……………………………………………………………….………iii
A. The Complaint……………………………………………………………..…..1 thru 4
B. Civil Cover Sheet………………………………………………………………...…..…5
C. Summons for each defendant named in the complaint…………………..…5 thru 8
D. Filing Fee……………………………………………………………………………..8
E. Obtaining an Attorney………………………………………………………...9 thru 12
F. Motions…………………………………………………………………….…...13 thru 17
G. Counterclaim……………………………………………………………..18 thru 24.
H. Motion for reconsideration…………………………………………….....25, 26
I. Motion for Physical or Mental Examination………………………….…………27
J. Ending the Case Without a Trial………………………………………..…..…..27
Court listing of Pro Se information availability…………………..…………..1-1 thru 1-7

# Introduction

This independent report is written as an aid to help guide Pro Se litigants through what I found was sometimes "Unequal Justice for Some." I have put this report together as a friend of the court and hope that the court receives it as so.

Of the approximately ninety two United States District Courts, forty six address Pro Se litigation in detail. Forty six only touch on the topic, with little or no guidance.

As an example, Illinois Central District Court; 7th Circuit, devotes one page, while California Northern District Court; 9th Circuit, devotes one hundred and thirty nine pages and also provide a Pro Se Office. One more example of Pro Se information disseminated through a not so largely populated district is the Guam District Court; 9th Circuit. Sixty four total pages of detailed Pro Se guidance.

The point that I am presenting in the preceding paragraph, is that the geographic location (jurisdiction) of a persons legal complaint, when it entails Pro Se litigation is very important. It can be the difference between a dismissal or a settlement.

In closing, my primary reason for this report, are the inconsistencies in the phrase, "Equal Justice for All."

One other important note of importance is the Eastern District Civil Litigation Fund will reimburse certain expenses for Pro Se litigation.

No mention of Pro Se litigation procedure in Federal Judicial Center Publication Catalog of publication list.

http://www.fjc.gov/newweb/jnetweb.nsf/pages/582

Final question is who is guilty of not providing the needed information to provide "Equal Justice for All;" The Federal Bar Association, The State Bar Association or the United States Justice System.

# Purpose of Report

Knowing the course to follow or take with the proper guidance to the end result of justice without jeopardizing the courts unbiased mission for equal and fair justice, without giving legal advice.

The following facts presented are what I personally experienced in my representing myself Pro Se in a United States Court of Law.

Information on Case Number, Complaint specifics or Participants will be made available in this report.

The end result which I was seeking as a Pro Se Litigant, was American Justice in front of a Judge in a Court of Law.

Date.......06-01-05

Phone.....386-761-8193

E-mail.....jmoore3263 a bellsouth.net

John E. Moore

## A. The Complaint.

(a) A civil lawsuit is begun by filing a complaint in the office of the Clerk of Court. Complaint forms may be obtained in person from the intake clerk in the Clerk's Office, by mail from the Court's Pro Se Office. and from the Western District Court web site at <http://www.nywd.uscourts.gov>.

"Filing" a document means to deliver it to the Clerk of Court either in person or by mail to have it file-stamped. The purpose of the complaint is to give notice to the persons being sued and the court as to the nature of the lawsuit. The complaint should contain:

(1) A caption specifying in which the case is filed and the names of the parties. Every document you file should have a caption at the top of the first page. The complaint And all other pleadings must be on 8 ½"x 11" paper. The Court allows double spacing.

You should list the names of all the defendants you wish to sue in the caption. Do not use phrases like 'et al.' or 'etc.' in your caption. Do not use 'John or Jane Doe' unless you do not know the defendants name. If you only know the nickname, use that in the caption. You will need to describe the defendants more fully in another part of the complaint. If you don't know their names, be prepared to describe them by their titles or positions. It is your obligation as plaintiff to identify the people who allegedly injured you.

(2) A short and plain statement of why the court has jurisdiction. Your complaint should be written in short, numbered paragraphs, each of which contains

1

a single idea. The first paragraph should identify the bases of the Court's jurisdiction. You should include in your jurisdictional statement a statement of venue, that is, why you are filing suit in Western District of New York. Generally speaking, you must bring a federal action in the district in which the defendants reside, or in which the events giving rise to your claim occurred. (example) If your claim arises in or the defendants live in the 17 western –most counties of New York State, than it is properly venued in the Western District of New York  In a separate paragraph for each individual party, You should identify each party by name, title or some other unique characteristic. You should also indicate where the party lives or maintains a business. The location of a defendants residence or place of business is important for determining venue.

    (3) A short and plain statement of the claim showing why you, the plaintiff, are entitled to relief, including a concise statement of the facts. Generally, each statement of the claim should be made in separately numbered paragraphs, with each paragraph limited as far as possible to a statement of a single set of factual circumstances. In short, clear, numbered paragraphs describe the actions or omissions of the defendant that you believe the defendant or defendants violated. If the statute under which you are bringing your case requires you to exhaust administrative remedies before filing a federal action, describe your efforts to exhaust those administrative avenues.

    (4) A statement of the particular relief sought. Tell the Court what you want to require the defendant to do,

whether it is to stop doing something, to start doing something, or to pay you damages.

Sign and date your complaint, if possible in the presence of a notary. If you do not have access to a notary public, write the following above your signature: "I declare under penalty of perjury that the forgoing is true and correct. Executed on <insert the date you sign the complaint>." The complaint, as well as all subsequent pleadings filed in the case, should be simple and direct; no technical legal jargon is required. The complaint and all subsequent pleadings must include your address and telephone number, and must be signed by you. See Rules 8-11, Federal Rules of Civil Procedure. It is mandatory that you keep the Clerk of Court informed of your current address and telephone during the entire lawsuit. Failure to do so is grounds for dismissal of the case. See Local Rule of Civil Procedure 5.3(d).

United States District Court, Western District of New York. Pro Se Office.

(b) Civil Lawsuit

(1) Facts: You cannot sue someone merely because you have a feeling that person may have violated your rights. You must state facts to support your lawsuit such as the time and place of the incident, who violated your rights, and what they did to violate your rights. The burden of proving the case is on the plaintiff or petitioner (the person who brings the law suit). Without factual evidence, the case cannot be won.

When preparing a complaint, you must include facts, --who, what, when (including dates), where and how – that support your claim, against each defendant. For example, you may not list six defendants, but discuss only one or two of them in your complaint. You must include specific allegations of wrongful conduct in your complaint

of every person you have named.

(2) **Real Injury or Wrong:** You cannot sue someone just because you are angry at them. You must have been injured (such as physically or economically) in some way. Sometimes emotional injuries can be compensated, but their must usually be a related physical injury.

(3) **Relief:** You must tell the Court what you want it to do to remedy the wrong you believe you have suffered. There are several types of relief usually requested: You may recover the actual (real) monetary losses you suffered as a result of someone's actions. For example, if someone injures you and you incur medical bills and are unable to work for a period of time, you may be entitled to reimbursement for your medical expenses and lost wages.

Punitive damages are monetary damages in addition to the amount of money that will compensate you for your actual loss. Punitive damages are allowed only in extraordinary circumstances, when the Court finds conduct particularly outrageous. Punitive damages are meant to punish wrongful conduct and to prevent future bad conduct.

Injunctive relief "enjoins" (stops) someone from doing something or requires someone to do something.

Declaratory relief asks the Court to decide what the law is when you are unsure of your legal rights in an actual controversy. The Court may issue a declaratory judgment where it "declares" the law which is binding on the parties to the lawsuit.

United States District Court, Alaska. Pro Se Handbook.

## B. Civil Cover Sheet.

Not mandatory in some District Courts. (JS-44)

Pro Se litigants exempt from submittal of cover sheet.

## C. Summons for each defendant named in the complaint.

(a) Service upon the United States shall be effected:

(1) by delivering a copy of the summons and of the complaint to the United States attorney for the district in which the action is brought or to an assistant United States attorney or clerical employee designated by the United States attorney in a writing filed with the clerk of court or by sending a copy of the summons and of the complaint by registered or certified mail addressed to the civil process clerk at the office of the United States attorney and

(2) by also sending a copy of the summons and of the complaint by registered mail or certified mail to the Attorney General of the United States at Washington, District of Columbia, and

(3) in any action attacking the validity of an order or agency of the United States not made a party, by also sending a copy of the summons and of the complaint by registered or certified mail to the officer or agency.

(b) (1) Service on an agency or corporation of the United States, or an officer or employee of the United States sued only in an official capacity, is effected by serving

the United States in the manner prescribed by Rule 4(i)(1) and by also sending a copy

of the summons and complaint by registered or certified mail to the officer, employee,

agency, or corporation.

(2) Service on an officer or employee of the United States sued in an individual

capacity for acts or omissions occurring in connection with the performance of duties on

behalf of the United States – weather or not the officer or employee is sued also in an

official capacity – is effected by serving the United States in the manner prescribed by

Rule 4 (e), (f), or (g). [Note: Rule 4 (i)2 was amended effective 12/01/00]

(c)The court shall allow a reasonable time to serve process under Rule 4 (i) for

the purpose of curing the failure to serve:

(1) all persons required to be served in an action governed by Rule 4 (i)(2)

(A), if the plaintiff has served either the United States  attorney or the Attorney General

of the United States, or

(2) the United States in an action governed by Rule 4(i)(2)(B), if the plaintiff

has served an officer or employee of the United States sued in an individual capacity.

[Note: Rule 4(i)3 was amended effective 12/01/00]

United States District Court, Ohio Southern District. Pro Se litigate guide.

(d) The waiver of service rule does not apply to the United States as a Defendant.

Formal service upon the federal government or any of its agencies can be accomplished

by certified mail (return receipt required) with the properly executed summons form

and the AO85.

(e) Professional process servers are listed in the telephone directory yellow pages and will serve a summons and complaint for a fee. Any other person who is at least 18 years of age and who is not a party of the lawsuit, such as an employee, family member or friend, may serve the summons and complaint, but they must be careful to follow the service procedure exactly or the case my be dismissed for improper service. The United States Marshal can also serve process on behalf of a party who has not been granted permission to proceed in forma pauperis, but the party must first obtain an order of the Court directing service by the Marshal (forms for doing so my be obtained in person from intake clerk of the Clerk's Office, by mail from Pro Se Office. There is a small fee per complaint served for this service.

United States District Court, Western District of New York. Pro Se Office.

(f) The answer: Once the complaint and summons is served, the defendant, in an ordinary civil case , will have twenty (20) days from the date of service of the complaint to file an "answer." The United States or a federal official will have sixty (60) days (except the Social Security Administration, which has ninety (90) days). Just as the plaintiff in the complaint must make a short and plain statement of the claim, the defendant in the answer must state the defenses to the claim and either admit or deny the specific allegations contained in the complaint. As with the complaint and all other pleadings, a defendant must file the answer with the Clerk of Court and serve a copy on the opposing party. Failure to answer or other wise defend in a timely fashion is grounds for judgment by default against the defendant (see Federal Rule of Civil Procedure 55)

(g) Certificate of service: After you complete service of the complaint and summons, you should file a "certificate of service" (or a "proof of service") with the court which shows when and how you served the complaint and summons on each defendant. The purpose of the certificate of service is to allow the court to determine whether service of the documents was actually accomplished in accordance with the requirements of the law.

1. The date service was completed;

2. The place where service was completed;

3. The method of service used;

4. The names and street address or email address of each person served; and

5. The documents that were served;

The certificate of service must be signed and dated by the person who actually served the complaint and summons. If you hired a process server, the certificate of service must be signed by the process server. If you asked a friend to serve the complaint and summons, the certificate of service must be signed by the friend who actually served the complaint and summons. The person who served the documents must also swear under penalty of perjury that the statements in the certificate of service are true.

United States District Court. California Northern District. Handbook for Litigants without a lawyer.

## D. Filing Fee: $250.00 or the forms used to request permission to proceed in forma paupers.

z

## E. Obtaining an Attorney.

(a) Court-Appointed Counsel in Non-Habeas Cases: You may ask that the court request the services of a volunteer lawyer if you are unable to secure counsel on your own. However, there are many more people seeking volunteer counsel than there are attorneys available to volunteer their services. You must file your request on the forms provided by the Court. The Court then considers several factors: (1) weather you are within the low income guidelines for volunteer counsel; (2) whether you have made a reasonable attempt to find a lawyer without success; (3) whether your case has a reasonable possibility of success on the merits; and (4) whether your case is so factually and legally complex that you need a lawyer to articulate your claims.

United States District Court, Alaska. Pro Se Handbook.

(b) Although a Pro Se plaintiff may request that the court appoint an attorney to represent him or her at no cost to the plaintiff, the court infrequently grants this request. generally, the court will grant such a request only when representation by a licensed attorney seems to the court especially warranted, given the complexity of the case. When an appointment is made, representation is undertaken on a pro bono (literally, "for the good," meant to describe legal services provided free of charge) basis. It is important to remember, however, Pro Se litigants have no right to be represented by court-appointed counsel. A request for appointment of counsel is made by motion and accompanies your complaint at the time of filing.

United States District Court, Tennessee Western Dist. Pro Se Handbook.

Note: also see, F. (1) and (2)

(c) Pro Se litigants may ask the court to appoint an attorney, or counsel, for them in a civil case. The Court has a limited number of attorneys to accept cases on behalf of the Court. These attorneys serve pro bono, or without charge, to the Pro Se litigant. pro se litigants have no right to be represented by court-appointed counsel, and the court has no obligation to appoint counsel. The court will appoint counsel in a select cases where having an attorney seems particularly appropriate or important. If you would like to request that the court appoint counsel to represent you in your lawsuit, you must file a "motion for appointment of counsel" form with the court. The form should be filed with the complaint. A copy of a motion for appointment of counsel is attached to this Guide as Appendix E.

United States District Court, Utah. Pro Se Office.

(d) Pro Se litigants may ask the court to appoint an attorney for them in a civil case. However, counsel is only appointed in a few select cases where representation by an attorney seems particularly appropriate or necessary since Pro Se litigants have no right to be represented by court-appointed counsel and the Court has no funds to pay appointed counsel. If you would like to request that the Court appoint counsel to represent you in your lawsuit, you must file along with your complaint a Motion for Appointment of Counsel. In the motion, you should explain why you think you need the assistance of an attorney.

United States District Court, Georgia Middle District. Pro Se Handbook.

# Continuation of "E" Obtaining an Attorney

July 1, 2005

Note: Six random incidence of legal request.

**One.**  Firm; Shaw, Bransford, Veilleux and Roth.

Washington, DC.    Attorney. J. Wheat.

10:00 am appointment on 12-02-03, cancelled appointment for 12-02-03 at 8:40 am.

Reason; see memo dtd. 12-01-03 to 12-03-03.

Comment: Door slamming 10:00 pm to 12:30 am, wake up again at 3:30 am,

high pitch tone, head ach. Would not reschedule, no call back.

**Two.**  Firm; Asbill, Moffitt and Boss.

Washington, DC.    Attorney. W. Mertens.

Spoke with him on 11-02-03, he called me 11-25-03. Sent him a copy of court

complaint of law suite. Also sent him a copy of Brainwave Technology report.

He suggested that I contact a patent attorney. ref. e-mail dtd. 12-02-03.

**Three.** Firm; Bogin, Munns and Munns.

Orlando, FL.    Attorney. D. Broderson.

Appointment on 05-26-07, met with him that day. Went over case exhibits and

defendants. He asked me about three murders and implant (BWT). Suggested

I set up another appointment to continue dialogue on case. I called his office for

an appointment on  06-01-04. Appointment for 06-15-04 at 10:00 am was made.

I phoned his office on 06-14-04 to confirm appointment. Secretary informed me

that I am not listed in appointment book. Note: See Bell South telephone bill.

Note: *

**Four.** Firm; G.S Groziano. 05-24-04 suggested that I contact Attorney Broderson.

Note: *

**Five.** Firm; Papas, Tinsley and Russell.

Daytona Beach, FL.     Attorney. D. Pepe.

Appointment at 08-10-00 at 2:30 pm, he did not show up. 4:55 pm call to

apologize, made new appointment for 08-14-00 at 1:30 pm. He suggest that i

talk with a sociolojust three times, also mention that I was paranoid. Ref. F.B.I.

Boston 10-03-00 at 10:40 am interview. Report states that I am paranoid.

**Six.** Firm; G.R. Keating.

Daytona Beach, FL.     Attorney Keating.

Secretary said he was dealing with a murder trial, recommended another

Attorney.

Note: *

## F. Motions.

(a) Although most defenses against the complaint must be asserted in the answer, a defendant has the option of asserting certain defenses in the form of a motion to dismiss the complaint before filing the answer. A motion is an application to the Court asking that the Court take some particular action in the case. Motion to dismiss the complaint typically make the following arguments: (1) the Court lacks the power to decide the subject matter of the case or to compel a defendant to appear; (2) service of process was not sufficient; or (3) the complaint fails to state a claim which the law will recognize as enforceable.

If such a motion is made by a defendant in your case, you will have ten (10) days after it is served in which to file a response. It is very important to respond to such motions to dismiss: otherwise, the case may be dismissed without your having an opportunity to present an argument to the Court. Twenty (20) days is allowed for response to a motion for summary judgement. (summary judgment is discussed in a later section). If a party fails to file a response to a motion, the Court will assume that the motion is not opposed.

The proper form for motion papers requires you present the Court with three separate documents which all become part of your motion papers. You may obtain forms for bringing a motion in person from the intake clerk in the Clerk's Office or the Pro Se Office.

(1)The first document is a **Notice of Motion**. The Notice of Motion is addressed to your opponent.

In the upper left hand corner of your Notice of Motion, copy the caption of your case as it appears on an official document (for example on the order granting or denying you permission to proceed in forma pauperis). In the upper right hand corner, at the same height on the paper as the caption, write the docket number of your case (for example 89-CV-1234C). Below the docket number write "NOTICE of Motion."

Directly beneath the caption write "To' and the name of the party to whom is addressed. On the next line write "Please take notice that the undersigned will move this Court on _____, at a term of this Court for an order…," and then insert the relief you want the Court to give. For example you might say "for an order appointing counsel to represent the plaintiff;" or"…for an order compelling defendants to respond to plaintiff's interrogatories;" or …for an order granting summary judgment." Leave the blank empty; the Court will fill it in later.

Sign your Notice of Motion. The judge's courtroom deputy will schedule your motion according to the judge's calendar, and you will be notified.

(2)The second document that is part of your motion papers is an **Affidavit in Support** of your Motion. The caption and index number on your affidavit should be written out just as on the Notice of Motion, but instead of writing "Notice of Motion," you should write "Affidavit in Support of Motion" below the docket number.

Your affidavit should briefly re-state the relief you want the Court to grant, and you should explain in short numbered paragraphs the reasons you are entitled to that relief. For example, in moving for Appointment of Counsel, you should describe your inability to continue the action without legal assistance, you should explain to the Court why you believe your law suit has merit, and you should tell the court what efforts you made to secure counsel on your own.

(b) These Instructions assume that you have access to a Notary Public, and can get your papers notarized. An affidavit is a statement that a person swears is true before a Notary Public, and is witnessed by that Notary. If you do not have access to a Notary Public, you can use an affirmation. The difference between an Affidavit and an Affirmation is that, instead of a Notary's seal , the party who signs the affirmation must include a short statement affirming that the statement is true.

(3) The third document that is part of your motion papers is a **Memorandum of Law.** A Memorandum of Law is required, and it should be captioned and titled as are the other motion papers. It should contain a statement of facts on which the motion is based; a discussion of the cases, statutes and/or regulations relevant to a favorable ruling; and a statement describing the relief sought. It must be signed.

You are required to serve a copy of any motion papers you file in your lawsuit on your opponents, or their lawyers if they have lawyers. The only exception to this rule is when you are filing a motion before your opponents have answered your complaint. In many cases, your motions will be addressed to the other party because you are trying to get the Court to order the other party to do something. However, even when you are simply asking the Court to take some action on its own, you must send a copy of your motion papers to your opponent.

15

You must notify the Court that you have served a copy of your motion on your opponents by enclosing with your motion papers an Affidavit (or Affirmation) of Service. Like the Affidavit in Support of your motion, your affidavit of service must be signed and notarized, or if it is an affirmation, signed under penalty of perjury.

Do not complete your affidavit of service until after you have prepared the the copies of your motion papers for your opponent and placed them in an envelope.

Do not send your motion papers directly to the judges chambers. The motion must be recorded in the official record of your case (the docked sheet) by the Clerk's office before the judge takes any action on it. If you mail your papers directly to the judge, you will only delay the time it takes for your papers to be considered. Do not send extra copies of your papers to the judge. Sending extra copies of your motion papers only creates confusion, and will cause unneeded expense and effort.

Local Rules of Civil Procedure 7.1 governs service and filing of papers, and in paragraph (f) contains some page number restrictions for memoranda and briefs. Be sure to follow this rule very carefully.

(c) Motion for more definite statement;

Instead of filing a motion to dismiss, Rule 12(e) permits a defendant to file a motion for a more definite statement before filing an answer to the complaint. In a motion for a more definite statement the defendant argues that the complaint is so vague, ambiguous, or confusing that the defendant cannot respond to it. The motion must point out how the complain is defective, and ask for the details that the defendant needs in order to respond to the complaint.

Under Rule 12(a)(4)(B0 of the Federal Rules of Civil Procedure, if the court grants a

Motion for a more definite statement, the defendant must file a written response to the

complaint within ten days after the defendant receives the more definite statement.

The written response can be answered or another motion under rule 12 of the Federal

Rules of Civil Procedure.

If the court denies the motion, the defendant must file a written response to the complaint

Within ten days after receiving notice of the courts order.

**(d) If you have any questions of a technical nature, you can write to the Pro Se Staff Attorney at either Clerk's office address. The Pro Se Staff Attorney maintains offices in both Buffalo and Rochester, and mail is forwarded to the Pro Se Staff Attorney from both Clerk's offices. Please be aware, however, that the Pro Se Staff Attorney is only permitted to advise you on procedural matters, and cannot assist you with the substantive aspects of your case or give you legal advice.**

**United States District Court, Western District of New York.** Pro Se.

17

## G. Counterclaim

(a) Because a counterclaim is a complaint against the plaintiff, the plaintiff must file a written response to it. Rule 7(a) of the Federal Rules of Civil Procedure states that the answer to a counterclaim is called a "reply." Rule 12(a)(2) of the Federal Rules of Civil Procedure requires the plaintiff to file a reply to a counter claim within twenty days after being served, unless the plaintiff files a motion to dismiss under Rule 12(b). Otherwise the same rules that apply to filing a written response to a complaint also apply to filing a written response to a counterclaim.

(b) Explained above, once you are served with a complaint, you have a limited amount of time to file a written response to the complaint. That written response must be eventually be an answer. However, you can also choose to file one of the motions specified in Rule 12 of the Federal Rules of Civil Procedure. If you file one of those motions, you do not need to file your answer until after the court decides your motion. A motion to dismiss the complaint argues that there are legal problems with the way the complaint was written, filed, or served. Rule 12(b) of the Federal Rules of Civil Procedure lists the following defenses that can be raised in a motion to dismiss the complaint:

**1. Motion to dismiss the complaint for lack of subject matter jurisdiction.** In this type of motion the defendant argues that the court does not have the legal authority to here the kind of lawsuit that the plaintiff filed.

**2. Motion to dismiss the complaint for lack of personal jurisdiction over the defendant.** In this type of motion the defendant argues that he or she has so little

connection with the district in which the case was filed that the court has no legal authority to hear the plaintiff's case against that defendant.

**3. Motion to dismiss the complaint for improper venue.** In this type of motion the defendant argues that the lawsuit was filed in the wrong place.

**4. Motion to dismiss the complaint for insufficiency of process, or for Insufficiency of service of process.** In these types of motions the defendant argues that the plaintiff did not prepare the summons correctly or did not properly serve the summons on the defendant.

**5. Motion to dismiss the complaint for failure to state a claim.** In this type of motion the defendant argues that even if everything stated in the complaint is true, the defendant did not violate the law. A motion to dismiss for failure to state a claim is **not** appropriate if the defendant wants to argue that the facts alleged in the complaint are not true. Instead, in the motion to dismiss the complaint for failure to state a claim the defendant assumes that the facts alleged in the complaint **are** true, but argues that those facts do not constitute a violation of any law.

**6. Motion to dismiss the complaint for failure to join an indispensable party under rule 19.** In this type of motion the defendant argues that the plaintiff failed to sue someone who must be included in the lawsuit before the court can decide the issues raised in the complaint.

Under rule 12(a)(4) of the Federal Rules of Civil Procedure, if the court denies a motion to dismiss, the defendant must file an answer within ten days after receiving notice that the court denied the motion.

If the court grants the motion to dismiss, it can grant the motion "with leave to amend" or "with prejudice."

If the court grants a motion to dismiss with leave to amend, that means that their is a legal problem with the complaint that the plaintiff may be able to fix. The court will give the plaintiff a certain amount of time to file an amended complaint in which the plaintiff can try to fix the problems identified in the court's order. Once the defendant is served with the amended complaint, he or she must file a written response to the amended complaint within the time ordered by the court. The defendant can either file an answer or file another motion under Rule 12 of the Federal Rules of Civil Procedure.

If the court grants the motion to dismiss with prejudice, that means there are legal problems with the complaint that cannot be fixed. Any claim that is dismissed with prejudice is eliminated permanently from the lawsuit. If the court grants a motion to dismiss the entire complaint with prejudice, the case is over.

If the court grants a motion to dismiss some claims with prejudice and denies the motion to dismiss other claims, the defendant must file an answer to the remaining claims within ten days after receiving notice of the court's order.

(c) Under Rule 36 a party may serve on another party requests for admission of the genuineness of documents or of facts or of the application of law in fact. The party served is obligated to make reasonable inquiry before responding. Failure to answer constitutes an admission. In the answer the party served may admit, deny, state that he or she lacks

knowledge or information sufficient to permit admission or denial (only after making inquiry), or object to the request. An admission is for the purpose of the pending action only; but it is conclusive, rather than evidentiary, unless leave is obtained to withdraw or amend it. The post-trail sanction for improper failure to admit is payment of the requesting party's expenses of the proof of the fact. Additionally, the requesting party may seek pretrial judicial scrutiny of the sufficiency of answers or objections; the Court may order an answer, amendments to answers, or even that the mater be deemed admitted.

United States District Court, California, Northern District. Pro Se.

(1)The first document is a **Notice of Motion**. The Notice of Motion is addressed to your opponent.

In the upper left hand corner of your Notice of Motion, copy the caption Of your case as it appears on an official document (for example on the order granting Or denying you permission to proceed in forma pauperis). In the upper right hand corner, at the same height on the paper as the caption, write the docket number of your case (for example 89-CV-1234C). Below the docket number write "NOTICE of Motion."

Directly beneath the caption write "To' and the name of the party to whom

is addressed. On the next line write "Please take notice that the undersigned will move this Court on _____, at a term of this Court for an order…," and then insert the relief you want the Court to give. For example you might say "for an order appointing counsel to represent the plaintiff;" or"…for an order compelling defendants to respond to plaintiff's interrogatories;" or …for an order granting summary judgment." Leave the blank empty; the Court will fill it in later.

Sign your Notice of Motion. The judge's courtroom deputy will schedule your motion according to the judge's calendar, and you will be notified.

(2)The second document that is part of your motion papers is an **Affidavit in Support** of your Motion. The caption and index number on your affidavit should be written out just as on the Notice of Motion, but instead of writing "Notice of Motion," you should write "Affidavit in Support of Motion" below the docket number.

Your affidavit should briefly re-state the relief you want the Court to grant, and you should explain in short numbered paragraphs the reasons you are entitled to that relief. For example, in moving for Appointment of Counsel, you should describe your inability to continue the action without legal assistance, you should explain to the Court why you believe your law suit has merit, and you should tell the court what efforts you made to secure counsel on your own.

(b) These Instructions assume that you have access to a Notary Public, and can get your papers notarized. An affidavit is a statement that a person swears is true before a Notary Public, and is witnessed by that Notary. If you do not have access to a Notary Public, you can use an affirmation. The difference between an Affidavit and an Affirmation is that, instead of a Notary's seal , the party who signs the affirmation must include a short statement affirming that the statement is true.

(3) The third document that is part of your motion papers is a **Memorandum of Law.** A Memorandum of Law is required, and it should be captioned and titled as are the other motion papers. It should contain a statement of facts on which the motion is based; a discussion of the cases, statutes and/or regulations relevant to a favorable ruling; and a statement describing the relief sought. It must be signed.

You are required to serve a copy of any motion papers you file in your lawsuit on your opponents, or their lawyers if they have lawyers. The only exception to this rule is when you are filing a motion before your opponents have answered your complaint. In many cases, your motions will be addressed to the other party because you are trying to get the Court to order the other party to do something. However, even when you are simply asking the Court to take some action on its own, you must send a copy of your motion papers to your opponent.

23

You must notify the Court that you have served a copy of your motion on your opponents by enclosing with your motion papers an Affidavit (or Affirmation) of Service. Like the Affidavit in Support of your motion, your affidavit of service must be signed and notarized, or if it is an affirmation, signed under penalty of perjury.

Do not complete your affidavit of service until after you have prepared the the copies of your motion papers for your opponent and placed them in an envelope.

Do not send your motion papers directly to the judges chambers. The motion must be recorded in the official record of your case (the docked sheet) by the Clerk's office before the judge takes any action on it. If you mail your papers directly to the judge, you will only delay the time it takes for your papers to be considered. Do not send extra copies of your papers to the judge. Sending extra copies of your motion papers only creates confusion, and will cause unneeded expense and effort.

Local Rules of Civil Procedure 7.1 governs service and filing of papers, and in paragraph (f) contains some page number restrictions for memoranda and briefs. Be sure to follow this rule very carefully.

**(c) If you have any questions of a technical nature, you can write to the Pro Se Staff Attorney at either Clerk's office address. The Pro Se Staff Attorney maintains offices in both Buffalo and Rochester, and mail is forwarded to the Pro Se Staff Attorney from both Clerk's offices. Please be aware, however, that the Pro Se Staff Attorney is only permitted to advise you on procedural matters, and cannot assist you with the substantive aspects of your case or give you legal advice.**

United States District Court, Western District of New York. Pro Se.

## H. Motion for reconsideration.

(a) A motion for reconsideration asks the court to consider changing a previous decision. A motion for reconsideration must be made **before** the trial enters a judgment. Civil Local Rule 7-9 explains the rules for filing a motion for reconsideration.

(b) No party is permitted to file a motion for reconsideration without first getting permission from the court. Therefore, before filing a motion for reconsideration, the party must file a motion for permission to file a motion for reconsideration. The court will not give permission to file a motion for reconsideration unless the party seeking permission shows:

1. The facts or law that the parties presented to the court are significantly different from the actual facts or law and the party applying for reconsideration could not reasonably have known the true facts or law before the court entered the order that the party now wants the court to change; or

2. Material new facts have emerged, or significant change in the law has occurred, since the order was entered; or

3. The court clearly failed to consider material facts or key legal arguments that were presented to the court before the order was issued.

A motion for permission to file a motion for reconsideration may not simply repeat the same arguments that you made previously to the court. If you file such a motion, the court may impose sanctions against you.

No response needs to be filed to a motion for permission to file a motion for reconsideration unless the court requests it.

If the court grants a motion for permission to file a motion for reconsideration, the motion will be scheduled for a hearing on the normal thirty-five day schedule, unless the court sets a different schedule. The parties may file opposition briefs and reply briefs, as with any other motion.

If the court grants a motion for reconsideration, it will vacate the original order, which will have no further effect. The court either will issue an entirely new order, or will issue an amended version of the original order, changing its original decision.

United States District Court. California, Northern District. Handbook for Litigants without a Lawyer.

## I. Motion for Physical or Mental Examination.

Reference; Federal Rules of Civil Procedure 35 provides that, when the physical or mental condition of a party or a nonparty over whom a party has custody or legal control is in controversy, on motion, the court my order a physical or mental examination. Showing in good cause is a prerequisite.

## J. Ending the Case Without a Trail.

Ending the case without a trail: Reference; Local Rules of Civil Procedure 56 sets forth the procedure for filing a motion for summary judgment. The party filing the motion: (1) states that he or she is entitled to prevail on some or all of the issues in the case; (2) state on a separate piece of paper all of the facts in the case that are not in dispute; and (3) state the reasons why he or she should prevail on some or all of the issues in the case.

Note: when submitting for SUMMARY JUDGMENT you are required to attach a separate short and concise statement of the material facts which you believe are undisputed in your action.

Maine District Court...1st Circuit...
**Pro Se Litigation Information and Rules...Pages.18**

Massachusetts District Court...1st Circuit...
**Pro Se Litigation Information and Rules...Pages. 23**

New Hampshire District Court...1st Circuit...
**Pro Se Litigation Information and Rules...Pages. 46**

Puerto Rico District Court...1st Circuit...
**Pro Se Litigation Information and Rules...Pages. 7**

Rhode Island District Court...1st Circuit...
**Pro Se Litigation Information and Rules...Pages.** /ero

Connecticut District Court...2nd Circuit...
**Pro Se Litigation Information and Rules...Pages.** /ero.0

New York Eastern District Court...2nd Circuit...
**Pro Se Litigation Information and Rules....Pages. 4**

New York Northern District Court...2nd Circuit...
**Pro Se Litigation Information and Rules...Pages. 26**

New York Southern District Court...2nd Circuit...
**Pro Se Litigation Information and Rules...Pages.** /ero.

New York Western District Court...2nd Circuit
**Pro Se Litigation Information and Rules...Pages. 38**

Vermont District Court...2nd Circuit
**Pro Se Litigation Information and Rules...Pages. 7**

Delaware District Court...**3rd Circuit...**
**Pro Se Litigation Information and Rules...Pages.** *zero.*

New Jersey District Court...**3rd Circuit...**
**Pro Se Litigation Information and Rules...Pages.53 total.**

Pennsylvania Eastern District Court...**3rd Circuit...**
**Pro Se Litigation Information and Rules...Pages.** *zero.*

Pennsylvania Middle District Court...**3rd Circuit...**
**Pro Se Litigation Information and Rules...Pages.9 total.**

Pennsylvania Western District Court...**3rd Circuit...**
**Pro Se Litigation Information and Rules...Pages.8 total.**

Virgin Island District Court...**3d Circuit...**
**Pro Se Litigation Information and Rules...Pages.** *zero.*

Maryland District Court...**4th Circuit...**
**Pro Se Litigation Information and Rules...Pages.10 total.**

North Carolina Eastern District Court...**4th Circuit...**
**Pro Se Litigation Information and Rules...Pages.5 total.**

North Carolina Middle District Court...**4th Circuit...**
**Pro Se Litigation Information and Rules...Pages.** *zero.*

North Carolina Western District Court...**4th Circuit...**
**Pro Se Litigation Information and Rules...Pages.** *zero.*

South Carolina District Court...**4th Circuit...**
**Pro Se Litigation Information and Rules...Pages.47 total.**

Virginia Eastern District Court...**4th Circuit...**
**Pro Se Litigation Information and Rules...Pages.** *zero.*

Virginia Western District Court...**4th Circuit...**
**Pro Se Litigation Information and Rules...Pages.** *zero.*

West Virginia Northern District Court...**4th Circuit...**
**Pro Se Litigation Information and Rules...Pages.** *zero.*

West Virginia Southern District Court...4th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Louisiana Eastern District Court...5th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero

Louisiana Middle District Court...5th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero

Louisiana Western District Court...5th Circuit...
**Pro Se Litigation Information and Rules...Pages.2 total.**

Mississippi Northern District Court...5th Circuit...
**Pro Se Litigation Information and Rules...Pages.15 total.**

Mississippi Southern District Court...5th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Texas Eastern District Court...5th Circuit...
**Pro Se Litigation Information and Rules...Pages.21 total. .**

Texas Northern District Court...5th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Texas Western District Court...5th Circuit...
**Pro Se Litigation Information and Rules...Pages.51 total.**

Kentucky Eastern District Court...6th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Kentucky Western District Court...6th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Michigan Eastern District Court...6th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Michigan Western District Court...6th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Ohio Northern District Court...6th Circuit...
**Pro Se Litigation Information and Rules...Pages.10 total.**

Ohio Southern District Court...6th Circuit...
**Pro Se Litigation Information and Rules...Pages.17 total.**

Tennessee Eastern District Court...6th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Tennessee Middle District Court...6th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Tennessee Western District Court...6th Circuit...
**Pro Se Litigation Information and Rules...Pages.12 total.**

Illinois Central District Court...7th Circuit...
**Pro Se Litigation Information and Rules...Pages.1 total.**

Illinois Northern District Court...7th Circuit...
**Pro Se Litigation Information and Rules...Pages.63 total.**

Illinois Southern District Court...7th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Indiana Northern District Court...7th Circuit...
**Pro Se Litigation Information and Rules...Pages.3 total.**

Indiana Southern District Court...7th Circuit...
**Pro Se Litigation Information and Rules...Pages.40 total. .**

Wisconsin Eastern District Court...7th Circuit...
**Pro Se Litigation Information and Rules...Pages.13 total.**

Wisconsin Western District Court...7th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Arkansas Eastern District Court...8th Circuit...
**Pro Se Litigation Information and Rules...Pages.3 total.**

Arkansas Western District Court...8th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Iowa Northern District Court...8th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Iowa Southern District Court...8th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Minnesota District Court...8th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Missouri Eastern District Court...**8th Circuit...**
**Pro Se Litigation Information and Rules...Pages.10 total.**

Missouri Western District and Bankruptcy Courts...**8th Circuit...**
**Pro Se Litigation Information and Rules...Pages.** Zero.

Nebraska District Court...**8th Circuit...**
**Pro Se Litigation Information and Rules...Pages.** Zero.

North Dakota District Court...**8th Circuit...**
**Pro Se Litigation Information and Rules...Pages.12 total.**

South Dakota District Court...**8th Circuit...**
**Pro Se Litigation Information and Rules...Pages.** Zero.

Alaska District Court...**9th Circuit...**
**Pro Se Litigation Information and Rules...Pages.23 total.**

Arizona District Court...**9th Circuit...**
**Pro Se Litigation Information and Rules...Pages.19 total.**

California Central District Court...**9th Circuit...**
**Pro Se Litigation Information and Rules...Pages.** Zero.

California Eastern District Court...**9th Circuit...**
**Pro Se Litigation Information and Rules...Pages.18 total.**

California Northern District Court...**9th Circuit...**
**Pro Se Litigation Information and Rules...Pages.139 total.**

California Southern District Court...**9th Circuit...**
**Pro Se Litigation Information and Rules...Pages.24 total.**

Guam District Court...**9th Circuit...**
**Pro Se Litigation Information and Rules...Pages.64 total.**

Hawaii District Court...**9th Circuit...**
**Pro Se Litigation Information and Rules...Pages.** Zero.

Montana District Court...**9th Circuit...**
**Pro Se Litigation Information and Rules...Pages.** Zero.

Nevada District Court...**9th Circuit...**
**Pro Se Litigation Information and Rules...Pages.** Zero.

Northern Mariana Island District Court...9th Circuit...
**Pro Se Litigation Information and Rules...Pages.20 total.**

Oregon District Court...9th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Washington Eastern District Court...9th Circuit...
**Pro Se Litigation Information and Rules...Pages.10 total.**

Washington Western District Court...9thCircuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Colorado District Court...10th Circuit...
**Pro Se Litigation Information and Rules...Pages.31 total.**

Kansas District Court...10th Circuit...
**Pro Se Litigation Information and Rules...Pages.57 total.**

New Mexico District Court...10th Circuit...
**Pro Se Litigation Information and Rules...Pages.6 total.**

Oklahoma Eastern District Court...10th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Oklahoma Northern District Court...10th Circuit...
**Pro Se Litigation Information and Rules...Pages.3 total.**

Oklahoma Western District Court...10th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Utah District Court...10th Circuit...
**Pro Se Litigation Information and Rules...Pages.30 total.**

Wyoming District Court...10th Circuit...
**Pro Se Litigation Information and Rules...Pages. Currently being updated.**

Alabama Middle District Court...11th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Alabama Northern District Court...11th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Alabama Southern District Court...11th Circuit...
**Pro Se Litigation Information and Rules...Pages.21 total.**

Florida Middle District Court...11th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Florida Northern District Court...11th Circuit...
**Pro Se Litigation Information and Rules...Pages.3 total.**

Florida Southern District Court...11th Circuit...
**Pro Se Litigation Information and Rules...Pages.** Zero.

Georgia Middle District Court...11th Circuit...
**Pro Se Litigation Information and Rules...Page.21 total.**

Georgia Northern District Court...11th Circuit...
**Pro Se Litigation Information and Rules...Page.** Zero.

Georgia Southern District Court...11th Circuit...
**Pro Se Litigation Information and Rules...Page.** Zero.

DC District Court....................DC Circuit...
**Pro Se Litigation Information and Rules...Page.** Zero.

# BRAINWAVE
# TECHNOLOGY



## INDEPENDENT

## REPORT

# Table of Contents

Introduction.................................................................................i
Purpose of Report......................................................ii thru iv
Reproducing brainwave data from an external source................1a thru 5a
Temporal coding of sensory information in the brain................1 thru 13
*John St Clair Akwei N.S.A.Civil Action.(No Legal Council).13a thru.13n
*John St Clair Akwei N.S.A. Civil Action..(Case Evidence)...
...Complete copy available on diskette......................................13o
Brain computer interface. Web site ............................................14
Meld brain machine...........................................................14a
D.A.R.P.A. DSO. Brain program. Dr. Eisenstadt........................15,16
Cyberkinetics Neurotechnology Systems....................................17,18
Cyberkinetics Neurotechnology Systems Hardware.................19 thru 21
D.A.R.P.A. DSO. Brain Machine Interfaces......................,......22 thru 24
MEMO Washington Trip (1)..............................................25
MEMO Washington Trip (2)..............................................26,27
E.P.I.C. Electronics Privacy Information Center............................28
N.A.S.A. No "Mind Reading" Technology without review................29
N.A.S.A. WATCH..........................................................30 thru 32
F.A.A. Metal Detector (body search).......................................33,34
F.D.A. Metal Implants. MRI safe.............................................35
*Chip Implant: Using syringe to insert Chip Implant................35.a thru.c
High-tech Images...........................................................36,37
Digital evidence...........................................................,....38
Bio simulators............................................................,...39
MEMO, Brain control. (personal)........................................40,41
U.S. Revises Definition of Torture..........................................42,43
.....None Delivery of Documents pertaining to Brainwave Technology*.....
Thomas E. Mooney Judiciary Committee*....................................44
University of Cincinnati (implant)*...........................................45
University of Cincinnati (implant)*...........................................46
Electronics Test and Measurement*..........................................47
MEMS Implant. Hearing System. D.A.R.P.A........................48 thru 50
F.B.I. Boston Office.........................................................51
*Russell Tice v N.S.A...(No Legal Council)...................................51a
*Russell Tice v N.S.A.......................................................51b

F.B.I. New Agents..................................................................……..…………52
*N.S.A. and Law Enforcement..Copy available on Diskette................52a
Obtaining an Attorney……………………………...…………………53,54
Closing Comments…………………………………….……...………v thru ix

* Revised Edition Changes. November 10, 2006.

# INTRODUCTION

This independent report is written as an aid to furnish some facts pertaining to the intrusion of privacy and in some cases torture, with the use of Brainwave Technology, both passive, active or a combination of both.

I have been active in the electronic field for plus forty years, my time distributed equally between the Department of the Navy and the Federal Aviation Administration. I have been certified in all levels of Air Traffic Control Systems. My career with Navy Department services consisted of both nuclear (fast attack) submarines and all types of surface vessels. While with the Navy Department, I have held many security clearances in the field of electronics.

I will touch lightly on my comments with the "Purpose of this Report" pages and hard proof of evidence will be furnished in my "Closing Comments." I have included many examples of possibilities with Brainwave Technology. I wanted to provide as much evidence as possible to substantiate my claim of this torture hardware.

Subject: **Temporal Brainwave Coding Transmission.**

E-mail: jmoore3263@bellsouth.net

Phone: 386-761-8193

Keywords: temporal coding, passive, active, uv...ultra violet, ir...infrared, detector, plug-in, EEG, EMG, implant, computer interface, cover up, Falls Church, VA.

i

# Purpose of Report

My purpose for this report is to furnish this information to prove without a reasonable doubt that Brainwave Technology does exist within our United States Government and that it can control our Justice System, our Lives and our Health.

Which one or more of the fifteen Security Agencies are the controlling agencies, I will not attempt to analyze or make a guess of which one or more of the agencies have control of Brainwave Technology.

What I plan for my presentation of this report is to provide from the contents list, my comments on each line as to why I included this article or topic in this report. The "why" and "how" of me being involved in Brainwave Technology will be addressed in my "Closing Comments."

Reproducing Brainwave Data from an external source Pg. 2a thru Pg. 5a as presented are offered throughout this report. The most important example of the danger of Brainwave Technology is the example shown on page three, line one. Example: word power of answer, yes or no spoken as a data command.

By using Dr. Peter A Cariani as my reference information to Brainwave Technology. Pg. 1 thru 13, subject of coding is both easy to comprehend in laymen terms and to follow the brain coding with neurocomputation.

While on my search of computer keyboard control of Brainwave Technology. Pg. 14 is a good source of information for keyboard controlling of input and output data.

Brain Machine Interface is the system which marries Brainwave Technology to computer control. It is fully covered on Pg. 14a thru 21. Dr. Eric Eisenstadt is program

ii

manager for Brain Machine Interface, both passive and active. The main goal is to control Brainwave Technology.

D.A.R.P.A. D.S.O. Brain Machine Interface Pg. 22 thru Pg. 24 are self explanatory. As you read their goals toward brain control in the medical field.

Pg. 25 thru Pg. 27 shows how control of your every move and taught when need be are controlled using Brainwave Technology.

Electronic Privacy Information Center (E.P.I.C.). Pg. 28; Furnished Mr. Hoofnagle with a brochure containing technical information on Brainwave Technology. Also my progress with this enormous challenge.

F.A.A. Metal Detector. (body search) Pg. 33,34. This is another non delivery of mail with no response from Washington D.C; pertaining to implant safety in MRI. Also Pg. 35 fully addresses this topic.

Pg. 36,37 The main point of my interest in this document are lines twenty eight and twenty nine. In my particular case, fibers and tissues.

Pitfalls in Digital Evidence. Pg. 38. CAT scan, MRI and Fingerprints are all subject to faulty presentation of evidence.

Bio Simulators. Pg. 39. Included to provide more medical information on Bio Simulators.

M.E.M.O. Brain Control. Pg. 40, 41. Day to day incidences, just a partial listing.

Pg. 42,43. I have included these two pages to provide what the U.S. Justice Department ruling of Torture is. As to my own interpretation, which I have experienced for real, both physically and mentally are ingenuous as a victim of Brainwave Technology

iii

Pg. 44 thru Pg. 47 are other non delivery of registered mail pertaining to Brainwave Technology.

Pg. 48 thru Pg. 50 is an example of a M.E.M.S. electronic chip which has some or all of the characteristics of Brainwave Technology hardware.

Pg. 51 thru Pg 54. Please view "Closing Comments" for documentation and comments.

June 25, 2003

Subject; Reproducing brainwave data from an external source.

Research; John E. Moore

Email: jmoore3263@bellsouth.net

Reference;

      Title : Temporal coding of sensory information in the brain.

Affiliations: Department of Otology and Laryngology.
               Harvard Medical School.

      Title: John Hopkins Family Health Book 2003.



1a



# Component Detailed Explanation

CARRIER: Deliver brainwave data to ASIC.
BRAIN WAVE: Rides on carrier with data information.
ASIC DETECTOR: Detects data off the carrier and deposits at
address section of brain.
Note: I have no data on this statement. But a what if?
ASIC transmit data out.
MODULATOR: Combines brain wave data (neurons) and carrier for
Transmission.


As shown in above diagram is an electronic micro-chip, some
types under contract for U.S. Government. (D.A.R.P.A) It can detect
audio frequency down to milli-hertz. (brain wave frequency range)

As you read this short introduction to the science of (brain wave
technology, holding on to layman terms. You will see the simplicity of
reproducing an input from the inner ear to the brain or an input from
the ASIC detector (implant) to the brain. Although through different
paths, but same data to brain and same end result. Sound or data
travel through bone as a conductor with hardly any resistance, in this
case the temporal bone.

Example: word Yes or No spoken as a command from modulator, hand function microphone (black box) will transmit neurons (data) to ASCI. Inner ear is audio in to brain, ASIC as an input can disseminate between audio and other address data commands. Pain, speech, vision, thought etc. all control is by neurotransmitters.

Returning to the diagram on page two, you will see the brain wave frequency, which is data to the brain. Here is a partial list of brain addresses, some of which can be reproduced electronicly.

CEREBRUM: Has four lobes, consisting of an infinite amount of cell's/neuron's, which are the seat of mental addresses.

Cerebelluim lobe: consisting of muscle coordination, equilibrium.

Temporal Occipital lobe: consisting of vision, hearing and speech. limbic system control—emotion, memory, motivation.

Frontal Occipital lobe: consisting of motor language and planning to sheletal muscle. Sensation, thaught, movement, consciousness.

Brain Stem lobe: Contain centers to control body functions. breathing, eye reflexes, taste; integral to speech neck, tongue. Motor signals to; jaw, face, eye movement, Arm and leg movement. Cardiovascular function (heartbeat) pulse. Sleep, digestion.

Information is coded under normal conditions to disseminate the delivery of the data to the proper addressed lobe. (cell's) All sensation to the brain through various nerve path ways receive and transmit electro chemical pulses. Neurotransmitters produce electrical charge, which communicate between neurons.

3a

ASIC >>>>>>>> neurotransmitters >>>>>>>> BRAIN
(neuron)                    molecules                    (neurons)

Conclusion: Brain is more complex than the most sophisticated
computer ever built. Both communicate with data bits.
It is dangerous if used for the wrong perfunctory. Repro-
duction of brain wave electronic data has endless
possibilities, both positive and negative. (remember the
Yes or No inserted into the ASIC?) Pg.3. In a court of law
that could be the weight of innocence or guilt.
I believe this type of technology will unbalance the scale
of justice. This type of data can cause pain or decisions
in ones thinking or speech or both.
Touching lightly on my research material, some are
directly involved with this material while other documents
are worth taking note of, your judgment will guide your
thinking.
The microchip that I am using as an example pg.2
(Reproducing Brainwave Data) was developed 1997.
There is no information available on its use, or availability.
I would like to make note of the immense material
provided to me on this interesting and at times very
technical topic.
Dr. Cariani and John Hopkins Medical Book provided
invaluable material for this report.

4a

## Brainwave Frequency Wave Forms Signal Generated



**Fig. 7**

**Fig. 8**

**Fig. 1**



*Figure 7:* MATLAB pure signal periodogram with noise at 38 Hz



*Figure 8:* MATLAB sampled output with noise at 38 Hz, showing an alias



**Fig. 2**

**Fig. 3**

As shown in Fig. 1 is a periodogram of brain frequency spikes and as shown with much inherent noise. Fig. 7 also indicates a large noise factor. Fig. 8 presents a cleaner spike presentation that if you compare with Pg. 9 (C) (Temporal Coding Documents) come close to the intrinsic temporal patters shown, and with the right capacitance circuit could present a clean square wave, as shown in Fig. 3.
A filtered out put which can be compared with Pg. 9 (D) (Temporal Coding Documents)

These wave forms were created with audio freq. generator, with pulse width, pulse spacing and db gain pre-entered.

# Temporal coding of sensory information in the brain

Peter A. Cariani

## Affiliations

Department of Otology and Laryngology
Harvard Medical School

Eaton Peabody Laboratory of Auditory Physiology
Massachusetts Eye & Ear Infirmary

## Mailing address:

Eaton Peabody Laboratory, Massachusetts Eye & Ear Infirmary,
243 Charles St., Boston, MA 02114 USA

## Email:
peter@epl.meei.harvard.edu

## Website:
www.cariani.com

## Telephone:
EPL: (617) 573-4243
MGH: (617) 726-5419

## Keywords
Temporal coding, phase-locking, autocorrelation, interspike interval, spike latency, neurocomputation

**Running title:** Temporal coding of sensory information

Fonts: **Times-bold**, Times, **Helvetica-bold**, Helvetica

**Biographical sketch**

Peter Cariani received his B.S. in Life Sciences from M.I.T. in 1978. As a graduate student he studied under theoretical biologist Howard Pattee in the Department of Systems Science at the State University of New York at Binghamton, receiving his Ph.D. in 1989. His doctoral thesis addressed evolution of new sensing functions and its implications for artificial devices. In 1990 he joined the Eaton Peabody Laboratory of Auditory Physiology as a postdoctoral fellow, and worked with Bertrand Delgutte on the coding of pitch, timbre, musical consonance, and phonetic distinctions in the auditory nerve. Dr. Cariani is currently an Assistant Professor in Otology and Laryngology at Harvard Medical School and a Research Associate at the Eaton Peabody Laboratory. He is currently developing neural timing networks that process information in distributed fashion completely in the time domain, and collaborating with Dr. Mark Tramo in the investigation of the neural representation of pitch in the auditory cortex.



2

**Abstract**

Physiological and psychophysical evidence for temporal coding of sensory qualities in different modalities is considered. A space of pulse codes is outlined that includes 1) channel-codes (across-neural activation patterns), 2) temporal patterns codes (spike patterns), and 3) spike latency codes (relative spike timings). Temporal codes are codes in which relative spike timings (rather than spike counts) are critical to informational function.

Stimulus-dependent temporal patterning of neural responses can arise extrinsically or intrinsically: through stimulus-driven temporal correlations (phase-locking), response latencies, or characteristic timecourses of activation. Phase-locking is abundant in audition, mechanoception, electroception, proprioception, and vision. In phase-locked systems, temporal differences between sensory surfaces potentially subserve representations of location, motion, and spatial form that can be analyzed via temporal cross-correlation operations. To phase-locking limits, patterns of all-order interspike intervals that are produced reflect stimulus autocorrelation functions that potentially subserve representations of form. Stimulus-dependent intrinsic temporal response structure is found in all sensory systems. Characteristic temporal patterns that may encode stimulus qualities can be found in the chemical senses (gustation, olfaction), the cutaneous senses (nocioception), and some aspects of vision (color, form). In some modalities (audition, gustation, color vision, mechanoception, pain), particular temporal patterns of electrical stimulation elicit specific sensory qualities.

**Keywords**

Temporal coding, phase-locking, autocorrelation, interspike interval, spike latency, neurocomputation

3

# Temporal coding of sensory information in the brain

Peter A. Cariani

## 1. General classes of neural pulse codes

Neuroscience begins with the basic assumption that virtually all capabilities of organisms for effective perception and action are the consequences of organized neural activity. The neural coding problem involves the identification of which particular aspects of neural activity subserve specific perceptual and behavioral functions. The first step in solving this problem is to identify candidate neural codes and to determine which dimensions of neural coding space correspond to dimensions of perception and action. Determination of the nature of neural representations of information is thus a key prerequisite for understanding how the brain works as an information-processing system.

The neural coding problem in perception involves the identification of the neural correlates of sensory distinctions. Psychophysics studies these distinctions by mapping relations between stimulus and percept, as revealed by overt judgments, in order to characterize the functional capabilities of sensory systems. Contemporary neuroscience mainly studies the structures, interconnections, and input-output behavior of parts of the system with the goal of predicting neural responses given a particular stimulus. Parts of neuroscience that come under the rubrics of computational and systems neuroscience, psychophysiology, and neuropsychology, study relations between neural activity and perceptual judgments in order to understand the neural representations and informational operations that subserve perception. In this short overview, we will review a broad range of psychophysical, neurophysiological and psychophysiological evidence that bears on the use of temporal codes in perception.

Pulse codes afford many different means of encoding information. Many individual neural coding schemes as well as whole catalogues and taxonomies of possible codes have been proposed. [1-11]

A comprehensive space of neural pulse codes is presented in Figure 1. Three basic classes of codes lie at the vertices of the triangle: channel-codes, temporal pattern codes, and time-of-arrival codes. These classes correspond to three independent dimensions of any time-series signal: its physical transmission channel, its internal structure (waveform, Fourier spectrum, autocorrelation), and the timing of its arrival. A fourth basic dimension, absolute signal amplitude, is not shown. Being complementary aspects of signals, these fundamental modes of encoding informational distinctions are not mutually exclusive of each other, and can be combined to form more complex coding schemes (a few are shown on the edges of the triangle).

Channel-based codes convey sensory informational distinctions through stimulus-specific patterns of neural activation. These codes are also called "labeled line" codes because the respective identities (labels) of the channels determine the functional meanings of the spike train signals they convey. The simplest channel-codes are "doorbell" codes in which activity in a given element signifies some specific state of affairs. "Rate-place" schemes encode patterns and property-combinations through across-neuron profiles of average discharge rates (which neurons fire how frequently). By far the predominant coding assumptions in the neurosciences involve variants on rate-place schemes. These can take the form of somatotopic, retinotopic, cochleotopic maps in which neural tunings are spatially-ordered, Such orderings may play essential functional roles in and of themselves, or they may be products of locally-correlated activity on the sensory surfaces to which they are connected. Rate-place schemes also include spatially-distributed mosaics of neural tunings to individual stimulus properties and their combinations.

4



Figure 1. A space of possible neural pulse codes.

Temporal codes convey informational distinctions through the relative timings of spikes rather than through patterns of channel activations and average spike rates. These codes are considered as temporal "correlation codes" because alterations of a spike's timing changes its relation to other spikes which in turn alters the meaning of the conveyed distinction.[7, 12] Temporal codes can be further subdivided into temporal pattern codes and time-of-arrival codes.

Temporal pattern codes utilize the internal time structure of spike trains to convey information. The simplest temporal pattern code is an interspike interval code in which time durations between spikes, produced by the same neuron or by different neurons, convey information about stimulus properties. Signaling by means of more elaborate temporal patterns, such as multiple interspersed intervals,[13, 14] sequences of different intervals,[15] and post-onset timecourses of discharge,[16-18] permit multiplexing of different kinds of information.

Time-of-arrival codes utilize the relative timings of spikes produced by different neurons to encode information. The simplest time-of-arrival code compares spike arrival times between two neurons to convey the time difference between them (irrespective of the temporal order internal to each spike train). Since greater activation almost invariably shortens first spike latencies, across-neuron profiles of relative first spike times can serve as indicators of channel activation (latency place code). Across-neuron latency differences can be further enhanced by feedforward lateral inhibition.[19] Ranges of relative latencies also potentially convey information concerning the intensity of a stimulus.[1, 20-22] Onsets of less intense stimuli tend to produce relatively more dispersed latency distributions, while those of more intense stimuli produce narrower, less dispersed distributions. Interneural synchrony describes the degree to which spikes produced by

different neurons share either the same arrival times (simultaneity) or similar arrival patterns (constant temporal offset). In addition to roles related to encoding sensory qualities themselves, synchrony and common temporal pattern (e.g. "oscillation" frequency) can also be used to group patterns of spikes and/or channels to form separate perceptual objects.[23-26]

While the taxonomy presented in Figure 1 covers a large number of candidate neural pulse codes, the coding space that it lays out does not exhaust all possibilities. For example, neural coding schemes could rely on ordinal sequences of channel activations, spike times, and temporal patterns rather than the metrical relations outlined above [27] Coarse temporal coding schemes intermediate between rate and spike correlation codes have also been proposed.[8, 9] Joint, statistical properties of neural ensembles, such as fractions of channels activated[28] or synchronized, variability of responses[1, 29] and dynamical topology[30], lie together with many other possible population-based codes. [12, 31]

Some evidence for temporal coding of exists in virtually every sensory modality. Some commonalities of temporal coding strategies across modalities have been suggested in the past. [1-3, 7, 28, 32-40]. This review will concentrate on time-of-arrival and temporal pattern codes that arise from both phase-locked and intrinsic temporal response properties of sensory systems.


## 2. Time-of-arrival codes in sensory systems

A highly robust cue for the direction of a stimulus is the temporal pattern of activation across different sensory surfaces. In audition, mechanoception, and electroception, there appear to be common mechanisms that make use of this cue to translate temporal differences into apparent location [1, 2, 32, 36, 41]. In all of these systems, receptors phase-lock to their respective adequate stimuli, such that the temporal structure of the stimulus is faithfully impressed on the timings of spikes produced by primary sensory neurons. By virtue of phase-locking, relative-times-of-arrival of a stimulus at different receptor sites are translated into relative spike latencies in their respective sensory pathways. These relative spike timings are in turn analyzed via neural delay lines and temporal coincidence detectors. This temporal cross-correlation operation appears to be common neurocomputational strategy for a number of sensory systems in a phylogenetically-broad range of organisms.

A well known example is the localization of sounds in the azimuthal plane by means of interaural time differences (ITD). [42] Humans are able to use interaural time differences as small as 20-30 usecs to localize sounds. Wavefronts from sound sources not directly in front of an observer arrive at the two ears at different times. These wavefronts produce phase-locked spikes in auditory nerve fibers whose relative timings reflect the interaural time differences. In the auditory brainstem, highly secure synapses, tapped delay lines, and neural coincidence detectors in effect implement binaural cross-correlation operations that provide a readout of interaural time delays, and consequently, of azimuth estimates.[40, 43-45]. Units whose discharge rates reflect tuning to particular interaural delays[46, 47] (and in echolocation, echo delays)[48] are found at higher stations in the ascending auditory pathway. Central representations of auditory space may also utilize location-dependent temporal response patterns [49] and/or population-latency profiles [50].

A strikingly similar situation can be found in mechanoception, where relative delays of mechanical stimulation at different skin locations of a millisecond or more manifest themselves perceptually as changes in apparent location of stimulation. [32] As in audition, the apparent location of the stimulus moves toward that associated with the sensory surface that leads in time.

Mechanoceptive receptors phase-lock to skin deformations and hair displacements, such that relative timings of mechanical deformations are impressed on the timings of neurons at many stations in the somatosensory pathway.[51-55]. Muscle stretch and joint position receptors similarly phase-lock to movements, which provide the central nervous system with the relative timings of different joint-motions.[56] Vestibular afferents phase-lock to head accelerations.[57] Phase-locking to water pressure waves in lateral line systems permit representation of wave direction and form.[58] Related proposals have been made for such relative timing mechanisms for olfactory localization.[59, 60]

Active sensing involves the observation of the effects of actions on the external environment.[61] In the echolocation systems of bats and cetaceans, acoustic signals are emitted and the effects of environmental interactions in the form of echo patterns are observed. Time delays between emitted signals and their echoes provide information about distances and shapes of objects, while low-frequency modulations caused by interactions between the emitted signal and its Doppler shifted echo provide potential temporal cues for relative velocity (e.g. target flight speed and fluttering wingbeats).[62] In bat echolocation systems, relative times-of-arrival between spikes produced by a cry and its echoes permit precise estimates of target ranges and shapes that correspond to time differences of microseconds and possibly less.[62-64]

Another time-based active sensing strategy is found in electroception.[36, 43, 65, 66] Weakly electric fish produce sinusoidally-varying electrical fields around their bodies that are deformed by the presence of nearby external objects. These deformations alter the relative phases of the electric field at different body locations, which alter the relative latencies of spikes produced in afferent electroceptive pathways. As in the binaural example, these pathways have highly secure, low jitter connections, delay lines, and central coincidence detectors that permit extremely small time-of-arrival differences (here, $< 1$ usec) to be distinguished.

Visual receptor arrays can also be considered as collections of receptor surfaces. Phase-locking to temporal modulations of luminance produced by moving spatial patterns is ubiquitous in the visual systems of animals. [67-69] Many neurons in early stages of visual processing phase-lock to visual flickers of 50-100 Hz and higher. [70] Highest observed precisions of stimulus-driven spike timings in visual systems range from hundreds of microseconds to a few milliseconds [39, 71-74]. Stimulus-dependent synchronizations of spikes produced by different spatially remote neurons on the order of a few milliseconds are also seen.[75] As in many other sensory systems, perceptual discriminations that seen in visual psychophysical tasks are much finer than those permitted by the relatively coarse spatial resolutions of individual receptive fields. This is known as the hyperacuity problem.[2, 39] However, if the visual system were able to make use of fine spike timing, then spike precisions of 1 millisecond would account for its acuity.[76].

As a consequence of phase-locking, temporal correlations between spikes produced in different visual channels potentially provide a general neurocomputational basis for the representation of visual motion. In the fly visual system, different spike timings in neighboring ommatidia are used for detection of motion. [39, 71, 77, 78] This temporal cross-correlation mechanism permits rapid and precise motion from small a few incoming spikes to inform flight course corrections in as little as 30 ms. [39, 71]

Binocular vision similarly involves cross-correlation of spatiotemporal patterns registered on the two retinas. Introduction of systematic delays between the outputs of the two retinas can be produced by placing a neutral density filter over one eye that attenuates luminance and increases the spike latencies in that monocular pathway. When a horizontally moving object is viewed under such circumstances, an illusion of depth, known as the Pulfrich effect, is created by the internal temporal

disparities produced by the different spike latencies in the two pathways.[2, 79, 80] Provided that at least some spikes are temporally correlated with the movements of object edges across receptive fields[81], then a Jeffress-type temporal cross-correlator could be potentially used to spatially segregate binocular disparities in a manner similar to processing of interaural temporal disparities in binaural hearing.

### 3. Temporal pattern codes in phase-locked receptor systems

To the extent that sensory receptors follow the time structure of their adequate stimuli, that time structure is impressed on the timings of discharges of sensory neurons. As we have seen above, comparisons of the relative timings across receptors yields information about the direction, movement, and in some cases, the spatiotemporal form of the stimulus. For many kinds of stimuli, sensory qualities are related to the internal time structure of the stimulus waveform. Pitch, timbre, rhythm, flutter, and tactile texture are examples of qualities of this sort. Temporal patterns of spikes produced by arrays of phase-locking receptors reflect this internal structure and thus provide information about the temporal form of the stimulus.

In the auditory system, functional roles for phase-locked neural timing information in frequency representation and binaural localization have been widely appreciated for at least the better part of a century.[33, 82-86] Phase-locking of auditory nerve fibers to acoustic stimuli creates time intervals between spikes (interspike intervals) that are directly related to stimulus periodicities.[87, 88] Distributions of interspike intervals from auditory neurons consequently contain information about the stimulus waveform and power spectrum for frequencies up to the limits of phase-locking (5-10 kHz, depending on species and statistical criterion). At many stations in the auditory pathway, from auditory nerve to primary auditory cortex, minimum jitter in first spike latency is typically in the 100-200 usec range,[89] making the coding of transient onsets especially precise.[86] Phase-locking is maintained at virtually all sound pressure levels above response thresholds such that interspike interval representations easily account for the high precision of auditory frequency discrimination over a wide range of frequencies and sound pressure levels.[85, 90, 91] Interestingly, the smallest human Weber fractions of 0.2% for pure tone frequencies near 1000 Hz correspond to temporal jnd's of 20 usec that in turn are comparable to those seen in binaural localization using interaural time differences. The progressively poorer ability of human listeners to distinguish higher frequencies from 2-10 kHz covaries with the progressive decline in phase-locking (and the quality of interval-based information) at those frequencies.[84, 92] Likewise, the frequency region for which there is good phase-locking, roughly up to 4 kHz, is coextensive with the existence region of musical tonality (octave matching, easily recognized musical intervals and melodies). These psychoneural correspondences break down for rate-place representations of frequency, which tend to saturate and shift at high sound pressure levels (> 80 dB SPL) and whose discriminative capacities in terms of Weber fractions progressively improve at higher frequencies.[84]

In addition to pitches produced by pure tones, the pitches of complex tones may be explicable in terms of interspike interval distributions. Harmonic complex tones produce pitches at their fundamental frequencies, even in the absence of any spectral energy at the fundamental itself ("the pitch of the missing fundamental"). Many different kinds of stimuli with very different spectral energy distributions can produce the same pitches.[85, 93-97] These complex perceptual equivalence classes consequently provide strong constraints on possible neural representations for pitch.

**Extrinsic, phase-locked temporal response patterns**

### A. Auditory nerve fibers

### B. Lateral geniculate neuron



### Intrinsic temporal response patterns

#### C. Gustatory neural responses (whole chorda tympani)

#### D. Achromatic temporal patterns that produce subjective colors



9

The most comprehensive and successful theories of the neural basis for pitch compute temporal autocorrelations using all-order interspike intervals (all-order intervals are those between both consecutive and nonconsecutive spikes). In 1951 J.C.R. Licklider proposed a time-delay neural network that operated on phase-locked auditory nerve responses to perform an autocorrelation analysis of interspike intervals in each frequency channel. [98, 99] Three decades later related models for pitch were proposed that summed together interspike intervals from all frequency channels. [85, 100, 101] These temporal pitch models have been tested in computer simulations [102, 103] and in neurophysiological studies. [104-106]

The major finding of these studies has been that the most common interval present in the auditory nerve at any given time almost invariably corresponds to the pitch that is heard (the few exceptions being octave shifts). The fraction of pitch-related intervals amongst all others qualitatively corresponds to the strength of the pitch that is heard. Such purely temporal, population-interval representations also account for a number of complex and subtle pitch phenomena: pitches of complexes with "missing fundamentals", pitch equivalence classes (metamery), relative invariance of pitch and pitch salience with sound pressure level, pitches of stimuli having psychophysically-unresolved harmonics, the "nonspectral" pitches of amplitude modulated noise, as well as complex patterns of pitch shift that are heard for inharmonic stimuli. In effect, population-wide distributions of all-order interspike intervals form general-purpose temporal representations of the stimulus that resemble stimulus autocorrelation functions. [106, 107]

Purely temporal representations of vowel quality are also possible. Auditory nerve fibers phase-lock to frequency components in formant regions, consequently producing related intervals whose respective numbers depend on component intensities. The result is that population-wide interval distributions represent spectral envelope shapes (formant patterns) through patterns of short intervals (0-4 msec). These interval patterns are characteristic of the different vowels that produced them [4, 96, 107-109] Thus, purely temporal, population-based representations of pitch and timbre are possible.

The somatosensory analogue of auditory pitch is the sense of flutter-vibration. [2, 32, 51, 110, 111] Discrimination of vibration rates of up to 1 kHz appears to be based on interspike interval patterns produced through phase-locking of cutaneous afferents. [53, 54] As with pitches and timbres produced by complex acoustic tones, complex tactile patterns produce corresponding temporal patterns of spikes [55, 112, 113], such that discrimination of tactile textures could similarly be based on analysis of distributions of interspike intervals.

Thus, in those sensory systems where spikes are locked to stimulus transients and ongoing periodicities, direct temporal representation of the form of the stimulus is possible. Since the autocorrelation function of the stimulus contains the same information as its power spectrum, many representatons of form that are traditionally based on recognizing spectral patterns (e.g. pitches of complex tones, timbres) can be carried out in the time domain using the temporal correlations that are inherent in interspike intervals that are produced by phase-locking.

There is a question of whether visual forms could be encoded through time intervals across different retinal locations. The eyes are in constantly drift even during fixation, and, as was noted above, many central visual neurons are known to discharge with relatively precise latency when contrast gradients (edges) cross their receptive fields. Recent psychophysical demonstrations have shown that visual forms can be created through short-term spatiotemporal correlations that have no long-term spatial structure. [114]

Spatial frequency is the visual analogue of auditory pitch, with sinusoidally modulated gratings being the visual analogues of pure tones. When such gratings are drifted across receptive fields at

constant velocities, their temporal frequency at any given point simply reflects their spatial frequency. Spike timings, as analyzed through post-stimulus time (PST), period, and all-order interval histograms (Figure 2B), faithfully replicate the temporal structure of the drifting image.[115] Temporal frequency can thus be accurately estimated from interspike interval statistics much in the same way that pitch can be. From the all-order interval distributions shown in the figure, temporal modulation frequencies of 16 and 32 Hz could be estimated to within 0.1 Hz using best cosine fit.

Visual representations based on spatial autocorrelations have been proposed that effectively account for many aspects of shape and texture perception.[28, 116-120]. Interestingly, there is a visual "missing fundamental" phenomenon that parallels the pitch of the missing fundamental in audition. The spatial periodicity of a grating with spatial frequencies at 4f, 5f, and 6f is easily matched to that having a single spatial frequency at the fundamental (1f).[121, 122] In both auditory and visual cases, perception of the fundamental can be simply accounted for in terms of autocorrelation-like representations. Neurocomputational models that compute spatial autocorrelations have been proposed that operate on stationary spatial activation patterns[118] and on neural synchronies.[119, 120]  These latter models begin to connect stimulus-driven, temporally correlated spatial structure with representations based on spatial autocorrelation and cross-correlation. As in the auditory example, phase-locking potentially provides a means of carrying out Fourier analysis in the time domain, here using interneural spatiotemporal intervals for representation of spatial autocorrelations and relative spike timings for representation of phase. These relational, correlation-based representational strategies constitute alternatives to analysis of combinations of local features.[28, 116, 118]

## 5. Intrinsic temporal patterns for encoding sensory quality

Some sensory qualities, such as distinctions of smell, taste, pain, color, and temperature do not have natural correlates in the internal structure of stimulus waveforms. In sensory systems that subserve such distinctions, there may nevertheless be intrinsic, temporal patterns of neural response that are stimulus-dependent. All sensory receptors and neural populations have impulse- and step-response patterns that reflect timecourses of underlying biophysical, biochemical, and neural processes. Classic examples of such intrinsic response patterns are the different types of tone burst responses (chopping, pausing, buildup, onset) that are seen in the cochlear nucleus.[87] Early lateral inhibitory interactions also set up temporal precedence relations between different types of elements that can depend upon different relative response latencies for different stimuli. Findings of receptor and neural specificity therefore do not necessarily rule out coding by intrinsic temporal response, since activation of particular elements may serve to produce specific temporal patterns that bear the information that subserves the sensory distinction. While the temporal patterns may be generated by particular neurons, it is the temporal pattern, not which neurons are active, that ultimately determines what is perceived.

The most striking evidence for temporal coding in the chemical senses is found in the gustatory system. In primary gustatory neurons of the rat, neural responses exhibit tastant-specific temporal discharge patterns (Figure 2C).[123-125] Electrical stimulation of other rats using recorded temporal response patterns elicit orofacial expressions and behaviors that would normally be associated with the respective tastant. When these recorded, naturally-generated temporal patterns used for stimulation are scrambled, or isochronous pulse trains with the same pulse rates are used, no corresponding orofacial expressions and behaviors are produced.

In olfaction, odorant-related time patterns of neural response have been observed in a wide variety of systems.[126-132] Historically, efforts to find temporal pattern primitives for olfactory

perceptual dimensions have been confounded by changes in temporal response patterns with odorant concentration [133, 134] and complex history-dependencies of response [135, 136]. However, phase-locking to air-intake (sniffing) cycles [137] and emergent synchronized oscillations may provide population-based reference times for latency-pattern [130, 131] and latency-offset codes.[126, 138, 139]

Intrinsic temporal patterns of neural response potentially encode a number of visual attributes: texture, contrast, pattern, and color. Different patterns of visual stimulation produce different timecourses of response in neural populations[140] and single units [16, 17, 141, 142] that in many cases permit the respective stimuli to be distinguished. Different kinds of visual information may be represented and multiplexed together using interspike intervals of different durations that reflect characteristic response patterns rather than stimulus waveforms. [13, 14]

A considerable literature exists on color percepts evoked by temporal flicker. The best known demonstration of these "subjective", "achromatic" "Fechner colors" is the Benham Top (Figure 2D), which generates temporal sequences of changing luminances and edges that correspond to particular colors.[80, 143-147] Glow tubes have also been used to characterize the time patterns that elicit various colors.[143] Related temporal patterns of electrical stimulation of the retina produce correspondingly colored phosphenes.[148] One interpretation is that both temporally-patterned flicker and electrical stimulation extrinsically drive retinal elements to produce temporal discharge patterns that are subsequently interpreted as color signals by central visual stations. These imposed temporal patterns are presumably similar to intrinsic ones that would normally be generated by wavelength-dependent responses in the retina. Wavelength-dependent interspike interval patterns [149] latency patterns [150], and characteristic time courses of response [14, 17, 141] are seen in different visual systems, although how these neural response patterns might be related to temporal patterns that produce subjective colors is far from clear.

Historically there has been a longstanding debate over whether cutaneous sensations such as pain, touch, warmth, and cold are encoded via labeled lines (neural specificity models) or via pattern codes (channel patterns and temporal patterns).[56, 151] Emmers has reported finding interval sequence patterns in single thalamic units whose presence coincides with behavioral signs of pain, and whose disruption by means of appropriately patterned electrical stimulation appears to provide analgesia.[15] Other investigators have found precise, repeating interval sequence patterns in the form of spike triplets in cortical spike trains, but their informational role remains obscure.[152, 153]

## 6. Percepts evoked by temporally-patterned electrical stimuli

The ability of a specific temporal pattern of electrical stimulation to evoke a particular sensory quality is strongly suggestive of an underlying temporal code. Since electrical stimulation with gross electrodes nonspecifically drives large ensembles of neurons in the same way, it is difficult to attribute anything but the crudest of sensory distinctions that are produced to activation of particular neural subpopulations.

Cochlear implant users can distinguish periodicity pitches up to 500-1000 Hz, albeit poorly for periodicities above 500 Hz. [154, 155] Although auditory nerve fibers phase lock extremely well to electrical stimuli up to 10 kHz,[156] electrical stimulation produces highly abnormal interval patterns for periodicities above 600 Hz that may explain their poor discrimination.[157] Much of the impressive effectiveness of present day cochlear implants in restoring speech reception may be attributable to the important role that lower-frequency temporal patterns (< 200 Hz) play in the speech code itself.[158, 159]

Sensations of flutter-vibration are similarly evoked by periodic electrical stimulation of the skin.[54] In a number of examples listed above, temporally-patterned electrical stimuli apparently generated taste[123, 125], color[148], and pain percepts[15], while randomly patterned electrical stimulation controls did not.

## 7. Conclusions

Stimulus-dependent temporal response structure is found in an astonishingly wide range of sensory systems. Phase-locked responses permit time differences of response to be used as cues for stimulus location that can be analyzed using neural temporal cross-correlation architectures. Phase-locking impresses stimulus time structure on neural responses, providing interval-based representations of the stimulus form that can be analyzed through neural temporal autocorrelation architectures. Intrinsic temporal response patterns produce temporal cues for stimulus properties. Psychoneural correspondences between perceptual qualities and temporal response patterns produced by natural and electrical stimuli suggest that temporal codes may subserve many more perceptual functions than is commonly believed.

## 8. Acknowledgements

This work was supported by NIH Grant DC03054 from the National Institute for Deafness and Communications Disorders, a part of the National Institutes of Health.

## Figure captions

Figure 1. A space of possible neural pulse-codes.

Figure 2. Extrinsic and intrinsic temporal response patterns. A. Phase-locked responses in six auditory nerve fibers in Dial-anesthetized cat. Plot shows stimulus waveform and post-stimulus time histograms arranged by characteristic frequency (CF) for 100 presentations at 60 dB SPL. B. Phase-locked responses of a typical lateral geniculate parvo cell in sulfentanil-anesthetized macaque to 16 and 32 Hz sinusoidal temporal modulations of luminance.[160] Plots show period histograms and all-order interval (autocorrelation) histograms over a total duration of 25 sec. Stimulus waveform and autocorrelation have been superimposed (phase-matched). Data courtesy of Andrzej Przybyszewski and Dan Pollen. C. Intrinsic timecourses of response in the gustatory system to four tastants of diffferent classes: 0.1M NaCl (salty), 0.1M quinine (bitter), 0.1M HCl (sour), 0.5M sucrose (sweet). Waveforms are typical whole-nerve responses recorded from the chorda tympani of decerebrate rats. From Covey (1980), reproduced with permission. D. Achromatic temporal patterns that produce subjective colors. Left. Rotating patterns of Helmholtz and Benham, from Zouthout (1939). Right: Glow tube luminance patterns and the subjective colors they elicit, redrawn from Festinger et al (1973).



# ~ *Project Freedom* ~

# Covert Operations of the U.S. National Security Agency.

### From an article in Nexus Magazine April/May 96

**A lawsuit filed against the U.S. National Security Agency reveals a frightening array of technologies and programs designed to keep tabs on individuals.**

> # John St Clair Akwei
> ## vs
> # National Security Agency
> # Ft George G. Meade, MD, USA
> # (Civil Action 92-0449)

The following document comprises evidence for a lawsuit filed at the U.S. Courthouse in Washington, DC, by John St Clair Akwei against the National Security Agency, Ft George G. Meade, Maryland (**Civil Action 92-0449**), constitutes his knowledge of the NSA's structure, national security activities proprietary technologies and covert operations to monitor individual citizens Ed.

## 1. THE NSA'S MISSION AND DOMESTIC INTELLIGENCE OPERATION

### Communications Intelligence (COMINT)

**Blanket coverage of all electronic communications in the US and the world to ensure national security. The NSA at Ft Meade, Maryland has had the most advanced computers in the world since the early 1960s.** NSA technology is developed and implemented in secret from private corporations, academia and the general public.

13a

### Signals Intelligence (SICINT)

The Signals Intelligence mission of the NSA has evolved into a program of decoding EMF waves in the environment for wirelessly tapping into computers and track persons with the electrical currents in their bodies. Signals Intelligence is based on fact that everything in the environment with an electric current in it has a magnetic flux around it which gives off EMF waves. **The NSA/DoD [Department of Defence] developed proprietary advanced digital equipment which can remotely analyze all objects whether manmade or organic, that have electrical activity.**

### Domestic Intelligence (DOMINT)

**The NSA has records on all US citizens. The NSA gathers information on US citizen who might be of interest to any of the over 50,000 NSA agents (HUMINT).** These agents are authorized by executive order to spy on anyone. The NSA has a permanent national security anti-terrorist surveillance network in place. This surveillance network is completely disguised and hidden from the public.

Tracking individuals in the US is easily and cost-effectively implemented with NSA's electronic surveillance network. **This network (DOMINT) covers the entire US, involves tens of thousands of NSA personnel, and tracks millions of persons simultaneously .** Cost-effective implementation of operations is assured by NSA computer technology designed to minimize operations costs. NSA personnel serve in quasi-public positions in their communities and run cover businesses and legitimate businesses that can inform the intelligence community of persons they would want to track. **NSA personnel in the community usually have cover identities such as social workers, lawyers and business owners.**

### Individual Citizens Occasionally Targeted for Surveillance by Independently Operating NSA Personnel

NSA personnel can control the lives of hundreds of thousands of individuals in the US by using the NSA's domestic intelligence network and cover businesses. The operations independently run by them can sometimes go beyond the bounds of law. Long-term control and sabotage of tens of thousands of unwitting citizens by NSA operatives is likely to happen. **NSA DOMINT has the ability to assassinate US citizens covertly or run covert psychological control operations to cause subjects to be diagnosed with ill mental health.**



13b



(a) FORCED MEMORY BLANKING AND INDUCED ERRONEOUS ACTIONS

INDUCED CHANGES TO HEARING - BOTH APPARENT DIRECTION AND VOLUME, AND SOMETIMES EVEN CONTENT

(b) SUDDEN, VIOLENT ITCHING INSIDE EYELIDS

FORCED MANIPULATION OF AIRWAYS, INCLUDING EXTERNALLY CONTROLLED FORCED *SPEECH*

(c) WILDLY RACING HEART WITHOUT CAUSE

REMOTELY INDUCED VIOLENT NO-RASH ITCHING, WITH PREFERENCE FOR HARD-TO-REACH AREAS, OFTEN DURING DELICATE OR MESSY WORK

(d) FORCED NUDGING OF ARM DURING DELICATE OR MESSY WORK, CAUSING INJURY OR SPILLS

SPECIAL ATTENTION TO GENITAL AREA: ITCHING, FORCED ORGASM, INTENSE PAIN

(e) INTENSE GENERAL PAIN, OR HOT-NEEDLES-PUSHED-DEEP-INTO-FLESH SENSATIONS.

ALSO - WILD FLAILING, SOMETIMES FOLLOWED BY SHORT PERIODS OF "RIGOR MORTIS"

HARD-TO-REACH ITCH SITE, TOP AND BOTTOM, NEVER ANY RASH, WHICH OFTEN STARTS AS THE SENSATION OF SMALL ELECTRICAL SHOCKS

"DEMO" NEURO-CONTROL BY BENDING EACH TOE BACKWARDS ALMOST 90 DEGREES, ONE AT A TIME, OVER A COUPLE OF MINUTES

READING AND BROADCASTING THOUGHTS (f)

CONTROLLED DREAMS

FORCED WAKING VISIONS SOME SYNC'ED WITH BODY MOTION

MICROWAVE HEARING ✱ (g)

"TRANSPARENT EYELIDS"

ARTIFICIAL TINNITUS

FORCED MOVEMENT OF JAW AND CLACKING OF TEETH

Forced Movement of Facial Features (k)

FORCED "MUSCLE QUAKING" OF THE LARGE MUSCLES ON THE BACK

FORCED PRECISION (h) MANIPULATION OF HANDS, SOMETIMES SYNC'ED TO THE FORCED WAKING VISIONS

✱ THE FIRST UN-CLASSIFIED SUCCESSFUL TRANSMISSION OF THE HUMAN VOICE DIRECTLY INTO THE SKULL OF A LIVING PERSON WAS PERFORMED BY DR. JOSEPH C. SHARP, OF THE WALTER REED ARMY INSTITUTE OF RESEARCH IN **1974**

BY TRANSFORMING A HYPNOTIST'S VOICE USING THE LOWERY SILENT SOUND OR SMIRNOV SCRAMBLE METHODS, USED IN THE GULF WAR, IT IS POSSIBLE TO HYPNOTIZE A TARGET WITHOUT THE TARGET BEING AWARE, FROM HIDING LEAVING ZERO TRACE EVIDENCE

(i) GENERAL EFFECTS: SUDDEN OVERHEATING, ALL-BODY PAIN, FORCED "CAFFEINE FIELD" SLEEP PREVENTION, FORCED "DROP-IN-YOUR-TRACKS" SLEEP INDUCEMENT, IRRESISTIBLE "GO HERE, GO THERE" COMMANDS, MICROWAVE BURNS, ELECTRIC SHOCKS

INVOLUNTARY TEST SUBJECTS ALSO EXPERIENCE: FREQUENT BREAK-AND-ENTERS AT HOME AND AT WORK WITH CLOTHING AND FURNITURE, BUSINESS PAPERS, COMPUTER FILES SABOTAGED (j) MODIFIED OR STOLEN. PSYCHOLOGICAL WARFARE RESEARCH IS THE LIKELY MOTIVE.

# PSYCHO-ELECTRONIC WEAPON EFFECTS

www.raven1.net

9/29/20

The above symptoms highlight a fraction of the vast array of
Secret Electromagnetic Frequency Assaults perpetrated by the Police and
Military Intelligence Agencies toward
Remote Mind Control Experiments, Behavioural Manipulation and Murder.

## 2. NSA'S DOMESTIC ELECTRONIC SURVEILLANCE NETWORK

As of the early 1960s, the most advanced computers in the world were at the NSA, Ft Meade. Research breakthroughs with these computers were kept for the NSA. At the present time the NSA has nanotechnology computers that are 15 years ahead of present computer technology. **The NSA obtains blanket coverage of information in the US by using advanced computers that use artificial intelligence to screen all communications, regardless of medium, for key words that should be brought to the attention of NSA agents/cryptologists.** These computers monitor all communications at the transmitting and receiving ends. This blanket coverage of the US is a result of the NSA's Signals Intelligence (SIGINT) mission. The NSA's electronic surveillance network is based on a cellular arrangement of devices that can monitor the entire EMF spectrum. This equipment was developed, implemented and kept secret in the same manner as other electronic warfare programs.

### ⁂Signals Intelligence Remote Computer Tampering

The NSA keeps track of all PCs and other computers sold in the US. This is an integral part of the Domestic Intelligence network. The NSA's EMF equipment can tune in RF emissions from personal computer circuit boards (while filtering out emissions from monitors and power sup- plies). The RF emission from PC circuit boards contains digital information in the PC. Coded RF waves from the NSA's equipment can resonate PC circuits and change data in the PCs. Thus the NSA can gain wireless modem-style entry into any computer in the country for surveillance or anti-terrorist electronic warfare.

### ⁂Detecting EMF Fields in Humans for Surveillance

A subject's bioelectric field can be remotely detected, so subjects can be monitored anywhere they are. With special EMF equipment NSA cryptologists can remotely read evoked potentials (from EEGs). These can be decoded into a person's brain-states and thoughts. The subject is then perfectly monitored from a distance. **NSA personnel can dial up any individual in the country on the Signals Intelligence EMF scanning network and the NSA's computers will then pinpoint and track that person 24 hours a day.** The NSA can pick out and track anyone in the US.

13d



**Mind Control Information Feedback Paths: Disparity and Repression**

The Mind Controllers, their Collaborators and Apologists
- many have knowledge of the whole system
- are allowed private thoughts
- easy to criticize and attack victim with his own thoughts
- mob psychology allows massive ridicule and nazi - like acts
- have access to information stolen from other victims
- may " earn" a good salary for inflicting torture; pension plan

Microwave voices, e-aks persistent zapping,direct harassment | Newspaper Magazine, Print Medal, T.V. including Ads | Gossip Rumors Social and web connections | Virtuous internet methods | Mind raped Thought streams | Bugged Conversations Private writings | Public Writings, Public declarations

**A Victim**
- Usally alone in his/her torture
- has no privacy even for his/her private thoughts
- cannot plan secretly, hold trade secrets or intellectual prop.
- is subject to vicious physial and psychological attacks
- does not know how harrassment is happening or by whom
- does not know why harrassment is happening
- may be accused of mental illness, called delusional
- cannot get away, no matter where he/she goes

# 3. NSA SIGNALS INTELLIGENCE USE OF EMF BRAIN STIMULATION

NSA Signals Intelligence uses EMF Brain Stimulation for Remote Neural Monitoring (RNM) and Electronic Brain Link (EBL). EMF Brain Stimulation has been in development since the MKULTRA program of the early 1950s, which included neurological research into radiation (non-ionizing EMF) and bioelectric research and development. The resulting secret technology is categorized at the National Security Archives as "Radiation Intelligence", defined as "information from unintentionally emanated electromagnetic waves in the environment, not including radioactivity or nuclear detonation". Signals Intelligence implemented and kept this technology secret in the same manner as other electronic warfare programs of the US Government. The NSA monitors available information about this technology and withholds scientific research from the public. There are also international intelligence agreements to keep this technology secret.

The NSA has proprietary electronic equipment that analyze electrical activity in humans from a distance. **NSA computer generated brain mapping can continuously monitor all of the electrical activity in the brain continuously.** The NSA records and decode individual brain maps (of hundreds of thousands of persons) for national security purposes. EMF Brain Stimulation is also secretly used by the military for brain-to-computer link (in military fighter aircraft, for example).

**For electronic surveillance purposes, electrical activity in the speech center of the brain can be translated into the subject's verbal thoughts.** RNM can send encoded signals to the brain's auditory cortex, thus allowing audio communications direct to the brain (bypassing the ears). NSA operatives can use this covertly to debilitate subjects by simulating auditory hallucinations characteristic of

13e

paranoid schizophrenia.

**Without any contact with the subject, Remote Neural Monitoring can map out electrical activity from the visual cortex of a subject's brain and show images from the subject's brain on a video monitor. NSA operatives see what the surveillance subject's eyes are seeing.** Visual memory can also be seen. RNM can send images direct to the visual cortex, bypassing the eyes and optic nerves. NSA operatives can use this surreptitiously to put images into a surveillance subject's brain while they are in REM sleep for brain-programming purposes.

### Capabilities of NSA Operatives Using RNM

There has been a Signals Intelligence network in the US since the 1940s. The NSA, Ft Meade has in place a vast two-way wireless RNM system which is used to track subjects and noninvasively monitor audio-visual information in their brains. This is all done with no physical contact with the subject. RNM is the ultimate method of surveillance and domestic intelligence. **Speech, 3D sound and subliminal audio can be sent to the auditory cortex of the subject's brain (bypassing the ears), and images can be sent into the visual cortex.** RNM can alter a subject's perceptions, moods and motor control.

Speech cortex/auditory cortex link has become the ultimate communications system for the intelligence community. RNM allows for a complete audio-visual brain-to-brain link or brain-to-computer link.



The above is a simple flowchart of Nuero-Electromagnetic Frequency Assaults showing methods that can be perpetuated by the Police and Military Intelligence Agencies toward Remote Mind Control Experiments, Behavioral Manipulation and Murder

131

# 4. NATIONAL SECURITY AGENCY SIGNALS INTELLIGENCE ELECTRONIC BRAIN LINK TECHNOLOGY

**NSA SIGINT can remotely detect, identify and monitor a person's bioelectric fields.**

The NSA's Signals Intelligence has the proprietary ability to monitor remotely and non-invasively information in the human brain by digitally decoding the evoked potentials in the 30-50 Hz, 5 milliwatt electromagnetic emissions from the brain.

Neuronal activity in the brain creates a shifting electrical pattern that has a shifting magnetic flux. This magnetic flux puts out a constant 30-50 Hz, 5 milliwatt electromagnetic (EMF) wave. Contained in the electromagnetic emission from the brain are spikes and patterns called "evoked potentials". Every thought, reaction, motor command, auditory event and visual image in the brain has a corresponding "evoked potential" or set of "evoked potentials". The EMF emission from the brain can be decoded into the current thoughts, images and sounds in the subject's brain.

NSA SIGINT uses EMF-transmitted Brain Stimulation as a communications system to transmit information (as well as nervous system messages) to intelligence agents and also to transmit to the brains of covert operations subjects (on a non-perceptible level).

**EMF Brain Stimulation works by sending a complexly coded and pulsed electromagnetic signal to trigger evoked potentials (events) in the brain, thereby forming sound and visual images in the brain's neural circuits. EMF Brain Stimulation can also change a person's brain-states and affect motor control.**

Two-way electronic Brain Link is done by remotely monitoring neural audio-visual information while transmitting sound to the auditory cortex (bypassing the ears) and transmitting faint images to the visual cortex (bypassing the optic nerves and eyes). The images appear as floating 2D screens in the brain.

Two-way electronic Brain Link has become the ultimate communications system for CIA/NSA personnel. **Remote neural monitoring (RNM, remotely monitoring bioelectric information in the human brain) has become the ultimate surveillance system.** It is used by a limited number of agents in the US Intelligence Community.



13g



Caption inside figure:

**\* REMEMBER: THIS WAS DO-ABLE IN 1974 !**

Steady tone, near the high end of the hearing range, say, 15,000 Hz

Output is now more or less a steady tone, like tinnitus, but with hypnosis embedded.

Each vertical line is one short pulse of microwave signal at a frequency to which the human brain is sensitive . . . then brain converts the train of microwave pulses back to inaudible voice; there is no conscious defense possible against the hypnosis.

Hypnotist's Voice, varying from, say, 300 Hz to 4,000 Hz

Mic.

FREQUENCY MODULATOR, VOICE CONTROLS FREQ.

Transmitter

Curve below is magnified to show how the FM-voice controls the timing of the transmitter's pulses.

Timing of each micro-wave pulse is controlled by each down-slope crossing of the voice wave (Sharp's original 1974 method).

HOW SILENT *(CONVERTED-TO-VOICE-FM)* HYPNOSIS CAN BE TRANSMITTED USING A VOICE FREQUENCY MODULATOR TO GENERATE THE "VOICE", THEN *PULSED-MICROWAVE VOICE-TO-SKULL* FOR DISTANCE AND COVER
http://www.raven1.net/hypno2s.gif                                    Mar 21/00

The above is a simple flowchart of Nuero-Electromagnetic Frequency Assaults showing methods that can be perpetuated by the Police and Military Intelligence Agencies toward Remote Mind Control Experiments, Behavioural Manipulation and Murder.

## 5. [NO HEADING IN ORIGINAL DOCUMENT]

RNM requires decoding the resonance frequency of each specific brain area. That frequency is then modulated in order to impose information in that specific brain area. The frequency to which the various brain areas respond varies from 3 Hz to 50 Hz. Only NSA Signals Intelligence modulates signals in this frequency band. (See Table 1.) This modulated information can be put into the brain at varying intensities from subliminal to perceptible. Each person's brain has a unique set of bioelectric resonance/entrainment frequencies. Sending audio information to a person's brain at the frequency of another person's auditory cortex would result in that audio information not being perceived.

The Plaintiff learned of RNM by being in two-way RNM contact with the Kinnecome group at the NSA, Ft Meade.

They used RNM 3D sound direct to the brain to harass the Plaintiff from October 1990 to May 1991.

13h

As of 5/91 they have had two-way RNM communications with the Plaintiff and have used RNM to attempt to incapacitate the Plaintiff and hinder the Plaintiff from going to the authorities about their activities against the Plaintiff in the last 12 years. The Kinnecome group has about 100 persons working 24 hours a day at Ft Meade. They have also brain-tapped persons the Plaintiff is in contact with to keep the Plaintiff isolated. **This is the first time ever that a private citizen has been harassed with RNM and has been able to bring a lawsuit against NSA personnel misusing this intelligence operations method.**



## 6. NSA TECHNIQUES AND RESOURCES

**Remote monitoring/tracking of individuals in any location, inside any building, continuously, anywhere in the country.** A system for inexpensive implementation of these operations allows for thousands of persons in every community to be spied on constantly by the NSA.

**Remote RNM Devices**

**NSA's RNM equipment remotely reads the evoked potentials (EEGs) of the human brain for tracking individuals, and can send messages through the nervous systems to affect their performance.** RNM can electronically identify individuals and track them anywhere in the US. This

13i

equipment is on a network and is used for domestic intelligence operations, government security and military base security, and in case of bioelectric warfare.

## Spotters and Walk-Bys in Metropolitan Areas

Tens of thousands of persons in each area working as spotters and neighbourhood/business place spies (sometimes unwittingly) following and checking on subjects who have been identified for covert control by NSA personnel.

Agents working out of offices can be in constant communication with spotters who are keeping track of the NSA's thousands of subjects in public. NSA agents in remote offices can instantly identify (using~ RNM) any individual spotted in public who is in contact with surveillance subject.

## Chemicals and Drugs into Residential Buildings with Hidden NSA Installed and Maintained Plastic Plumbing lines.

The NSA has kits for running lines into residential tap water and air ducts of subjects for the delivery of drugs (such as sleeping gas or brainwashing-aiding drugs). This is an outgrowth of CIA pharmapsychology (psychopharmacology).

## Brief Overview of Proprietary US Intelligence/Anti- Terrorist Equipment Mentioned

Fixed network of special EMF equipment that can read EEGs in human brains and identify/track individuals by using digital computers. ESB (Electrical Stimulation to the Brain) via EMF signal from the NSA Signals Intelligence is used to control subjects.

EMF equipment that gathers information from PC circuit boards by deciphering RF emissions, thereby gaining wireless modem- style entry into any personal computer in the country. All equipment hidden, all technology secret, all scientific research unreported (as in electronic warfare research). Not known to the public at all, yet complete and thorough implementation of this method of domestic intelligence has been in place since the early 1980s.

**Editor's Note: I tried ringing Mr Akwei to find out what was the out- come, if any, of his court case. He firmly but kindly told me that he could not speak about anything to do with the case over the phone and hung up. A subsequent conversation of similar length resulted in the information that he did not wish his address or phone number published with this article. So, if we hear of any developments, we'll let you know.**

Its totally obvious from the above article that the US National Security Agency is none other than a covertly run terrorist organisation.

13j

Their highly sophisticated technology that is used to monitor and manipulate the minds of millions of innocent people daily, is a blatant expression of the dominating and authoritarian mentality that exists behind the facade of our so called democratic society.

George Orwell's "THOUGHT POLICE" is an absolute reality in today's world.

Whether we realise it or not, every individual within our society is negatively effected by this dictatorship attitude.

*It has to change - It will change - It starts with you!*

**George Farquhar
Project Freedom**

## An example of EMF Brain Stimulation

| Brain Area | Bioelectric Resonance Frequency | Information Induced Through Modulation |
|---|---|---|
| Motor Control Cortex | 10 Hz | Motor Impulse co-ordination |
| Auditory Cortex | 15 Hz | Sound which bypasses the ears |
| Visual Cortex | 25 Hz | Images in the brain bypassing the eyes |
| Somatosensory | 9 Hz | Phantom touch sense |
| Thought Center | 20 Hz | Imposed subconscious thoughts |

# RESOURCES

**These publications have only been discovered since December 1991, after Plaintiff had already notified authorities (Dept of Justice, etc.) of Public Corruption by named NSA employees. When**

13k

**no action was taken against the NSA employees, I researched the Intelligence Community electronic surveillance technology involved and discovered the following publications.**

**The Body Electric:** Electromagnetism and the Foundation of Life, by Robert Becker, M.D. Monitoring neuroelectric information in the brain ESB. (p. 265,313,318)

**Cross currents,** by Robert Becker. Simulating auditory hallucinations. Remote computer tampering using RF emissions from the logic board. (p. 70,78,105,174,210,216,220,242,299,303)

**Currents of Death,** by Paul Brodeur. Driving brain electrical activity with external EM; magnetophosphenes; Delgado. (p. 27,93)

**The Zapping of America,** by Paul Brodeur. DoD EM ESB research; simulating auditory hallucinations.

**Of Mice, Men and Molecules,** by John H. Heller 1963 Bioelectricity; probing the brain with EM waves. (p, 110)

**The Three-Pound Universe,** by Judith Hooper. CIA EEG research; EEGs for surveillance. (p.29,132,137)

**In the Palaces of Memory,** by George Johnson. EM emissions from the brain; the brain as an open electromagnetic circuit.

**The Puzzle Palace,** by James Bamford. Signals Intelligence; most advanced computers in the early 'sixties.

**The US Intelligence Community.** Glossary terms at National Security Archives; Radiation Intelligence (information from unintentionally emanated electromagnetic energy, excluding radioactive sources).

**The Search for the "Manchurian Candidate",** by John Marks. Electrical or radio stimulation to the brain; CIA R&D in bioelectrics. (p.227)

**Secret Agenda,** by Jim Hougan. National security cult groups.

**Crimes of the Intelligence Community,** by Morton Halperin. Surreptitious entries; intelligence agents running operations against government workers.

**War in the Age of Intelligent Machines,** NSA computer supremacy, complete control of information.

**Alternate Computers,** by Time-Life Books. Molecule computers.

**The Mind, by Richard Restak,** M.D. EEG Systems inc.; decoding brain EM emanations, tracking

131

thoughts on a computer. (p. 258)

**MedTech,** by Lawrence Galton. Triggering events in the brain, direct to auditory cortex signals.

**Cyborg,** by D.S. Halacy, Jr, 1965. Brain-to-computer link research contracts given out by the US government.

**Psychiatry and the CIA: Victims of Mind Control,** by Harvey M. Weinstein M.D. Dr. Cameron; psychic driving; ultraconceptual communications.

**Journey Into Madness**: The True Story of Secret CIA Mind Control and Medical Abuse, by Gordon Thomas, Intelligence R&D; Delgado; psychic driving with radio telemetry. (p. 127,276,116,168,169)

**Mind Manipulators,** by Alan Scheflin and Edward M. Opton. MKULTRA brain research for information-gathering.

**The Brain Changers,** by Maya Pines. Listening to brain EM emissions. (p.19)

**Modern Bioelectricity.** Inducing audio in the brain with EM waves; DoD cover-up; EM wave ESB; remote EEGs

**Magnetic Stimulation in Clinical Neurophysiology,** by Sudhansu Chokroverty. Magnetophosphenes; images direct to the visual cortex.

**The Mind of Man, by Nigel Calder.** US intelligence brain research.

**Neuroelectric Society Conference,** 1971. Audio direct to the brain with EM waves; 2-way remote EEGs.

**Brain Control,** by Elliot S. Valenstein. ESB., control of individuals.

**Towards Century 21,** by C.S. Wallia. Brain Stimulation for direct-to-brain communications (p21)

**Mind Wars,** by Ron McRae (associate of Jack Anderson). Research into brain-to-brain electronic communications., remote neural EM detection (PP. 62 106, 136).

**Mind Tools,** by Rudy Rucker. Brain tapping; communications with varying biomagnetic fields (p82).

**US News and World report,** January 2nd 1984. EM wave brain stimulation; intelligence community hi-tech (p38).

**Ear Magazine.** Article on extremely low frequencies radio emissions in the natural environment; radio emissions from the human body.

**City Paper,** Washington DC January 17, 1992. Article FCC and NSA "complete radio spectrum"

13m

listening posts.

**Frontiers in Science**, by Edward Hutchings Jr 1958 (p48).

**Beyond Bio Feedback**, by Elmer and Alyce Green, 1977 (p118)

**The Body Quantum**, by Fred Alan Wolf

**Cloning**; A Biologist Reports, by Robert Gillmore McKinnell. Ethical review of cloning humans.

**Hoovers' FBI**, by Former agent William Turner. Routines of electronic surveillance work. (p280).

**July 20th 2019**, by Arthur C. Clarke LIDA; Neurophonics; Brain-computer link.

**MegaBrain**, by Michael Hutchison. Brain stimulation with EM waves; CIA research and information control. (pp.107,108,117,120,123).

**The Cult of Information**, by Theodore Rosnak, 1986. NSA Directive #145; personal files in computers; computer automated telephone tapping.

**The Body Shop**, 1986 implantation of an electrode array on the visual cortex for video direct to the brain; other 1960's research into electronically triggering Phosphenes in the brain, thus bypassing the eyes.

**Evoked Potentials**, by David Regan. Decoding neuroelectric information in the brain.

Home

http://www.mindcontrolforums.com/pro-freedom.co.uk/cov_us.html                    9/29/2006

# How The NSA Harasses Thousands Of Law Abiding Americans Daily By The Usage Of Remote Neural Monitoring (RNM)

**John St. Clair Akwei**
**vs.**
**NSA, Ft. Meade, MD, USA**

## Table of Contents

Cover Page
NSA Mission & Operations

Communications Intelligence
Signals Intelligence
Domestic Intelligence
Independently Operating Personnel Target Citizens

NSA's Domestic Electronic Surveillance Network

Signals Intelligence Remote Computer Tampering
Detecting EMF Fields in Humans for Surveillance

NSA Signals Intelligence Use of EMF Brain Stimulation
Capabilities of NSA operatives using RNM
NSA Signals Intelligence Electronic Brain Link Technology

Table: An example of EMF Brain Stimulation

NSA Techniques and Resources

Remote RNM Devices
Spotters and Walk-Bys in Metropolitan Areas
Chemicals and Drugs
Intelligence Anti-Terrorist Equipment

Resources

Further Resources

Evidence for the Lawsuit filed at the US courthouse in Washington, D.C.
(Civil Action 92-0449)

John St.Clair Akwei  vs.  NSA Ft George G. Meade, MD

My knowledge of the National Security Agency's structure, national security activities, proprietary technology, and covert operations to monitor individual citizens.

# The NSA's mission and the NSA's domestic Intelligence operation.

## Communications Intelligence (COMINT)

Blanket coverage of all electronic communication in the U.S. and the world to ensure national security. The NSA at Ft. Meade, Maryland has had the most advanced computers in the world since the early 1960's. NSA technology is developed and implemented in secret from private corporations, academia, and the general public.

## Signals Intelligence (SIGINT)

The Signals Intelligence mission of the NSA has evolved into a program of decoding EMF waves in the environment for wirelessly tapping into computers and tracking persons with the electrical currents in their bodies. Signals Intelligence is based on the fact that everything in the environment with an electric current in it has a magnetic flux around it which gives off EMF waves. The NSA/DoD has developed proprietary advanced digital equipment which can remotely analyze all objects whether man-made or organic that have electrical activity.

## Domestic Intelligence (DOMINT)

The NSA has records on all U.S. citizens. The NSA gathers information on U.S. citizens who might be of interest to any of the over 50,000 NSA agents (HUMINT). These agents are authorized by executive order to spy on anyone. The NSA has a permanent National Security Anti-Terrorist surveillance network in place. This surveillance network is completely disguised and hidden from the public.

Tracking individuals in the U.S. is easily and cost-effectively implemented with the NSA's electronic surveillance network. This network (DOMINT) covers the entire U.S., involves tens of thousands of NSA personnel, and tracks millions of persons simultaneously. Cost effective implementation of operations is assured by NSA computer technology designed to minimize operations costs.

NSA personnel serve in Quasi-public positions in their communities and run cover businesses and legitimate businesses that can inform the intelligence community of persons they would want to track. N.S.A. personnel in the community usually have cover identities such as social workers, lawyers and business owners.

## Individual citizens occasionally targeted for surveillance by independently operating NSA personnel.

NSA personnel can control the lives of hundreds of thousands of individuals in the U.S. by using the NSA's domestic intelligence network and cover businesses.

13p

# BRAIN-COMPUTER INTERFACE

http://ms101.mysearch.com/jsp/GGmain.jsp?searchfor=brain-computer-interface

Note: See News- Journal dtd. 01-09-05. Mind over Matter. (brain waves)

# Company hopes to meld brain, machine

**By ANDREW POLLACK**
NEW YORK TIMES

Can a machine read a person's mind? A medical device company is about to find out.

The company, Cyberkinetics Inc., plans to implant a tiny chip in the brains of five paralyzed people in an effort to enable them to operate a computer by thought alone.

The Food and Drug Administration has given approval for a clinical trial of the implants, according to the company.

The implants, part of what Cyberkinetics calls its BrainGate system, could eventually help people with spinal cord injuries, strokes, Lou Gehrig's disease or other ailments to communicate better or even to operate lights and other devices through a kind of neural remote control.

"You can substitute brain control for hand control, basically," said Dr. John P. Donoghue, chairman of the neuroscience department at Brown University and a founder of Cyberkinetics, which hopes to begin the trial as early as next month.

The melding of man and machine has long been a staple of science fiction. Indeed, the participants in Cyberkinetics' clinical trial, who have not yet been chosen, will have a cable sticking out of their heads to connect them to computers, making them look something like characters in "The Matrix."

But in real life, several research groups have already implanted devices in monkeys that allow them to control cursors on computer screens or move robot arms using their brainpower alone, setting the stage for the trial in people.

"Among many people in the field, there's a feeling now that the time is here for moving the technology to test in humans," said Dr. Richard A. Andersen, professor of neuroscience at the California Institute of Technology, who is working on his own device for the brain. Still, for the trial, there is trepidation mixed with anticipation.

"A disaster at this early stage could set the whole field back," said Dr. Dawn M. Taylor, a research associate at Case Western Reserve University and Cleveland Veterans Affairs Medical Center, who is testing similar systems in monkeys.

Devices have long been implanted in the brains of patients with Parkinson's disease to deliver pulses of electricity that reduce tremors and rigidity.

But systems like BrainGate do not deliver current.

Instead, they listen to the electrical signals produced by the brain's neurons as they work. The aim is to discern a pattern of neuronal activity indicating the intention to initiate a particular physical movement.

In typical monkey trials of neural implants, the animals, which are not paralyzed, are trained to perform a task, like moving a cursor with a joystick, while a tiny subset of their neurons is monitored.

14a

 

DEFENSE SCIENCES OFFICE

- Technology Thrusts
- Personnel
- Solicitations
- Future Areas of Interest
- Completed Programs
- Briefings
- Web Site Additions
- Home

- Contact the DSO Webmaster with questions or comments.

Programs    Search    Site Map

**BIOLOGICAL SCIENCES > BIOLOGY >**

## Brain Machine Interfaces

Program Manager: Dr. Eric Eisenstadt

The Brain Machine Interfaces Program represents a major DSO thrust area that will comprise a multidisciplinary, multipronged approach with far reaching impact. The program will create new technologies for augmenting human performance through the ability to noninvasively access codes in the brain in real time and integrate them into peripheral device or system operations. Focus will be on the following areas:

1. Extraction of neural and force dynamic codes related to patterns of motor or sensory activity required for executing simple to complex motor or sensory activity (e.g., reaching, grasping, manipulating, running, walking, kicking, digging, hearing, seeing, tactile). This will require the exploitation of new interfaces and algorithms for providing useful nonlinear transformation, pattern extraction techniques, and the ability to test these in appropriate models or systems.

2. Determination of necessary force and sensory feedback (positional, postural, visual, acoustic, or other) from a peripheral device or interface that will provide critical inputs required for closed loop control of a working device (robotic appendage or other peripheral control device or system).

3. New methods, processes, and instrumentation for accessing neural codes noninvasively at appropriate spatiotemporal resolution to provide closed loop control of a peripheral device. This could include both fundamental interactions of neural cells, tissue, and brain with energy profiles that could provide noninvasive access to codes (magnetics, light, or other).

4. New materials and device design and fabrication methods that embody compliance and elastic principles, and that capture force dynamics that integrate with neural control commands. These include the use of dynamic materials and designs into working prototypes.

5. Demonstrations of plasticity from the neural system and from an integrated working device or system that result in real time control under relevant conditions of force perturbation and cluttered sensory environments from which tasks must be performed (e.g., recognizing and picking up a target and manipulating it).

6. Biomimetic implementation of controllers (with robotics or other

15

devices and systems) that integrate neural sensory or motor control
integrated with force dynamic and sensory feedback from a working
device or system. The first phase of the program may include dynamic
control of simple and complex motor or sensory activity directly using
neural codes integrated into a machine, device, or system. Simple
actions considered include using a robotic arm or leg to sense a target,
reach for it and manipulate it, throw or kick an object at a target, or
recognize a sensory input and responding to it (visual, acoustic) directly
through input/output brain integration. More complex activity may include
issues related to force or sensory perturbation in more complex
environments.

▲ Back to Top

**Quick Links**

Biological Sciences
Materials & Devices
Mathematics

16



Cyberkinetics Neurotechnology Systems, Inc. Platform Tech...

- Participate in a Clinical Trial
- View Text-Only page

**Home     About Us     Clinical Trials     Medical Products     Research Products     Technology     Investor Relations**



# Technology

Change Font Size  A  A  A  **A**

## Platform Technology

O Publications

Neurons are cells that use a language of electrical impulses to communicate messages from the brain to the rest of the body. At Cyberkinetics, we have the technology to **sense, transmit, analyze** and **apply** the language of neurons. We are developing products to restore function, as well as to monitor, detect, and respond to a variety of neurological diseases and disorders.

Cyberkinetics offers a systems approach with a core technology to sense, transmit, analyze and apply the language of neurons in both short and long-term settings. Our platform technology is based on the results of several years of research and development at premier academic institutions such as Brown University, the Massachusetts Institute of Technology, Emory University, and the University of Utah.

### Sense

Cyberkinetics' unique technology is able to simultaneously sense the electrical activity of many individual neurons. Our sensor consists of a silicon array about the size of a baby aspirin that contains one hundred electrodes, each thinner than a human hair. The array is implanted on the surface of the brain. In the BrainGate™ Neural Interface System, the array is implanted in the area of the brain responsible for limb movement. In other applications the array may be implanted in areas of the brain responsible for other body processes.

### Transmit and Analyze

The human brain is a super computer with the ability to instantaneously process vast amounts of information. Cyberkinetics' technology allows for an extensive amount of electrical activity data to be transmitted from neurons in the brain to computers for analysis. In the current BrainGate™ System, a bundle consisting of one hundred gold wires connects the array to a pedestal which extends through the scalp. The pedestal is connected by an external cable to a set of computers in which the data can be stored for off-line analysis or analyzed in real-time. Signal processing software algorithms analyze the electrical activity of neurons and translate it into control signals for use in various computer-based applications.

17

Case 1:07-cv-08107-RMB   Document 22   Filed 06/22/2007

**Apply**

Cyberkinetics' ability to generate control signals and develop computer application interfaces provides us with a platform to develop multiple clinical products. For example, using the BrainGate™ Neural Interface System, a person may be able to use his thoughts to control cursor motion and/or replicate keystrokes on a computer screen. In another example, a doctor may study patterns of brain electrical activity in patients with epilepsy before, during and after seizures.

At Cyberkinetics, we are leveraging our core technology to sense, transmit and analyze the language of neurons to developing products to restore function, as well as to monitor, detect, and respond to a variety of neurological diseases and disorders.

Back to Top

Home   •   Terms of Use   •   Site Map   •   Contact Us

©2005 Cyberkinetics Neurotechnology Systems, Inc.

Designed & Developed by Embarc, Inc.
Photography by Rick Friedman Photography

18



**Cyberkinetics**
Neurotechnology Systems, Inc.

Home   Research   Products    Technology    Patients    Physicians    Investors    Contact    Disclaimer

Technology

Scientific references

128 Channel Data
Aquisition Sytem

Multielectrode Arrays

Connectors

Surgical Training

Download Brochures

Request Price quote

Technical Support

Announcements

FAQs

## CEREBUS: 128 Channel Data Aquisition System

---

### Key Concepts

- 128 channels of amplification and data acquisition.
- Digitization at 30,000 samples/sec per channel.
- Simultaneous spike and local field potential recording
- 16 Analog inputs, 4 analog outputs, 2 digital inputs and 8 digital outputs.
- Ultra-compact front-end design
- Flexible front-end mounting options
- Fiber optic data link
- Differential amplification with respect to a common referece signal.
- Parallel multi-user, multi-PC, control and operationPC basedWindows 2000 Pro.
- User-friendly graphical interface.
- Interface with Neuroexplorer and Matlab



Neural Signal Processor

Front−End Amplifier

### General Description

The CEREBUS data acquisition system is a scalable embedded on-line system for recording and processing neural signals for up to 128 extracellular electrodes. The system is composed of compact front-end modules that carry 32-channel processing boards and the modules are available in 4 and 8 board sizes for up to 128 or 256 channels per module. The front-end modules amplify, pre-filter, and digitize the neural signals and transmit them by fiber-optic data links to a central neural signal processing module. A single fiber-optic pair can carry information from up to 256 electrodes. The neural signal processing unit contains an array of up to 8 data signal processors for final filtering and on-line analysis of the neural signals. The neural signal processor module then transmits the processed data to a host PC system via Ethernet data link.

The interface software running on the PC allows the user to configure the data processing and visualize the incoming data as it is acquired. The flexible digital architecture of the system allows the user to perform a variety of different on-line analyses from simple data streaming and storage to on-line extracellular spike sorting. The wide pre-filtering used in the front-end modules allows the system to simultaneously acquire field potentials and spike waveforms from the same electrodes.

The CEREBUS system is available as a 32-, 64-, 96-, and 128-channel system.

### Graphical User Interface

All operations are monitored by and controlled from the PC's computer monitor. The GUI has been designed to provide maximum information to the user about the status of the experiment, and to facilitate the user supervision and setting of thresholds on each of the active electrodes.

The GUI has six main windows:

* setup window to configure each channel
* window for the online classification of action potentials on the selected channel
* two windows for viewing the kinetics of individual action potentials and local field potentials on all channels
* an activity map summarizing and viewing the firing rates on all channels
* a window to control data acquisition and storage

All operations are monitored by and controlled from the PC's computer monitor. The GUI has been designed to provide maximum information to the user about the status of the experiment, and to facilitate the user supervision and setting of thresholds on each of the active electrodes.

Activity on the analog and digital inputs is also indicated on the GUI. Thresholds are set with the mouse and experimental parameters are entered from the keyboard.

## Specifications for 128 Channel Front-End Amplifier

- Amplification: 5000
- Input referred noise (input grounded): less than 3uV rms
- Output voltage range: +/- 4.5 volts
- Input voltage range: +/- 7.5 mV with 16-bit resolution
- Input bias/leakage current: +/- 5 pA typical, +/- 20 pA max
- Input impedance: >10^12 ohms; 3pF
- Common mode rejection ratio: greater than 90dB at 50/60 Hz
- Common mode input range: up to +/- 3.0 V between input and ground
- Differential input range: up to +/- 3.0 V between electrode and reference inputs
- Maximum input voltage range: up to =/- 5.0 V between any input and ground
- Crosstalk between channels: < 1LSB for all configurations
- High pass filtering: first order with 0.3 Hz corner in full-bandwidth mode; first order with 250 Hz corner in fast-settle mode
- Low pass filtering: third order Butterworth response with 7.5 kHz corner
- Headstage power supply: +/- 5.0 V output, up to 150 mA for powering optional headstages
- Headstage power connectors: Four 6-pin, 2 mm pitch female header (Samtec SQT series)
- Input connectors: Four 34 pin, 2 mm pitch male header (Samtec ZSTMM Series)
- Control/ Data output connections: MT-RJ fiber-optic port with 2-way 150 Mbps 8B/10B encoded data-stream and 32-bit CRC data validation
- Local ground connection: Binding post supporting up to 10 ga wire and standard 4.44 mm Banana plug
- Mounting options: 18 distributed 1/4-inch, 20 threads/inch standard mounting sockets
- Power dissipation: 5.5 W with four 32-channel boards
- External power supply: Five channel with monitoring, sequencing, and emergency shutdown control; Input: 120/240 VAC selectable 50/60 Hz 1.0 A max; Outputs: +5.0 V, 500 mA analog supply, -5.0 V, 500 mA analog supply, +3.3 V, 300 mA quiet digital supply, +3.3 V, 500 mA standard digital supply, 5.0 V, 300 mA standard digital supply
- Dimensions: 4.3" W x 1.7"H x 7.3"D
- Weight: 600 g

## Specifications for 128 Channel Neural Signal Processor

- Neural Signal inputs: 128
- Data sampling rate: 30,000 samples per second per channel
- Digitization: 16 bit
- Front-end input connectors: MT-RJ fiber-optic port for Front End Unit with up to 128 neural signal channels
- PC hardware interface: 100-Mbit or Gigabit Ethernet (must be separate from office/;Internet connection)
- PC software interface: Windows 2000 Professional or Windows XP
- Digital Signal Processing: adaptive line noise cancellation and 8th-order hi/lo pass digital filtering for all analog channels. Neural signal processing includes separate filters for simultaneous LFP and spike streams along with online spike extraction and classification using time/amplitude windows and/or template matching
- Experiment analog inputs: 16 +/- 5 V, 16-bit
- Experiment analog outputs: Four +/- 5 V, 600 Ohm, 16-bit
- Experiment digital I/O: One 16-bit input port (DB-37) with Word and Packet Strobe control lines, one RS232 I/O port (DB-9) with 2400 to 115k baud input and output; Four single-bit digital outputs (BNC) with programmable monitoring functions. One TTL output (BNC) sampling synchronization output port.
- Audio outputs: Two +/- 1V l;ine-level outputs with BNC and 3.5mm female connectors
- Multi-NSP synchronization: Two rear daisy-chain RJ-45 ports for synchronizing up to 8 NSP modules
- Power input: standard 3-pin PC power connector accepting 110-240 VAC, 50-60 Hz
- Dimensions: 3.5"H x 17"W x 19.3"D
- Weight: 6.8 kg.

Caution: Investigational Device, Limited by Federal Law to Investigational Use

© Copyright 2004, Cyberkinetics Inc. All rights reserved.

Query **_Brain Machine Interfaces_** against
document /darpatech2002/presentations/dso_pdf/speeches/eisenstadt.pdf

You can navigate between the hits using the "<<" and ">>" tags around a hit. Clicking "<<" takes you to the previous hit, clicking ">>" takes you to the next hit in this document.

**Click to go to the first hit in the document.**

**New Query**

Dr. Eric Eisenstadt Defense Sciences Office ( DSO) << Brain Machine Interface>>  Our office director, Michael Goldblatt, briefly touched upon the Agency' s bio vision and its four components: enhancing system performance, protecting human assets, enhancing human performance, and developing new tools for biology. As we bring this brief overview of the Defense Sciences Office to a close, I' m pleased to have the opportunity to describe our newest and boldest initiative in human performance enhancement —the << Brain Machine Interface>> . This program exemplifies how the office coalesces its expertise in materials, biology, and mathematics to create imaginative new opportunities that live at the << interface>> of multiple disciplines. Picture a time when humans see in the UV and IR portions of the electromagnetic spectrum, or hear speech on the noisy flight deck of an aircraft carrier; or when soldiers communicate by thought alone. Imagine a time when the human << brain>> has its own wireless modem so that instead of acting on thoughts, warfighters have thoughts that act. Later during DARPATech, you will hear from IPTO about efforts to create intelligent << machines>> . Our << Brain Machine Interface>> Program is about giving << machine-like>> capabilities to intelligence, asking the << brain>> to accommodate synthetic devices, and learning how to control those devices much the way we control our arms and legs today. Our path to realizing this vision is an interdisciplinary one —drawing from DARPA' s foundational investments, combining the best of materials science, mathematics and, of course, biology. The << brain>> ' s performance is dynamic and amazing. It contains perhaps as many as 100 trillion connections; this is vastly more than the mere 55 million transistors on a Pentium 4 chip. Understanding how these connections are used to process information and control behavior is one of the great challenges of our time. DARPA is exploring the << brain>> from a number of dimensions, from pharmacology and physiology to learning and behavior. Several efforts are looking at improving the ability of the bra<< in to>> process and retain data either by improving knowledge visualization or by active feedback and monitoring of the bra<< in' s>> ability to capture information and record data to memory. Other efforts are evaluating target sites and molecules for pharmacological intervention in cognitive processes. Several programs are drawing on DARPA' s strength in material science to develop devices that are orders of magnitude denser than those currently available. And, most important, several initiatives are leveraging DoD' s historical ability to locate the data within noisy environments. Our unique signal processing capabilities will be deployed to help us decipher the language of the bra<< in as>> we learn to record the chatter of millions of neurons communicating with one another in the language of action potentials, local field potentials, and chemical signals. Beginning almost 2 years ago, Science and Nature began featuring articles from a project in Alan Rudolph' s Controlled Biological Systems Program that reveal that honeybees translate optical flow data into spatial coordinates as a way to communicate the location of a food source to their hivemates. So insects use optical flow processing strategies in motion detection to

22

navigate with high maneuverability and speed when chasing targets, avoiding collisions, and finding reproductive mates. We have mimicked this capability in silicon by engineering microchips that control small, unmanned vehicles with the maneuverability of insects. We have demonstrated an autonomous helicopter, which can hover and do terrain following and collision avoidance at high speeds using optical flow. We also plan on using the chip in a 1-centimeter long micromechanical flying insect. And finally, to get the most bangs for our buck, we have just begun to partner with the Navy at China Lake to place a biomimetic seeker on a hydrorocket. We are betting that a fairly low-resolution rocket using biologically inspired signal processing algorithms on the front end could be used to find and hit a moving target with greater accuracy. The harbinger of our << Brain Machine Interface>> Program began with our foray into the creation of a wireless << brain>> modem for a freely moving rat. Here, we are able to create, in real-time, at a standoff distance, interactions with the << brain>> to allow us to control the motor behavior of a rat. The objective of this effort is to use remote teleoperation via direct interconnections with the << brain>> . These implants can last in the << brain>> for a year or more and are used to steer the rat by providing positive rewards to the rats (or other animal systems) as they perform in accordance with certain desires. As this movie of Roborat demonstrates, he can be directed to move in unusual and quite capable ways. Here, Roborat is demonstrating that we can obtain the kind of mobility and dynamic capability in locomotion that could be very useful in search and rescue or other surveillance opportunities. Most roboticists can appreciate that there is nothing in their labs that can move like this. The next obvious move in this direction is to use higher density interconnects to create and collect information from the << brain>> in other regions associated with sensory input. Why? As just one example, imagine if we could plug into the olfactory cortex region of the << brain>> and interpret from a distance what an animal smells. Is that cocaine? Explosives? A rat-fearing human? You may have read recently about clinical experiments using a retinal implant that utilized a prosthetic device carrying an array of only 16 elements that enabled blind patients to discriminate light from dark and shadows. But to provide a blind person with the ability to see images, prosthetic vision devices require much higher resolution. We are about to find out what happens when you plug high-density interconnects into the visual sensory system. Another project in the Controlled Biological System Program —a collaborative effort between investigators at Johns Hopkins University and the Naval Research Laboratory —developed a nanochannel glass array containing 3, 200 elements that can communicate with the retina compared to the 16 that were used in the current experimental devices. Images from a digital camera will be transferred via the high-density nanochannel array to the retina and to the << brain>> , where an image will be created. Wires are now used to transport images from the digital camera to the nanoarray. In the future, however, images will be transmitted wirelessly. We anticipate that within a year or so, the new high-resolution device will be in human clinical trials. These and other projects involving high density interconnects with the << brain>> seduced DARPA to further investigate interactions with other regions of the << brain>> . We are creating new high-density interconnects for << brain machine interfaces>> that will allow us to monitor the << brain>> patterns associated with a wide variety of behaviors and activities relevant to DoD. And now we are equipped to aggressively begin moving beyond acting on thoughts to having thoughts that act. Hence, the recently initiated << Brain Machine Interface>> Program. This program was launched to demonstrate the use of << brain>> activity to command, control, actuate, and communicate with the world directly through << brain interfaces>> . Initially theses interactions are with peripheral devices, but

23

Case 1:07-cv-00151-RMU    Document 12    Filed 03/28/2007    Page 9 of 21

ultimately it may be interaction with another << brain >> . The first peripheral devices were robotic arms. Three research groups supported by DARPA recently demonstrated that when a monkey is trained to do a peripheral motor task, such as reaching for a piece of fruit, the executive command activity associated with that behavior can be intercepted and then used to control artificial devices that execute the same movements. In a closed loop, the monkey can learn to drive a peripheral device —or a cursor on a screen —using only its brain' s<< exec >> utive motor commands. We are pushing hard to study how to provide the sensory feedback directly to the << brain >> of the experience of that peripheral device. The << Brain Machine Interface >> Program is asking the << brain >> to accommodate synthetic devices and learn how to control these devices much the way we control our arms and legs. There are a number of important new materials and signal-processing questions that we will be asking in terms of controlling more complex kinds of DoD-related technologies, such as exoskeletons or airframes. Additionally, even the most aggressive proponents of the << brain machine interface >> vision recognize the longterm need to be able to noninvasively capture the << brain >> 's internal communications, to listen and understand without having to implant hardware. Who knows . . . if we can eavesdrop on the << brain >> , maybe we can sort out deceit from honesty, truth from fiction. What a lie detector that would be! The skills required to make this happen —math, biology, material science, physics, and imagination —represent many of the strengths of the Defense Sciences Office. Thank you.

# MEMO

## Washington trip 12-01-03 to 12-03-03

12-01 left for airport. Stop for paper in gas station D.A.P.D. in station. Arrived airport, checked in, went to secure area. Sat in coffee shop and read paper. Two Sheriff were company for an hour.

Arrived Atlanta and sat in lounge, hands started trembling, could not lift glass to my lips. (see yellow folder pg. 100 notes. dtd.. 11-24-03.)

Picked up Hertz rental car at Reagan National and drove to Washington Terrace Hotel. 7:00 pm phoned my wife to let her know everything ok. Ten minutes later my wife called to tell me that a man had left his wallet in the rental car that I had. I phoned Hertz and they told me to please look in car for a wallet. I spoke with front desk to check for same with no luck. Woman at front desk thought that that was kind of odd.

Later had dinner down stairs and came up and went to bed. 10:00 pm door slamming begin and continued until after 12:30 pm. At 3:30 am woke me to high pitch tone and head ache freq; no sleep after. Got up at 6:00 am, same head ache but more intense. I was so tired I could not think strait or converse intelligently with a person.

Went down for breakfast 6:45 am. Noticed in hall that newspapers were at my door, across the hall and next door. None all the way to the elevator, which was a good seventy-five feet.

Went up to my room and saw Washington P.D. parked out front for an hour. I phoned Attorney Wheat and left word of my cancellation and that I would reschedule at a later date. At noon headache freq. subsided. Dropped documents off at Atty. Merten office, which he had requested.

(see memo) Left brain wave documents at G.A.P. Office.

I went to airport to exchange flt. tickets to leave one day early.

12-03-03 wake-up at 4:00 am to tone. Arrive Atlanta Airport Terminal to tone and head ache freq. Eyes hurt from pressure. (see yellow folder pg. 100- notes. dtd. 11-24-03.) Torture ended as soon as I boarded the plane for Daytona Beach. Arrived Daytona Beach, Sheriff at plane hatch when open.

Driving home with my wife, I drove right by street we were to take. D.A.B.P. at corner. D.A.B.P. around corner of our street.

……jem…..

# M.E.M.O.

## Washington trip 03-02-04 to 03-04-04

03-02-04 Arrived Washington DC. Drove to E.P.I.C. and Attorney Wheat's Office to familiarize myself with the route from the hotel to the offices I plan to visit.

Note: E.P.I.C. (Electronic Privacy Information Center and Attorney Wheat Office are both located on Connecticut Avenue); a distance of approximately 1.0 mile. There are three rotary circles from the hotel to the offices. There are six local streets entering each rotary. Time for trip to first office 25 minutes normal. Did trip from hotel to Connecticut Avenue twice.

03-03-04 wake-up was at 4:00am by b/w electronics. Left for E.P.I.C. at 8:30am, arrived at 10:00am. Had four wrong exits at rotary,s. Day before, had no problem. Felt like site seeing tour.

Spoke with Chris at E.P.I.C; gave him the information and paper work on brainwave technology. Also court case information. He pointed out N.A.S.A. had spoke with him on the subject and indicated to me he would be in touch.

Spoke with Cathy; Attorney Wheat legal secretary and left her a memo of 12-02-03 visit, also documentation of some brainwave incidence. Left her brainwave theory information manual. She said she would present them to Attorney Wheat.

Note: usual brainwave takeover at both meetings.

Return to hotel, head ach freq. xmitted. Left for walk, W.D.C.P. parked on corner. Left for dinner 6:00pm. Walked after, W.D.C.P. parked front of hotel as I walked by twice in half hour.

03-04-04 wake up call 4:30am. (brainwave)

Note: No clicking, no heavy heart beat as I toss and turn in bed.

…..j.e.m……

# MEMO

## Cont. Washington trip. Lawyer contact.

Called Attorney Wheat office 01-05-04 to reschedule appointment. Explained to Cathy, who I was and asked her for an appointment on 01-13-04. She told me she would get back to me the following day, 01-06-04. I recall asking her name, she told me at the beginning of our conversation. This is an example of what takes place when I discuss this case with an attorney. The end result as always is no return call. Your conversations are all controlled.

27

# ELECTRONIC PRIVACY INFORMATION CENTER

# About EPIC

EPIC is a public interest research center in Washington, D.C. It was established in 1994 to focus public attention on emerging civil liberties issues and to protect privacy, the First Amendment, and constitutional values.

EPIC publishes an award-winning e-mail and online newsletter on civil liberties in the information age – the EPIC Alert. We also publish reports and even books about privacy, open government, free speech, and other important topics related to civil liberties.

We have no clients, no customers, and no shareholders. We need your support.

---

**Contact EPIC:**

Electronic Privacy Information Center
1718 Connecticut Ave. N.W.
Suite 200
Washington, DC 20009

tel: +1 202 483 1140
fax: +1 202 483 1248

Press and general inquiries: info@epic.org
Publications inquiries: bookstore@epic.org

EPIC Staff and Board Directory

---

EPIC Home Page

Met with Chris Hoofnagle, Associate Director. We discussed Brain Waive Technology

and the fact that NASA is experimenting with its uses. I left him what information that I

had and to keep in touch. Met with him on 03-03-04. jem

28

http://www.epic.org/privacy/profiling/

```
================================================================
```
[5] NASA: No "Mind-Reading" Technology Without Independent Review
```
================================================================
```

EPIC recently obtained documents under the Freedom of Information Act
(FOIA) that show NASA researchers have proposed the use of
"non-invasive neuro-electric sensors" for airport security.  These
sensors would act like "super lie-detectors," according to NASA
officials, and would be integrated into the security check.  In
response to a Washington Times article based on those documents, NASA
issued a press release stating that it has not approved of any
research in the area of "mind reading" and that "because of the
sensitivity of such research," the agency would seek independent
review before granting approval to future projects.

This information was part of a briefing NASA made to Northwest
Airlines in December 2001 on the ways NASA could assist aviation
security.  Other measures outlined in the briefing included extensive
data mining and risk profiling of all airline passengers.  The
documents were obtained as part of an FOIA lawsuit EPIC initiated
against the Transportation Security Agency.  While the brain scanning
technology might be a distant possibility, the documents highlight the
risk of the government funding the development of new surveillance
technologies without appropriately considering their potential impact
on society.

NASA Ames Research Center Northwest Airlines Briefing:

     http://www.epic.org/privacy/airtravel/foia/foia1.html

EPIC Air Travel Privacy Page:

     http://www.epic.org/privacy/airtravel

NASA Press Release:

     ftp://ftp.hq.nasa.gov/pub/pao/pressrel/2002/02-160.txt

NASA Plans to Read Terrorist's Minds at Airports, Washington Times,
August 17, 2002:

     http://www.washtimes.com/national/20020817-704732.htm

NASA Watch on the information behind Washington Times story:

     http://www.nasawatch.com/misc/08.19.02.mindreading.html

```
================================================================
```
[6] EPIC Bill-Track: New Bills in Congress
```
================================================================
```

*House*

H.R.5117 Making supplemental appropriations for the Department of
Defense for the fiscal year ending September 30, 2002, and for other
purposes. Sponsor: Rep Young, C. W. Bill (R-FL). Latest Major Action:
7/15/2002 Referred to House committee. Status: Referred to the House
Committee on Appropriations. Committees: House Appropriations.

**NASA Watch**

19 August 2002

**Editor's note:** A helpful NASA Watch reader sent us the following in response to the slightly silly (but not alltogether incorrect) article "NASA plans to read terrorist's minds at airports" that appeared in the Washington Times last weekend:

---

I have been able to infer that the NASA proposal will likely use sensors that are relatively close to the passengers (similar to the wands) only these will be picking up EEG/EMG readings. How the data can be correlated in any way seems far fetched. The following data are the PUBLIC sources of data I have gathered about the NASA project.

The following seems to be the NASA Ames group working on this project

(EXTENSION OF THE HUMAN SENSES GROUP, NEURO-ENGINEERING, COMPUTATIONAL SCIENCES DIVISION). http://ic.arc.nasa.gov/projects/ne/ehs.html Their projects include EEG Pattern Recognition which aims to improve performance of NASA missions by developing brain-computer interface (BCI) technologies for augmented human-system interaction and EMG Pattern Recognition. Solicitations for NASA Passenger Profiler are listed at the following web sites:

- http://www.eps.gov/spg/NASA/ARC/OPDC20220/RFQ2-38121-MXS/SynopsisP.html

- http://www.fbodaily.com/archive/2002/04-April/19-Apr-2002/FBO-00061682.htm

which discuss Voquette Inc.-----

*"NASA/ARC plans to issue a Request for Quotation (RFQ) for a production data acquisition and organization capability to enable the continued development of NASA/ARC's Aviation Security Passenger Screening System. The system will demonstrate the Information Technology capabilities developed at ARC and the relevance of those technologies to ensuring flight safety through the identification of potentially threatening passengers. NASA/ARC intends to purchase the items from Voquette Inc, of San Mateo, CA (1) based on its unique capabilities to provide production data acquisition software and to provide speed of data acquisition. Voquette software has already been used to develop a baseline database generation capability at NASA Ames. In order to continue this development, NASA Ames intends to procure a license to the Voquette software so that Ames personnel can develop new capabilities in-house. This data acquisition system is a critical building block for the baseline database generation capability and must be established immediately. Other factors for the procurement include the speed of data acquisition of the Voquette product, Voquette's experience in the development of terrorist information systems, and Voquette's exclusive patent rights to a semantic processing capability, enabling the aforementioned delivery of data pertinent to the situation and the dynamic definition of "interesting" data. Continuation of the use of Voquette software is also expected to be cost-effective with regards to installation, personnel training, engineering services from company experts, and the expense of further interruption in the development of the system, supporting the Ames role in Aviation Security."*

Apparently this contract was awarded and listed in the following web site
http://prod.nais.nasa.gov/cgi-bin/facs/adhoc.cgi (search under VOQUETTE's name for FY 2002)
30

The following is the text of the search:

"Contractor VOQUETTE INC
SAN MATEO CA
Contract Number A 65489D
NASA Center ARC- Ames Research Center
Place of Performance SAN MATEO CA
Award Date 12/19/2001
Completion Date 02/19/2002
Contractor Type Business, Not Disadvantaged
Award Type Fixed Price, Firm
Current FY Obligations $95,840
Total Obligations $95,840
Total Award Value $95,840
NAICS Code: 541511
Description of Work NASA PASSENGER PROFILER SYSTEM

Contractor VOQUETTE INC
SAN MATEO CA
Contract Number A 66295D
NASA Center ARC- Ames Research Center
Place of Performance SAN MATEO CA
Award Date 05/07/2002
Completion Date 08/07/2002
Contractor Type Business, Not Disadvantaged
Award Type Fixed Price, Firm
Current FY Obligations $79,200
Total Obligations $79,200
Total Award Value $80,000
NAICS Code: 541511
Description of Work SOFTWARE LICENSE AND MAINTENANCE"

Another item of interest that is being bought is the following: http://prod.nais.nasa.gov/cgi-bin/eps/synopsis.cgi?acqid=101874 which mentions QUASAR Co. as the source for sensors.

"NASA/ARC plans to issue a Request for Quotation (RFQ) for a set of four parallel sensors (8 non-contact electrodes in 4 differential pairs). Capacitively coupled contactless electrodes for use with Electromygogram (EMG) and Electroenecephalogram (EEG) detection. NASA/ARC intends to purchase the items from Quantum Applied Science and Research (QUASAR), 6730 Mesa Ridge Rd., Suite A, San Diego, CA 92121. QUASAR is the only company that manufactures these contactless EMG and EEG electrodes."

The reason this seems applicable to the project, though not stated directly, is another site: http://www.arpa.gov/DSO/thrust/sp/metaEng/quasar.html This site is from the Defense Advanced Research Projects Agency's (DARPA) Defense Sciences Office (DSO) and states

"Recent sensor development has produced a capacitive electric potential sensor capable of reaching the microvolt level from 1 Hz to 10 kHz. The free space potential is sensed using a small, unobtrusive, non-contacting thin metallic electrode that can be used through clothing. This advance opens up the possibility of including high resolution ECG and EEG capability into the Land Warrior medical equipment package."

31

**Return to NASA Watch**

John E. Moore
9 Pleasant View Cir.
Daytona Beach, FL.
32118-5511
386-761-8193

January 20, 2004

Department of Transportation
Federal Aviation Administration
800 Independence Ave. SW
Washington, DC
20591-3484

Subject: Airport Security.

Reference: Metal Detector. (Body Search)

Dear Sir or Madam:

I am writing this letter to inform you of what I believe is a flaw in your metal detector
body search equipment.
Listed are four incident of none alarm entry into a secure area of an air terminal having a
metal object on my person. (stainless steel watch) This type of metal does not contain any
iron substance and no reaction to magnetic proprieties. (lines of flux)

1, DAB--12-01-03--12:00N--FLT.DL4502
2, WASH.R.NAT.--12-03-03--11:05AM--FLT.DL1897
3, DAB--01-15-04--07:15AM--FLT.DL1024
4, MCH. NH.--01-19-04--7:35AM--FLT.DL385

The first time I mistakenly forgot to remove it prior to my passing through the detector.
The next three times it was more of a test of the system. The latter three provided the
same results as the first.
I hope that this information will be of some value to your organization, and foremost to
your security system.
Please inform me of your results or findings in reference to this information that was
provided to you.

Respectfully,

John E. Moore

33

# M.E.M.O.

03-05-04

Ref: Additional information to my ltr. dtd. 01-20-04.
      Federal Aviation Administration.

5, Federal Bldg. Ord. 02-18-04....1:35pm. watch, sun glasses.
6. DAB. 03-02-04...07:00am. Flt...Dl.1024. No watch, No alarm.
7. Wash.R.Nat. 03-04-04...11:05am. Flt...Dl.1003

04-13-04—1:35pm

8. Visit to Federal Bldg.Ord. 04-05-04, Metal detector body search equipment.
After passing through search section of detector, I brought to the attention of
the security guard that I had my wrist watch on with no alarm indication. He
said to me that some time it does not detect a watch. He used his hand
detector and it caused an alarm when pointed at my watch.

## washingtonpost.com

# Use of Implanted Patient-Data Chips Stirs Debate on Medicine vs. Privacy

By Rob Stein
Washington Post Staff Writer
Wednesday, March 15, 2006; A01



When Daniel Hickey's doctor suggested he have a microchip implanted under his skin to provide instant access to his computerized medical record, the 77-year-old retired naval officer immediately agreed.

"If you're unconscious and end up in the emergency room, they won't know anything about you," Hickey said. "With this, they can find out everything they need to know right away and treat you better."

Roxanne Fischer felt the same way, and she had one of the devices injected into the arm of her 83-year-old mother, who has Alzheimer's disease. "I may not be available if she ends up in the emergency room. This gives me tremendous peace of mind," Fischer said.

The two D.C. residents are among just a handful of Americans who have had the tiny electronic VeriChip inserted since the government approved it two years ago. But the chip is being aggressively marketed by its manufacturer, which is targeting Washington to be the first metropolitan area with multiple hospitals equipped to read the device, a persuasive factor for Fischer and Hickey. Within weeks, the first hospital is expected to announce plans to start routinely scanning all emergency-room patients.

Some doctors are welcoming the technology as an exciting innovation that will speed care and prevent errors. But the concept alarms privacy advocates. They worry the devices could make it easier for unauthorized snoops to invade medical records. They also fear that the technology marks a dangerous step toward an Orwellian future in which people will be monitored using the chips or will be required to have them inserted for surveillance.

"It may seem innocuous, but the government and private corporations could use these devices to track people's movements," said Liz McIntyre, who co-wrote a book warning about the dangers of such radio-frequency identification (RFID) technology. "It may sound paranoid, but this is bound to be abused."

The devices, originally developed to track livestock, have been implanted in more than 6 million cats and dogs to trace lost or stolen pets. For medical identification, the device -- a microchip and a copper antenna encased in a glass capsule about the size of a grain of rice -- is inserted, usually under the skin on the back of a patient's arm, in a quick, relatively painless procedure. Each unit, which lasts

35a

Use of Implanted Patient-Data Chips Stirs Debate on Medicine vs. Privacy    Page 21 of 21    Page 2 of 4

Case 1:07-cv-00109-RMC    Document 22-7    Filed 06/22/2007

indefinitely, transmits a unique 16-digit number that can be read by a handheld scanner. The number is used to locate a medical record previously stored on a secure Web site.

Using the system, emergency-room doctors could scan unconscious or incoherent patients to quickly check their blood type and find out if they are taking any medications or have allergies or other medical conditions. Nurses could identify family members and determine whether patients are organ donors or have living wills. Surgeons could scan patients on the operating table to make sure they are working on the right person.

VeriChip Corp. of Delray Beach, Fla., is selling kits containing scanners and the large-bore needles used to insert the chips, and recommending that doctors charge patients about $200 each. The company has sold about 2,500 chips worldwide for use in people, and several hundred have been implanted, including about 100 in the United States, spokesman John Procter said. So far in the United States, however, most of the chips have been implanted into the company's own employees. Suspecting that many people are hesitant to get the chips until more emergency rooms are able to scan them, the company has begun giving scanners to hospitals for free, Procter said.

Hackensack University Medical Center in New Jersey became the first hospital to begin routinely scanning emergency-room patients last summer, and about a dozen people in that area have now been "chipped," Procter said. About 80 other hospitals nationwide have agreed to follow, a number the company hopes will reach 200 by the end of the year.

Many of the hospitals, including three in the Washington area, have received scanners and started training their emergency-room staffs in their use, he said. Procter declined to name the hospitals until they formally announce their plans.

One area doctor has begun implanting the chips.

thought this would be important to offer to many of my patients," said Jonathan Musher, a Chevy Chase physician the company hired to help recruit hospitals and assemble a nationwide network of doctors offering the chips. "With this, a quick scan back and forth across their arm could make all the difference in critical life-and-death situations where seconds count."

Privacy advocates, however, worry that the devices are prone to invasion because they can be surreptitiously scanned from a distance.

"As far as I can tell, there are no security measures taken with the chip. It's not a secure chip," said Richard M. Smith, an Internet and privacy consultant in Boston. "There's nothing to stop someone from accessing the code and cloning the chip" to access records, he said.

Even though the medical information is stored in a protected computer, anyone with a password could obtain the information.

"Once the identification number is obtained, who gets to decide who gets access to the Web site?"

35b

Use of Implanted Patient-Data Chips Stirs Debate on Medicine vs. Privacy    Page 1 of 29    Page 3 of 4

Case 1:07-cv-00107-RMC    Document 22-8    Filed 06/22/2007

asked Janlori Goldman of the Columbia College of Physicians and Surgeons, who heads the Health Privacy Project, a Washington-based research and advocacy group. "Can law enforcement have access? Can public health workers have access? Can employers have access? Given the recent efforts by law enforcement and data monitoring by the government, this is exactly the kind of technology that would be attractive."

And, like any computerized database, it could be vulnerable to hackers.

"We know from many other examples that there are lots of security breaches that occur across the country," said Marc Rotenberg of the Electronic Privacy Information Center, another Washington research and advocacy group. "There's no reason to think this will be any different."

Company officials and other proponents say the device and accompanying system are carefully designed to protect recipients.

"The privacy of VeriChip's customers is our highest priority," said Scott Silverman, the chief executive of Applied Digital Solutions Inc., the firm's parent company. "Both the amount of information and who has authorized access to that information is determined by the user."

Others worry about how the devices will be used in the future.

"This device is intended to uniquely number humans. It's embedded in the flesh, and it's permanent. It can be read without someone's knowledge and consent," McIntyre said. "Scanners can be installed in doorways or ceiling tiles to track people's comings and goings without people even being aware it's happening. That's not so far off."

Company officials scoff at those fears.

"Some people say, 'Oh, my God. It's "1984." It's George Orwell,' " Musher said. "But this is a passive device. It's not controlling or tracking anyone."

The company is, however, marketing the devices to limit entry to secure facilities. The Mexican government is using the implants like key cards for high-security offices. And CityWatcher.com of Cincinnati, which stores surveillance-camera footage from around the country, recently started using the chips to control access to tapes. Bars in Spain and Amsterdam, meanwhile, are offering the chips to patrons who want quick entry and to run electronic tabs.

"We're just waiting for the first case where a convicted sex offender on condition of release is required to have a VeriChip implanted," Rotenberg said.

For their part, Fischer and Hickey hope the devices catch on.

"This is the wave of the future," Fischer said. "I'm looking at this from the positive side. To obtain optimal care, I think we have to take advantage of the best technology available."

35c

boston com

THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

# FDA works to make metal implants safe in MRI

The Boston Globe

**By Lauran Neergaard, Associated Press | September 28, 2004**

A mannequin skull sits in an MRI machine, about to be filled with a thick, brainlike gel.

MRIs are required tests for numerous disorders. But they are off-limits for millions of patients with certain implants, such as pacemakers or brain electrodes. The scanners can dangerously heat the metal parts.

"The MRI industry thinks it's simple: 'Don't use' " in those patients, said the Food and Drug Administration's Larry Kessler. "That's not the end game."

Instead, amid pressure from doctors, the agency wants to speed development of MRI-compatible implants. Hence the mannequin, part of a little-known FDA research program where 140 scientists probe the pitfalls and promises of medical devices.

Much of the work by Kessler's $21 million Office of Science and Engineering Laboratories is aimed at helping the FDA better analyze new devices before approving their sale.

Recently, a man was left temporarily comatose after an MRI scan was performed even though he had a "deep brain stimulator," an implant increasingly used to fight Parkinson's disease and other tremors.

FDA scientist Howard Bassen filled the mannequin skull with a gel substance similar to the consistency of the brain. He attached electrodes from a deep brain stimulator and zapped the skull with the radio waves that MRIs emit. The electrodes' temperature rose more than 20 degrees in five seconds, Bassen found. Heat concentrated at the tip where it literally can burn a hole in delicate brain tissue. The thinner the wire, the hotter it got; that is important for recognizing which devices are riskier. ∎

© Copyright 2004 The New York Times Company

Case 1:07-cv-00107-RMB    Document 22-3    Filed 01/22/2007    Page 3 of 4

# boston.com

THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

# High-tech images open window into the skull

The Boston Globe

**By Carolyn Y. Johnson, Globe Correspondent | September 28, 2004**

Both women had trouble speaking and moving their right sides when they showed up recently at Massachusetts General Hospital's emergency room. The patients, who didn't know each other, were roughly the same age and had similar symptoms, but imaging technologies quickly changed the arcs of their stories.

One woman's brain scans showed an incurable, malignant tumor that left her with a life expectancy of eight months. The other was sent home with a prescription for blood thinners after a bright spot on her scan indicated that she had had a minor stroke.

"We were able to diagnose them within an hour in the emergency room," said Dr. Gilberto Gonzalez, chief of neuroradiology at the hospital. "In the old days, it could have taken a week or more to sort [their diagnoses] out."

It's just one example of how the ability to see inside the brain without cutting it open has revolutionized doctors' abilities to understand and treat one of the body's most complex organs. By superimposing images of the blood flow, chemistry, and electricity that keep the brain alive, doctors can create a multidimensional map that can help them find, treat, and monitor neurological diseases that were once visible only through autopsies or surgery.

Better imaging also has pushed the limits of treatment, as new therapies spring up for stages of disease that were never previously seen.

Before scanners began to proliferate as clinical and research tools, Gonzalez said, "we didn't treat [patients], essentially; we'd watch them." New treatments were often tested "the hard way," by giving brain tumor patients a proposed drug therapy and then waiting to see who lived and who died. Many stroke victims faced paralysis or death, even if they got to the hospital quickly. When surgeons opened up the brain to look for a problem, they were handicapped by the lack of information about what was wrong and where they needed to look.

The window into the brain began opening in the mid-1970s with the introduction of a more sophisticated X-ray called computerized tomography, or CT, which shows both bone and some tissue. In the 1980s, the window inched open a bit more with the introduction of magnetic resonance imaging, or MRI, which reveals structure, tissue, and blood flow, a sign of activity in different areas of the brain.

"If we look at those images now, we're shocked; they look so crummy," said Alexandra Golby, a neurosurgeon at Brigham and Women's Hospital.

Over the past decade, variants of MRI and CT have expanded the kinds of topographical features that brain mappers can find to blood vessels, tissues, physical structure, and nerve fibers that connect different areas.

In a darkened room off Mass. General's emergency ward, Gonzalez called up pictures last week that told the story of a potential tragedy: a 38-year-old woman with two children who collapsed on her kitchen floor and was rushed to the hospital from her home in the North End.

A variant of MRI showed that a small region of her brain was dead from a stroke and that a large portion was still at great risk. A medical team used a CT scan taken just after she was admitted to hunt down the blood clot that caused her stroke.

Doctors then threaded a catheter through an artery to reach the clot and injected a drug to break it up. A later scan showed that a whole network of spidery blood vessels cut off by the clot had basically come back to life.

36

Case 1:07-cv-00107-RMC    Document 22-8    Filed 06/22/2007    Page 4 of 29

"After this procedure, she could talk, and she could move, and she literally walked home three days later," Gonzalez said.

Brain images have also provided doctors with better choices and more information, transforming long-existing treatments from a crapshoot to an informed choice.

Now, when surgeons decide to remove tumors, they have a better, though still not perfect idea of what they are slicing through and can steer around regions responsible for thought, talking, or movement.

Golby, a neurosurgeon since the infancy of combined imaging and surgery in 1996, worked with her team to develop what they describe as a global positioning, or GPS, navigation system for the brain. During surgery, she can point a wand to any portion of the patient's brain and see where she is on a computer image of the brain, which also incorporates information from other scans.

Understanding the meaning of these images remains a huge problem. "When you speak to me on the telephone, you may be using 58 different parts of the brain, but maybe only 20 of those are essential for you to speak to me," Golby said during a phone interview.

Her scans show her the 58 crucial areas, but don't tell her which 38 are not essential and could therefore be cut during surgery.

So, Golby looks for ways to relate her images to the current "gold standard" in brain mapping. In that system, surgeons, working with patients who are awake during surgery, identify crucial areas by zapping them with tiny electric currents and seeing what happens to the patients.

Golby looks forward to the day when the scans alone will give her a seamless map of the brain under her scalpel. "It would be great," he said, "if we'd have a definitive answer to the question: Someone's got something in their brain; what is it?"

*Carolyn Johnson can be reached at cjohnson@globe.com.* ∎

© Copyright 2004 The New York Times Company

# pitfalls in digital evidence

**By BRIAN BERGSTEIN**
ASSOCIATED PRESS

When Victor Reyes went on trial for murder last year, the technology that fingered him was supposed to be a star witness.

Police in Florida had used software known as More Hits to determine that a smudged handprint they had found on duct tape wrapped around a body — but originally couldn't decipher — implicated Reyes in the 1996 killing.

The judge let prosecutors introduce More Hits' digital enhancement. But the defense called it "junk science" and had an art professor testify that the process resembled how Adobe Photoshop can be used to make trick-photo illustrations.

Reyes was acquitted.

Jurors said they based their decision mainly on the notion that the print didn't prove Reyes was the killer — not on the legitimacy of More Hits' method. And a Florida appeals court later ruled that More Hits' technology — used by 215 U.S. police departments — is acceptable.

Still, some defense attorneys learned a lesson: Get more aggressive about challenging digitally generated evidence.

"Now, whenever you hear the word enhancement, an antenna goes up," said Hilliard Moldof, a



A computer scene shows an enlarged digital image of a smudged fingerprint from a crime scene Tuesday at the police forensics lab in Salem, Ore.

Florida defense attorney who is questioning digitally enhanced fingerprints in two cases.

As more police departments abandon chemically processed film in favor of digital photography, the technology could be confounding for the justice system.

Film images are subject to darkroom tricks, but because digital pictures are merely bits of data, manipulating them is much easier. And although willful evidence manipulation is rare, forensic specialists acknowledge that a poorly trained examiner incorrectly using computer enhancement pro-

grams can unwittingly introduce errors.

"What you can do in a darkroom is 2 percent of what Photoshop is capable of doing," said Larry Meyer, former head of photography for State Farm Insurance Co.

Courts have consistently allowed digital photographs and enhancement techniques. But some observers say such methods should endure a more thorough examination, as have technologies such as DNA analysis.

"There have been relatively few challenges to the use of digital technology as evidence and,

in most of them, the courts have looked at them in a fairly superficial way," said Edwin Imwinkelried, an evidence expert at the University of California-Davis law school.

Concerns about the impeachability of digital photographs are one reason many police departments have been hesitant to ditch film for crime scene photographs and forensic analysis.

In fact, some people who train law enforcement agencies in photography estimate that only 25 percent to 30 percent of U.S. police departments have gone digital — despite the huge cost benefits of no longer having to buy film and the ease with which digital pictures can be captured and disseminated.

Some law enforcement officials also worry about the limitations that still plague digital photography.

Digital pictures can't be blown up as clearly for courtroom displays as film photos. Or the compression needed to store a digital file on disk can make the image blurry or blocky, potentially obscuring key details.

"Digital imaging for the most part has a long way to go to meet the quality of film," said Richard Vorder-Bruegge, an FBI forensic expert who chaired a panel that wrote guidelines for law enforcement use of digital imaging.

## ROBOT

### Simulator mimics humans

**SARASOTA —** Stan can be shot and suffer the effects of nerve gas. He can bleed and he can die. He can even complain or yell out in pain when doctors work on him.

Stan, a lifelike medical training simulator, has helped train physicians and nurses for years. Now, he's helping to train military medics and emergency crews who would respond to a terror attack.

People involved in such training say Stan — short for Standard Man — is so lifelike that medical personnel can feel his pulse, hear him breathe and see his eyes dilate as a computer program causes him to react to different scenarios.

— *Associated Press*

*01 - 11 - 04*

## HEALTH

### Biofeedback, PCs help with autism

**GREENSBORO, N.C. —** Biofeedback and computers are helping 8-year-old Ricky Stone with his autism and learning disabilities. The breakthrough is an alternative to traditional medicinal treatments: a computer game, "Play Attention," that is all about moving images on a computer screen with one's mind.

Built on technology originally used by NASA and the Air Force, "Play Attention" taps into brain waves through a red bike helmet lined with sensors, which send information to a computer to control scenarios on the screen.

For example, Ricky plays a game in which a whale swims in the ocean. The more Ricky focuses on the whale, the deeper it swims, and Ricky's score jumps. A high score can't get Ricky too excited because, without his full concentration on the whale — which he nicknamed Shamu — the whale swims to the surface.

— *Associated Press*

# Virtual patients new medical training tool

**By LINDA A. JOHNSON**
ASSOCIATED PRESS

**NEW BRUNSWICK, N.J. —** The days of new doctors practicing on real patients may be numbered.

Today, many doctors in training are making their first diagnoses — and their first mistakes — on plastic, wires and computer circuits rather than flesh and blood. These virtual patients come in different shapes and sizes, much like the real ones.

Some are almost lifelike mannequins with plastic ears and hair, veins that can be injected, eyes that can move and interchangeable genitals. They can't be hurt or killed, even though they have a pulse, a beating heart and lungs that breathe. The most sophisticated can be programmed to simulate every imaginable medical crisis and then respond as a doctor works on the "patient."

Other, virtual reality-type simulators combine video or computer images with tactile feedback. Trainees insert needles or surgical tools into a plastic box whose innards give the sensation of cutting flesh or pushing through body parts such as the throat or colon. A video screen shows what a doctor would watch during the procedure, such as ultrasound images.

"Do I think this is a wave of the future? No question," said Dr. Stephen Miller of the American Board of Medical Specialties, which oversees certification for medical specialists. "This is a major goal of the medical education and evaluation system."

The top systems are pricey but so realistic that experts predict they'll become standard for training new doctors and for testing experienced ones who soon will face tougher recertification.

Scaled-down simulators cost at least $40,000 and the most high-tech ones cost well over $200,000. Because different simulators teach different skills, putting together a bare bones lab costs at least $600,000 and a top-notch center can cost $2.5 million.

39

P/O Exibit "I" pg.1m          **M.E.M.O.**

December 29, 2003

Excerpts from some of the day to day incidence pertaining to brain control.

Pg. 63-dtd.8-23 Had optical problem with left eye, (see diagram) lasted approx. 15 min. While driving home from P.O. same optical problem occurred for 10 min. Went to pick up S.K. eye problem re-occurred for 15 min.

eye diagram



Pg. 90-dtd.7-28 Left for Allstate Ins. P.O; P.O.P. on Nova Rd. Head ache freq. on at office, hi gain, eyes hurt, could not recognize Christy, who I spoke with last wed.

Pg. 91-dtd.7-31 C.M. and I were watching T.V. at 6:30pm, clicking in left ear started. I mentioned to her the problem and that it came on while I was on the phone talking to Diane the evening before. C.M. mentioned to me she has had a tone in her ear the last couple of years. Clicking ended.

Pg. 91-dtd.8-06 Went to P.O. to pay Allstate Ins. (no head ache freq.) P.O.P. on side of road across from ins. office. I could not recognize Christy again.

Pg. 92-dtd.8-23 Left for S.K. at 1:30pm watch football, came home at 3:30pm. Went to gas station, had to fill tank for trip to Orlando, take S.K. to work. Started to pump gas, head ache freq. On. Motor scooter pulled up at other pump, had law bike helmet on. (had high gain on freq; could not read pump info.) I stopped pumping gas and started again. When I went to pay the attendant, he was upset that I had two totals on slip. I apologized to the attendant, and drove out. D.A.P.D. half way home and turned around and followed me, no head ache freq. now.

Pg. 88-dtd.7-01 Have new torture trick, makes tick like sound 10 to 20 sec. apart. Makes sound like it is emitting from nose, ears, or throat. Later nose sore and running during the day.

Pg.102-dtd.12-20 CM&I having coffee this morning. Clicking started in left ear and I told her. She said that she hears her heart beat in her ear, as I do, when they do their torture.

1...................................jem

Pg.102-dtd.12-29 New clicking location, throat. Told CM it was happening and clicking ended. Also told her that it is part of electronic torture.

Pg.100-dtd.11-24 Called two attorneys in Washington. Began studdering and trembling. Could not remember phone numbers I was dialing.

Pg.105-dtd. 02-24 Spoke with Skippy at Dependable Civil Process, (brainwave xmit. head ach. Could not carry on normal conversation. She said to bring summons to her at 2:30pm. Head ach freq. high gain, could not go, felt bad.

Pg.106-dtd. 03-08 Woke CM up at 3:00am, me 3:30am, clicking, tone, head ach freq. Went to drop off summons at Dependable Civil Process. One DABP, one Sheriff on way. #11 lid up in van. Sheriff helper while I was there. All United Security was at corner of street.

Pg.106-dtd. 03-11 I was reading phone bill on P.C. CM came in and asked same question three times. Felt pain, temporal bone, became upset. (chopper) SK called at 2:22pm. 2:45pm I called him and asked if he had called? Half hour later went to kitchen to get check book. Got to kitchen and mind went blank, could not remember.

Pg. 137-dtd. 02-02 Brain Wave setup. 4:00pm, sent me out to see cat. Chopper came over twice.                              I was standing in the sun room, just then one quarter of my right eye was a wavy presintation, also a blurred presentation. I told Clara what was happening to my eye. She had a name for it, migraine trangent. She said she would call Mary, she said that she had had it also herself, also Linda and Marie. She ask me not to look up the meaning. After I hung up the phone talking to Mary, she also asked me not to look it up. I said I would not. Mary called back and said that I should get a physical.

       Here are two innocent victims of brain wave tech- knowledgy, as we and many others are.

2........................jem

41

boston com

THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

# US revises definition of torture

The Boston Globe

**By R. Jeffrey Smith and Dan Eggen, Washington Post | January 1, 2005**

WASHINGTON — The Justice Department has published a revised and expansive definition of acts that constitute torture under domestic and international law, overtly repudiating one of the most criticized policy memorandums drafted during President Bush's first term.

In a statement published on the department's website late Thursday, the head of its Office of Legal Counsel declares that "torture is abhorrent both to American law and values and international norms."

The statement goes on to reject a previous statement that only "organ failure, impairment of bodily function, or even death" constitute torture punishable by law.

That earlier definition of torture figured prominently in complaints by Democrats and human rights groups about White House counsel Alberto Gonzales, who oversaw its creation and is Bush's nominee to become attorney general for the second term. The new memo's public release came a week before the start of Senate Judiciary Committee hearings on Gonzales's nomination.

The new document also omits two assertions made in an earlier version: that Bush, as a wartime chief executive, had the authority to permit acts barred by US laws against torture, and that US personnel following executive orders involving torture had legal defenses against criminal liability. The new memo states that torture violates US and international law.

The administration's legal document defining torture was first written in 2002, before the Iraqi prison abuse scandal became public.

The White House insisted yesterday that the United States has operated under the spirit of the Geneva Conventions, which prohibit violence, torture, and humiliating treatment, the Associated Press reported. It said the new document did not represent a change in administration policy.

"It has been US policy from the start to treat detainees humanely and in accordance with the Geneva Conventions or under the spirit of the Conventions where they do not apply," said White House deputy press secretary Trent Duffy.

In the new memo, Acting Assistant Attorney General Daniel Levin said torture may consist of acts that fall short of provoking excruciating and agonizing pain and thus may include mere physical suffering or lasting mental anguish. His opinion is meant, according to its language, to undermine any notion that those who conduct harmful interrogations may be exempt from prosecution.

This second effort by the Bush administration to parse the legal meaning of the word "torture" was provoked by the damaging political fallout from the disclosure this summer of the first memo, drafted in August 2002 and criticized by human rights lawyers and experts around the world.

Many of the critics charged that the first memo — which they said laid out a very narrow view of what behavior might constitute torture and was crafted to help interrogators at the CIA evade prosecution — created the context for a record of persistent ill treatment by that agency and the US military of detainees at prisons in Iraq, Afghanistan, Cuba's Guantanamo Bay, and undisclosed locations.

"Clearly the release of this now is backfilling for Gonzales's confirmation hearing," said I. Michael Greenberger, a senior Justice Department official in the Clinton administration who now heads the Center for Health and Homeland Security at the University of Maryland. "These memos have been a tremendous source

42

of embarrassment to both Gonzales and the administration."

Greenberger said that recent accounts of widespread abuse at US detention facilities -- including disclosures that military interrogation practices were sharply criticized over the past two years by FBI and Defense Intelligence Agency personnel in the field -- have given ammunition to those within the administration who favor adherence to international norms against torture.

"It could be that this is not just a cynical ploy but a real sign of change," Greenberger said.

One of the most controversial provisions of the earlier memorandum, signed by Levin's predecessor, Jay S. Bybee, was an assertion that the president's executive powers were sufficient to permit tolerance of torturous acts in extraordinary circumstances. The International Committee of the Red Cross had declared in response that the prohibition on torture, embodied in a global convention signed by the United States, has no exceptions.

But advocates of strict adherence to the convention previously lost interagency battles to hard-liners in the Defense Department, the Justice Department, and the White House, who asserted the president has expansive powers during the war on terrorism. The new memo pointedly sidesteps this issue, stating that the "consideration of the bounds of any such authority would be inconsistent with the president's unequivocal directive that United States personnel not engage in torture."

The memo also drops an attempt in the earlier version to rule that harmful acts not specifically intended to cause severe pain and suffering might be legal, and to define "specific intent." ■

© Copyright 2004 The New York Times Company

John F. Moore
136 Sand Pebble Cir.
Port Orange, Fl
32119-3698

November 7, 2000

Thomas E. Mooney
Judiciary Committee
2138 Rayburn H.O.B.
Washington, DC.
20515

Dear Chief of Staff

I am writing this letter to you in hopes that you will read and pass on to your fellow
Members of Congresses Judiciary committee. I feel that this subject should be brought
to your attention, although it is a law enforcement problem.
I have been introduced to a high pitch tone for approxamatly four years now, which
incidently is the the time frame of my complaint which I submitted to the Attorney
Generals Office pertaining to my being a victim who was wrongly accused
This tone is turned on or off whenever law enforcement choses. It is a form of
punishment which is handed out outside of and beyond the American Judicial System.
I will not go into alot of detail, in hope that someone will persue this subject further,
and request more detail from me.
I will tell you that I have had a Cat Scan and it showed that a micro hearing implant is
used to introduce this tone into a persons inner ear. There are many audio possibilities
once this is done. I am enclosing a sample type of implant that can painlessly be installed
while asleep and the victem is unaware it is implated. I hope that I will be given the
opportunity to prove this physically, medically and electronicly. I am sure that there are
many recipients of this hardware.
In closing, I hope that you will take this information very seriously and will have
someone from your office contact me. I am sure law enforcement will not admit to this
type of hardware, but it is out their
I might add that this use or miss use of a hearing implant was not thought up at the local
level of government
In closing, I remain a law bideing citizen and support the Constitution of the United States
Of America and its freedoms.

State of Florida
County of Volusia

Sworn to and subscribed before me this _____ day
of November ___, _____

Yours Truly,

John F. Moore

Bonni R Messner
My Commission CC970779
Expires September 27, 2004

44

John E Moore
136 Sand Pebble Cir.
Port Orange, FL.
32119-3698
Phone 904-761-8193
Fax    904-761-8193
Em JMoore3263@att.net

November 21, 2000


To: CMS & MEMS


I am writing this letter hoping that you will be kind enough to supply me this information that I am requesting.

1. Is frequency of the signal from inner ear to brain usable , or intelligible if they are above or below normal listening frequency range, if induced in outer ear?

2. Information on MEMS Fully Implantable Hearing System. (I now hold mems.uc.edu/research/104. documents) Also other other hardware which is incorporated in the system if available.

3. If a similar type system is obtainable on the medical market.

4. Can hearing implant be installed in outpatient inviorment?

5. Could you please supply me with contact name so that I will be able to explain my intentions for my request for this information.

   You may Email, Fax or mail your answers to my requests.


Sincerely,

John E Moore

45

U.S. Postal Service
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

CINCINNATI OH 45221

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | $1.25 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ |

NOV 21 2000

Name (Please UNIVERSITY OF CINCINNATI
Street, Apt. N 2624 CLIFTON AVE
City, S CINCINNATI, OHIO 45221

John E Moore
136 Sand Pebble Cir.
Port Orange, FL.
32119-3698
Phone 904-761-8193
Fax    904-761-8193
JMoore3263@aol.com

January 17, 2001

To: CMS & MEMS

I am writing this letter hoping that you will be kind enough to supply me this information
that I am requesting.

1. Is frequency of the signal from inner ear to brain usable , or intelligible if
   they are above or below normal listening frequency range, if induced in outer
   ear?

2. Information on MEMS Fully Implantable Hearing System. (I now hold
   mems.uc.edu/research/104. documents Also other other hardware which is
   incorporated in the system if available.

3. If a similar type system is obtainable on the medical market.

4. Can hearing implant be installed in outpatient inviorment?

5. Could you please supply me with contact name so that I will be able to
   explain my intentions for my request for this information.

   You may Email, Fax or mail your answers to my requests.

Sincerely,

John E Moore

CONTINENTAL RESOURCES, INC.

"0" ITEMS IN CART | VIEW CART    SUBMIT REQUEST

Open Account | International Business | ISO | Careers | About | Contact

TEST EQUIPMENT RENTAL, SALES & LEASING    SEARCH All Manufacturers

All Test Equipment Products

Keyword    Go

800.937.4888

## Test Equipment Products

- Logic Analyzers
- Network Analyzers
- Oscilloscopes
- Signal/Spectrum Analyzers
- Signal Generators
- Wireless Communications
- AC Power Supplies
- Accessories
- Amplifiers
- Audio/Distortion Analyzers
- Calibrators
- Compliance Test
- Counters

Go

## Manufacturers

- Agilent (HP)
- Dranetz-BMI
- Fluke Networks
- QuadTech
- Rohde & Schwarz
- Spirent (TAS)
- Tektronix
- Acterna (TTC)
- Advantest
- Agilent (HP)
- Alcoa Fujikura
- Amplifier Research
- Ando
- Associated Research

Go

**New and used test equipment rental and sales including:** oscilloscopes **network analyzers spectrum analyzers and other electronic**

**A breakthrough in signal generation.**

# Test Equipment

New Test Equipment Promotions- Hurry! T

## NEW! Test Equipment Promotions

- Tektronix: TDS30x4B "Pick One Free Accessory Program"
- **Tektronix:** Education Incentive Program- Extended!
- **Tektronix:** TDS3000B Options Performance Bundle

## HOT! New Tektronix Product for Sale!



**Tektronix AFG3000 Series Arbitrary/Function Generator**

## HOT! New Rohde & Schwarz Product



**FSL 3/6 Spectrum Analyzer**

## Hot New Rental Available!



**Tektronix TDS6000C Place your rental orders in advance with CRI for these hot new 12 and**



Tektronix



**Agilent Technologies**
*Authorized Rental Company*

CRI Certified Pre-Owned Test Equipment SALE!!!

CRI Certified 9-Point Quality Program
Learn More!

47

# MEMS Research
## Center for Microelectronic Sensors and MEMS



Main Menu
MEMSResearch
 Researches
 People
 Facilities
 Collaborations
 Courses
 MEMS Links
 Ohio MEMSNet
 Web Site Info

 Core Faculty
 Slide
 Presentation

# Fully Implantable Hearing Aid Systems

An electrostatic microactuator in a package about the size of the screw which holds eye glasses together, contacts the fluid of the inner ear, driven by a remotely-controllable implanted microchip and power supply which operates years before out-patient battery change. Frequency is adjustable remotely in seven bands for custom adaptation to hearing loss. Device replaces need for ossicular chain.



- Micro Biological and Chemical Sensors
- Fully Implantable Hearing Aid Systems
- Photolithography-Based LIGA (High Aspect Ratio Microstructures)

Center for Microelectronic Sensors and MEMS, ECECS, College of Engineering, University of Cincinnati. P.O. Box 210030, Cincinnati Ohio 45221-0030
Last modification May 25, 1997 by kah@ececs.uc.edu



[ 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 ]

University of Cincinnati

## ASIC Circuits for A Totally Implantable Hearing System

Main Home
MEMS@UC
Research
People
Facilities
Collaborations
Courses
MEMS Links
Ohio MEMSNet
Web Site Info
- - - - - - - - - - - - - - - -
Research Areas
Core Faculty
Slide
Presentation
Automatic Slide
(413Kb)



Center for Microelectronic Sensors and MEMS (CMSM)

Center for Microelectronic Sensors and MEMS, ECECS, College of Engineering, University of Cincinnati, P.O.Box 210030, Cincinnati, Ohio 45221-0030
Last modified on May 25, 1997 by koh@dolphin.eng.uc.edu



[ 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 ]

University of Cincinnati

**Fully Implantable Hearing System**
**Magnetic Microactuator**

Main Home
MEMS@UC
Research
People
Facilities
Collaborations
Courses
MEMS Links
Ohio MEMSNet
Web Site Info

Research Areas
Core Faculty
Slide
Presentation
Automatic Slide
(413Kb)



**Mask Layout**

Center for Microelectronic Sensors and MEMS (CMSM)

*Center for Microelectronic Sensors and MEMS, ECECS, College of Engineering, University of Cincinnati, P.O.Box 210030, Cincinnati, Ohio 45221-0030*
Last modified on May 25, 1997 by koh@dolphin.eng.uc.edu



# FEDERAL BUREAU OF INVESTIGATION
## COMPLAINT/QUERY FORM

**(Please fill out completely)**

Date: _10 - 3 - 00_

Time: _10:40 AM_

NAME: _John E Moore_

ADDRESS: _126 SAND PEBBLE CIR_

CITY/STATE: _PORT ORANGE   FL_

ZIP CODE: _32119_        TELEPHONE: ( )___

DATE OF BIRTH: _9-15-35_

SOCIAL SECURITY NUMBER: _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_

DESCRIPTION OF COMPLAINT/QUERY: _I WAS SET-UP BY LAW EFORCEMENT OFFICER (RETIRED) I HAVE BEEN HARRASED FOR 4 YEARS. I CANNOT GET ANY LEGAL HELP FROM LOCAL, COUNTY, OR STATE. I HAVE EVIDENCE_

b7C ██████████████████████████ _lives in_ ██████████ _- is harassing Mr. Moore. Moore seems to be paranoid, his visit was to let The FBI Know he is being watched in FLA._

_Copy of Complaint for_

51

6

# Think Progress

Search

Hot topics: Iraq Media Congress Administration Politics Election

## NSA Whistleblower To Expose More Unlawful Activity: 'People...Are Going To Be Shocked'

CongressDaily reports that former NSA staffer Russell Tice will inform the Senate Armed Services Committee next week that not only do employees at the agency believe the activities they are being asked to perform are unlawful, but that what has been disclosed so far is only the tip of the iceberg. Tice will tell Congress that former NSA head Gen. Michael Hayden, Bush's nominee to be the next CIA director, oversaw more illegal activity that has yet to be disclosed:

● A former intelligence officer for the National Security Agency said Thursday he plans to tell Senate staffers next week that unlawful activity occurred at the agency under the supervision of Gen. Michael Hayden beyond what has been publicly reported, while hinting that it might have involved the illegal use of space-based satellites and systems to spy on U.S. citizens. ...

[Tice] said he plans to tell the committee staffers the NSA conducted illegal and unconstitutional surveillance of U.S. citizens while he was there with the knowledge of Hayden. ... **"I think the people I talk to next week are going to be shocked when I tell them what I have to tell them. It's pretty hard to believe," Tice said. "I hope that they'll clean up the abuses and have some oversight into these programs, which doesn't exist right now."** ...

● **Tice said his information is different from the Terrorist Surveillance Program that Bush acknowledged in December and from news accounts this week that the NSA has been secretly collecting phone call records of millions of Americans. "It's an angle that you haven't heard about yet," he said.** ... He would not discuss with a reporter the details of his allegations, saying doing so would compromise classified information and put him at risk of going to jail. He said he "will not confirm or deny" if his allegations involve the illegal use of space systems and satellites.

Tice has a history for blowing the whistle on serious misconduct. He was one of the sources that revealed the administration's warrantless domestic spying program to the New York Times.

Filed under: National Security

Posted by Faiz May 12, 2006 4:11 pm

Permalink | Comment (275)

## 275 Comments »

The URI to TrackBack this entry is:
http://thinkprogress.org/2006/05/12/more-unlawful-activity/trackback

# Think Progress

Search

Hot topics: Iraq  Politics  Election  Ethics  Media  Ballot Watch

## NSA Blocking Whistleblower From Telling Committee About Shocking, Illegal Activities

Last month, ThinkProgress reported that NSA whistleblower Russell Tice would meet with members of the Senate Armed Services Committee to discuss undisclosed unlawful activity that the Agency has engaged in. "I think the people I talk to next week are going to be shocked when I tell them what I have to tell them," Tice said.

Since that time, little has been reported of Tice's meeting. CongressDaily (sub. req'd) follows-up today, "Tice met last month in a closed session with senior staff from the Senate Armed Services Committee. Tice said he told the staffers everything he knew. But he said the aides did not say how, or if, they would follow up on his allegations."

CongressDaily also reports that House Government Reform National Security Subcommittee, through its Chairman Christopher Shays (R-CT) and ranking member Dennis Kucinich (D-OH), is seeking to interview Tice, but the NSA is resisting.

> **Tice said his information is different from the terrorist surveillance program that President Bush acknowledged in December and from news accounts last month that the NSA has been secretly collecting phone call records of millions of Americans.** Because he worked on special access programs, however, it has not been clear on Capitol Hill which committees have jurisdiction to debrief him. Shays and Kucinich gave the NSA until Friday to explain any legal reason why they cannot interview him. **But that deadline passed without a response, and a subcommittee aide today called the missed deadline troubling.**

> Shays and Kucinich had originally asked the NSA to give them a reason by May 26, but the agency asked for an extension until June 9. NSA spokesman Don Weber said today that the agency "is performing due diligence in developing a response to the committee's request," but added that **Tice has not notified the agency of the alleged illegal activity. Tice said he does not believe he needs to notify the agency of his allegations.**

Congress deserves to hear from Tice, who has a history for blowing the whistle on serious misconduct. He was one of the sources that revealed the administration's warrantless domestic spying program to the New York Times.

Filed under: National Security

Posted by Faiz June 12, 2006 3:47 pm

Permalink | Comment (156)

## 156 Comments »

7-1-00  THE NEWS-JOURNAL  6A

# FBI uses Holocaust to teach new agents

**By MICHAEL J. SNIFFEN**
Of The Associated Press

WASHINGTON — The FBI has begun teaching its new agents how a failure by police to protect citizen rights helped produce the Holocaust in which 6 million Jews, as well as other minorities and political dissidents were murdered by the Nazis.

The training segment for agents-to-be at the FBI Academy began last month and was announced Friday by FBI Director Louis J. Freeh; Sara J. Bloomfield, director of the U.S. Holocaust Memorial Museum and Abraham H. Foxman, national director of the Anti-Defamation League.

"We do this early on in their training ... to remind them of the horror and evil which can result from not just a government, but particularly law enforcement, abandoning its mission to protect people and becoming the engine of oppression," Freeh said.

The trainees are given a guided tour of the Holocaust Museum here and instruction about Adolf Hitler's use of the police in Germany in the 1930s and 1940s to round up Jews, political opponents and other targeted groups.

There is a classroom discussion and then trainees must write an essay on the question: "Of what relevance is this history to you as a human being and a law enforcement official?"

After the first session, a student wrote, "It has taught me that making sure our Constitution is strictly followed should be a number one priority throughout my career."

The topic of police complicity in the Holocaust has been a concern of Freeh's for some time. In 1994, over objections from the State Department and the U.S. ambassador to Poland, Freeh visited the Nazi death camp at Auschwitz during a European trip and gave a speech at Jagellonian University in nearby Krakow, Poland, on the police role in Hitler's oppression.

Foxman applauded the FBI's commitment to "law enforcement's critical role as defenders of the Constitution and guardians of individual rights" and said the training "has tremendous potential to impact the next generation of law enforcement leadership."

52

Order Code RL30252

# CRS Report for Congress

Received through the CRS Web

## Intelligence and Law Enforcement: Countering Transnational Threats to the U.S.

**Updated December 3, 2001**

Richard A. Best, Jr.
Specialist in National Defense
Foreign Affairs, Defense, and Trade Division

# Continuation of "E" Obtaining an Attorney

July 1, 2005

Note: Six random incidence of legal request.

**One.**  Firm; Shaw, Bransford, Veilleux and Roth.

Washington, DC.    Attorney. J. Wheat.

10:00 am appointment on 12-02-03, cancelled appointment for 12-02-03 at 8:40 am.

Reason; see memo dtd. 12-01-03 to 12-03-03.

Comment: Door slamming 10:00 pm to 12:30 am, wake up again at 3:30 am,

high pitch tone, head ach. Would not reschedule, no call back.

**Two.**  Firm; Asbill, Moffitt and Boss.

Washington, DC.    Attorney. W. Mertens.

Spoke with him on 11-02-03, he called me 11-25-03. Sent him a copy of Court

Complaint of law suite. Also sent him a copy of Brainwave Technology report.

He suggested that I contact a patent attorney. Ref. e-mail dtd. 12-02-03.

**Three.** Firm; Bogin, Munns and Munns.

Orlando, FL.    Attorney. D. Broderson.

Appointment on 05-26-04, met with him that day. Went over case exhibits and

Defendants. He asked me about three murders and implant (BWT). Suggested

I set up another appointment to continue dialogue on case. I called his office for

an appointment on 06-01-04. Appointment for 06-15-04 at 10:00 am was made.

I phoned his office on 06-14-04 to confirm appointment. Secretary informed me

that I am not listed in appointment book. Note: See Bell South telephone bill.

Note: *

**Four.** Firm; G.S Groziano. 05-24-04 suggested that I contact Attorney Broderson.

Note: *

**Five.** Firm; Papas, Tinsley and Russell.

Daytona Beach, FL.     Attorney. D. Pepe.

Appointment at 08-10-00 at 2:30 pm, he did not show up. 4:55 pm call to

apologize, made new appointment for 08-14-00 at 1:30 pm. He suggest that I

talk with a sociologist three times, also mention that I was paranoid. Ref. F.B.I.

Boston 10-03-00 at 10:40 am interview. Report states that I am paranoid.

**Six.** Firm; G.R. Keating.

Daytona Beach, FL.     Attorney Keating.

Secretary said he was dealing with a murder trial, recommended another

Attorney.

Note: *

# Closing Comments

I would like to present to the reader of this "Independent Report," of my experiences and knowledge of Brainwave Technology. I have been a victim of Brainwave Technology since October 14, 1996. That first night I heard a dial tone for two to three minutes, there was no telephone presentation on the television screen. At some time during the evening, I was awaken with the sound of a data transmission tone in my head. That was the prelude to my life of Brainwave Technology torture.

To the best of my knowledge the U.S. Government has been hiding behind the Medical Field to do some of their experiments in mind control hardware.

I have what appears as a small pimple in the area of my temporal bone. Ref: Cat Scan 0673986 Halifax Medical Center, also MRI 574910.

My reason for having these medical tests were that I first tried ear plugs, which did not correct the problem. My next move was to retrieve my Cat Scan negatives which I had marked with a cut, which was put in the corner of each negative. When I retrieved the negatives, not much to my surprise their was no mark and the implant presentation was not indicated. Note: reference pg. 2a Temporal Implant, reference pg. 36, 37 High-Tech Images, line 28, 29, reference pg. 38 Digital Evidence. Temporal Bone detail of pimple size tissue, no presentation on Cat Scan or M.R.I.

I would like to bring together my experience with the F.A.A. Metal Detector, Air Port Security pg. 33, 34, F.D.A. Metal Implants M.R.I. safe. pg. 35

Touching on a small sample of Brainwave Technology experiences pg. 40, 41 are

v

examples of the control of the mind and danger of Brainwave Technology.

One comment I would like to make on N.A.S.A. No "Mind Reading" Technology without review pg. 29 and N.A.S.A Watch pg. 30 thru 32 are in my eyes wasting the tax payers money. To me it's the "Been their Done that" theory. It's a reproduction of an original problem that has been solved with Brainwave Technology.

Which leads me to my next question as to whether D.A.R.P.A. has made any successful testing in Brainwave Technology in the field of uv, ir or laser interface systems.

The Brain Computer Interface web site pg. 14 has some interesting and some not so interesting information on the subject. Much information on Brainwave Technology is solid and some is pure garbage. It brings back memories of when the news agencies were quoting that from the information given on the internet a person could construct an atomic bomb, which turned out to be logical. In my eyes this presentation has the same level of danger

Now that Brainwave technology has been mainly completed and from my point of view successful and D.A.R.P.A. and some of the Security Agencies have reached their goals, they are now going public in the Medical Field with Brain Machine Interface. As we touch on D.A.R.P.A. D.S.O. pg. 15, 16  I have to wonder what Dr. Eisenstadts knowledge of Brainwave Technology in the human brain control and implants as to reference pg. 2.

To touch lightly on pages 17 thru 21, what it does is convey more information to the availability of Brain control Hardware as similar to previously presented on pg. 14.

D.A.R.P.A. D.S.O. Brain Machine Interfaces pg. 22 thru 24, in my estimation makes my claim by myself and other victims of Brain Wave Technology more believable than not.

vi

I have tried not to ask many "what if questions" in this report. First and foremost a report should provide statistics or hard core facts of the subject or subjects.

Another point that is troubling to me on the subject of Brain Machine Interfaces are the use of uv (ultraviolet), ir (infared) and laser control hardware. pg. 22 line 9. Will it replace Temporal Implants for Brainwave Technology.

Reference to Digital Camera Data pg. 23 line 24 should be tied in with my pg. 40, 41. A lot of similar facts with image transmission as presented to my own vision.

What we have read in the previous three pages, pg.22 thru 24 could be the most dangerous of the data presented thus far and hope that the watch dogs do a professional and through job. With my own personnel observation, the answer is no.

As noted in my in "Introduction" of this report, I had brought up the subject of Security Clearances. Which myself and others who have had access to, avoid commenting on. Because of the need for me proving the existence of Brainwave Technology I must mention the subject. My clearance in the Crypto Field, which at the time had electronic instruction at Falls Church, Va. Our work included US Naval Vessels and Nato Projects.

I must comment on pg. 42, 43 on the U.S. Definition of Torture. I am at a loss for words on how anyone can make a ruling of what torture is if the person has not been tortured. As using Brainwave Technology as an example, I arrived in the state of Delaware, Hampton Inn Hotel on my way to Bradley International Airport, Conn. 07-25-99. I was the victim of Brainwave Technology, consisting of a hi pitch tone and what I describe as a head ach freq. Awake all night, I knelt on floor in my room holding my head. This same situation took place the previous evening in N. Carolina. I could not go on and returned to Florida. I

vii

lost my employment with Technical Resources of California. (F.A.A. Contract) I have

been a victim of Brainwave Technology from its inception. (1996)

Pg. 44 thru 47 are a partial list of non delivery of Registered Mail pertaining to Brain-

wave Technology. Note; Senator Bill Nelson office is working on tracing these non

deliveries.

Pg. 48 thru 50. I have one question pertaining to this hardware, and that is the where-

abouts of this M.E.M.S. hardware.  Lots of tax payer money was put out for this hardware

and I am sure that the University of Cincinatti, Ohio was paid for it's design and testing.

My search for this hardware has produced a blank.

Now comes the final pleading of my of my case to prove the "How" and "Why" of

Brainwave Technology. I have held back pg.25 thru 27 for my final part of my present-

ation. Here are a few of the many instances of Brainwave Technology. The real torture

commence at lights out, at bed time for my wife and I. Note: I now hold approximately

one hundred and fifty pages of day and night experiences.

Pg. 51 F.B.I. Boston Office. First off, I have had dealings with this agency many times

during my career with the F.A.A. It was always nothing but a professional relation.

I was in the Boston area due to no return communication taking place with the F.B.I.

Office, Daytona Beach, FL.

My time at the F.B.I. Boston Office was all of four minutes . In that time I tried to convey

to the agent of my circumstances. Four times he pointed out that he could not help, that

it was out of his jurisdiction. When I asked for identification he would not provide that.

Note: I filed a request with the F.O.I.A. which was denied. The last three lines on that

complaint form were not said by me, at least not in those terms. One important note is that

this agent was told this person is part of a nazi hate group. Which leads me to my final comment. This person reported to Falls Church Va. for Brainwave Technology instruction. This is without a doubt a tremendous breach of security for our nation and our Security Agencies. One other point of interest of mine is that this technology is now at the Law Enforcement level. I will make one more powerful statement, that Law Enforcement will never lose a case in a Court of Law. And as I have stated, I have documented proof to substantiate my claim.

Pg. 52 All the U.S. Government agencies that I have communicated with were given a copy of this document for information. I have never received any feed back.

Pg. 53, 54 Here are six examples out of many attempts at acquiring legal assistance

- Denotes

I hope that the information which I have presented in my "Closing Comments" will install some interest in this very important topic of Brainwave Technology.