IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**RECEIVED**

AUG 2 8 2008

Clerk, U.S. District and
Bankruptcy Courts

JOHN E. MOORE,                )
                             )
        Plaintiff,            )
                             )
v.                           )          Civil Action No. 07-0107 (RMC)
                             )
GEORGE BUSH,                 )
President of the United States, et al.    )
                             )
        Defendant,           )
_____)

## PLAINTIFF MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS DEFENDANTS MOTION, OR ALTERNATIVELY TO DISMISS MOTION FOR SUMMARY JUDGMENT

Plaintiff here by submits this motion to dismiss Defendants, National Security Agency ("NSA") and Federal Bureau of Investigation ("FBI") pursuant to Federal Rules of Civil Procedure 12(b)(5) because Defendant failed to investigate the disappearance of complaint, Civil Action No. 07-0107 (RMC). The Plaintiff hereby submits a motion pursuant to Federal Rules of Civil Procedure 12 (e) which the Plaintiff move for a more definite statement such as United States Department of Justice, United States Attorney's Office require a statement of facts, which to this date and time, the Defendants have not met their obligations. (1) by not returning to sender if misaddressed. (2) investigate its where' a-bouts or (3) or forward to proper recipient. As to the U. S. Attorney General service, there is no question of its delivery to the proper recipient.

## BACKGROUND

I as plaintiff, filed this complaint in which Defendants President George W. Bush, Senator Bill Nelson, the National Security Agency ("NSA"), the United States Department

of Justice ("DOJ"), the Federal Bureau of Investigation ("FBI"), the Volusia County

sheriff Department ("VCS"), (collectively the "Government Defendants"). The Southern

Poverty Law Center ("SPLC"), the America Civil Liberties Union ("ACLU"), and

Dependable Civil Process. ¶ Comp. Doc. # 1.

   I am presenting this background synopsis of claims which I believe will contradict the

Defendants allegations which I see as frivolous and devoid of merit. On February 26, 2008,

the Court, as pointed out by Defendants, President Bush and Senator Nelson, ("VCS"),

("SPLC") and ("ACLU"). ¶ Doc. # 45. Plaintiff plans appeal to the present ruling, concerning

Defendants President Bush, Senator Nelson and the ("VCS"). (collectively) the "Government

Defendants."

   As it concerns the current moving Defendants, and the FOIA to ("NSA") dated August

31, 2006, in which a request as to "a short statement on existence of Brainwave Technology"

Complaint. (Comp) ¶ 29. Which ("NSA") neither confirms nor denies the existence of such

a program. Which in my argument phase will furnish evidence to the contrary and also

information pertaining to one of the functions of Falls Church, Virginia, which was also part

of same request on its use as an example and reference toward Brainwave Technology.

Siers Decl. ¶ 10. As it concerns the ("FBI") Plaintiff requested "the name of the agent at the

Boston Office who interviewed Plaintiff on October 3, 2000." Hardy Decl. ¶ Ex. I. Plaintiff

claims this agent in his zeal to twist the facts, use "paranoid tendencies" in his descriptive

comment describing this short interview. As he continues his statement contending that

plaintiff believes that he is "is being watched" is absolutely devoid of merit and ludicrous.

Plaintiff mailed a FOIA request on September 5, 2002, prior to my personnel contact with

("FBI") Office, Daytona beach, Florida. On November 4, 2002 I visited Agent Bonner.

Comp. ¶ 41. That was the last dialog with Agent Bonner.

## ARGUMENT

**I        Plaintiff has made proper Service of Process on the United States.**

Defendants has failed to fulfill their duty as to provide justice and integrity to the public.

Plaintiff makes note of Federal Rule of Civil procedure 12(6)(5) which the Defendant

claims insufficiency of service of process. Pursuant to Federal Rule of Civil procedure 8(b).

The afore mentioned statement by Defense is proof of the inconsistencies provide in their

claim. Plaintiff as of this date, have not received any documentation proposing any effort to

locate or investigate the loss of the afore mentioned legal documents signed for and delivered

to U. S. Department of Justice, U.S. Attorneys Office and U. S. Attorney General of the

United States. 950 Pennsylvania Avenue, NW, Washington, DC. 20530-0001. ¶ Doc. 6-5,

Same Day Process Server on April 4, 2007. F.R.C.P. 8(a), Claims for Relief. Plaintiff is

Entitled to relief due to the none existence of any investigation, or effort by ("DOJ").

Dismissal is required pursuant as to Defendant Federal Rules of Civil Procedure 12(b)(5)

insufficiency of service of process, 4(i)(1)(A) serve a copy of summons and complaint, 4(c)

(1);  Fed. R. Civ. P. 4(m). fail to properly serve the United States. To date Plaintiff has

fulfilled its obligation of service as to Federal Rules of Civil procedure as to the afore

mentioned Rules, also at this time pursuant to Fed. R. Civ. P. Rule 11.[1] A Demand for

judgment for the relief that the Plaintiff seeks, would be a documented statement of the facts

in the effort to explain this complete breakdown of receipt of these documents by

Defendants.

[1]Fed. R. Civ. P. Rule 11, Requires all papers to be signed by the attorney (if party is
represented). It also provides for sanctions against the attorney or client for harassment,
frivolous arguments, or a lack of factual investigation.

Dismissal of the charges is required pursuant to Federal rules of Civil Procedure 8(a)

which states a requirement for jurisdiction which the Defendants are Federal Agencies

of the United States Government. Plaintiffs claim Federal Rules of Civil Procedure

12(b)(5) for insufficiency of service of process. Which is Defendants "short and plain

statement of the claim. Which I again state are frivolous arguments as to factual investigation

of the claims by Defendants. Fed. R. Civ. P. 8(b) states that the defendant's answer must

admit or deny every element of the plaintiff claim. Fed. R. Civ. P. 8(c) also requires that the

Defendant's answer state any affirmative defenses.

### II.    The Plaintiff is entitled to Summary Judgment, if not Trial.

### A.  Standard of Review.

Two criteria must be met before Summary Judgment my be properly granted.

(1)Their must be no <u>genuine issues</u> of material facts, and (2) the moving party must be

entitled to judgment as a matter of law. A <u>genuine issue</u> of material fact is a legal term

often used as a basis for a motion for Summary Judgment. A factual issue "genuine" if

it is not capable of being conclusively foreclosed by reference to undisputed facts.

Although there my be genuine disputes over certain facts, a fact is "material" when its

existence facilitates the resolution of an issue in the case "material" facts tend to prove

or disapprove a disputed fact that is relevant to the outcome of a case. Summary Judgment

is to be freely granted where there are no  "material" facts in dispute and the party is

entitled to judgment as a matter of law. In this case, (NSA") and the ("FBI") have each

failed to discharge their obligations, both on the bases of FOIA and Federal Rules of Civil

Procedure guidelines.

A.    **N.S.A. is Not Entitled to Summary Judgment.**

I.    **There are specific facts which are material which**
       **for the resolution of, require a trial.**

"Target and Plugged-in" , are the most feared words when ("NSA") is the subject of

conversation, owing to fear and its multiple FOIA exemptions. Which leaves a potential

target of theirs with no defense.

II.    **Brainwave Technology-Presenting documentary evidence**

Plaintiff John St. Clair Akwei v. ("NSA") Case No. 92-0449, states his knowledge

of ("NSA") structure, activities, proprietary technologies and covert operations. ¶ Id 2.

How the ("NSA") Harasses Thousands of Law abiding Americans daily by usage of  Remote

Neural Monitoring (RNM). This article Published by I. A. H. F. Mr. John C. Hammell,

Editor. States Plaintiff notified U. S. Department of Justice, etc of Public Corruption

By named ("NSA") employees. Also states lawsuit against ("NSA") never went to court,

also states ("NSA") cannot be sued.¶ Id 3. Nexus Magazine article, Plaintiff John St. Clair

Akwei v. ("NSA") Case No. 92-0449, states his knowledge of ("NSA"). ¶ Id. 4. This article

published by Mr. Duncan M. Roads, Editor of Nexus Magazine. Both these articles are

somewhat similar. Mr. Roads states he has no record of contact of Mr. George Farquhar

author of article. ¶ Id. 5. As presented in court documents referenced to John St. Clair

Akwei v. ("NSA") Case No. 92-0449, I find no evidence presented to the court of Brain-

wave Technology. ¶ Id. 7. As presented ¶ Id. 2 alleges "NSA" torture. Also ¶ Id  4 present

same allegation only different media. Brainwave Technology Independent Report. (BWT)

The following are excerpts of points which I feel important in presenting personnel proof

of (BWT). This presentation indicates location of subject implant. (BWT) ¶ 2a

This location which as presented is the exact area that was shown on the pre-digital enhanced cat scan # 0673986 dtd. December 30, 1998. This evidence can be digitally enhanced as information furnished. (BWT). ¶ 38, also is this precaution being observed with our Government Security Agency's. (BWT) ¶ 35 As for my fruitful events pursuing (BWT) evidence. Certified Mail was not an option to acquire this information. (BWT) ¶ 45 & 46. Here is a sample of a MEMS ECECS micro chip. (BWT) ¶ 48. A full copy of (BWT) available: Document 36-3,4,5.

### III.    Plaintiff presents specific facts showing genuine issue for trial.

There are many issues of "material" fact for trial as to their resolution in applying the law to the undisputed facts. There are many unanswered questions on the subject of ("BWT") that must be addressed. (1) Why do both editors of this particular article have no contact information or documentation on Plaintiff John St. Claire Akwei. ¶ Id  3, Id 5. (2) What contractual agreement was promulgated, as to truth and fiction. (3) Who prepared this highly technical document? (4) As to plaintiff Akwei Case No. 92-0449 and Court Documents, why is their no mention of technical data, such as "RNM" Remote Neural Monitoring, "COMINT" Communication Intelligence, "SIGINT"  Signals Intelligence or ("BWT") as some examples presented in his alleged article. Apparently Mr. Akwei had harassment problems beginning in 1981 thru. 1991. Through-out this time frame of harassment their was no communication with the named Defendants. Where was all this information obtained? (5)   Legal aid was not provided, taking in to account his financial status. Plaintiff request was documented.

Reference request for Oral Hearing, **LCvR7(f) and LCv R40.5(3)(4)** are related as to

(ii) involve common issues of fact or (iii) grow out of the same event or transaction. First what should be noted is [Authentication] of this documentary evidence that was compiled from Plaintiff, Mr. Akwei Case No. 92-0449 Court Documents and media information purported to be provide by Mr. Akwei thru. Nexus Magazine, Mr. D. Roads, Editor and I.A.H.F. Magazine, Mr. J. Hammell. ¶ Doc. 18. As I being a victim of (BWT) harassment, and the technical knowledge acquired as a victim, it is imperative that I interview this witness so as to give testimony to corroborate the statements made in aforementioned article and Court Documents. (BWT) Siers Decl.¶ 24.

   Plaintiff is filing this motion LCvR 5.2(b) in regard to first ("NSA") Training Center, (off campus). Falls Church, Virginia. Plaintiff requested a "short statement pertaining to the existence of Brainwave Technology" in 1996; whether "the system instruction [was] disseminated at Falls Church, V.A. in 1996. Siers  Decl. ¶ 24. In the 1996 time frame, this [ex] Volusia County Sheriff attended Brainwave Technology instruction at the off campus located at Falls Church, V.A. Mr. R. Tucker, Mr. H. Wilson, Mr. J. Freitas and Mr. R. Keiler, to mention a few of the crypto technicians that received instruction at NSA/CSS Falls Church, VA; which I had participate in many shipboard projects while employed at Boston Naval Shipyard and Portsmouth Naval Shipyard, Portsmouth, NH. Performing final system checkout and sea trial of complete crypto system with afore mentioned names. A short time after his return, I being a target, was " plugged in" to the system. I am seeking Judicial Review in accordance with 5 U.S.C. § 552 (a) (4) (B)[1] and 5 U. S. C. § 552 (a) (4) (F)[2]

_____

[1] On complaint, the district court of the United States in the district in which the complainant resides, or has principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters which a court accords substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B)

[2] Whenever the court orders the production of any agency records improperly withheld from the complainant and assesses against the United States reasonable attorney fees and other litigation costs, and the court additionally issues a written finding that the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding, the Special Counsel, shall promptly initiate a proceeding to determine whether disciplinary action is warranted against the officer or employer who was primarily responsible for the withholding. The Special Counsel, after investigation and consideration of the evidence submitted, shall submit his findings and recommendations to the officer or employee or his representative. The administrative authority shall take corrective action that the Special Counsel recommends.

I am presenting this evidence in conjunction with ("NSA"), as it is a dual breach of National Security involving my futile attempts at requesting assistance in civil rights matters. I am requesting that this document be deleted from this ("FBI") Civil Rights Program. ¶ Id. 9. My request in this particular instance would be a full investigation of the participants ("NSA"), ("FBI") and the named alleged felon who should be punished for these crimes.

This documentary evidence that I am introducing is a copy of a document that was faxed to Office of Information and Privacy. It covers incidents over a time frame when this alleged felon became very active. At this time frame I was in contact with ("FBI") [ no response] and U. S. Attorneys Office, Orlando, Florida. FOIA Case 03-0136 was being investigated. I contacted Priscilla Jones at Office of Information and Privacy and questioned her in providing documentation in reference to this case.

I received her approval to my request, and she provide me with the fax. no. that will provide this document to her. Fax. number listed as U. S. department of Justice, ¶ Id. 10.

Plaintiffs' request for injunctive relief as to Local Civil Rule LCvR 65.1(c) Id. Doc. 32. Of note on doc. 32 is noted: "let this be scheduled" 11/21/07 (RMC). I beg the Courts indulgence in proceeding with the dispensing of Motion request for Injunctive Relief. The intimidation and harassment continues as this case progresses with no relief in site. ¶ Id. 11

## IV.    NSA General Issues of fact by Known Indirect Entities

Examples introduced are three separate document files that were stored in my personnel computer files under the titles of: D.I.A.A. Shaffer, 021506 Smith D.I.A. and John St. Clair Akwei. documentary evidence of my personnel computer being compromised by what I claim are carried out by, (collectively the "Government Defendants"). ¶ Id. 12

This is another example of ("NSA") (BWT) in another part of the world. Written by Dr. Rauni Kilde, formally Chief Medical Officer for Northern Finland. She is not only known for her medical expertise but also making it known to the dangers of (BWT). Here is one article of many that profess to ("NSA") incorporated by our United States Government. ¶ Id. 13.

Here is a document with powerful rules toward the upholding of our United States Constitution. The following are excerpt of Initiative Measure No. 630 Enacted by the People of the State of Washington. Documentary evidence in support of Plaintiff case.

**Sec. 4.** Senators and rep. of the State of Washington. Illegal to meet with the intelligence Board in Washington D.C. Either for Political or to do any business with the National Security Agency in the state of Washington, until this agency is disbanded and a Constitutional agency is set up.
**Sec. 9.** City, County, town and state agencies will not use their positions too harass a Business that is a national security agency target may not use their position to threaten a business that has a person working in a business that is a national security agency target.
**Sec. 13.** Illegal for any agency involved with the law, may not discriminate against a target of the national security agency. Bar association may not have on its staff national security agency person, may not protect an attorney who belongs to this agency.

Civil Liberties Unions may not have national securities agencies on staff and may not discriminate against a NSA target. Civil rights agencies may not have national security agency on it staff and may not discriminate against target of NSA.

Attorneys in the state of Washington may not belong to the National Security Agency. Judges may not have secreat meeting with national security agency judges in secreat sessions to review cases may not take advice from any person belonging to the national security agency in the state of Washington or outside the state of Washington.

**Sec. 33.** Communications: Telephone Company, telegraph co. computer systems, cannot have NSA staff, may not violate privacy of hospitals, nursing homes, private homes, in in phone conversations or conversations in home, work places, violates the privacy act.

**Sec. 37.** Physiological torture: the threats to family members, that if support is given to the target, jobs and other benefits will be lost. The threats to those in places of employment, to avoid target in order to break down target and loss of self esteem.

Is this more bragging rights by our National Security Agency? ¶ <u>Id.</u> 14.

National Security Agency Whistleblowers: Psychological abuse. "delusional," "paranoid" or "psychotic." This is the false labeling used by our security agencies. As an example ("FBI") <u>paranoid</u> ¶ <u>Id.</u> 9 This is I fine example of harassment by our government. I introduced this particular document as documentary evidence as it reestablishes my point in this complaint. As I study these complaints v. ("NSA") there are no defense attorneys representing any of what I classify as victims, as myself unable to procure legal representation. When an attorney is contacted he immediately becomes a "target" of the requested Plaintiff or Defendant. This is one reason that we all have become targets of ("NSA") and "plugged- in". "Targets".Siers Decl.¶ 16. Whistle blowers ¶ <u>Id.</u> 15.

David A. Larson (Whistleblower). A copy of a letter to Senator Dianne Fienstein and requesting help as I the Plaintiff had requested with no response from Senator Nelson Office.[1] Mr. Larson is also a victim of an over zealous cover-up, and am presenting this as documentary evidence in support of Plaintiff case, as to ("NSA") and (FBI). ¶ <u>Id.</u> 16

---

[1] Defendants memorandum of law, "NSA" and  FBI incorporate the arguments made by President Bush and Senator Nelson pursuant to Fed. R. Civ. P. Rule 8(a), 12(b)(1) and 12(b)(6). Plaintiff plans to appeal pursuant to Fed. R. Civ. P. Rule 12(e), 8(b) also Rule 11

I am presenting this documentary evidence of home invasion by alleged Defendants National Security Agency ("NSA") and Federal Bureau of Investigation ("FBI") (collectively p/o the "Government Defendants"). Also notified are Federal Trade Commission (FTC) and Federal Communication Commission (FCC). I am entering ¶ Id. 16 as material evidence, also documented as presented to (FCC) involvement in criminal misconduct. I believe this evidence speaks for itself. This crime is in addition to ¶ Id. 11.

Presented here are documentary evidence of two U.S. patent # 3,951,134 and U.S. Patent # 5,270,800 which provide documented proof of U. S. Government involvement in the use of Brainwave Technology. ¶ Id. 19. also Siers Decl. ¶ 24.

Presented here are documentary evidence to specific forms of authentication, which include photographs, e-mails, data stored disc information, documentation of intimidation and harassment from alleged ("NSA") agent. ¶ Id. 9. ( listed as STALKER), Volusia County Sheriff Dept (VCS). harassment documentation. other law enforcement incidence.
Other incidence as documented. Two hundred and forty + pages. This document consists of hand written notes, evidence of harassment  with documentation of flyover's of (VCS)  choppers, also any court business (VCS) or (FSA) intimidation would be present as I arrived at these destinations such as FEDEX or U.S. Post Office. this will be entered as documentary evidence if a hearing is commenced.
First date of entry is April 16, 1996, documentation to present 2008, Auguest. 242 pages.

Presented here is documented material evidence of fact involving unmitigated harassment by a law enforcement entity of the (collectively, the "Government Defendants"). Traffic citation collectively by Volusia County Sheriff Department, National Sheriff Association, Office- Falls Church, Virginia. Florida Sheriff Association (FSA) and Daytona Beach Shores Police Department. Copy of citation as presented. Case dismissed, January 18,

2008. (no show by either of two Police Officers)¶ Id. 20.

---

**B.    F. B. I. Is Not Entitled to Summary Judgment**

    **I.    There are specific facts which are material facts which for the resolution of, require a trial.**

Material facts of genuine issues will be presented in the following presentation which will provide substantial evidence that a dispute of "material facts" exists. (F.B.I.) has not introduced substantial evidence of F.O.I.A. Rules for Summary Judgment.

    **II.    Representing F.O.I.A. evidence of fact and a dispute of material facts exists. Statement of Facts. (stf)**

In reference to Ca. 6:03-cv-1499-Orl-28-DAB ¶ Id.21 improper excisions as per. Title 5 U.S.C.552 and 552(a).[1] Improper excisions were not exercised as to disclosure of personal information in reference to my date of birth and social security information. ¶ Id. 4h. I provided the excisions on my own. This document compromised my personnel privacy, which was illegally provide by ("FBI") Boston, Mass. Dated September 26, 2002. ¶ Id. 2h.

Reference to Federal Bureau of Investigation ("FBI") File No. 190-BS-90887. ¶ Id. 22 As to ("FBI") Boston, Mass. Letter dated September 26, 2006, with routing at bottom left of page. Originator of corrected letter. Hardy Decl. ¶ (7) No notification of corrected letter. This **Exhibit B** also includes corrected copy of ("FBI") letter dated September 26, 2002 bearing corrections as to proper excisions of personnel information, date of birth and social security information. Hardy Decl. ¶ (7).

U. S. Department of Justice (FOIA) 04 reference guide. FOIA request example, ¶ Id. 23

such as ("FBI"): list the date, location and name of interviewing agent, and subject of

investigation. This procedural information is obtained from: /04foia/referenceguidemay99

---

[1]552 (b)(7)(C) Could reasonable be expected to constitute an unwarranted invasion of personal privacy. 552a(k)(2) investigative material compiled for law enforcement purposes, other than criminal, which did not result in loss of right, benefit of privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence.

Notification of Plaintiff request of records held at JFO indicate no record held. No

record of request at ("FDPS") dated April 15, 2007 with an assigned file number 972947.

Hardy Decl. ¶ (17). Plaintiff request letter File No. JK 190-C1-970 (FOIPA) Dated February

5, 2003, which does not reference 972947. I cannot comprehend why the difference in File

Numbers and Information. ¶ Id. 24.

In reference to Ca. 6:03-cv-1499-Orl-28-DAB Middle District of Florida. ¶ Id. 25 Citizens

Complaint Summary on information of complaint. Id. f3 thru. f6. I also call attention to

document titled "Criminal Section Overview" [1] Title 5 U.S.C. 552(b)(7)(B) as to a fair and

impartial investigation. Letter from U.S. Attorney stating document receipt by fax.

document was hand delivered in person, misstated. Id. pg.15.

This Exhibit F information is provided as to the lack of interest shown by the Daytona

Beach Office of the ("FBI") and its inability to show an interest in the evidence that was

provided to this office and the lack of professional respect as to the freedoms provided in the

Constitution of the United States. ¶ Id. 26-document dated January 9, 2003.

This documentary evidence that I am introducing as both ("NSA") ¶ Id. 9 as well as

("FBI") ¶ Id. 27. Hate crimes introduced by both agency's are well provided with this

evidence. I am requesting this evidence and statements by Plaintiff be investigated.

Motion request for Injunctive relief is request in both ("NSA") ¶ Id. 11 and ("FBI") ¶ Id. 28. aka. (collectively, p/o the "Government Defendants"). Again I beg the Courts indulgence in proceeding with the Motion request for Injunctive Relief. The intimidation and harassment continues as this case progresses with no relief in sight. Document 30.

Plaintiff request for evidentiary hearing Document 18. ¶ Id. 29. Filing of discovery materials with motions and at trial. LCvR 5.2(b)

Motion filing of Discovery v. National Security Agency ("NSA") ¶ Id. 9 Federal Bureau of Investigation ("FBI") and Volusia County Sheriff Department ("VCS") p/o (collectively, the Government Defendants'). Pertinent information as to "of campus" Falls Church, Virginia. (witness's) ("NSA") ¶ Id. 9. My argument and conclusion should present my Evidence to document. More documentation and relief request ("NSA") ¶ Id. 9 "FBI uses Holocaust to teach new agents" is important evidence in my claim, which leads to my request to delete Id. 10 FBI Investigative Programs, Civil Rights.

Here I am presenting an example of a home invasion perpetrated by white collar hate crime, allegedly by (collectively, the "Government Defendants"). This type of home invasion of electronic system control is not accomplished with off the shelf type Radio Shack equipment. Photo of complete entertainment system compromised by "Government Defendants" and Federal Communication Commission and obstruction of justice by use of FCC regulated spectrum. Jamming Directv surround sound audio. One year old forty six inch LCD television compromised. ¶ Id. 31

Evidence of a traffic violation set-up by allegedly law enforcement. As I stated in the dismissal of charges and no show of both police officers at Court hearing. As the documents provided to the Court, it is illegal to operate a traffic radar along a length of metal fence

due to inaccurate data due to reflections. ¶ <u>Id</u>. photo presented to Court. Also incident of our

auto towed as woman in car (FSA). ¶ <u>Id</u>. 20 observed incident. <u>Id</u>. Photo.3 P/O (collectively,

the "Government Defendants"). Also ¶ Inj. Rlf. Doc. 30. National Sheriff Association. (NSA)

National Office, Falls Church, Varginia. ¶ <u>Id</u>. 32

 Whistleblower David A. Larson is presented as a look alike case as this Plaintiff presenting

his version of a "Government Cover-up." Primary to this Case is evidence of BWT and

technical evidence, also implant data, which has been labeled comprised of "fanciful claims"

and " bizarre conspiracy theories" are " essentially fictitious" and to the Defense are

ludicrous I'm sure. How the F.C.C has given free protocol "suspended carrier," which

again has given ("NSA") an open ticket to BWT frequencies. ¶ <u>Id</u>. 33

## PRAY FOR RELIEF

Plaintiff respectfully request that the Court:

Declare that Defendants' program of none warrant surveillance, Brainwave

Technology and harassment unlawful by (collectively the "Government Defendants.") Order

that Defendants disclose to Plaintiff all unlawful surveillance of Plaintiffs' Communication,

also the use of Brainwave Technology carried out pursuant to the program. Also investigate

and persevere and convict within the limits of the Law by Special Counsel.

Award such other relief as the Court my deem just and proper

## <u>CONCLUSION</u>

 For the reasons set forth above, Plaintiff respectfully request that judgment be

entered in favor of the Plaintiff.

Respectfully submitted,

John E. Moore Pro Se

9 Pleasant View Circle
Daytona Beach, Florida.
32118-5511
386-761-8193

<u>CERTIFACATE OF SERVICE</u>

I hereby certify that on this 27th day of August 2008, a copy of the foregoing

Plaintiff s' Memorandum of Law Motion to dismiss Defendants Motion or alternatively

to dismiss Motion for Summary Judgment was Fedex pre-paid to:

> MICHELLE N. JOHNSON ,
> D.C. BAR # 491910
> Assistant United States Attorney
> 555 4[th] St., N.W. Room E 4212
> Washington, D.C. 20530
> 202-514-7139

> /s/ John E. Moore Pro Se
>
> _____
> 9 Pleasant View Circle
> Daytona Beach, Florida
> 32118-5511
> 386-761-8193

.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN E. MOORE,                          )
                                        )
          Plaintiff,          )
                                        )
   v.                                   )          CA. NO.  07-0107 (RMC)
                                        )
GEORGE W. BUSH, et al                   )
                                        )
         Defendant,          )
                                        )
_____ )

## <u>NOTICE OF MOTION</u>

**To:**    Michelle N Johnson
        Assistant United States Attorney
        United States Attorney's Office
        Civil Division
        555 4th  Street, N.W. Room E4212
        Washington, D.C. 20530
        (202) 514-7139

### PLAINTIFFS' MOTION FOR LEAVE TO SUBMIT SURREPLY
and
### MEMORANDUM OF LAW IN SUPPORT
with
### FILING FOR PURPOSE OF MOTION LCvR 5.2 (b)

Copies of which are served upon you.

Respectfully submitted,

/s/ John E. Moore Pro se

_____

9 Pleasant View Circle
Daytona Beach, Florida
32118-5511
(386) 761-8193

# CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of August 2008, I have place a true and

exact copy of the following:

## PLAINTIFFS' MOTION FOR LEAVE TO SUBMIT SURREPLY
### and
## MEMORANDUM OF LAW IN SUPPORT
### with
## FILING FOR PURPOSE OF MOTION LCvR 5.2 (b)

### <u>TITLE:</u> U.S. Department of Justice Case 03-0136

### NSA: Exhibit I. FBI: Exhibit G.

in the U. S. Mail, first class postage, prepaid, addressed to:


MICHELLE N. JOHNSON, BAR # 491910
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W. Room E4212
Washington, D.C. 20530
(202) 514-7139


/s/ John E. Moore Pro se

_____
9 Pleasant View Circle
Daytona Beach, Florida.
32118-5511
(386) 761-8193

John E. Moore
9 pleasant View Cir.
Daytona Beach, FL.
32118-5511
386-761-8193
November 4, 2002

Office of Information and Privacy
United States Dept. of Justice
Flag Building, Suite 570
Washington, DC
20530

Ref: U.S. Dept of Justice Case 030136

Subj: Case files to support my claim of hate crimes and law
enforcement support.

Dear Co Director:

I am requesting that the enclosed case files be included in
ref. case no. 030136. Thank you for your consideration.

Victim No. 1, On 06-16-00 had a meeting with Atty. Smith
A.C.L.U. Next day my sister found my mother on bedroom floor, and aunt
was found dead in rest home that she was at.

Victim No. 2, On 05-28-97 Mr. Harry S. found dead in his
under shorts. (son Pete)

Victim No. 3, On 03-03-00 Mr. Walter M. found dead in under
shorts by Mr. Benjamin G. Blood on face.

Victim No. 4, On 12-03-02 Mr. Joe K. found dead in under
shorts by apartment manager. Blood on face.

Victim No. 5, On 07-14-98 Mr. Benjamin G. had attorney
against defendant.

Victim No. 6, On 06-98 Mr. Walter B. had atty. against
Defendant

Victim No. 7, On 07-98 Mr. Walter B. took defendant to Court.

Victim No. 7,8 On 03-01-99 both Walter B. and Ludwig M. took defendant to court. Later did victory parade on our street

Victim No. 9, On approx. 08-08-96 had defendant beat-up. Made himself, [defendant] noticeable for two weeks after incident. Head was all bandaged from head injuries.

Note: Some names and address's left out due to confidentiality. Information will be provided in person. All but two victims were residence of Bear Foot Park, where my wife and I resided with these victims.

Victim No. 10, is me. First off I will not try to cover ground that is covered in my case folders. I will just try to influence you in granting me an interview in person, so that we can discuss this case in detail.

Financially, I reached the $100,000 loss in income early on. I am retired from the Federal Aviation Administration. (electronics) I was doing contract work for Raytheon Co. in Burlington Mass; before that eventful night in Delaware (Hampton Inn) which ended my career. (07-25-99)

In closing, I have said this many times that I will submit to a polygraph test on any statement made in this case file. I am a victim of character assassination

Sincerely Yours,

John E. Moore

Send Confirmation (Event ID: Succeeded)

| | | | |
|---|---|---|---|
| Date: | 11/26/2002 | Time: | 05/19 PM |
| Pages: | 4 | Duration: | 1 min 21 sec |
| Recipient: | Priscilla Jones | Company: | United States Dept of Justice |
| Fax Number: | 12025141009 | Subject: | |
| Type: | Fax | | |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOHN E. MOORE,                          )
                                        )
                Plaintiff,              )
                                        )
v.                                      )        Civil  Action No. 07-0107 (RMC)
                                        )
GEORGE W. BUSH,                         )
President of the United States, et al.  )
                                        )
                Defendants,             )
                                        )
                                        )
_____ )

**THE PLAINTIFFS' STATEMENT OF FACTS AS TO WHICH THERE ARE
GENUINE ISSUES PERTAINING TO THE REMAINING FEDERAL DEFENDANTS**

Pursuant to LCvR 56.1 and 7(h). The plaintiff hereby files this statement of material facts as to which the plaintiff states that there are genuine issues regarding the remaining federal defendants, the National Security Agency ("NSA") and the Federal Bureau of Investigation ("FBI") (collectively p/o the "Government Defendants").

**I.        PLAINTIFF DECLARATION OF MATERIAL FACTS**

**A.    NSA Genuine Issues**

1. The purpose of this declaration is to provide the facts which I believe are pertinent to providing true and just evidence as to ("NSA"). Whether directly or indirectly the responsibility of this litigation.

2. Plaintiff John St. Clair Akwei v. "NSA" states his knowledge of "NSA" structure, activities, proprietary technology and covert operations. I believe this is a fictitious presentation provided by the "NSA", used for the sole purpose of instilling fear and intimidation toward American citizens. ¶ Id (2)

3.  As stated by Mr. John C. Hammell, John Akwei never appeared in court to provide a deposition in person. Court docket indicates dismissal of case March 6. 1992. ¶ Id (3)

4.  Plaintiff evidence of material facts states his knowledge of "NSA" structure, activities, proprietary technology and covert operations. I again also believe that this is another fictitious presentation by "NSA" use for the sole purpose of intimidation toward the American public. ¶ Id (4)

5.  As stated by Mr. Duncan M. Roads, Editor of Nexes Magazine, where said article was published. He states that he has no record or contact of Mr. George Farquhar, Author of article written for Project Freedom Magazine. ¶ Id (5)

6.  Brainwave Technology Independent Report. (BWT) The following are excerpts of points which I feel important in presenting personnel proof of (BWT). This presentation indicates the location of subject implant. (BWT) ¶ Id 2a  This location which as presented is the exact area that was shown on the pre-digital enhanced cat scan # 0673986 dtd. December 30, 1998. comp. ¶ Id 16. This evidence can be digitally enhanced as information furnished (BWT) ¶ 38. also is this precaution being observed with our Government Security Agency's. (BWT) ¶ 35. As for my fruitful events pursuing (BWT) evidence. Certified mail was not an option to acquire this information. (BWT) ¶ 45,46, undelivered certified mail. Here is a sample of a MEMS ECECS micro chip. (BWT) ¶ 48.

7.  Plaintiff John St. Clair Akwei v. "NSA" case no. 92-0449. I find no mention of (BWT) in the evidence presented to the Court. ¶ Id (7) As presented ¶ Id (2) alleges "NSA" torture. Also ¶ Id (4) same allegations only different media.

8.  It is imperative that a hearing be granted as to Plaintiff John St. Clair Akwei, in reference to Case No. 92-0449. With my personnel investigating as to the veracity of the

Plaintiffs' statements describing (BWT), and to who has had personnel contact with this alleged provider of this information to the media. Hearing request (Doc.) Id. 18. 06/11/07.

9.   My justification for the use of the term "off campus" in reference to Falls Church, Virginia, as a geographical location pertaining to "NSA" Fort George G. Meade, MD. As my involvement in crypto as a technician which I performed I/O ancillary crypto equipment system check-out on U.S. Navy surface ships and U.S. Navy nuclear submarine vessels, also providing instruction pertaining to the system. Mr. R. Tucker, Mr. H. Wilson, Mr. J. Freitas and Mr. R. Keiler, to mention a few of the crypto technicians that received instruction at NSA/CSS Falls Church, VA. which I had been involved with, while employed at both the Boston Naval Shipyard and Portsmouth Naval Shipyard.

10.   I have included this document as an example of what a nazi faction and law enforcement can be of a controlling factor in a neighborhood. Originally this document was sent to Office of Information and Privacy attention to Priscilla Jones. U.S. Department of Justice. ¶ Id. Ex.I. After permission from her was provided, as I was assured the ("FBI ") would observe this document, since it was in conjunction with Case No. 030136.

11.   Motion request for Injunctive Relief. ¶ Id. Ex.J. noted: Doc. 32 Let This be Sched. No action or response has been forth coming, as to the decision of this Court. This torture and intimidation continues.

## B.  NSA  Genuine Issues by Known Indirect Entities

12.   Example of three documents that were deleted from my personnel computer. Here is another example of the insecurity of our home.

3

13. This is another example of ("NSA") (BWT) in another part of this world. Written by Dr. Rauni Kilde formally Chief Medical Officer for Northern Finland, ("NSA") is not only known for her medical expertise but also making it known to the dangers of (BWT) and the government control.

14. Here is a document with powerful rules toward the upholding of our United States Constitution. Of note: Initiate Measure No.360. Section 13 <u>Legal Profession,</u> concerning Attorneys and Judges. 2, <u>comint law</u> NSCID directive #6. 11, <u>police</u>. 29, <u>Federal Agencies,</u> 33, <u>Communications</u>. 34, <u>National Security Employees</u>. 37, <u>Department of Mental Health,</u> (physiological torture). For the State of Washington.

15. Here are documented proof files of illegal treatment of our government and [ex] government employees. (whistleblowers) I believe the term being used, and the false labeling being used, such as "delusional," "paranoid" or "psychotic." These are employees or former employees of ("NSA"). Former employees: Russell D. Tice, Diane T. Ring, Thomas G. Reinbold and former employee, "Agent X."

16. David A. Larson (whistleblower) involving government agencies "Special Access Program (SAP)" "Defense Advance Research Projects Agency (DARPA)" "M.E.M.S," "F.B.I;" "D.O.J." and the Executive Branch of our United States Government.

17. I am presenting here more evidence of a home invasion perpetrated by (collectively, the Government Defendants"). No investigation initiated by either "Federal Communication Commission (FCC) nor The Federal Trade Commission (FTC) in an attempt to insure a justifiable solution.

18. Presented here are documents of U. S. Patents No. 3,951,134 and U. S. Patents

No. 5,270,800. Which provide documented proof of U.S. Government involvement in the use of Brainwave Technology.

19. In reference to Comp. ¶ 19, the documented proof total number of pages now total over two hundred and forty pages. Among listed casualties are: property damage, electronic control and interference of home entertainment systems, remote units auto problems, brainwave torture and complete control of PC and the most flagrant of listed cover-ups is brainwave technology.

20. Another example of harassment and intimidation by a member of the (collectively, the " Government Defendants"). Traffic citation collectively by Volusia County Sheriff Department, National Sheriff Association (NSA), Florida Sheriff Association and Daytona Beach Shores Police Department. Copy of Citation and evidence as presented. Case Dismissed January 18, 2008. (no-show by law enforcement)

## II.    PLAINTIFF DECLARATION OF MATERIAL FACTS ("FBI")

### A.    <u>Plaintiff Statement of FOIA Material</u>

21. (2) In reference to Ca. 6:03-cv-1499-Orl-28-DAB improper excisions as per Title 5 U.S.C. 552 and 552(a)[1]. Improper excisions were not exercised as to disclosure of personal information in reference to my date of birth and social security information. ¶ <u>Id</u> 4h. I provide the excisions on my own. This document compromised my personnel privacy, which was provide by ("FBI") Boston, Mass. Dated September 26, 2002. ¶ <u>Id</u> 2h.

22. (3) Reference to Federal Bureau of Investigation ("FBI") file No. 190-BS-90887. As to ("FBI") Boston, Mass. Letter dated September 26, 2002 with routing at bottom left.

---

[1]552 (b)(7)(C) Could reasonably be expected to constitute an unwarranted invasion of personal privacy. 552(k)(2) Investigative material compiled for law enforcement purposes,

other than criminal, which did not result in loss of right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence.

Originator of corrected letter David M. Hardy, (DMH) excisions included. ¶ Id Exhibit B.

23. (4) U. S. Department of Justice (FOIA) 04 reference guide. FOIA request example, such as ("FBI"): list the date, location and name of the interviewing agent, and subject of the investigation. This information is provided from /04foia/ referenceguidemay99.

24. (5) Notification of plaintiff request for records held at JFO indicated no records held. No record of request at ("FDPS") dated April 15, 2007 with an assigned file number 972947, there are no documentation of my request in detail. Hardy Decl.¶ (17). I hold in my possession a document from JFO dated February 5, 2003 stating no records found but their is no case assignment number as noted 972947 ("FBI") FOIPA.

25. (6) In reference to case No. 6:03-cv-1499-Orl-28-DAB. Middle District of Florida. Citizen Complaint Summary on information or complaint. ¶ Id. F3 to f6. I call attention to Criminal Section overview, U. S. Department of Justice, Civil Rights Division. Color of Law Police Misconduct. ¶ Id. f3 thru. f6.

26. (7) FOIA request to ("FBI") Daytona Beach, Florida, dated September 5, 2002. Went to office on November 10, 2002 in reference to FOIA letter, I was told by Special Agent Bonner, that he had sent to JFO. He then proceeded to ask me for a copy of this document. It is now well over the twenty day rule of response to request made. The receipt of this FOIA request was February 5, 2003. Their was no letter of acknowledgement nor request number. ¶ usdoj/04foia/referenceguide. There was little to no dialogue on the subject of this ongoing hate crime and Volusia County Sheriff.

27. (8) Office of Information and Privacy, pertaining to ("FBI") reference case No. 03-0136 pertaining to hate crimes. Documented fax. information. These statements are by the Plaintiff providing evidence of hate crime documentation. ¶ Id 30.

28. (9) Injunctive Relief Motion request as to schedule of time and date. Note on file has schedule to be announced. Statement of fact and the need for relief.

29. (10) Plaintiff request for Evidentiary Hearing as to schedule time and date. Would provide physical evidence as to implant.

30. (11) Motion filing of Discovery v. National Security Agency ("NSA"), Federal Bureau of Investigation ("FBI") and Volusia County Sheriff Department ("VCS") p/o (collectively, the "Government Defendants"). Pertinent information as to "off campus," Falls Church, Virginia. (witness's) ¶ Id NSA 9. "paranoid" is one of many choice descriptive word usage to intimidate most citizens. The motion is self explanatory as to appeal Office of Information and Privacy No. 03-0136. It has affirm the ("FBI") action as to my request.

31. (12) Here is another example of a home invasion hate crime perpetrated by (collectively, the "Government Defendants"). This type of electronics system control is not accomplished with off the shelf Radio Shack type equipment. The F.C.C. allows this type of home invasion of electronics to take place by our Government Security Agencies, Enclosed are two pages of just home entertainment compromised evidence, also photo evidence of compromised units.

32. (13) Evidence of traffic violation set-up by law enforcement. As I stated in the dismissal of charges and no show of both police officers at Court hearing.

As the documents provided to the Court, it is illegal to operate a traffic radar along a length of metal fence due to inaccurate data due to reflections. ¶ Id Photo. 3. Also incident of our auto towed  as woman in car (same agency) observed incident. Id pg. 00058, also ¶ Inj. Rlf. Doc.#30. National Sheriff Association. (NSA) National Office, Falls Church, Virginia.

33. (14) Whistle blower David A. Larson is presented as a look alike case as this Plaintiff presenting his version of a "Government Cover-up." Primary to this case is evidence of BWT and technical evidence, also implant data. How the F.C.C. has given free protocol to "suspended carrier," which again has given "NSA" an open ticket to BWT frequencies.

Respectfully submitted,

  /s John E. Moore Pro se
9 Pleasant View Circle
Daytona Beach, Florida
32118-5511
386-761-8193

8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN E. MOORE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 07-0107 (RMC) |
| | ) |
| GEORGE BUSH, | ) |
| President of the United States, et al. | ) |
| | ) |
| Defendants, | ) |
| _____ | ) |

**PLAINTIFF SUBMITS MOTION FOR DISMISSAL OR ALTERNATIVELY**
**FOR SUMMARY JUDGMENT DISMISSAL AS TO REMAINING FEDERAL**
**DEFENDANTS MOTION**

Plaintiff hereby submits this motion to dismiss defendants motion pursuant to Federal

Rule of Civil Procedure 12(a)(5) as being ambiguous and vague. defendants National

Security Agency ("N.S.A.") and the Federal Bureau of Investigation ("F.B.I.") failed

to even make a concerted effort as to the whereabouts of said legal federal documents for the

betterment of true justice. The plaintiff hereby submits a motion pursuant to Federal Rules of

Civil Procedure 12 (e).Defendant failed to provide a more definitive response. As to

Defendants seeking summary judgment pursuant to Federal Rules of Civil Procedure

56 (e), plaintiff will provide genuine undisputed material facts. Plaintiff will submit

affidavits, including documentary evidence which will provide genuine issues of

material facts, as per Federal Rules of Civil Procedure 56(e)(1)(2)[1]. Also Local Rule

LCvR 7(h)[2]

[1]Requiring that oppositions to motions for summary judgment "shall" be accompanied by a "separate" concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to that: Fed. R. Civ. P. 56 (e)(1) A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits. Fed. R. Civ. P. 56 (e)(2). When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather , its response must– by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

[2]Each motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends their is no genuine issue, which shall include references to the parts of the record relied on to support the statement. An opposition to such a motion shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement. Each such motion and opposition must also contain or be accompanied by a memorandum of points and authorities required by section (a) and (b) of this Rule. In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion

Respectfully submitted,

John E. Moore Pro Se

_____
9 Pleasant View Circle
Daytona Beach, Florida.
32118-5511
386-761-8193

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of August, 2008, I have place a true and

exact copy of the following:

### PLAINTIFFS' MOTION FOR LEAVE TO SUBMIT SURREPLY
and
### MEMORANDUM OF LAW IN SUPPORT
with
### FILING FOR PURPOSE OF MOTION LCvR 5.2 (b)

Fedex, prepaid, addressed to:

MICHELLE N. JOHNSON, BAR # 491910
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W. Room E4212
Washington, D.C. 20530
(202) 514-7139

/s/ John E. Moore Pro se

_____
9 Pleasant View Circle
Daytona Beach, Florida.
32118-5511
(386) 761-8193

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of August 2008, I have placed a true and

exact copy of the following:

### PLAINTIFFS FILING OF DISCOVERY  OF
### MATERIAL NOT PREVIOUSLY ENTERED
### WITH REQUEST FOR EVIDENTURY HEARING

Fedex, prepaid, addressed to:


MICHELLE N. JOHNSON, BAR # 491910
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W. Room E4212
Washington, D.C. 20530
(202) 514-7139

/s/ John E. Moore Pro se

_____
9 Pleasant View Circle
Daytona Beach, Florida.
32118-5511
(386) 761-8193

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ <br> ) <br> ) <br> JOHN E. MOORE, ) <br> ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> GEORGE W. BUSH, et al., ) <br> ) <br> Defendant, ) <br> ) <br> _____ _____) | Civil Action No. 07-00107 |

### PLAINTIFF FILING OF DISCOVERY OF MATERIAL
### NOT PREVIOUSLY ENTEREDWITH REQUEST
### TO ENTER AS EVIDENCE

This Motion  LCvR 5.2 (b) is being submitted to this Court to present

documentary evidence of intrusion to Plaintiff personnel computer. This shows the

blatant lack of respect of our Judicial System as the Plaintiff was preparing what to

me are an all important presentation of documentary evidence. I am introducing pages: 9,

10, 11, and 12 of Court Document, Titled: "Plaintiff Memorandum of Law in Support

of Motion to Dismiss Defendants Motion, or Alternatively to Dismiss Motion for Summary

Judgment." To delete these horizontal lines was not an option. Here is another example of

"home invasion" as to a personnel computer by (collectively the" Government Defendants.")

Respectfully submitted,

John E. Moore Pro Se

_____
9 Pleasant View Circle
Daytona Beach, Florida
32118-5511

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN E. MOORE,                              )
                                           )
                    Plaintiff,             )
                                           )
    v.                                     )          CA. NO.  07-0107 (RMC)
                                           )
GEORGE W. BUSH, et al                      )
                                           )
                    Defendant,             )
                                           )
_____   )

## **NOTICE OF MOTION**

**To:**   Michelle N Johnson
          Assistant United States Attorney
          United States Attorney's Office
          Civil Division
          555 4th  Street, N.W. Room E4212
          Washington, D.C. 20530
          (202) 514-7139

### **PLAINTIFFS' MOTION FOR LEAVE TO SUBMIT SURREPLY**
and
### **MEMORANDUM OF LAW IN SUPPORT**
with
### **FILING FOR PURPOSE OF MOTION LCvR 5.2 (b)**

Copies of which are served upon you.

Respectfully submitted,

/s/ John E. Moore Pro se

_____

9 Pleasant View Circle
Daytona Beach, Florida
32118-5511
(386) 761-8193



US District Court, District of Columbia
Nancy Mayer Whittington, Clerk

AUG 2 8 2008

Mail Room
RECEIVED

**FedEx Express** · US Airbill

FedEx Tracking Number  8645 7089 5921

Form ID No.  0200

**1 From**

Date

Sender's Name · Phone

Company

Address

City · State · ZIP · Dept./Floor/Suite/Room

**2 Your Internal Billing Reference**

**3 To**

Recipient's Name · Phone

Company

Recipient's Address

We cannot deliver to P.O. boxes or P.O. ZIP codes.
To request a package be held at a specific FedEx location, print FedEx address here.

Address

City · State · ZIP · Dept./Floor/Suite/Room

**4a Express Package Service**

- FedEx Priority Overnight
- FedEx Standard Overnight
- FedEx 2Day
- FedEx Express Saver

FedEx Envelope rate not available. Minimum charge: One-pound rate.

**4b Express Freight Service**

- FedEx 1Day Freight
- FedEx 2Day Freight

**5 Packaging**

- FedEx Envelope
- FedEx Pak
- FedEx Box
- FedEx Tube
- Other

**6 Special Handling**

- SATURDAY Delivery
- HOLD Weekday
- HOLD Saturday

Does this shipment contain dangerous goods?

- No
- Yes (Shipper's Declaration not required)
- Yes (As per attached Shipper's Declaration)
- Dry Ice  Dry Ice, 9, UN1845 ___ kg
- Cargo Aircraft Only

**7 Payment** Bill to:

- Sender
- Recipient
- Third Party
- Credit Card
- Cash/Check

Total Packages · Total Weight · Total Declared Value $ ___ .00

**8 Residential Delivery Signature Options**

- No Signature Required
- Direct Signature
- Indirect Signature

Rev. Date 10/04 · Part #158281 · ©1994–2004 FedEx · PRINTED IN U.S.A. · SRF

8645 7089 5921

520

fedex.com 1.800.GoFedEx 1.800.463.3339

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN E. MOORE )<br><br>Plaintiff, )<br><br>v. )<br><br>GEORGE W. BUSH, et al., )<br><br>Defendant, ) | Civil Action No. 07-00107 |

## DECLARATION OF PLAINTIFF v. N.S.A.

(1) The purpose of this Declaration is to provide to Defendants (N.S.A.) undeniable proof that what are presented here as **(Exhibits)** will produce without a reasonable doubt the true facts of this travesty of Justice.

(2) Evidence for the Law Suit filed at the U.S. District Court for the District of Columbia. Civil Action 92-0449, John St. Clair Akwei vs. N.S.A. Ft. George G. Meade, MD. The Plaintiff states in the following document as presented, that the afore mentioned statement states as: My knowledge of the National Security Agency structure, National Securities activities, proprietary technology and covert operations to monitor individual Citizens. (twelve pages) **See Exhibit A**

(3) A statement from Mr. John C. Hammell. I.A.H.F. Legislative Advocate founder and alleged author or interviewer of stated article. (one page) **See Exhibit B**

(4)  Evidence for Law Suit filed at the U.S. District Court for the District of Columbia. Civil Action 92-0449, John St Clair Akwei v. N.S.A. Ft George G. Meade, MD. The Plaintiff states in the following document as presented, that the afore mentioned statement states as: Constitutes his knowledge of the National Security structure, National Securities activities, proprietary technology and covert operations to monitor individual Citizens. (eleven pages) **See Exhibit C**

(5)  Statement from Mr. Duncan M. Roads. Alleged author or interviewer of stated article. Nexus Magazine Editor. (two pages) **See Exhibit D**

(6)  Brainwave Technology Independent Report. (Partial Presentation) Full complete page document access instruction included in **See Exhibit E**  Technical and detail data presented as evidence of implant documentation. (fourteen pages) **See Exhibit E.**

(7)  Plaintiff John St. Clair Akwei v. N.S.A. Case No. 92-0449. included are copies of Complaint, also opinion memorandum and order of U.S. District Court, District of Columbia. (six pages) **See Exhibit F**

(8)  Plaintiff Motion request for oral hearing. No action or response has been fourth coming as to the decision of this Court. Filing date was June 11, 2007. Related case 92-0499. Plaintiff John St. Clair Akwei v. National Security Agency. (three pages) **See Exhibit G**

(9)  Plaintiff Motion for Discovery. (F.B.I.) Case ID BS 62.0 Boston Mass. This is both an N.S.A. and F.B.I. compromise of the Plaintiffs' Civil Rights as to " The Government Defendants" participants. (eleven pages) **See Exhibit H**

(10)  Office of Information and Privacy. Reference: U.S. Department of Justice-Case 03013, documents via. fax. To Priscilla Jones O.I. & P. pre-approved, as case ongoing. (four pages) **See Exhibit I**

(11)   Motion request for Injunctive Relief, filing date November 20, 2007. No action or response has been forth coming as to the decision of this Court.  (thirteen pages) <u>See</u> <u>Exhibit J</u>

(12)   Here are three U.S. Government employees that their names were included on a list of U.S. Government  whistle blowers that were stored on my computer. (three pages) <u>See Exhibit K</u>

(13)   Dr. Rauni Kilde, formally Chief Medical Officer for Northern Finland. Here is a good example of what Microchip implant, Mind control and Cybernetics are presented as. (four pages) <u>See Exhibit L</u>

(14)   Secretary of State Ralph Monro of the State of Washington and his fight for Freedom v. N.S.A. Initiative Measure No. 630 and 631 **Sec.1** executive branch , charter, NSCID number 9. This law is contrary to the Constitution of the United States of America. Illegal in the State of Washington. (ten pages) <u>See Exhibit M</u>

(15)   N.S.A. whistleblowers: Psychological abuse not only these security employees, but also this Plaintiff, who was falsely targeted. (eleven pages) <u>See Exhibit N</u>

(16)   David Larson whistleblowers letter to Senator Dianne Feinstein. His problems and harassment examples are notably out of the same book as the Plaintiff. (twelve pages) <u>See Exhibit O</u>

(17)   Updated report on continued harassment of Plaintiff, allegedly carried out by (collectively, "the Government Defendants"). ¶ doc. 45 Id.1. Photo. evidence presenting units  disabled. Letter addressed to Directv, which was our service provider at the time of the crimes committed at our home. Complaint filed with Federal Communication Commission. Complaint No. 08-C00022428. Harassment continues with new service provider, Bright House Network.  (seven pages) <u>See Exhibit P.</u>

(18)   Documentation of U. S. Patents pertaining to the design and use of Brainwave Technology. Designed for and used by our U. S. Government. (two pages) **See Exhibit Q.**

(19)   Documentation of atrocities of torture and destruction of personnel property allegedly carried out by (collectively, The Government Defendants"). (two hundred and forty pages) **See Exhibit R.** Note: Will provide copy on request.

(20)   Documentation of harassment by National Sheriff Association (N.S.A.), or member agency, Florida Sheriff Association (F.S.A.). Traffic speeding  violation by Daytona Beach Shores Police Department, in the County of Volusia, Florida. (eleven pages) **See Exhibit S.**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
                                                    )
JOHN E. MOORE,                                      )
                                                    )
                                                    )
        Plaintiff,                                  )
                                                    )
            v.                                       )        Civil Action No. 07-00107
                                                    )
GEORGE W. BUSH, et al.,                             )
                                                    )
        Defendant,                                  )
                                                    )
_____ _____)

**EXHIBIT  A**

How The National Security Agency (NSA) Illegally And Unconstitutionally Harasses Law-Abiding Americans Everyday. How, you ask? Quite simply, actually. It's done by EMF or ELF Radio Waves, and a technology known as "Remote Neural Monitoring". Haven't you ever wondered about that ringing in your left ear? Well, here are the reason (s). And just why should the NSA do this, you ask? To silence any who who dare to speak out against them or any other agency, or the Government or simply to think for themselves, and "outside the box", if you will. Think not? Then, read on..........

# How The NSA Harasses Thousands Of Law Abiding Americans Daily By The Usage Of Remote Neural Monitoring (RNM)

## John St. Clair Akwei
## vs.
## NSA, Ft. Meade, MD, USA

**Table of Contents**

# Cover Page

Evidence for the Lawsuit filed at the US courthouse in Washington, D.C.
(Civil Action 92-0449)

John St.Clair Akwei  vs.  NSA Ft George G. Meade, MD

My knowledge of the National Security Agency's structure, national security activities, proprietary technology,and covert operations to monitor individual citizens.

# The NSA's mission and the NSA's domestic Intelligence operation.

## Communications Intelligence (COMINT)

Blanket coverage of all electronic communication in the U.S. and the world to ensure national security. The NSA at Ft. Meade, Maryland has had the most advanced computers in the world since the early 1960's. NSA technology is developed and implemented in secret from private corporations, academia, and the general public.

## Signals Intelligence (SIGINT)

The Signals Intelligence mission of the NSA has evolved into a program of decoding EMF waves in the environment for wirelessly tapping into computers and tracking persons with the electrical currents in their bodies. Signals Intelligence is based on the fact that everything in the environment with an electric current in it has a magnetic flux around it which gives off EMF waves. The NSA/DoD has developed proprietary advanced digital equipment which can remotely analyze all objects whether man-made or organic that have electrical activity.

## Domestic Intelligence (DOMINT)

The NSA has records on all U.S. citizens. The NSA gathers information on U.S. citizens who might be of interest to any of the over 50,000 NSA agents (HUMINT). These agents are authorized by executive order to spy on anyone. The NSA has a permanent National Security Anti-Terrorist surveillance network in place. This surveillance network is completely disguised and hidden from the public.

Tracking individuals in the U.S. is easily and cost-effectively implemented with the NSA's electronic surveillance network. This network (DOMINT) covers the entire U.S., involves tens of thousands of NSA personnel, and tracks millions of persons simultaneously. Cost effective implementation of operations is assured by NSA computer technology designed to minimize operations costs.

NSA personnel serve in Quasi-public positions in their communities and run cover businesses and legitimate businesses that can inform the intelligence community of persons they would want to track. N.S.A. personnel in the community usually have cover identities such as social workers, lawyers and business owners.

**Individual citizens occasionally targeted for surveillance**
**by independently operating NSA personnel.**

NSA personnel can control the lives of hundreds of thousands of individuals in the U.S. by using the NSA's domestic intelligence network and cover businesses. The operations independently run by them can sometimes go beyond the bounds of law. Long-term control and sabotage of tens of thousands of unwitting citizens by NSA operatives is likely to happen. NSA Domint has the ability to covertly assassinate U.S. citizens or run covert psychological control operations to cause subjects to be diagnosed with ill mental health.

# NSA's domestic electronic surveillance network

As of the early 1960's the most advanced computers in the world were at the NSA, Ft. Meade. Research breakthroughs with these computers were kept for the NSA. At the present time the NSA has nanotechnology computers that are 15 years ahead of present computer technology.

The NSA obtains blanket coverage of information in the U.S. by using advanced computers that use artificial intelligence to screen all communications, irregardless of medium, for key words that should be brought to the attention of NSA agents/cryptologists. These computers monitor all communications at the transmitting and receiving ends. This blanket coverage of the U.S. is a result of the NSA's Signals Intelligence (SIGINT) mission.

The NSA's electronic surveillance network is based on a cellular arrangement of devices that can monitor the entire EMF spectrum. This equipment was developed, implemented, and kept secret in the same manner as other electronic warfare programs.

With this technology NSA personnel can non-obtrusively tap into any communication device in existence. This includes computers, telephones, radio and video-based devices, printers, car electronics, and even the minute electrical

fields in humans (for tracking individuals).

## Signals Intelligence Remote Computer Tampering

The NSA keeps track of all PCs and other computers sold in the U.S. This is an integral part of the Domestic Intelligence network.

The NSA's EMF equipment can tune in RF emissions from personal computer circuit boards (while filtering out emissions from monitors and power supplies). The RF emission from PC circuit boards contains digital information in the PC. Coded RF waves from the NSA's equipment can resonate PC circuits and change data in the PC's. Thus the NSA can gain wireless modem-style entry into any computer in the country for surveillance or anti-terrorist electronic warfare.

Radio and Television signals can be substituted at the receiving end with special EMF equipment. Replacing signals in Radios and Televisions is another outgrowth of the NSA's Signals Intelligence (SIGINT) mission.

## Detecting EMF Fields in Humans for Surveillance.

A subject's bioelectric field can be remotely detected, so subjects can be monitored anywhere they are. With special EMF equipment NSA cryptologists can remotely read evoked potentials (from EEGs). These can be decoded into a person's brain-states and thoughts. The subject is then perfectly monitored from a distance.

NSA personnel can dial up any individual in the country on the Signals Intelligence EMF scanning network and the NSA's computers will then pinpoint and track that person 24 hours-a-day. The NSA can pick out and track anyone in the U.S.

# NSA Signals Intelligence Use of EMF Brain Stimulation

NSA Signals Intelligence uses EMF Brain Stimulation for Remote Neural Monitoring (RNM) and Electronic Brain Link (EBL). EMF Brain Stimulation has been in development since the MKUltra program of the early 1950's, which included neurological research into "radiation" (non-ionizing EMF) and bioelectric research and development. The resulting secret technology is categorized at the National Security Archives as "Radiation Intelligence," defined as "information from unintentionally emanated electromagnetic waves in the environment, not including radioactivity or nuclear detonation."

Signals Intelligence implemented and kept this technology secret in the same manner as other electronic warfare programs of the U.S. government. The NSA monitors available information about this technology and withholds scientific research from the public. There are also international intelligence agency agreements to keep this technology

secret.

The NSA has proprietary electronic equipment that analyzes electrical activity in humans from a distance. NSA computer-generated brain mapping can continuously monitor all the electrical activity in die brain continuously. The NSA records aid decodes individual brain maps (of hundreds of thousands of persons) for national security purposes. EMF Brain Stimulation is also secretly used by the military for Brain-to-computer link. (In military fighter aircraft, for example.)

For electronic surveillance purposes electrical activity in the speech center of the brain can be translated into the subject's verbal thoughts. RNM can send encoded signals to the brain's auditory cortex thus allowing audio communication direct to the brain (bypassing the ears). NSA operatives can use this to covertly debilitate subjects by simulating auditory hallucinations characteristic of paranoid schizophrenia.

Without any contact with the subject, Remote Neural Monitoring can map out electrical activity from the visual cortex of a subject's brain and show images from the subject's brain on a video monitor. NSA operatives see what the surveillance subject's eyes are seeing. Visual memory can also be seen. RNM can send images direct to the visual cortex. bypassing the eyes and optic nerves. NSA operatives can use this to surreptitiously put images in a surveillance subject's brain while they are in R.E.M. sleep for brain-programming purposes.

# Capabilities of NSA operatives using RNM

There has been a Signals Intelligence network in the U.S. since the 1940's. The NSA, Ft. Meade has in place a vast two-way wireless RNM system which is used to track subjects and non-invasively monitor audio-visual information in their brain. This is all done with no physical contact with the subject. RNM is the ultimate method of surveillance and domestic intelligence. Speech and 3D sound, and subliminal audio can be sent to the auditory cortex of the subject's brain (bypassing the ears) and images can be sent into the visual cortex. RNM can alter a subject's perceptions, moods, and motor control.

Speech cortex/auditory cortex link has become the ultimate communications system for the intelligence community. RNM allows for a complete audio-visual brain-to-brain link or brain-to-computer link.

# National Security Agency Signals Intelligence
# Electronic Brain Link Technology

NSA SigInt can remotely detect, identify and monitor a person's bioelectric fields.

The NSA's Signals Intelligence has the proprietary ability to remotely and non-invasively monitor information in the human brain by digitally decoding the evoked potentials in the 30-50 hz, .5 milliwatt electro-magnetic emissions from the brain.

Neuronal activity in the brain creates a shifting electrical pattern that has a shifting magnetic flux. This magnetic flux puts out a constant 30-50 hz, .5 milliwatt electromagnetic (EMF) wave. Contained in the electromagnetic emission from the brain are spikes and patterns called "evoked potentials."

Every thought, reaction, motor command, auditory event, and visual image in the brain has a corresponding "evoked potential" or set of "evoked potentials." The EMF emission from the brain can be decoded into the current thoughts, images and sounds in the subject's brain.

NSA SigInt uses EMF-transmitted Brain Stimulation as a communications system to transmit information (as well as nervous system messages) to intelligence agents and also to transmit to the brains of covert operations subjects (on a non-perceptible level).

EMF Brain Stimulation works by sending a complexly coded and pulsed electromagnetic signal to trigger evoked potentials (events) in the brain, thereby forming sound and visual images in the brain's neural circuits. EMF Brain Stimulation can also change a person's brain-states and affect motor control.

Two-way Electronic Brain-Link is done by remotely monitoring neural audio-visual information while transmitting sound to the auditory cortex (bypassing the ears) and transmitting faint images to the visual cortex (bypassing the optic nerves and eyes, the images appear as floating 2-D screens in the brain).

Two-Way Electronic Brain Link has become the ultimate communications system for CIA/NSA personnel. Remote Neural Monitoring (RNM, remotely monitoring bioelectric information in the human brain) has become the ultimate surveillance system. It is used by a limited number of agents in the U.S. Intelligence Community.

RNM requires decoding the resonance frequency of each specific brain area. That frequency is then modulated in order to impose information in That specific brain area. The frequency to which the various brain areas respond varies from 3 Hz to 50 Hz. Only NSA Signals Intelligence modulates signals in this frequency band.

An example of EMF Brain Stimulation:

| Brain Area | Bioelectric Resonance Frequency | Information Induced Through Modulation |
|---|---|---|
| Motor Control Cortex | 10 HZ | Motor Impulse Co-ordination |
| Auditory Cortex | 15 HZ | Sound which bypasses the ears |
| Visual Cortex | 25 HZ | Images in the brain, bypassing the eyes |
| Somatosensory Cortex | 09 HZ | Phantom Touch Sense |
| | | |

| Thought Center | 20 HZ | Imposed Subconscious Thoughts |

This modulated information can be put into the brain at varying intensities from subliminal to perceptible.

Each person's brain has a unique set of bioelectric resonance/entrainment frequencies. Sending audio information to a person's brain at the frequency of another person's auditory cortex would result in that audio information not being perceived.

The Plaintiff learned of RNM by being in two-way RNM contact with the Kinnecome group at the NSA, Ft. Meade. They used RNM 3D sound direct to the brain to harass the Plaintiff from 10/90 to 5/91. As of 5/91 they have had two-way RNM communications with the Plaintiff and have used RNM to attempt to incapacitate the Plaintiff and hinder the Plaintiff from going to authorities about their activities against the Plaintiff in the last twelve years.

The Kinnecome group has about 100 persons working 24-hours-a-day at Ft Meade. They have also brain-tapped persons the Plaintiff is in contact with to keep the Plaintiff isolated. This is the first time ever that a private citizen has been harassed with RNM and has been able to bring a lawsuit against NSA personnel misusing this intelligence operations method.

# NSA Techniques and Resources

Remote monitoring/tracking of individuals in any location. inside any building, continuously, anywhere in the country.

A system for inexpensive implementation of these operations allows for thousands of persons in every community to be spied on constantly by the NSA.

## Remote RNM Devices

a) NSA's RNM equipment remotely reads the evoked potentials (EEGs) of the human brain for tracking individuals and can send messages through the nervous system to affect their performance.

b) [Information missing from original]

c) RNM can electronically identify individuals and track then anywhere in the U.S. This equipment is on a network and is used for domestic intelligence operations, government security, and military base security, and in case of bioelectric warfare.

## Spotters and Walk-Bys in Metropolitan Areas

a) Tens of thousands of persons in each area working as spotters and neighborhood/business place spies (sometimes unwittingly) following and checking on subjects who have been identified for covert control by NSA personnel.

b) Agents working out of offices can be in constant communication with Spotters who are keeping track of the NSA's thousands of subjects in public.

c) NSA Agents in remote offices can instantly identify (using RNM) any individual spotted in public whom is in contact with surveillance subject.

## Chemicals and Drugs into Residential Buildings with hidden NSA-Installed and maintained plastic plumbing lines.

a) The NSA has kits for running lines into residential tap water and air ducts of subjects for the delivery of drugs (such as sleeping gas or brainwashing aiding drugs). This is an outgrowth of CIA pharmapsychology.

## Brief Overview of Proprietary U.S. Intelligence/Anti-Terrorist Equipment Mentioned.

Fixed network of special EMF equipment that can read EEGs in human brains and identify/track individuals by using digital computers. ESB (Electrical Stimulation to the Brain) via EMF signal from the NSA Signals Intelligence is used to control subjects.

EMF equipment that gathers information from PC circuit boards by deciphering RF emissions thereby gaining wireless modem-style entry into any personal computer in the country.

All equipment hidden, all technology secret, all scientific research unreported (as in electronic warfare research).

Not known to the public at all, yet complete and thorough implementation of this method of domestic intelligence has been in place since the early 1980's.

# Resources

These publications have only been discovered since December 1991, after Plaintiff had already notified authorities (Dept. of Justice, etc.) of Public Corruption by named NSA employees. When no action was taken against the NSA employees I researched the Intelligence Community electronic surveillance technology involved and discovered the

following publications: The Body Electric

>Electromagnetism and the Foundrrtion of Life, by Robert Becker, M.D.
>p. 265/313/318. Monitoringeuroelectric information in the brain. E-M wave E.S.B.

Cross Currents, by Robert Becker, M.D.

>p. 70, p. 78, p. 105/210/216/220/242/299/303 E-M ESB. Simulating auditory hallucinations. p. 274, "Remote computer tampering using the RF emissions from the logic board."

Currents of Death by Paul Brodeur

>p. 27/93. Driving brain electrical activity with external E-M, Magnetophosphenes, Delgado.

The Zapping of America by Paul Brodeur

>DoD E-M ESB Research, simulating auditory hallucinations.

Of Mice, Men and Molecules, by John H. Heller. 1963.

>p. 110, Bioelectricity. probing the brain with E-M waves.

The 3-Pound Universe, by Judith Hooper

>p. 29/132/137. CIA EEG research. EEG's for surveillance.

In the Palaces or Memory, by George Johnson

>E-M emissions from the brain,the brain as an open electromagnetic circuit.

The Puzzle Palace, by James Bamford

>Signals intelligence, most advanced computers in the early Sixties

The U.S. Intelligence Community - Glossary terms at National Security Archives:

>Radiation intelligence - information from unintentionally emanated electromagnetic energy, excluding radioactive sources.

The Search for the "Manchurian Candidate," by John Marks

>p. 327. Electrical or radio stimulation to the brain, CIA R&D in bioelectrics.

Secret Agenda, by Jim Hougan

>National Security cult groups.

Crines of the Intelligence Commununity. by Morton Halperin

Surreptitious entries: intelligence agents running operations against government workers

War in the Age of Intelligent Machines

NSA computer supremacy, complete control of information

Alternate Computers, by Time-Life Books

Molecule Computers

The Mind, by Richard Restak, M.D.

p. 258, EEG Systems Inc., decoding brain E-M emanations, tracking thoughts on a computer.

MedTech, by Lawrence Gallon

Triggering events in the brain" direct to auditory cortex signals.

Cyborg, by D.S. Halacy, Jr. (1965)

Brain-to-computer link research contracts given out by the U.S. Government

Psychiatry and the C.I.A.: Victims of Mind Control by Harvey M. Weinstein. M.D.

Dr. Cameron, psychic driving, ultraconceptual communications.

Journey Into Madness: The True Story of Secret CIA Mind Control and Medical Abuse, by Gordon Thomas

p. 127/276/116, 168-69. Intelligence R & D. Delgado. Psychic driving with radio telemetry.

Mind Manipulators, by Alan Scheflin and Edward M. Opton

MKULTRA brain research for information gathering

The Brain Changers, by Maya Pines.

p. 19. Listening to brain E-M emissions.


## Further Resources


These publications have only been discovered since December 1991, after Plaintiff had already notified authorities (Dept. of Justice, etc.) of Public Corruption by named NSA employees. When no action was taken against the NSA

employees I researched the Intelligence Community electronic surveillance technology involved and discovered the following publications:

Modern Bielectricity

 Inducing audio in the brain with e-m waves, DoD cover-up, E-M wave ESB. Remote EEGs.

Magnetic Stimulation in Clinical Neuropsysiology by Sudhansu Chokroverty

 Magneto-Phosphenes. Images direct to the visual cortex.

The Mind of Man by Nigel Calder

 U.S. Intelligence brain research

Neuroelectric Society Conference - 1971

 Audio direct to the brain with e-m waves, two waf remote EEG.

Brain Control by Elliot S. Valenstein

 ESB control of individuals

Towards Century 21 by C.S. Wallia

 p. 21. Brain Stimulation for direct to brain communication.

Mind Wars by Ron McRae, associate of Jack Anderson

 p 62/106/136. Research into brain-to-brain electronic communications, remote neural e-m detection.

Mind Tools by Rudy Rucker

 Brain tapping, communication with varying biomagnetic fields. p. 82

U.S. News and World Report 1/2/84

 p. 88. e-m wave brain stimulation. Intelligence community high tech.

Ear Magazine article on extremely low frequency radio emissions in the natural environment, radio emissions from the human body.
City Paper article on FCC and NSA "complete radio spectrum" listening posts. 1/17/92.
Frontiers in Science - 1958 - by Edward Hutchings, Jr.

 p. 48

Beyond Biofeedback - 1977 - by Elmer and Alyce Green

 p. 118

The Body Quantum by Fred Alan Wolf
Cloning - A Biologist Reports by Robert Gilmore McKinnell

Ethical review of cloning humans.

Hoover's FBI by former agent William Turner

p. 280. Routines of electronic surveillance work.

July 20, 2019 by Arthur C. Clarke

Lida, Neurophonics, Brain/Computer Link

MegaBrain by Michael Hutchison

p. 107/108/117/120/123. Brain stimulation with e-m waves. CIA research and information control.

The Cult of Information by Theodore Rosnak - 1986

NSA Directive #145. Personal Files in Computers. Computer automated telephone tapping

The Body Shop

1968 implantation of an electrode array on the visual cortex for video direct to the brain and other 1960s research into electronically triggering phosphenes in the brain, thus bypassing the eyes.

Evoked Potentials by David Regan

Decoding neuroelectric information in the brain

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                              )
                              )
JOHN E. MOORE,                )
                              )
                              )
     Plaintiff,               )
                              )
          v.                  )          Civil Action No. 07-00107
                              )
GEORGE W. BUSH, et al.,       )
                              )
     Defendant,               )
                              )
_____ _____)


**EXHIBIT  B**

**jmoore3263@bellsouth.net**

| | |
|---|---|
| **From:** | "John Hammell" <jham@iahf.com> |
| **To:** | <jmoore3263@bellsouth.net> |
| **Sent:** | Wednesday, July 09, 2008 6:56 PM |
| **Subject:** | Re: N.S A. illegally and unconstitutionally harrases law-abiding americans every day. |

At 03:48 PM 7/9/2008, you wrote:

Mr. John C. Hammell.

This e-mail to you is in referance to an article published by I. A. H. F. titled: the n.s.a. mission and the n.s.a. domestic

Intelligence operation. I am requesting I. A. H. F's help in providing me with contact information in reference to this article.

My reason for this request is i am presently proceeding with active litigation in Washington D.C. Federal District

Court, Case No. 1:07-cv-00107-RMC. One of theDefendants listed in this complaint is the National Security Agency.

I am interested in using this particular article with some of its contents and interview with John St. Clair Akwei

in prosecuting this case. My prime interest is the person who did the interview and if it was an in person, not phone type.

Again, if you could provide me with contact information, it would be much appreciated.

Sincerely,

John E. Moore

Sorry, I don't know how to get in touch with Akwei. He filed a lawsuit against NSA but it never went to court. You cannot sue NSA.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN E. MOORE,                          )
                                        )
        Plaintiff,                      )
                                        )
                v.                      )        Civil Action No. 07-00107
                                        )
GEORGE W. BUSH, et al.,                 )
                                        )
        Defendant,                      )
                                        )

**EXHIBIT  C**



**HUMAN RIGHTS WATCH**

# Covert Operations of the U.S. National Security Agency.

**From an article in Nexus Magazine April/May 96**

**A lawsuit filed against the U.S. National Security Agency reveals a frightening array of technologies and programs designed to keep tabs on individuals.**

> ### John St Clair Akwei
> ### vs
> ### National Security Agency
> ### Ft George G. Meade, MD, USA
> ### (Civil Action 92-0449)

The following document comprises evidence for a lawsuit filed at the U.S. Courthouse in Washington, DC, by John St Clair Akwei against the National Security Agency, Ft George G. Meade, Maryland (Civil Action 92-0449), constitutes his knowledge of the NSA's structure, national security activities proprietary technologies and covert operations to monitor individual citizens Ed.

## 1. THE NSA'S MISSION AND DOMESTIC INTELLIGENCE OPERATION

● **Communications Intelligence (COMINT)**

**Blanket coverage of all electronic communications in the US and the world to ensure national security. The NSA at Ft Meade, Maryland has had the most advanced computers in the world since the early 1960s.** NSA technology is developed and implemented in secret from private corporations, academia and the general public.

13a

## ● Signals Intelligence (SICINT)

The Signals Intelligence mission of the NSA has evolved into a program of decoding EMF waves in the environment for wirelessly tapping into computers and track persons with the electrical currents in their bodies. Signals Intelligence is based on fact that everything in the environment with an electric current in it has a magnetic flux around it which gives off EMF waves. **The NSA/DoD [Department of Defence] developed proprietary advanced digital equipment which can remotely analyze all objects whether manmade or organic, that have electrical activity.**

## ● Domestic Intelligence (DOMINT)

**The NSA has records on all US citizens. The NSA gathers information on US citizen who might be of interest to any of the over 50,000 NSA agents (HUMINT).** These agents are authorized by executive order to spy on anyone. The NSA has a permanent national security anti-terrorist surveillance network in place. This surveillance network is completely disguised and hidden from the public.

Tracking individuals in the US is easily and cost-effectively implemented with NSA's electronic surveillance network. **This network (DOMINT) covers the entire US, involves tens of thousands of NSA personnel, and tracks millions of persons simultaneously .** Cost-effective implementation of operations is assured by NSA computer technology designed to minimize operations costs. NSA personnel serve in quasi-public positions in their communities and run cover businesses and legitimate businesses that can inform the intelligence community of persons they would want to track. NSA **personnel in the community usually have cover identities such as social workers, lawyers and business owners.**

## ● Individual Citizens Occasionally Targeted for Surveillance by Independently Operating NSA Personnel

NSA personnel can control the lives of hundreds of thousands of individuals in the US by using the NSA's domestic intelligence network and cover businesses. The operations independently run by them can sometimes go beyond the bounds of law. Long-term control and sabotage of tens of thousands of unwitting citizens by NSA operatives is likely to happen. NSA **DOMINT has the ability to assassinate US citizens covertly or run covert psychological control operations to cause subjects to be diagnosed with ill mental health.**

13b

Covert Operations



## PSYCHO-ELECTRONIC WEAPON EFFECTS

www.raven1.net

9/29/20

> **The above symptoms highlight a fraction of the vast array of
> Nuero-Electromagnetic Frequency Assaults perpetuated by the Police and
> Military Intelligence Agencies toward
> Remote Mind Control Experiments, Behavioural Manipulation and Murder.**

## 2. NSA'S DOMESTIC ELECTRONIC SURVEILLANCE NETWORK

As of the early 1960s, the most advanced computers in the world were at the NSA, Ft Meade.
Research breakthroughs with these computers were kept for the NSA. At the present time the NSA ha:
nanotechnology computers that are 15 years ahead of present computer technology. **The NSA obtains
blanket coverage of information in the US by using advanced computers that use artificial
intelligence to screen all communications, regardless of medium, for key words that should be
brought to the attention of NSA agents/cryptologists.** These computers monitor all communications
at the transmitting and receiving ends. This blanket coverage of the US is a result of the NSA's Signals
Intelligence (SIGINT) mission. The NSA's electronic surveillance network is based on a cellular
arrangement of devices that can monitor the entire EMF spectrum. This equipment was developed,
implemented and kept secret in the same manner as other electronic warfare programs.

### Signals Intelligence Remote Computer Tampering

The NSA keeps track of all PCs and other computers sold in the US. This is an integral part of the
Domestic Intelligence network. The NSA's EMF equipment can tune in RF emissions from personal
computer circuit boards (while filtering out emissions from monitors and power sup- plies). The RF
emission from PC circuit boards contains digital information in the PC. Coded RF waves from the
NSA's equipment can resonate PC circuits and change data in the PCs. Thus the NSA can gain
wireless modem-style entry into any computer in the country for surveillance or anti-terrorist
electronic warfare.

### Detecting EMF Fields in Humans for Surveillance

A subject's bioelectric field can be remotely detected, so subjects can be monitored anywhere they are.
With special EMF equipment NSA cryptologists can remotely read evoked potentials (from EEGs).
These can be decoded into a person's brain-states and thoughts. The subject is then perfectly
monitored from a distance. **NSA personnel can dial up any individual in the country on the
Signals Intelligence EMF scanning network and the NSA's computers will then pinpoint and
track that person 24 hours a day.** The NSA can pick out and track anyone in the US.



13d



**Mind Control Information Feedback Paths: Disparity and Repression**

## J. NSA SIGNALS INTELLIGENCE USE OF EMF BRAIN STIMULATION

NSA Signals Intelligence uses EMF Brain Stimulation for Remote Neural Monitoring (RNM) and Electronic Brain Link (EBL). EMF Brain Stimulation has been in development since the MKULTRA program of the early 1950s, which included neurological research into radiation (non-ionizing EMF) and bioelectric research and development. The resulting secret technology is categorized at the National Security Archives as "Radiation Intelligence", defined as "information from unintentionally emanated electromagnetic waves in the environment, not including radioactivity or nuclear detonation". Signals Intelligence implemented and kept this technology secret in the same manner as other electronic warfare programs of the US Government. The NSA monitors available information about this technology and withholds scientific research from the public. There are also international intelligence agreements to keep this technology secret.

The NSA has proprietary electronic equipment that analyze electrical activity in humans from a distance. NSA computer generated brain mapping can continuously monitor all of the electrical activity in the brain continuously. The NSA records and decode individual brain maps (of hundreds of thousands of persons) for national security purposes. EMF Brain Stimulation is also secretly used by the military for brain-to-computer link (in military fighter aircraft, for example).

For electronic surveillance purposes, electrical activity in the speech center of the brain can be translated into the subject's verbal thoughts. RNM can send encoded signals to the brain's auditory cortex, thus allowing audio communications direct to the brain (bypassing the ears). NSA operatives can use this covertly to debilitate subjects by simulating auditory hallucinations characteristic of

13e

paranoid schizophrenia.

**Without any contact with the subject, Remote Neural Monitoring can map out electrical activity from the visual cortex of a subject's brain and show images from the subject's brain on a video monitor. NSA operatives see what the surveillance subject's eyes are seeing.** Visual memory can also be seen. RNM can send images direct to the visual cortex, bypassing the eyes and optic nerves. NSA operatives can use this surreptitiously to put images into a surveillance subject's brain while they are in REM sleep for brain-programming purposes.

### ▶Capabilities of NSA Operatives Using RNM

There has been a Signals Intelligence network in the US since the 1940s. The NSA, Ft Meade has in place a vast two-way wireless RNM system which is used to track subjects and noninvasively monitor audio-visual information in their brains. This is all done with no physical contact with the subject. RNM is the ultimate method of surveillance and domestic intelligence. **Speech, 3D sound and subliminal audio can be sent to the auditory cortex of the subject's brain (bypassing the ears), and images can be sent into the visual cortex. RNM can alter a subject's perceptions, moods and motor control.**

Speech cortex/auditory cortex link has become the ultimate communications system for the intelligence community. RNM allows for a complete audio-visual brain-to-brain link or brain-to-computer link.



**The above is a simple flowchart of Nuero-Electromagnetic Frequency Assaults showing methods that can be perpetuated by the Police and Military Intelligence Agencies toward Remote Mind Control Experiments, Behavioural Manipulation and Murder.**

# , NATIONAL SECURITY AGENCY SIGNALS INTELLIGENCE ELECTRONIC 3RAIN LINK TECHNOLOGY

**ISA SIGINT can remotely detect, identify and monitor a person's bioelectric fields.**

'he NSA's Signals Intelligence has the proprietary ability to monitor remotely and non-invasively nformation in the human brain by digitally decoding the evoked potentials in the 30-50 Hz, 5 nilliwatt electromagnetic emissions from the brain.

Jeuronal activity in the brain creates a shifting electrical pattern that has a shifting magnetic flux. This nagnetic flux puts out a constant 30-50 Hz, 5 milliwatt electromagnetic (EMF) wave. Contained in the lectromagnetic emission from the brain are spikes and patterns called "evoked potentials". Every hought, reaction, motor command, auditory event and visual image in the brain has a corresponding evoked potential" or set of "evoked potentials". The EMF emission from the brain can be decoded nto the current thoughts, images and sounds in the subject's brain.

JSA SIGINT uses EMF-transmitted Brain Stimulation as a communications system to transmit nformation (as well as nervous system messages) to intelligence agents and also to transmit to the rains of covert operations subjects (on a non-perceptible level).

**:MF Brain Stimulation works by sending a complexly coded and pulsed electromagnetic signal o trigger evoked potentials (events) in the brain, thereby forming sound and visual images in he brain's neural circuits. EMF Brain Stimulation can also change a person's brain-states and ffect motor control.**

Two-way electronic Brain Link is done by remotely monitoring neural audio-visual information while ransmitting sound to the auditory cortex (bypassing the ears) and transmitting faint images to the risual cortex (bypassing the optic nerves and eyes). The images appear as floating 2D screens in the rain.

Two-way electronic Brain Link has become the ultimate communications system for CIA/NSA >ersonnel. **Remote neural monitoring (RNM, remotely monitoring bioelectric information in the numan brain) has become the ultimate surveillance system.** It is used by a limited number of igents in the US Intelligence Community.



13g



**REMEMBER: THIS WAS DO-ABLE IN 1974 !**

HOW SILENT (CONVERTED-TO-VOICE-FM) HYPNOSIS CAN BE TRANSMITTED USING A VOICE FREQUENCY MODULATOR TO GENERATE THE "VOICE", THEN PULSED-MICROWAVE VOICE-TO-SKULL FOR DISTANCE AND COVER
http://www.raven1.net/hypno2s.gif                                    Mar 21/00

The above is a simple flowchart of Nuero-Electromagnetic Frequency Assaults showing methods that can be perpetuated by the Police and Military Intelligence Agencies toward Remote Mind Control Experiments, Behavioural Manipulation and Murder.

## 5. [NO HEADING IN ORIGINAL DOCUMENT]

RNM requires decoding the resonance frequency of each specific brain area. That frequency is then modulated in order to impose information in that specific brain area. The frequency to which the various brain areas respond varies from 3 Hz to 50 Hz. Only NSA Signals Intelligence modulates signals in this frequency band. (See Table 1.) This modulated information can be put into the brain at varying intensities from subliminal to perceptible. Each person's brain has a unique set of bioelectric resonance/entrainment frequencies. Sending audio information to a person's brain at the frequency of another person's auditory cortex would result in that audio information not being perceived.

The Plaintiff learned of RNM by being in two-way RNM contact with the Kinnecome group at the NSA, Ft Meade.

They used RNM 3D sound direct to the brain to harass the Plaintiff from October 1990 to May 1991.

13h

As of 5/91 they have had two-way RNM communications with the Plaintiff and have used RNM to attempt to incapacitate the Plaintiff and hinder the Plaintiff from going to the authorities about their activities against the Plaintiff in the last 12 years. The Kinnecome group has about 100 persons working 24 hours a day at Ft Meade. They have also brain-tapped persons the Plaintiff is in contact with to keep the Plaintiff isolated. **This is the first time ever that a private citizen has been harassed with RNM and has been able to bring a lawsuit against NSA personnel misusing this intelligence operations method.**



An overview of how the weapons are deployed by the Mind Control Police

Mass Remote Mind Control by Blanket Coverage of the Population which is achieved via the Mobile Phone Network

ECHELON - CITIZEN SPY BASE
U.S. National Security Agency
Menwith Hill
Yorkshire, England

GCHQ
General Communications H. Q.

M.O.D.
Ministry of Defence

MI5
Military Intelligence

## 5. NSA TECHNIQUES AND RESOURCES

**Remote monitoring/tracking of individuals in any location, inside any building, continuously, anywhere in the country.** A system for inexpensive implementation of these operations allows for housands of persons in every community to be spied on constantly by the NSA.

**Remote RNM Devices**

NSA's RNM equipment remotely reads the evoked potentials (EEGs) of the human brain for racking individuals, and can send messages through the nervous systems to affect their performance. RNM can electronically identify individuals and track them anywhere in the US. This

13i

Covert Operations

equipment is on a network and is used for domestic intelligence operations, government security and military base security, and in case of bioelectric warfare.

●**Spotters and Walk-Bys in Metropolitan Areas**

Tens of thousands of persons in each area working as spotters and neighbourhood/business place spie: (sometimes unwittingly) following and checking on subjects who have been identified for covert control by NSA personnel.

Agents working out of offices can be in constant communication with spotters who are keeping track of the NSA's thousands of subjects in public. NSA agents in remote offices can instantly identify (using~ RNM) any individual spotted in public who is in contact with surveillance subject.

●**Chemicals and Drugs into Residential Buildings with Hidden NSA Installed and Maintained Plastic Plumbing lines.**

The NSA has kits for running lines into residential tap water and air ducts of subjects for the delivery of drugs (such as sleeping gas or brainwashing-aiding drugs). This is an outgrowth of CIA pharmapsychology (psychopharmacology).

●**Brief Overview of Proprietary US Intelligence/Anti- Terrorist Equipment Mentioned**

Fixed network of special EMF equipment that can read EEGs in human brains and identify/track individuals by using digital computers. ESB (Electrical Stimulation to the Brain) via EMF signal from the NSA Signals Intelligence is used to control subjects.

EMF equipment that gathers information from PC circuit boards by deciphering RF emissions, thereby gaining wireless modem- style entry into any personal computer in the country. All equipment hidden, technology secret, all scientific research unreported (as in electronic warfare research). Not known to the public at all, yet complete and thorough implementation of this method of domestic intelligence has been in place since the early 1980s.

**Editor's Note: I tried ringing Mr Akwei to find out what was the out- come, if any, of his court case. He firmly but kindly told me that he could not speak about anything to do with the case over the phone and hung up. A subsequent conversation of similar length resulted in the information that he did not wish his address or phone number published with this article. So, if we hear of any developments, we'll let you know.**

Its totally obvious from the above article that the US National Security Agency is none other than a covertly run terrorist organisation.

13j

Covert Operations

> Their highly sophisticated technology that is used to monitor and manipulate the minds of millions of innocent people daily, is a blatant expression of the dominating and authoritarian mentality that exists behind the facade of our so called democratic society.
>
> George Orwell's "THOUGHT POLICE" is an absolute reality in today's world.
>
> Whether we realise it or not, every individual within our society is negatively effected by this dictatorship attitude.
>
> *It has to change - It will change - It starts with you!*
>
> **George Farquhar**
> **Project Freedom**

## An example of EMF Brain Stimulation

| Brain Area | Bioelectric Resonance Frequency | Information Induced Through Modulation |
| --- | --- | --- |
| Motor Control Cortex | 10 Hz | Motor Impulse co-ordination |
| Auditory Cortex | 15 Hz | Sound which bypasses the ears |
| Visual Cortex | 25 Hz | Images in the brain bypassing the eyes |
| Somatosensory | 9 Hz | Phantom touch sense |
| Thought Center | 20 Hz | Imposed subconscious thoughts |

## RESOURCES

**These publications have only been discovered since December 1991, after Plaintiff had already notified authorities (Dept of Justice, etc.) of Public Corruption by named NSA employees. When**

13k

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN E. MOORE,  )
                )
                )
                )
                )
Plaintiff,      )
                )
                )
v.              )            Civil Action No. 07-00107
                )
GEORGE W. BUSH, et al.,  )
                )
Defendant,      )
                )
                )

**EXHIBIT  D**

**jmoore3263@bellsouth.net**

| | |
|---|---|
| **From:** | "Duncan M  Roads" <editor@nexusmagazine.com> |
| **To:** | <jmoore3263@bellsouth.net> |
| **Sent:** | Wednesday, August 08, 2007 6:48 PM |
| **Subject:** | Re: contact Mr. Farquhar |

Dear John,

I have searched our files and records and have no contact details for George Farquhar.

Sincerely

Duncan


On 09/08/2007, at 3:23 AM, <                              > wrote:


                                        John E Moore
                                        9 Pleasant View Cir.
                                        Daytona Beach, Florida.
                                        32118-5511
                                        386-761-8193


                                        August 8 2007


Editor: Mr. Duncan M. Roads
         Nexus Magazine


Mr. Roads:

          This e-mail to you is in reference to an article published in Nexus Magazine

dated April-May 1996, titled "Covert Operation of U.S. National Security Agency."

          I am requesting your Magazine's help in providing me with contact information

for Mr. George Farquhar of Project Freedom. He has written an article referencing

information provided from Nexus Magazine.

          My reason for this request is I am presently proceeding with active Litigation

in Washington D.C. Federal District Court, CA. 1:07-cv-00107-RMC. One of the

Defendants listed in this Complaint is the National Security Agency.

I am interested in using this particular article with some of its contents and

Mr. Farquhar's interview with John St. Clair Akwei in prosecuting this case.

Again, if you could provide me with this contact information it would be

much appreciated.

Sincerely,

John E. Moore

Duncan M. Roads, Editor, NEXUS Magazine
PO Box 30, Mapleton Qld 4560 Australia.
Tel: 07 5442 9280; Fax: 07 5442 9381

"The nature of the universe is such that ends can never justify the means. On the contrary, the means always determine the end."
(Aldous Huxley)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
                                    )
JOHN E. MOORE,                      )
                                    )
                                    )
        Plaintiff,                  )
                                    )
            v.                      )        Civil Action No. 07-00107
                                    )
GEORGE W. BUSH, et al.,             )
                                    )
        Defendant,                  )
                                    )
_____ _____ )


**EXHIBIT  E**

# BRAINWAVE
# TECHNOLOGY



# INDEPENDENT

# REPORT

# Table of Contents

Introduction.................................................................................i

Purpose of Report.................................................................ii thru iv

Reproducing brainwave data from an external source................1a thru 5a

Temporal coding of sensory information in the brain.................1 thru 13

*John St Clair Akwei N.S.A.Civil Action.(No Legal Council).13a thru.13n

*John St Clair Akwei N.S.A. Civil Action..(Case Evidence)...

...Complete copy available on diskette......................................13o

Brain computer interface. Web site .............................................14

Meld brain machine..............................................................14a

D.A.R.P.A. DSO. Brain program. Dr. Eisenstadt..........................15,16

Cyberkinetics Neurotechnology Systems....................................17,18

Cyberkinetics Neurotechnology Systems Hardware.................19 thru 21

D.A.R.P.A. DSO. Brain Machine Interfaces...................,.......22 thru 24

MEMO Washington Trip (1)......................................................25

MEMO Washington Trip (2)...................................................26,27

E.P.I.C. Electronics Privacy Information Center.............................28

N.A.S.A. No "Mind Reading" Technology without review...............29

N.A.S.A. WATCH..........................................................30 thru 32

F.A.A. Metal Detector (body search)........................................33,34

F.D.A. Metal Implants. MRI safe...............................................35

*Chip Implant: Using syringe to insert Chip Implant..............35.a thru.c

High-tech Images..............................................................36,37

Digital evidence.............................................................,...38

Bio simulators....................................................................39

MEMO, Brain control. (personal).........................................40,41

U.S. Revises Definition of Torture........................................42,43

.....None Delivery of Documents pertaining to Brainwave Technology*.....

Thomas E. Mooney Judiciary Committee*...................................44

University of Cincinnati (implant)*...........................................45

University of Cincinnati (implant)*...........................................46

Electronics Test and Measurement*...........................................47

MEMS Implant. Hearing System. D.A.R.P.A...........................48 thru 50

F.B.I. Boston Office..............................................................51

*Russell Tice v N.S.A...(No Legal Council)..............................51a

*Russell Tice v N.S.A...........................................................51b

F.B.I. New Agents...................................................................52
*N.S.A. and Law Enforcement..Copy available on Diskette.............52a
Obtaining an Attorney........................................................53,54
Closing Comments.........................................................v thru ix

\* Revised Edition Changes. November 10, 2006.

Document Selection Menu

<div align="center">Multiple Documents</div>

Select the document you wish to view.

| Part | Description | |
|---|---|---|
| | Attachment 2 (part 1) | 29 pages |
| | Attachment 2 (Part 2) | 32 pages |
| | Attachment 2 (Part 3) | 33 pages |

View All    or    Download All    94 pages

<<<<<<<<<<<<<<<<<<<<PART OF DOCUMENT 36-3,4,5.>>>>>>>>>>>>>>>>>>>>

June 25, 2003

**Subject;** Reproducing brainwave data from an external source.

**Research;** John E. Moore

**Email:** jmoore3263@bellsouth.net

**Reference;**

Title : Temporal coding of sensory information in the brain.

Affiliations: Department of Otology and Laryngology.
Harvard Medical School.

Title: John Hopkins Family Health Book 2003.



1a



# Component Detailed Explanation

CARRIER: Deliver brainwave data to ASIC.
BRAIN WAVE: Rides on carrier with data information.
ASIC DETECTOR: Detects data off the carrier and deposits at
                address section of brain.
        Note: I have no data on this statement. But a what if?
            ASIC transmit data out.
MODULATOR: Combines brain wave data (neurons) and carrier for
            Transmission.


As shown in above diagram is an electronic micro-chip, some types under contract for U.S. Government. (D.A.R.P.A) It can detect audio frequency down to milli-hertz. (brain wave frequency range)

As you read this short introduction to the science of (brain wave technology, holding on to layman terms. You will see the simplicity of reproducing an input from the inner ear to the brain or an input from the ASIC detector (implant) to the brain. Although through different paths, but same data to brain and same end result. Sound or data travel through bone as a conductor with hardly any resistance, in this case the temporal bone.

2a

Example: word Yes or No spoken as a command from modulator, hand function microphone (black box) will transmit neurons (data) to ASCI. Inner ear is audio in to brain, ASIC as an input can disseminate between audio and other address data commands. Pain, speech, vision, thought etc. all control is by neurotransmitters.

Returning to the diagram on page two, you will see the brain wave frequency, which is data to the brain. Here is a partial list of brain addresses, some of which can be reproduced electronicly.

CEREBRUM: Has four lobes, consisting of an infinite amount of cell's/neuron's, which are the seat of mental addresses.

Cerebelluim lobe: consisting of muscle coordination, equilibrium.

Temporal Occipital lobe: consisting of vision, hearing and speech. limbic system control—emotion, memory, motivation.

Frontal Occipital lobe: consisting of motor language and planning to sheletal muscle. Sensation, thaught, movement, consciousness.

Brain Stem lobe: Contain centers to control body functions. breathing, eye reflexes, taste; integral to speech neck, tongue. Motor signals to; jaw, face, eye movement, Arm and leg movement. Cardiovascular function (heartbeat) pulse. Sleep, digestion.

Information is coded under normal conditions to disseminate the delivery of the data to the proper addressed lobe. (cell's) All sensation to  the brain through various nerve path ways receive and transmit electro chemical pulses. Neurotransmitters produce electrical charge, which communicate between neurons.

3a

ASIC >>>>>>>> neurotransmitters >>>>>>>> BRAIN
(neuron)                    molecules                    (neurons)


Conclusion: Brain is more complex than the most sophisticated
computer ever built. Both communicate with data bits.
It is dangerous if used for the wrong perfunctory. Repro-
duction of brain wave electronic data has endless
possibilities, both positive and negative. (remember the
Yes or No inserted into the ASIC?) Pg.3. In a court of law
that could be the weight of innocence or guilt.
I believe this type of technology will unbalance the scale
of justice. This type of data can cause pain or decisions
in ones thinking or speech or both.
Touching lightly on my research material, some are
directly involved with this material while other documents
are worth taking note of, your judgment will guide your
thinking.
The microchip that I am using as an example pg.2
(Reproducing Brainwave Data) was developed 1997.
There is no information available on its use, or availability.
I would like to make note of the immense material
provided to me on this interesting and at times very
technical topic.
Dr. Cariani and John Hopkins Medical Book provided
invaluable material for this report.

4a

# Brainwave Frequency Wave Forms Signal Generated



Fig. 7

Fig. 8

Fig. 1



Fig. 2

Fig. 3



**Figure 7:** *MATLAB pure signal periodogram with noise at 38 Hz.*



**Figure 8:** *MATLAB sampled output with noise at 38 Hz, showing an alias.*

As shown in Fig.1 is a periodogram of brain frequency spikes and as shown with much inherent noise. Fig. 7 also indicates a large noise factor. Fig. 8 presents a cleaner spike presentation that if you compare with Pg. 9 (C) (Temporal Coding Documents) come close to the intrinsic temporal patters shown, and with the right capacitance circuit could present a clean square wave, as shown in Fig. 3.
A filtered out put which can be compared with Pg. 9 (D) (Temporal Coding Documents)

These wave forms were created with audio freq. generator, with pulse width, pulse spacing and db gain pre-entered.



THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

# FDA works to make metal implants safe in MRI          The Boston Globe

**By Lauren Neergaard, Associated Press | September 28, 2004**

A mannequin skull sits in an MRI machine, about to be filled with a thick, brainlike gel.

MRIs are required tests for numerous disorders. But they are off-limits for millions of patients with certain implants, such as pacemakers or brain electrodes. The scanners can dangerously heat the metal parts.

"The MRI industry thinks it's simple: 'Don't use' " in those patients, said the Food and Drug Administration's Larry Kessler. "That's not the end game."

Instead, amid pressure from doctors, the agency wants to speed development of MRI-compatible implants. Hence the mannequin, part of a little-known FDA research program where 140 scientists probe the pitfalls and promises of medical devices.

Much of the work by Kessler's $21 million Office of Science and Engineering Laboratories is aimed at helping the FDA better analyze new devices before approving their sale.

Recently, a man was left temporarily comatose after an MRI scan was performed even though he had a "deep brain stimulator," an implant increasingly used to fight Parkinson's disease and other tremors.

FDA scientist Howard Bassen filled the mannequin skull with a gel substance similar to the consistency of the brain. He attached electrodes from a deep brain stimulator and zapped the skull with the radio waves that MRIs emit. The electrodes' temperature rose more than 20 degrees in five seconds, Bassen found. Heat concentrated at the tip where it literally can burn a hole in delicate brain tissue. The thinner the wire, the hotter it got; that is important for recognizing which devices are riskier. ■

© Copyright 2004 The New York Times Company

# pitfalls in digital evidence

**By BRIAN BERGSTEIN**
ASSOCIATED PRESS

When Victor Reyes went on trial for murder last year, the technology that fingered him was supposed to be a star witness.

Police in Florida had used software known as More Hits to determine that a smudged handprint they had found on duct tape wrapped around a body — but originally couldn't decipher — implicated Reyes in the 1996 killing.

The judge let prosecutors introduce More Hits' digital enhancement. But the defense called it "junk science" and had an art professor testify that the process resembled how Adobe Photoshop can be used to make trick-photo illustrations.

Reyes was acquitted.

Jurors said they based their decision mainly on the notion that the print didn't prove Reyes was the killer — not on the legitimacy of More Hits' technology — used by 215 U.S. police departments — is acceptable.

Still, some defense attorneys learned a lesson: Get more aggressive about challenging digitally generated evidence.

"Now, whenever you hear the word enhancement, an antenna goes up," said Hilliard Moldof, a



A computer scene shows an enlarged digital image of a smudged fingerprint from a crime scene Tuesday at the police forensics lab in Salem, Ore.

Florida defense attorney who is questioning digitally enhanced fingerprints in two cases.

As more police departments abandon chemically processed film in favor of digital photography, the technology could be confounding for the justice system.

Film images are subject to darkroom tricks, but because digital pictures are merely bits of data, manipulating them is much easier. And although willful evidence manipulation is rare, forensic specialists acknowledge that a poorly trained examiner incorrectly using computer enhancement programs can unwittingly introduce errors.

"What you can do in a darkroom is 2 percent of what Photoshop is capable of doing," said Larry Meyer, former head of photography for State Farm Insurance Co.

Courts have consistently allowed digital photographs and enhancement techniques. But some observers say such methods should endure a more thorough examination, as have technologies such as DNA analysis.

"There have been relatively few challenges to the use of digital technology as evidence and, in most of them, the courts have looked at them in a fairly superficial way," said Edwin Imwinkelried, an evidence expert at the University of California-Davis law school.

Concerns about the impeachability of digital photographs are one reason many police departments have been hesitant to ditch film for crime scene photographs and forensic analysis.

In fact, some people who train law enforcement agencies in photography estimate that only 25 percent to 30 percent of U.S. police departments have gone digital — despite the huge cost benefits of no longer having to buy film and the ease with which digital pictures can be captured and disseminated.

Some law enforcement officials also worry about the limitations that still plague digital photography.

Digital pictures can't be blown up as clearly for courtroom displays as film photos. Or the compression needed to store a digital file on disk can make the image blurry or blocky, potentially obscuring key details.

"Digital imaging for the most part has a long way to go to meet the quality of film," said Richard Vorder-Bruegge, an FBI forensic expert who chaired a panel that wrote guidelines for law enforcement use of digital imaging.

John E Moore
136 Sand Pebble Cir.
Port Orange, FL.
32119-3698
Phone 904-761-8193
Fax    904-761-8193
Em  JMoore3263@att.net

November 21, 2000

**To: CMS & MEMS**

I am writing this letter hoping that you will be kind enough to supply me this information that I am requesting.

1. Is frequency of the signal from inner ear to brain usable , or intelligible if they are above or below normal listening frequency range, if induced in outer ear?

2. Information on MEMS Fully Implantable Hearing System. (I now hold mems.uc.edu/research/104. documents.) Also other other hardware which is incorporated in the system if available.

3. If a similar type system is obtainable on the medical market.

4. Can hearing implant be installed in outpatient inviorment?

5. Could you please supply me with contact name so that I will be able to explain my intentions for my request for this information.

You may Email, Fax or mail your answers to my requests.

Sincerely,

John E Moore



45

John E Moore
136 Sand Pebble Cir.
Port Orange, FL.
32119-3698
Phone 904-761-8193
Fax    904-761-8193
JMoore3263@aol.com

January 17, 2001

To: CMS & MEMS

I am writing this letter hoping that you will be kind enough to supply me this information that I am requesting.

1. Is frequency of the signal from inner ear to brain usable , or intelligible if they are above or below normal listening frequency range, if induced in outer ear?

2. Information on MEMS Fully Implantable Hearing System. (I now hold mems.uc.edu/research/104. documents) Also other other hardware which is incorporated in the system if available.

3. If a similar type system is obtainable on the medical market.

4. Can hearing implant be installed in outpatient inviorment?

5. Could you please supply me with contact name so that I will be able to explain my intentions for my request for this information.

You may Email, Fax or mail your answers to my requests.

Sincerely,

**John E Moore**

46

Center for Microelectronic Sensors and MEMS                                        http://www.mems.uc.edu/research/rl04.

 # Research

*Center for Microelectronic Sensors and MEMS* 

## Fully Implantable Hearing Aid Systems

Main Home
MEMS Home
Researches
People
Facilities
Collaborations
Courses
MEMS Links
Ohio MEMSNet
Web Site Info

Core Faculty
Slide
Presentation

An electrostatic microactuator in a package about the size of the screw which holds eye glasses together, contacts the fluid of the inner ear, driven, by a remotely-controllable implanted microchip and power supply which operates years before out-patient battery change. Frequency is adjustable remotely in seven bands for custom adaptation to hearing loss. Device replaces need for ossicular chain [ ]



- Micro Biological and Chemical Sensors
- Fully Implantable Hearing Aid Systems
- Photolithograpy-Based LIGA (High Aspect Ratio Microstructures)

*Center for Microelectronic Sensors and MEMS, ECECS, College of Engineering, Universit. of Cincinnati, P.O.Box 210030, Cincinnati, Ohio 45221-0030*
Last modified on May 25, 1997 by kahp@uceng.eng.uc.edu

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                )
                                )
JOHN E. MOORE,                  )
                                )
                                )
    Plaintiff,                  )
                                )
          v.                    )     Civil Action No. 07-00107
                                )
GEORGE W. BUSH, et al.,         )
                                )
    Defendant,                  )
                                )
_____ _____)

**EXHIBIT  F**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN AKWEI,                          )
                                     )
                Plaintiff,           )
                                     )
        v.                           )    Civil Action No. 92-0449
                                     )    (Stanley Sporkin)
NATIONAL SECUTIRY AGENCY,            )
                                     )
                Defendant.           )
                                     )    **FILED**
_____    )
                                          MAR 0 9 1992

                                          CLERK, U.S. DISTRICT COURT
                                          DISTRICT OF COLUMBIA

MEMORANDUM OPINION AND ORDER

     Plaintiff has brought this action pro se, alleging that

employees of the National Security Agency have engaged in

harassment and criminal offenses directed toward him.  He is

seeking damages.  Plaintiff claims the harassment began when

certain individuals who are now employed by the NSA were students

with him at Northwood High School in Wheaton, Maryland.  He then

describes a variety of instances of harassment, all of which

appear to be frivolous.  For example, he alleges that in December

of 1981, he found a paragraph of "graphitti" on a bus shelter at

the Silver Spring Metro station that "described the jacket I was

wearing in detail, and contained a paragraph of threats and

racial slurs directed at me personally."  Complaint at 6.  He

also alleges that on December 24, 1991 there was an "attempted

poisoning."  His complaint includes a "List of Illegal Activities

Committed," one of which is "continuous attempts to damage mental

health since 1980."

     The Court is unable to construe this complaint as stating

(N)

3

any identifiable legal cause of action.  Accordingly, it will be dismissed as frivolous pursuant to 28 U.S.C. § 1915(d).

It is this _____6_____ day of March, 1992, hereby

ORDERED that this complaint is dismissed.


_____

Stanley Sporkin

United States District Court

2

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| PLAINTIFFS | DEFENDANTS |
|---|---|
| | *National Security Agency* |
| | 92-0449 |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____ |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|

## II. BASIS OF JURISDICTION (PLACE AN × IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN × IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

*Civil Rights Acts*

## V. NATURE OF SUIT (PLACE AN × IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates, etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Other | | | |

## VI. ORIGIN (PLACE AN × IN ONE BOX ONLY)

- ☐ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

**DEMAND $**

Check YES only if demanded in complaint
**JURY DEMAND:** ☐ YES ☒ NO

## VIII. RELATED CASE(S) IF ANY (See instructions)

JUDGE _____   DOCKET NUMBER _____

SIGNATURE OF ATTORNEY OF RECORD

FOR U.S. DISTRICT COURT

3

**PERSONS THAT CAN VERIFY THAT I WAS UNDER SURVEILLANCE**

(ALL OF THESE PERSONS WERE <u>FALSELY</u> TOLD THAT I WAS UNDER INVESTIGATION FOR CRIMINAL ACTIVITIES)

RESIDENTS OF APT. #5, 5407 HAMILTON STREET, HYATTSVILLE, MARYLAND
AT THE TIME OF 4/91

BRIAN MILLAR
OF AV WASHINGTON, INC. FAIRFAX, VIRGINIA

RESIDENTS OF 8556 FREYMAN DRIVE, CHEVY CHASE, MARYLAND
AT THE TIME OF 1/91

N.I.H TEMPORARY WORKER FROM TEMPWORLD, ROCKVILLE AROUND THE TIME OF
1/3/91.

## Authorities Contacted

Local Police called Three (3) times

FBI notified four (4) times

Filed with Allan C. Kornblum at the Department of Justice 202-514-2882

Filed with Joan Russo at Sen. Barbara Mikulski's State Office 301- 345-5517

Filed with the Select Committee on Intelligence 202-224-4654

Inspector General's Office at the N.S.A. at Fort Meade notified 11/1/91

THE FOLLOWING PAGE EXPLAINS MY BACKGROUND AND RELATIONSHIP WITH THE EMPLOYEES OF THE N.S.A. AND OTHER PERSONS WHO ARE RESPONSIBLE FOR THE AFOREMENTIONED CRIMINAL OFFENSES AND HARASSMENT..

I, John S. Akwei, attended Northwood High School in Wheaton, Maryland from 1978 to 1981.

I participated in the Northwood Cross-Country and Track teams and lived in the Loxford terrace neighborhood of Montgomery County, Maryland with several persons who would later become employees of the N.S.A.

Among those persons are Mary Kinnecome, Susan Kinnecome, Pat (last name unknown), Allison (last name unknown). Other persons who are involved in the Criminal Offenses and ten years of Harassment are Jeff Naimian, Steve Abate, Greg Abate, Micheal Prime, Susan Prime, Jeff Sullivan, Glenn (last name unknown). All of whom are now employed by the N.S.A.

The persons and motives behind this Criminal Activity have become apparent to me only since around June, 1991 due to these persons persuing a policy of leaving no physical evidence.

*The following is a partial list of instances of criminal activity and harassment which has led to this complaint.*

1.      Six months after the graduation day ceremonies at Northwood High School, on December, 1981, I found a paragraph of Graphitti, written in magic marker, at a bus shelter at the Silver Spring Metro station that I waited at every morning. The Graphitti described the jacket that I was wearing in detail. and contained a paragraph of threats and racial slurs directed at me personally.

Apparently this graphitti was meant as a warning by the members of the aforementioned group of people that they intended to keep track of my activities because of a personal dislike for me.

2.      From September, 1983 to December 1983 I was subjected to verbal harassment and surveillance at Montgomery College in Takoma Park, Maryland and at home.

3.      From January,1984 through July,1984 I was threatened, harassed, and under surveillance while living at an apartment in Takoma Park. I was also prevented from being employed at several places by the misuse of authority by the aforementioned persons.

4.      From July, 1984 to March, 1987 I was tracked, occasionally threatened, and prevented from being employed by these persons.

5.      During the first six months of 1988 I was prevented from attaining steady employment by these persons.

6.      From May, 1988 to October, 1990 I was closely monitored, by the aforementioned former acquaintances whom were now employees of the N.S.A and the C.I.A. They used N.S.A. facilities and equipment to monitor me at work and at home. This included using false identities and using adjacent apartments for surveillance and harassment.

7.      From October, 1990 to present I have been subjected to intense and completely unwarranted harassment, break-ins, intimidation . threats, and coercion by these persons ,whom attained the authority to do this from senior agents at the N.S.A. and have falsified evidence to obtain authorization. On 12/24/91 there was an attempted poisoning.

They have actively attempted to prevent me from going to authorities.

5

I, John S. Akwei, am a private citizen who has no record of criminal activity, or activity that would endanger National Security, yet I have been the subject of ten years of unwarranted criminal offenses and harassment by former acquaintances, whom I have known in the past, who are presently employees of the National Security Agency.

These events began ten years ago when I was acquainted with persons who are now employees of the N.S.A. as students at Northwood High School in Wheaton, Maryland. <u>Only over the last six months have I gained enough evidence to file a lawsuit against the N.S.A.</u>

This harassment was brought on by personal antagonism towards me during High School, and has led to a history of illegal activities and abuse of authority by aforementioned employees of the NATIONAL SECURITY AGENCY.

<u>None of these activities are sanctioned by Executive Order 12333.</u> Authorization to commit these acts against me was obtained by falsifying evidence and lying to superiors at the N.S.A and at other agencies.

National Security Agency Employees or acquaintances whom are actively involved in criminal activities against Plaintiff or whom participated in criminal activities at the request of the N.S.A. Employees.

MR. KINNECOME (Retired N.S.A. agent)
KAREN KINNECOME
MARY KINNECOME
MARYANN KINNECOME
SUSAN KINNECOME
PAT                                  (LAST NAME UNKNOWN)
ALLISON                          (LAST NAME UNKNOWN)
JEFF SULLIVAN
ONI SULLIVAN
PAUL JOHNSON
STEVE JOHNSON
MICHEAL (ALIAS)
MARISSA (ALIAS)
STEVE ABATE
GREG ABATE
PAUL STETTER
(Paul Stetter can be identified by Howard County or Montgomery County Police)

*NO PAGE 4 PER PLTF.*

- Conclusive proof of these crimes is Available. (Even though the agents have pursued a policy of leaving No physical evidence)

- My Mental Fitness to bring the NSA to trial is <u>verifiably excellent.</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN E. MOORE, ) ) ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Civil Action No. 07-00107 |
| GEORGE W. BUSH, et al., ) ) | |
| Defendant, ) ) ) | |

**EXHIBIT  G**

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN E. MOORE,                               )
                                             )
        Plaintiff,                           )
                                             )
            v.                               )       CASE NO. 1:07-CV-00107 (RMC)
                                             )
GEORGE W. BUSH, ET AL.,                      )
                                             )
        Defendants.                          )
                                             )
_____    )

**RECEIVED**

**PLAINTIFF JOHN E. MOORE,**
**MOTION REQUEST for ORAL HEARING**

JUN 1 1 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Reference: **LCvR7(f)**--Motion Request for Oral Hearing.

        **LCvR40.5(3)(4)**--Related Case. CASE NO. 92-0449. Plaintiff: John St.Clair Akwri.

        Plaintiff moves for support of this motion in the following statements brought forward

factually in Plaintiff John St Clair Akwri Complaint against the National Security Agency.

Also Court Docket Files and his being interview on this subject.

        One of particular importance to me will be in proving that Brainwave Technology

and the N.S.A. are a joint venturesome partnership which will eventually destroy our

Freedoms, one which could include our Justice System.

        Of particular interest to me, which I hope to make evident to this Court is Mr.

Akwri interview, which was promulgated by a Mr. George Farquhar, representing

"Project Freedom" who was the author of the article published in Nexus Magazine,

April/May of 1996. Titled "Covert Operations of National Security Agency".

## ARGUMENT

I have documented proof which I will present at this hearing, if sanctioned by this Court, as shown in detail on page 3 of 14 of Nexus Magazine, dated April/May 1996. I will present evidence of detailed incidents documented and recorded in detail as experienced by me, both electronically and physically. As shown on page 3 of 14 a thru. k, I have personally experienced the previously listed torture types. As an example Page 3 of 14(e), as I sat with my wife in our living room on numerous occasions when the signal to activate (e) code, I would jump from the pain of a pin like feeling entering my leg or other parts of my body.

## CONCLUSION

It is imperative that I be given permission by this Court to be heard and to produce proof of my claims of Brainwave Technology. I would like Mr. John St. Clair Akwri to be present at this hearing to substantiate his claims published in said interview, also any documentation that will provide a more vivid perspective to this case.  Included are three copies of AO88(Rev. 1206) Subpoena in a Civil Case, one of which will be returned to me signed for service. Also a copy of which will be provided to each of the Defendants named in this case, also a copy of said motion if granted. Enclosed you will find a copy of Mr. John St. Clair Akwri documented interview given to Nexes Magazine.

2

WHEREFORE, Plaintiff John E. Moore request that this motion be granted.

DATED; June 14, 2007

Respectfully submitted,

John E. Moore Pro se
9 Pleasant View Circle
Daytona Beach, Florida
32118-5511
386-761-8193

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                              )
                              )
JOHN E. MOORE,                )
                              )
                              )
        Plaintiff,            )
                              )
              v.              )        Civil Action No. 07-00107
                              )
GEORGE W. BUSH, et al.,       )
                              )
        Defendant,            )
                              )
_____ _____)

**EXHIBIT  H**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN E. MOORE,                            )
                                          )
                Plaintiff,                )
                                          )
v.                                        )        CA. No. 07-0107 (RMC)
                                          )
GEORGE W. BUSH, et al                     )
                                          )
                Defendant,                )
                                          )
_____          )

## PLAINTIFF MOTION FILING OF DISCOVERY
## NOT PREVIOUSLY ENTERED LCvR 52(b)

   I would like to present some important facts pertaining to this Federal Bureau
of Investigation (FBI) case. ID B.S. 62-0. Boston, Mass.

### BACKGROUND

   **I.**     Falls Church Virginia is the geographical location where the National Security

Agency (NSA/CSS) crypto training was administered at the time of my involvement. The

term off campus was the term used in reference to Fort George E. Meade, MD. Central

location of N.S.A. Some types of shipboard equipment which I was familiar with were KW-

37 rcvr.data, KG-14 xmt.data and KY-8 voice scrambler. My specific responsibilities or title

were I/O (input/output) crypto technician. To be more explicit, it was my responsibility to

provide the proper inputs to the units and the outputs to their proper destination for

completion of these classified circuits.

   **II.**     In reference to F.B.I. complaint form case ID B.S. 62-0-24554. There are very

distinct and important evidentiary words "blackened out," or completely deleted from our

# RECEIVED

### MAY 2 1 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

conversation. (a) first and last name of this ex Volusia County Deputy Sheriff, part of collectively, the "The Government Defendants." ¶ Dkt. #45. (b) he attended NSA/CSS off campus training. (c) he was part of a "nazi hate group." I informed this F.B.I. agent, also that I would present him a minimum of a half a dozen victim/witness names. Through all of this presentation to this agent, his only response, "I am sorry I cannot help." Again I submit, the "Government Defendants." ¶ Dkt. #45.

## ARGUMENT

I believe comp. ¶ Id.44 is one in the same person as ¶ II. Bckgrnd. Money talks. What relief was this? What I classified as a felon seeking and for what reason or crime was I the perpetrator of, what I see is a setup of my personal life. In August of 1996, he was on medical leave from Volusia County Sheriff Department and word was out in the neighborhood that this person was leaving for Falls Church Virginia. Fear was my only reaction, as I assumed what the possibilities could be, as I being familiar with the location name. I recalled that he saluted me as a nazi while being a neighbor of this person, most of the neighbors were uncomfortable in his presence. A short time after his return, I use the term "plugged in." [now it can be accomplished via physical or electronic means] ¶ Id. B.W.T. For the first two years, this B.W.T. consisted of tone type frequencies. I cannot make judgment on brain control at that time frame.

## CONCLUSION

Enclosed as part of motion evidence are copies of F.B.I. Complaint/Query form pg. 5, which is my claim of being harassed by this N.S.A. agent. The next line states that I am paranoid, pg. 6, is synopsis form, pg. 7,8 are copies of appeal no. 03-0136, request no. 968538. pg. 9 explanation of exemptions, ref. 5 U.S.C. § 552a (j)(2) no statement is presented to appease the plaintiff charges,

2

ref. U.S.C. § 552 (b)(7)(c) with my personnel privacy not only compromised, but

unwarranted invasion of. pg.10, F.B.I. Investigative Programs Civil Rights, of special

interest written on this document "Hate Crimes" and "Hate Crime Cases," I believe this

document should be deleted from the investigative program. I see this as an effrontery

to the Civil Liberties of Americans such as myself, an innocent victim, pg.11, F.B.I.

uses Holocaust to teach new agents. I do not believe this unnamed Boston Special Agent

of the F.B.I. had observed this document written by, then Director of the F.B.I. Louis J.

Freeh, which is my reason for including with this document.

## RELIEF

I am seeking judicial review in accordance with 5 U.S.C. § 552 (a) (4) (B)[1] and

5 U.S.C. § 552 (a) (4) (F)[2]

[1] On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any  agency records improperly withheld from the complainant. In such a case the court shall determine the de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters which a court accords substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B)

[2] Whenever the court orders the production of any agency records improperly withheld from the complainant and assesses against the United States reasonable attorney fees and other litigation costs, and the court additionally issues a written finding that the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding, the Special Counsel, shall promptly initiate a proceeding to determine whether disciplinary action is warranted against the officer or employee who was primarily responsible for the withholding. The Special Counsel, after investigation and consideration of the evidence submitted, shall submit his findings and recommendations to the administrative authority of the agency concerned and shall send copies of the findings and recommendations to the officer or employee or his representative. The administrative authority shall take the corrective action that the Special Counsel recommends.

I believe both afore mentioned agents, both F.B.I. and N.S.A. agents should be investigated for their complacency in this cover up. Plaintiff will be filing a motion seeking summary judgment as to the remaining defendants, National Security Agency and U.S. Department of Justice.

Respectfully submitted,

John E. Moore Pro se
9 Pleasant View Circle
Daytona Beach, Florida.
32118-5511
(386) 761-8193

4



# FEDERAL BUREAU OF INVESTIGATION
## COMPLAINT/QUERY FORM

**(Please fill out completely)**

Date: _10 - 3 : 80_

Time: _10:40 AM_

NAME: _John E Moore_
ADDRESS: _126 SAND PEBBLE CIR_
CITY/STATE: _PORT ORANGE    FL_
ZIP CODE: _32119_    TELEPHONE: (    )
DATE OF BIRTH: _9-5-35_
SOCIAL SECURITY NUMBER: _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_

DESCRIPTION OF COMPLAINT/QUERY: _I WAS SET UP BY LAW_
_EFORCEMENT OFFICER (RETIRED) I HAVE BEEN_
_HARRASED FOR 4 YEARS. I CANNOT GET_
_ANY LEGAL HELP FROM LOCAL, COUNTY,_
_OR STATE I HAVE EVIDENCE_

b?C ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ _lives in_
▓▓▓▓▓▓▓▓▓▓▓▓ _is harassing Mr. Moore. Moore_
_seems to be paranoid, his visit was to let_
_The FBI know he is being watched in FLA._

_copy complaint_
_complaint_

6

# FEDERAL BUREAU OF INVESTIGATION

Precedence: ROUTINE                          Date: rec'd @ C7 8/10/00

To: BOSTON                    Attn: C-7 SUPERVISOR
                                    C-7 ROTOR

From: BOSTON
        COMPLAINT ROOM, SA/IA ██████████

        Contact: ██████████ EXT. ████

Approved By: BURKETT JAMES D                              67C

Drafted By: ██████████ :mkm

Case ID #: BS 62-0

Title: John E. Moore
        136 Sand Pebble Circle
        Port Orange, FLA

Synopsis: Transmittal for personal visitor to the Complaint
Room.

Details: Attached to this communication is Reception Room form
indicating captioned individual was a walk-in complainant to the
Boston Division Complaint Room. Please serialize into 62-0 for
future retrieval.

♦♦

5

BS 62-0-24554



**U.S. Department of Justice**

Office of Information and Privacy

---

*Telephone: (202) 514-3642*                    *Washington, D.C. 20530*

Mr. John E. Moore                    Re:   Appeal No. 03-0136
9 Pleasant View Circle                     Request No. 968538
Daytona Beach, FL  32118-5511              RLH:ADW:BVE

Dear Mr. Moore:

     You appealed from the action of the Boston Field Office of the
Federal Bureau of Investigation on your request for access to records
concerning you.

     After carefully considering your appeal, I have decided to
affirm the FBI's action on your request.  Please be advised that the
Boston Field Office located only two pages of records responsive to
your request from one main file entitled Administrative Inquiry.

     These records are exempt from the access provision of the
Privacy Act of 1974 pursuant to 5 U.S.C. § 552a(j)(2).  See
28 C.F.R. § 16.96 (2002).  Because these records are not available to
you under the Privacy Act, your request has been reviewed under the
Freedom of Information Act in order to afford you the greatest
possible access to the records you requested.

     The FBI properly withheld from the pages released to you
certain information that is protected from disclosure under the
FOIA pursuant to 5 U.S.C. § 552(b)(7)(C).  This provision concerns
records or information compiled for law enforcement purposes, the
release of which could reasonably be expected to constitute an
unwarranted invasion of the personal privacy of third parties.  In
this instance, the FBI withheld the name of the FBI special agent who
met with you at the Boston Field Office and the name of a third party
not of investigative interest to the FBI.  I have determined that
this information is not appropriate for discretionary release.

     Further, I am returning the three folders of information you
included with your letter to this Office dated November 4, 2002.  For
your information, the function of the Office of Information and
Privacy is limited to the adjudication of appeals from the denials of
access to information pursuant to the FOIA and Privacy Act by
components of the Department of Justice.  The information contained
in the folders is unnecessary for the adjudication of your FOIA.

-2-

If you are dissatisfied with my action on your appeal, you may seek judicial review in accordance with 5 U.S.C. § 552(a)(4)(B).

Sincerely,

Richard L. Huff
Co-Director

**EXPLANATION OF EXEMPTIONS**

**SUBSECTIONS OF TITLE 5, UNITED STATES CODE; SECTION 552**

(b) (1)   (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy  and (B) are in fact properly classified pursuant to such Executive order;

(b) (2)   related solely to the internal personnel rules and practices of an agency;

(b) (3)   specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the  matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b) (4)   trade secrets and commercial or financial info..nation obtained from a person and privileged or confidential;

(b) (5)   inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b) (6)   personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b) (7)   records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to  a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual;

(b) (8)   contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b) (9)   geological and geophysical information and data, including maps, concerning wells.

**SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a**

(d) (5)   information compiled in reasonable anticipation of a civil action proceeding;

(j) (2)   material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k) (1)   information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k) (2)   investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k) (3)   material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k) (4)   required by statute to be maintained and used solely as statistical records;

(k) (5)   investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k) (6)   testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process;

(k) (7)   material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

FBI/DOJ

9

# FEDERAL BUREAU OF INVESTIGATION

SEARCH

## Contact Us

- Your Local FBI Office
- Overseas Offices
- Submit a Crime Tip
- File an Internet Crime Complaint
- More Contacts

## Learn About Us

- Facts & Figures
- What We Investigate
- Intelligence
- Information Technology
- Fingerprints, Forensics & FBI Training
- Reports & Publications
- History
- More About Us

## Be Crime Smart

- Wanted by the FBI
- E-Scams & Warnings
- More Protections

## Use Our Resources

- For the News Media
- For Law Enforcement
- For Communities
- For Researchers

# Investigative Programs
## Civil Rights

The Federal Bureau of Investigation (FBI) is the primary federal agency responsible for investigating all allegations regarding violations of applicable federal civil rights laws. These laws are designed to protect the civil rights of all citizens and persons within United States territory. The mission of the FBI's Civil Rights Program is to enforce federal civil rights statutes and to ensure that the protected civil rights of all inhabitants are not abridged.

The FBI's Civil Rights Program consists of the following sub-programs:

- *Hate Crimes*
- *Color of Law/Police Misconduct*
- *Involuntary Servitude/Slavery (ISS)*
- *Freedom of Access to Clinic Entrances (FACE)*

The four sub-programs are administered by the Civil Rights Unit at FBI Headquarters. In addition to providing oversight to field investigations related to Color of Law/Police Misconduct and Hate Crime, the Civil Rights Unit also provides training to FBI New Agents, FBI field agents, National Academy attendees and other state/local police officers from around the country.

The FBI, pursuant to guidelines established in cooperation with the Department of Justice's (DOJ's) Civil Rights Division, requires each field office to initiate a civil rights investigation whenever information is received from any source not known to be unreliable. Though most complaints are received from the victim, witness or a third party related to the victim, a significant number of cases are initiated based on media reports, complaints from community interest groups, referrals from DOJ or the local United States Attorney's Office, and Congressional inquiries.

The FBI has the mission to investigate allegations of civil rights violations pursuant to federal statutes. Final prosecutive authority rests with DOJ's Civil Rights Division.

Civil Rights Home Page

Hate Crime

Hate Crime Cases

Color of Law

Freedom of Access to Clinic Entrances

Involuntary Servitude/Slavery

Federal Civil Rights Statutes

News and Issues

10

7-1-00  THE NEWS-JOURNAL 6A

# FBI uses Holocaust to teach new agents

**By MICHAEL J. SNIFFEN**
Of The Associated Press

WASHINGTON — The FBI has begun teaching its new agents how a failure by police to protect citizens rights helped produce the Holocaust in which 6 million Jews, as well as other minorities and political dissidents were murdered by the Nazis.

The training segment for agents-to-be at the FBI Academy began last month and was announced Friday by FBI Director Louis J. Freeh, Sara J. Bloomfield, director of the U.S. Holocaust Memorial Museum and Abraham H. Foxman, national director of the Anti-Defamation League.

"We do this early on in their training . . . to remind them of the horror and evil which can result from not just a government, but particularly law enforcement, abandoning its mission to protect people and becoming the engine of oppression," Freeh said.

The trainees are given a guided tour of the Holocaust Museum here and instruction about Adolf Hitler's use of the police in Germany in the 1930s and 1940s to round up Jews, political opponents and other targeted groups.

There is a classroom discussion and then trainees must write an essay on the question: "Of what relevance is this history to you as a human being and a law enforcement official?"

After the first session, a student wrote, "It has taught me that making sure our Constitution is strictly followed should be a number one priority throughout my career."

The topic of police complicity in the Holocaust has been a concern of Freeh's for some time. In 1994, over objections from the State Department and the U.S. ambassador to Poland, Freeh visited the Nazi death camp at Auschwitz during a European trip and gave a speech at Jagiellonian University in nearby Krakow, Poland, on the police role in Hitler's oppression.

Foxman applauded the FBI's commitment to "law enforcement's critical role as defenders of the Constitution and guardians of individual rights" and said the training "has tremendous potential to impact the next generation of law enforcement leadership."

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN E. MOORE,                          )
                                        )
        Plaintiff,                      )
                                        )
            v.                          )        Civil Action No. 07-00107
                                        )
GEORGE W. BUSH, et al.,                 )
                                        )
        Defendant,                      )
                                        )

**EXHIBIT I**

John E. Moore
9 pleasant View Cir.
Daytona Beach, FL.
32118-5511
386-761-8193
November 4, 2002

Office of Information and Privacy
United States Dept. of Justice
Flag Building, Suite 570
Washington, DC
20530

Ref: U.S. Dept of Justice Case 030136

Subj: Case files to support my claim of hate crimes and law
        enforcement support.

Dear Co Director:

        I am requesting that the enclosed case files be included in
ref. case no. 030136. Thank you for your consideration.

        Victim No. 1, On 06-16-00 had a meeting with Atty. Smith
A.C.L.U. Next day my sister found my mother on bedroom floor, and aunt
was found dead in rest home that she was at.
        Victim No. 2, On 05-28-97 Mr. Harry S. found dead in his
under shorts. (son Pete)
        Victim No. 3, On 03-03-00 Mr. Walter M. found dead in under
shorts by Mr. Benjamin G. Blood on face.
        Victim No. 4,  On 12-03-02 Mr. Joe K. found dead in under
shorts by apartment manager. Blood on face.
        Victim No. 5, On 07-14-98 Mr. Benjamin G. had attorney
against defendant.
        Victim No. 6, On 06-98 Mr. Walter B. had atty. against
Defendant

Victim No. 7, On 07-98 Mr. Walter B. took defendant to Court.

Victim No. 7,8 On 03-01-99 both Walter B. and Ludwig M. took defendant to court. Later did victory parade on our street

Victim No. 9, On approx. 08-08-96 had defendant beat-up. Made himself, [defendant] noticeable for two weeks after incident. Head was all bandaged from head injuries.

Note: Some names and address's left out due to confidentiality. Information will be provided in person. All but two victims were residence of Bear Foot Park, where my wife and I resided with these victims.

Victim No. 10, is me. First off I will not try to cover ground that is covered in my case folders. I will just try to influence you in granting me an interview in person, so that we can discuss this case in detail.

Financially, I reached the $100,000 loss in income early on. I am retired from the Federal Aviation Administration. (electronics) I was doing contract work for Raytheon Co. in Burlington Mass; before that eventful night in Delaware (Hampton Inn) which ended my career. (07-25-99)

In closing, I have said this many times that I will submit to a polygraph test on any statement made in this case file. I am a victim of character assassination

Sincerely Yours,

John E. Moore

**Send Confirmation (Event Succeeded)**

| Date: | 11/21/2002 | Time: | 10:19 AM |
|---|---|---|---|
| Pages: | 4 | Duration: | 1 min 21 sec |
| Recipient: | Priscilla Jones | Company: | United States Dept. of Justice |
| Fax Number: | 12025141009 | Subject: | |
| Type: | Fax | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                  )
                                                  )
JOHN E. MOORE,                                    )
                                                  )
                                                  )
        Plaintiff,                                )
                                                  )
                v.                                )          Civil Action No. 07-00107
                                                  )
GEORGE W. BUSH, et al.,                           )
                                                  )
        Defendant,                                )
                                                  )
_____ _____)


**EXHIBIT  J**

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

JOHN E. MOORE,                    )
                                 )
        Plaintiff,            )
                                 )
v.                               )    CA. 1:07-cv-0107-(RMC)
                                 )
                                 )
GEORGE W. BUSH, ET AL.,          )
                                 )
        Defendant             )
                                 )
_____ )

Leave to file
Rosemary M Coley
11/20/07

### PLAINTIFF JOHN E. MOORE " MOTION REQUEST FOR INJUNCTIVE RELIEF"

    This request is in reference to CIVIL RULES **LCvR 65.1(c)** of the UNITED STATES

DISTRICT COURT for the DISTRICT of COLUMBIA.  For reasons and explanations

presented in my forthcoming statements

# RECEIVED

NOV 9 - 2007

**NANCY MAYER WHITTINGTON, CLERK**
**U.S. DISTRICT COURT**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN E. MOORE,                    )
                                  )
              Plaintiff,          )
                                  )
v.                                )        CA. 1:07-cv-0107-(RMC)
                                  )
                                  )
GEORGE W. BUSH, ET AL.,           )
                                  )
              Defendant           )
                                  )
_____  )

## PLAINTIFF JOHN E. MOORE " MOTION REQUEST
## FOR INJUNCTIVE RELIEF"

This request is in reference to CIVIL RULES **LCvR 65.1(c)** of the UNITED STATES

DISTRICT COURT for the DISTRICT of COLUMBIA. For reasons and explanations

presented in my forthcoming statements

# RECEIVED

NOV 1 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## POINTS AND AUTHORITIES

This application for **Preliminary Injunctive Relief** is being requested by Plaintiff

John E Moore for relief from what I label as harassment from Defendants listed: National

Security Agency (NSA), Federal Bureau of Investigation (FBI) represented by COUNSEL

for the afore named Defendants, Michelle N. Johnson, United States Attorney's Office.

Volusia County Sheriff Department represented by COUNSEL for the afore named

Defendant, Joseph Edward Hartmen. I have excluded the other named Defendants in said

case, knowing that the above named agencies have the resources to commit this type of

intrusion.

## BACKGROUND (Bkground)

Due to the inappropriate interference by a selective few of the previously named

Defendants, I find it very inconvenient and next to impossible to prepare a proper and

informative claim for relief. Included is my Documented Motion of material facts which

will be accompanied by a separate concise statement of genuine issues setting forth a total

listing of all material and personal facts necessary to be litigated as to LCvR 65. (c)

1.(a) Control of communication, such as web. Communication and e-mail.
   (b) Telephone-in call and out call.
   (c) Vehicle and property, deliberate damage to:
   (d) Brainwave Technology Torture.
   (e) Heat/Air home system, one year old at time of incidence.
   (f) Unknown photo. Was not photographed by yours truly. (do not own this type of unit)
   (g) Unknown photos.
   (h) TV System Problems

2. Documentation of proof of listed articles and systems compromised. Page i and ii are an
   itemize listing of photos and of compromised items.

(a) Photo page 2,3,4,5,6,7-019,020. Photo page 8-022,024. Photo page 9,10,11-032,033. Photo page 13-038. Page 00061 thru. 00067.
(b) Page 00047 thru. 00049(a). Page 00068(a) thru. 00074.
(c) Page 00053(a),(b) 00054 thru. 00057, 00060. Page 00058 and 00059 Documented Sheriff.
(cc) Photo page 12-034,035,036. Photo page13-037
(d) Page 00053 Brainwave Torture by type number.
(dd) Page 00051 00053 Type Four Torture. Like Anesthesia Awareness.
(e) Photo Page 1-001,002,003. see notes page i.
(f) Photo page 7-021. Unknown.
(g) Photo page 11-031.In bedroom ceiling. Photo page 13-039. Above kitchen door.
(h) Page 00050. Television system compromise.

### STATEMENT OF MATERIAL FACTS (StmFacts)

**1.** (Bkground)¶ 2(a). Documentation of Harassment of Personal Computer (PC).

As presented in listed photographs. P.C. control is lost at all function levels of operation.

printer accessibility is nonexistent, shut down capability, not operational, must use power

off button, only possible way for turn off. Photo presentation is the only way to produce

and record evidence. Note: P.C. control, not only takes place in web mode of operation

but in local operation. Cannot print photographs from digital camera.

     A. In the following text I am presenting sections of the Online Personal Privacy

Act of 2002, also HR 4678, Page 00061, that I feel my Rights were infringed upon.

SECTION 101-Collection, use or disclosure of personal identifiable information (pii).

SECTION 102-Notice and Consent requirements.

SECTION 103-Policy changes; Breach of Privacy.

SECTION 104-Exceptions; Disclosure for Law Enforcement or National Security

SECTION 106-Security.

SECTION 203-Action

SECTION 206-No Effect on other remedies.

SECTION 302-Application to Federal Agencies.

    B. Cyber Security Enhancement Bill. 1030 (a)(2); (RICO) statute. Pg. 00066

    C. The Privacy Protection Act. ("PPA"), 42 U.S.C. 2000aa. Pg. 00067.

**2.** (Bkground)¶ 2(b). Documentation of telephone calls as presented on pages 00047 thru. 00049, also updated list. 00049(a). This type of Harassment is indicative of a planed "setup" of caller ID, and speaking to a person that is not dialed but answered to that individual.

    A. Communication Act of 1934, amended, S704 (Sen. Nelson). Pg. 00068.

    Manipulation of "Caller Identification Information."

    B. Truth in caller ID Act of 2007. (HR. 251) Pg. 00069.

    C. Unwarranted Intrusion. Docket 60-756. Appellate Court. Pg. 00070.

**3.** (Bkground)¶ 2(c), 2(c)(c).

    A. (c) Billing receipts for damages to my wife's car over one year and a half.

    Note: Only used for local errands, Still has show room appearance.

    Model, KIA; total incidence nine. Total monetary damage to vehicle $4,109.04.

    B. (c)(c) Photographs of flat tires. Four each, all in drive way,

    Two which were screws in side of tire.

**4.** (Bkground)¶ 2(d), 2(d)(d).

    A. (d) Brainwave Torture Types by Number. Various time frame, day or night, mostly middle of the night.

4

    B.  (d)(d) Brainwave Torture Type 4. Wake up for this type of torture 1:00 AM to 5:00 AM, usual time frame. Usual time frame they conduct any of the eight types of torture that I have experienced as listed, or any combination of. And as this document describes, I am mentally alert but paralyzed, unable to speak or move to get out of bed. As I lay in bed helpless to communicate, then or later on this subject.

**5.**  (Bkground) ¶2(e).

Documentation of harassment of heat/air home system in our home. Digital Thermostat can be programmed at the command of the operative. Met with Technician from company. No problems were found with equipment. No malfunctions were experienced after meeting. Photographs are true images of data as it took place at the time. Note: Lower left reading (set time) 6:oo am day operation, temperature for day operation set at 77 degrees, top right. Top left indicates present room temperature. Example: Photo. Pg. 1, photo. 002, Request for 85 degrees room temperature was not done locally, at our home.

**6.**  (Bkground)¶ 2(f).

Documentation of Photo. Pg. 7-021. Unknown identifiable photograph. This photo; found on my digital camera was not taken by me. I have never seen this article, nor is it identifiable by me.

**7.**  (Bkground)¶ 2(g).

Documentation of unknown devices attached to our bedroom ceiling
and above our kitchen door. The latter two are inserted into the door
frame. The physical dimensions are approximately .25 inch diameter x
.125 inch thickness. The first pair are located external of the ceiling.

**8.** (Bkground) ¶2 (h).

Documentation of television home system installed by Direct TV,
also list of remote replacement and the listed of time frame when items
were compromised. Could not perform any normal commands to
television unit. (batteries normal)

## ARGUMENT

When preparing case documents using Law Libraries such as Cornell Law Library
Thomas (Library), Tech Journal, Law Journal or U.S. Courts. gov as examples to gather
information pertaining to this case I am immediately interrupted as per photos presented
and described in detail, 1¶ (StmtFacts). Also what Laws are in effect or are in the process
of becoming Law. The photos. which I had previously presented and offered as evidence
is just a portion of the harassment and evidence that has taken place and perpetrated by these
named agencies. These intrusions alone have compromised my first and fourth amendment
rights. As noted (A) The on Line Privacy Act of 2000, I believe the named Defendants have
complete control of my personal and (none) private computer. (B) This Bill infuses citizen
protection agencies and Government law agencies from over zealous intrusion. (C) I don't
believe that their was an approval of the U.S. Justice department for these intrusions to
our privacy and home. ("PPI"), 42 U.S.C. 2000aa.

6

As introduced as Caller ID Manipulation, such as Direct TV presentation on video television screen, when a phone call is received, it is presented on our screen with the caller ID presented. Some instances it is shown and other time it is not. I was told by Direct TV that the on/off control of presentation of Caller ID is controlled at the home site. Which can be access from the menu index, for turn on/off caller ID presentation.

2 ¶ (StmFacts), (A) Is exactly what I previously provide as an example of, which the Law was infringed upon, which Senator B. Nelson Introduced (S.704). (B) Pages 00047 thru. 00050(a) are a prime reason for the Senate to adopt HR 251, HR 5126. Page 00050(a) is an updated list of non-identifiable phone calls to our home. Another example of unlawful intrusion or spoofing is my "FAX" line, which I am receiving voice calls on my home phone line on fax number. Each line is a dedicated voice or data (fax) line, and cannot receive both. The fax line is a two ring (short) space ring and normal time spacing between sequences, also fax number is a different number than phone voice number. (C) This is another example of what I feel I am a victim of intrusion through improper means. I present this example case to impress upon this Court that the Injustice that has taken place in this day and time. As Noted, 2 ¶(StmFacts), This is pure evidence of what can transpire when Law Enforcement and Homeland Security become partners in what I call " White Collar Hate Crime."

3 ¶ (StmFacts), 2(c),  2(c)(c) are self explanatory as the name given in my previous descriptive statement by name.

4 ¶ (StmFacts), Is one of the most compelling reasons for this complaint. A. is a detail description of the types of torture I have experienced as of now. I decided to break them down into types for classification and identification.

I plan on covering this topic in more detail in my SPICIFIC POINTS OF LAW AND AUTHORITY v. National Security Agency. B This is one of the cruelest forms of torture that can be intrude upon a fellow man and the medical description and example are true to form.

5 ¶ (StmFacts), Many times in the early hours my wife or I would awake up to above normal temperature and would have to reset temperature set back to original setting. This type of incident also took place with our electric oven. Quite frequently when our oven was used to bake, the food would be over baked or almost burnt. We put an external thermostat in the oven and after we found both were in unison .

6 ¶ (StmFacts), I presume this photograph represents bragging rights to their prowess of control to the privacy of my wife and  my home.

7 ¶ (StmFacts), I believe as previously stated, that the probability of these articles are a type of amplifier used in the micro watt range. If not, just a plant. This is corroborative evidence in any event. It was put their for a reason.

8 ¶ (StmFacts), This is another example of the compromise of home personal electronics and harassment.

## CONCLUSION

1.  It is beyond comprehension that the pain that can be inflicted on innocent citizens of America and what I call "White Collar Crime" inspired by hate. This is but a small part of my presentation in this STATEMENT OF POINTS AND AUTHORITIES.

- ❖
- ❖
- ❖
- ❖
- ❖
- ❖
- ❖
- ❖
- ❖
- ❖
- ❖
- ❖
- ❖
- ❖

# WELCOME TO THE ANESTHESIA AWARENESS WEBSITE

## From the Anesthesia Awareness President

Anesthesia awareness is the phenomenon of being mentally alert (and terrified) while supposedly under full general anesthesia. The patient is paralyzed, unable to speak, and totally helpless to communicate his/her awareness. Actual cutting pain may or may not be present.

Anesthesia awareness continues to be reported between 100-200 times daily in the United States, in addition to an unknown number worldwide. Researchers believe that anesthesia awareness is under-reported by 50%-100% and occurs between 4-6 times more often in pediatric surgeries. Until the consistent use of every possible precaution (both human and equipment) to avoid awareness becomes routine, and such precautions are something of which a patient can be absolutely assured, this Campaign will not rest.

There are many thorough, vigilant, and compassionate anesthesia professionals, and for that we should all be grateful! No one enters the field of medicine to hurt people. What needs to be changed is the attitude about the possibility of awareness occurring with

any patient, in believing and validating reports of patient awareness, and realizing the necessity for immediate treatment of the terror and mental sequelae of awareness..

Even more unrecognized is the extent and extremity of the devastating sequelae on victims. Post-traumatic Stress Disorder (PTSD) occurs in approximately 50% of awareness victims, and of that 50%, it is suspected that 80% may never get over the *trauma*. This Campaign wants to see prevention of, and compassionate and effective treament for victims, and to bring about universal *awareness of awareness!*

While I am only a layperson, not a trained medical, mental health or legal professional, through my work with the Anesthesia Awareness Campaign, I think it fair to say that I am considered *the* lay expert in the area of Anesthesia Awareness through personally speaking by phone with over 2900 victims of awareness and (continuing to do so on a daily basis). Prior to this website containing much of the information available from the Anesthesia Awareness Campaign, over 10,000 packets of information were sent out free of charge. I have been privileged to have been interviewed in just about every major media, including television, cable, radio, newspapers, magazines, and professional journals, both in the US and internationally. (See "History of the A/A Campaign.")

In addition to being a media contact, a victim advocate and listener/ advisor, I have been invited to speak to medical professionals both nationally and internationally in annual meetings, Grand Rounds, and civic presentations. The Anesthesia Awareness Campaign holds, unquestionably, the largest database of awareness victims in the world — professional or lay.

Our goal is to be a touchstone of helf and affirmation for victims of anesthesia awareness, a lightening rod into the anesthesia provider community, and a toold of education and empowerment to the public in general -- almost all of whom will have surgery at time or another!

I hope you will check back often to see what new information, publications, links, and pictures have been added. You can still call me at 703-437-7327 and/or e-mail at anesawareness@aol.com.

Carol Weihrer, President and Founder (and webmaster!)

## TYPES BY NUMBER OF BRAINWAVE TORTURE THAT I AM EXPERIENCING

1. Pins and needles to arms and legs, severe pain.

2. Eyes pin pinprick like feeling watering itch type feeling. Ears and nose tickle sensation.

3. Heart beat, skip beat, chest pain and adjusted heart rate.

4. Wake-up torture during the night. (sleep deprivation) body and mind tired. Note:

   See example. Page 00051, 00052.

5. Clicking sensation in head. Adjusting of rate of clicking.

6. Arms and shoulder weak. Trembling feeling.

7. Brain torture. Lots of pain, like head will implode.

8. High pitch tone. Sometimes continuous.

Note: These types of torture are controlled by time, time length, severity of gain induced

   for level of pain.

2. A response is forth coming to my OPPOSING POINTS AND AUTHORITIES to:

U.S. DEPARTMENT of JUSTICE. Reference:

> GEORGE W. BUSH, President of the United States, et al.
> BILL NELSON, United States Senator.

I will also respond to OPPOSING POINTS AND AUTHORITIES to:

U.S. DEPARTMENT of JUSTICE. Reference:

> FEDERAL BUREAU of INVESTIGATION,
> NATIONAL SECURITY AGENCY, when served.

3. As I prepare to submit this motion request for Injunctive Relief to this Court and to cease and desist from this form of harassment in the privacy of my own home and private property by the named Federal Defendants also Volusia County Sheriff Department.

4. Award such other relief as the Court deem just and proper.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this  7th  day of November, 2007.

Respectfully submitted,

John E Moore ProSe
9 Pleasant View Circle
Daytona Beach, FL.
32118-5511
(386-761-8193)

9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN E. MOORE,                      )
                                    )
         Plaintiff,                 )
                                    )
              v.                    )    Civil Action No. 07-00107
                                    )
GEORGE W. BUSH, et al.,             )
                                    )
         Defendant,                 )
                                    )

**EXHIBIT  K**

```
@import url( lofiscreen.css );
```

…………………………………..D.I.A.A. Shaffer…………………………………….

```
%PDF-1.4
%âãÏÓ
 277 0 obj<</H[536 275]/Linearized 1/E 5676/L 44487/N 5/O 281/T 38899>>
endobj

 xref
 277 12
 0000000016 00000 n
 0000000992 00000 n
 0000000536 00000 n
 0000001285 00000 n
 0000001426 00000 n
 0000001648 00000 n
 0000002206 00000 n
 0000002446 00000 n
 0000002523 00000 n
 0000004954 00000 n
 0000005420 00000 n
 0000000811 00000 n
 trailer
 <</Size 289/Prev 38887/XRefStm 811/Root 278 0 R/Info 28 0
R/ID[<2e32cfd96ef079191bd882fcdc119c63><71e66b933d0209468453b415b5de4efb>]>>
 startxref
 0
 %%EOF
 279 0 obj<</Length 187/Filter/FlateDecode/C 199/L 183/S 123>>stream
 xÚb```b``þÄÀÌÀÀ'ÁÀÀ€ \
```

.......................................021506 Smith D.I.A.........................................



ÿØÿà ╪JFIF ┌┐┌ H H  ÿá ÄExif  MM ★   ▯ ●┌Ì ᴸ  ┌ ┌ ┌→ |  ┌  b┌← |  ┌  j┌( ᴸ
    ┌ ┐  ┌l ┐  ←  ┌┌2 ┐  ¶  ▯‡i ⌐  ┌  ¤  Đ  H  ┌  H  ┌Adobe Photoshop
CS Windows 2005:09:21 22:54:53    ᴸ ┌ ᴸ  ┌ÿÿ  ┐ ⌐  ┌ ᴸ
 ᴸ ⌐  ┌ ┐§   ─┌ᴸ ᴸ  ┌ ─ ┌→ |  ┌ ┌─┌← |  ┌ ┌&┌( ᴸ  ┌ ┐ ┐┌ ⌐  ┌ ┌.
┐┐ ⌐  ┌ ▯    H  ┌  H  ┌ÿØÿà ╪JFIF ┌┐┌ H H  ÿí

……………………………………John St_Clair Akwei…………………………………

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOHN E. MOORE, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| GEORGE W. BUSH, et al., | ) |
|  | ) |
| Defendant, | ) |

Civil Action No. 07-00107

**EXHIBIT L**

# Microchip Implants, Mindcontrol, and Cybernetics

## SPEKULA, 3rd Quarter, October 23, 1999



Eleanor White's comments: Dr. Rauni Kilde, formerly the Chief Medical Officer for Lapland (northern Finland), is one of our bravest professional supporters. She was given an award from CAHRA for her appearance on a now-unavailable video by Transmedia Productions in London, England.

See the text of the award plaque at:

She has given us permission to post this article, an example of the most vigorous support we have ever received. We thank Dr. Kilde most sincerely.

```
The following article was originally published in the 36th-year edition
of the Finnish-language journal, SPEKULA (3rd Quarter, 1999).  SPEKULA
is a publication of Northern Finland medical students and doctors of
Oulu University OLK  (OULUN LAAKETIETEELLINEN KILTA).  It is mailed to
all medical students of Finland and all Northern Finland medical doctors.
Circulation 6500.

MICROCHIP IMPLANTS, MINDCONTROL AND CYBERNETICS
by Rauni-Leena Luukanen-Kilde, MD
Former Chief Medical Officer of Finland

In 1948 Norbert Weiner published a book, CYBERNETICS, defined as a
neurological communication and control theory already in use in small
circles at that time.  Yoneji Masuda, "Father of Information Society,"
stated his concern in 1980 that our liberty is threatened
Orwellian-style by cybernetic technology totally unknown to most
people.  This technology links the brains of people via implanted
microchips to satellites controlled by ground-based super-computers.

The first brain implants were surgically inserted in 1974 in the state
of Ohio, U.S.A., and also in Stockholm,  Sweden.  Brain electrodes were
inserted into the skulls of babies in 1946 without the knowledge of
their parents.  In the 50's and 60's, electrical implants were inserted
into the brains of animals and humans, especially in the U.S., during
```

research into behavior modification, and brain and body functioning.
Mind control (MC) methods were used in attempts to change human behavior
and attitudes.  Influencing brain functions became an important goal of
military and intelligence services.

Thirty years ago brain implants showed up in xrays the size of one
centimeter.  Subsequent implants shrunk to the size of a grain of rice.
They were made of silicon, later still of gallium arsenide.  Today they
are small enough to be inserted into the neck or back, and also
intravenously in different parts of the body during surgical operations,
with or without the consent of the subject.  It is now almost impossible
to detect or remove them.

It is technically possible for every newborn to be injected with a
microchip, which could then function to identify the person for the rest
of his or her life.  Such plans are secretly being discussed in the U.S.
without any public airing of the privacy issues involved.  In Sweden,
Prime Minister Olof Palme gave permission in 1973 to implant prisoners,
and Data Inspection's ex-Director General Jan Freese revealed that
nursing-home patients were implanted in the mid- 1980's.  The technology
is revealed in the 1972:47 Swedish state report, STATENS OFFICIELLA
UTRADNINGER (SOU).

Implanted human beings can be followed anywhere.  Their brain functions
can then be remotely monitored by supercomputers and even altered
through the changing of frequencies.  Guinea-pigs in secret experiments
have included prisoners, soldiers, mental patients, handicapped
children, deaf and blind people, homosexuals, single women, the elderly,
school children and any group of people considered "marginal" by the
elite experimenters.  The published experiences of prisoners in Utah
State Prison, for example, are shocking to the conscience.

Today's microchips operate by means of low-frequency radio waves that
target them.  With the help of satellites, the implanted person can be
tracked anywhere on the globe.  Such a technique was among a number
tested in the Iraq war, according to Dr. Carl Sanders, who invented
the  intelligence-manned interface (IMI) biotic, which is injected into
people.  (Earlier during the Vietnam War, soldiers were injected with
the Rambo chip, designed to increase adrenaline flow into the
bloodstream.)  The U.S. National Security Agency's (NSA) 20 billion
bits/second supercomputers could now "see and hear" what soldiers
experience in the battlefield with a remote monitoring system (RMS).

When a 5-micromillimeter microchip (the diameter of a strand of hair is
50 micromillometers) is placed into optical nerve of the eye, it draws
neuroimpulses from the brain that embody the experiences, smells, sights
and voice of the implanted person.  Once transferred and stored in a
computer, these neuroimpulses can be projected back to the person's
brain via the microchip to be re-experienced.  Using a RMS, a land-based
computer operator can send electromagnetic messages (encoded as signals)
to the nervous system, affecting the target's performance.  With RMS,
healthy persons can be induced to see hallucinations and to hear voices
in their heads.

Every thought, reaction, hearing and visual observation causes a certain
neurological potential, spikes, and patterns in the brain and its
electromagnetic fields, which can now be decoded into thoughts, pictures
and voices.  Electromagnetic stimulation can therefore change a person's
brainwaves and affect muscular activity, causing painful muscular cramps
experienced as torture.

The NSA's electronic surveillance system can simultaneously follow and handle millions of people. Each of us has a unique bioelectrical resonance frequency in the brain, just like we have unique fingerprints. With electro-magnetic frequency (EMF) brain stimulation fully coded, pulsating electromagnetic signals can be sent to the brain, causing the desired voice and visual effects to be experienced by the target. This is a form of electronic warfare. U.S. astronauts were implanted before they were sent into space so their thoughts could be followed and all their emotions could be registered 24 hours a day.

The Washington Post reported in in May 1995 that Prince William of Great Britain was implanted at the age of 12. Thus, if he were ever kidnapped, a radiowave with a specific frequency could be targeted to his microchip. The chip's signal would be routed through a satellite to the computer screen of police headquarters, where the Prince's movements could be followed. He could actually be located anywhere on the globe.

The mass media have not reported that an implanted person's privacy vanishes for the rest of his or her life. S/he can be manipulated in many ways. Using different frequencies, the secret controller of this equipment can even change a person's emotional life. S/he can be made aggressive or lethargic. Sexuality can be artificially influenced. Thought signals and subconscious thinking can be read, dreams affected and even induced, all without the
knowledge or consent of the implanted person.

A perfect cyber-soldier can thus be created. This secret technology has been used by military forces in certain NATO countries since the 1980's without civilian and academic populations having heard anything about it. Thus, little information about such invasive mind-control systems is available in professional and academic journals.

The NSA's Signals Intelligence can remotely monitor information from human brains by decoding the evoked potentials (3.50HZ, 5 milliwatt) emitted by the brain. Prisoner experimentees in both Gothenburg, Sweden and Vienna, Austria have been found to have [missing word] brain lesions. Diminished blood circulation and lack of oxygen in the right temporal frontal lobes result where brain implants are usually operative. A Finnish experimentee experienced brain atrophy and intermittent attacks of unconsciousness due to lack
of oxygen.

Mind control techniques can be used for political purposes. The goal of mind controllers today is to induce the targeted persons or groups to act against his or her own convictions and best interests. Zombified individuals can even be programmed to murder and remember nothing of their crime afterward. Alarming examples of this phenomenon can be found in the U.S.

This "silent war" is being conducted against unknowing civilians and soldiers by military and intelligence agencies. Since 1980 electronic stimulation of the brain (ESB) has been secretly used to control people targeted without their knowledge or consent. All international human rights agreements forbid nonconsensual manipulation of human beings — even in prisons, not to speak of civilian populations. Under an initiative of U.S. Senator John Glenn, discussions commenced in January 1997 about the dangers of radiating civilian populations. Targeting people's brain functions with electromagnetic fields and beams (from helicopters and airplanes, satellites, from parked white vans,

Microchip Implants, Mindcontrol, C'ernetics

neighboring houses, telephone poles, electrical appliances, mobil phones, TV, radio, etc.), is part of the radiation problem that should be addressed in democratically elected government bodies.

In addition to electronic MC, chemical methods have also been developed. Mind-altering drugs and different smelling gasses affecting brain function negatively can be injected into air ducts or water pipes. Also, bacteria and viruses have been tested this way in several countries.

Today's supertechnology, connecting our brain functions via microchips (or even without them, according to the latest technology) to computers via satellites in the U.S. or Israel, poses the gravest threat to humanity. The latest supercomputers are powerful enough to monitor the whole world's population. What will happen when people are tempted by false premises to allow microchips into their bodies? One lure will be a microchip identity card. Compulsory legislation has even been secretly proposed in the U.S. to criminalize removal of an ID implant.

Are we ready for the robotization of mankind and the total elimination of privacy, including freedom of thought? How many of us would want to cede our entire life, including our most secret thoughts, to Big Brother? Yet the technology exists to create a totalitarian "New World Order." Covert neurological communication systems are in place to counteract independent thinking and to control social and political activity on behalf of self-serving private and military interests.

When our brain functions are already is connected to supercomputers by means of radio implants and microchips, it will be too late for protest. This threat can be defeated only by educating the public, using available literature on biotelemetry and information exchanged at international congresses.

One reason this technology has remained a state secret is the widespread prestige of the psychiatric DIAGNOSTIC STATISTICAL MANUAL IV produced by the U.S. American Psychiatric Association (APA), and printed in 18 languages. Psychiatrists working for U.S. intelligence agencies no doubt participated in writing and revising this manual. This psychiatric "bible" covers up the secret development of MC technologies by labelling some of their effects as symptoms of paranoid schizophrenia.

Victims of mind control experimentation are thus routinely diagnosed, knee-jerk fashion, as mentally ill by doctors who learned the DSM "symptom" list in medical school. Physicians have not been schooled that patients may be telling the truth when they report being targeted against their will or being used as guinea pigs for electronic, chemical and bacteriological forms of psychological warfare.

Time is running out for changing the direction of military medicine, and ensuring the future of human freedom.

Rauni Kilde, MD

December 6, 2000

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                )
                                )
JOHN E. MOORE,                  )
                                )
                                )
    Plaintiff,                  )
                                )
        v.                      )        Civil Action No. 07-00107
                                )
GEORGE W. BUSH, et al.,         )
                                )
    Defendant,                  )
                                )
_____ _____)


**EXHIBIT  M**

**INITIATIVE 630**

I, Ralph Munro, Secretary of State of the State of Washington and custodian of its seal, hereby certify that the attached are true and correct copies of Initiative Measure No. 630 and Initiative Measure No. 631 to the People as they were received by this office.

April 5, 1994

**Reviser's note:** Multiple initiatives were certified by this certificate. Each is filed as a separate document.

INITIATIVE MEASURE NO. 630

An Act relating to the national security agency:and creating new sections.

BE IT ENACTED BY THE PEOPLE OF THE STATE OF WASHINGTON:

NEW SECTION. **Sec.1.** In the state of washington, illegal for executive branch,charter,NSCID number 9,which gives carte blanche,to disreguard legal restraints,placed on the rest of government,for the benefit of national security members;This law is,contrary to the constitution of the U.S. as it gives, dictorial power to,an agency of the government and can use this power against innocent citizen's.

2.Illegal in the, state of washington, comint law NSCID directive #6. conflict section of, 605 the communications secreacy act of 1934.

3.Section 6 public law 86-36 is illegal in, the state of washington,denys access to, information on NSa, whom are breaking, the law and also places, the national security above the law, that all other citizens have to obey;It is unconstitutional, to have (a)secreat government, within the government, which makes it, own rules and use, the power they have, to harm American citizens,this being the national security agency ,a secreat military and police agency that is unconstitutional.

4. Senators and rep of the state of washington illegal to meet with the intelligence board in wash D,C.or to do any business with the national security agency in the state of washington until this agency disbanded and a constitutional agency is set up.

5. No elected official may meet with out of state NSA to do business in the state of washington,either political or for intelligence briefing,until NSA is disbanded and a correct intelligence agency is established.

6.Lobbying.
Military officials,and civilian figures it will be illegal to lobby,speak,do business in the state of wash to bring in collect money,for national security

agency business.

7.National Security Agency officials.
The President of the United States may not do business in the state of
washington that pertains to the national security agency, may not collect money
or take out money for the national security agency .

All former Presidents since Watergate may not use money or bring in money for
National Security agency business,in the state of washington.

attorney General of the United States may not do business in the state of
washington,may not bring in or take money out of state of washington for the
purpose of funding or doing business in the state of Washington for the national
security agency.

National security agency directors present and past will not do business in the
state of washington,bring in money or take money out of the state of washington
for the purpose of doing business for the national security agency.

Police intelligence units and military intelligence units as well as all special
forces which are under the national security agency director will not do
business in the state of washington will not bring in money or collect money for
the national security agency.

all above officials will not use the power of thier office to harrass to contact
schools, business,doctors,hospitals places of employment,dewelling places,state
officials,city and county,officilas ,in order to deny washington state resident
of thier civil rights.

8. newsmedia.
Newspapers, television stations,magazines will not have on it staff a
intelligence officer,will not practice censorship will not have on it staff any
person belonging to the NSA censorship of the news violates the U.S
constitution.

9.Business.
Business funded by the national security agency cannot operate in the state of
washington.
Business cannot discriminate against a person who is a target of the national
security agency cannot deny this person a right to work on orders from NSA.
business owners cannot discriminate against a national security agency target
who is renting or leasing property from owner on orders from national security
agency either in the state or from out of the state.

City County town and state agencys will not use thier positions to harras a
business that is a national security agency target may not use thier position to
threaten a business that has a person working in a business that is a national
security agency target.

Dummy corporations funded by the national security agency and have CIA and FBI who also belong to NSA may not operate in the state of washington.

Business may not have on it staff a national security agency employee whose job it is to replace NSA targets and also to sabatage a business that is a target.

10. Housing.
Housing authority in state of washington may not have on it staff National security agency person or any other person in an intelligence agency that may also belong to NSA,may not may not discriminate against a NSA target by not allowing them housing,may not discriminate against employees who may be national security agency targets.

Real Estate agency in the state of washington may not discriminat against a NSA target by not allowing a person to rent or buy a home.

Private owners and Real Estate owners may not discriminate by making a national security agency target move every 3 months.

11. Police
National security agency shall not have power over any police chief or any police official including regular policeman,may not have a national security agency person in any police station in the state of washington may not have intelligence files in local military bases,on targets of NSA may not have a list of citizens who are targets no red squad
police officals may not take orders from out of state NSA.

12.Prisons.
National security agency may not have a network in prisons in the state of washington may not have persons who contact certain persons in prisons by mail and phone & harrass a NSA target in prison.May not contact prisoners coming out to do black g bag jobs for NSa breaking into Dr. offices Homes as ordered for payment of money.this includes county federal state and city prisons.
Prisoners may not be used for medical experimentation by NSA if aware or not aware,no official in prisons may take orders from out of State NSA.

13. Legal Profession.
Illegal for any agency involved with the law may not discriminate against a target of the national security agency. Bar association may not have on it staff national security agency person,may not protect an attorney who belongs to this agency.
Civil Libertys union may not have national security agency on staff and may not discriminate against a NSA target. Civil rights agencys may not have national security agency on it staff and may not discriminate against target of NSA.

Attorneys in the state of washington may not belong to the national security agency.

Judges may not have secreat meeting with national security agency judges in

secreat sessions to review cases may not take advice from any person belonging to the national security agency in the state of washington or outside the state of washington.

Attorney may not deny national security agency targets the right to an attorney,may not take money or direction from out of state NSA and must afford person the right to fair representation.

14. Banking.
Banks in the state of washington may not have special accounts for those who are getting paid by the national security agency. Banks may not transfere money into bank from out of state national security agency accounts into banks for special accounts may not send money out of state that has been in special national security agency accounts.
banks may not have special accounts in bank for national secuirty agency funds that will be used in payment for persons who are getting paid from this account to harrass a target of the national security agency.

National security agency businesses may not be funded by any bank in the state of washington,nor by any other intellegence agency that has NSA on it staff also.

Banks may not have a national security agency intelligence person working in the bank at any time.

Banks may not dismiss any employee who is a target of the National security agency.

Banks may not harrass a patron who is a national security agency target.

15. Church.
Church organizations may not have on it staff national security agency persons,may not allow the national security agency to use church sponsored Hospitals,nursing homes,retirement homes,schools, as a front or recruit and do national security business,may not take orders from out of state NSA.

Church organizations may not allow the national security agency to use medical experimentation in any Hospital,nursing home retirement home nor allow national security agency on it staff

Church organizations may not allow the national security agency to have information on church members to gather information on members in order that NsA may not use this for future targets.

16. Post Office.
May not hold mail for national security agency may not give mail to national security agency to inspect,may not destroy mail for the national security agency,may not discriminate against an employee who is a national security agency target may not remove him or her from thier job on NSA orders. May not

discriminate against citizens who use Post office that are also targets and may
not take orders from Nsa to Harrass this citizens.

17. Transportation.
National security agency persons are not allowed on the boards of directors in
the state of washington,all transportation organizations are not to discriminate
against an employee or Citizen who is a NSa target.Buses,trains,airlines will be
illegal to take direction from out of state NsA also to harras employees or
citizens.

18. Animal rights groups.
Animal rights organization may not have national security agency persons on
staff.
Animal rights groups may not discriminate against a target of NSA if it be an
employee by denying persons who are targets to work,may not take orders from out
of state NSA.

19. Environmental groups.
Environmental groups may not have on staff national security agency members.may
not discriminate against employee who is a NSA target.National security agency
may not be on boards of directors.

20. Public Utilities.
Washington water Power,water

Public Utilities may not have on it board of directors NsA members,may not
discriminate aginst a national security agency target who is an employee may not
take orders from out of state NSA,may not discriminate against and harrass a
patron of washington water who is a NSA target may not have on it staff NSa
employee.

21.Volunteer Organizations.
Volunteer organizations may not have on staff national security agency
persons,may not keep and use a list of targets may not gather information and
give to NSA or out of state Nsa may not collect or give money to NSA.

22.Service business.
trades persons plummers, electricians,carpenters may not come in and destroy
property, or refuse to give service to a target of NsA.

23. Schools.
Public and Private schools may not have national security agency persons on
staff.
Schools both public and private may not discriminate against a NsA target in an
employee or a student may not deny the right to work may not deny the right to
an education to persons who are NSA targets.
Schools may not take direction from out of state NSA and may not deny grants to
Nsa targets.
National security agency research programs illegal in washington state.

Case 1:07-cv-00107-RMC    Document 54-3    Filed 08/28/2008    Page 106 of 160

Schools may not practice social isolation on students or employees.
Students who are national security agency and pursue other students who are
targets are banded from school until they disconnect from this agency.

24.Labor Unions.
Labor unions in the state of washington may not have on staff persons belonging
to the national security agency.May not take orders from out of state NSA may
not discriminate against an employee who is a NSA target.

25. Clubs.
Military,private, may not have national security agency on its staff may not
discriminate against NsA target may not take orders from out of state NSA.

26. Fire Departments.
Fire departments may not have on it s staff national security agency members.May
not tkae orders from out of state national security officials.May not have
monitoring and listneing devices for monitoring conversations and phones in any
fire station.

27.Civil rights.
Civil rights agencys in the state of washington may not have on its staff
national security agency person may not take orders from out of state NSA.May
not have a list of targets of the national security agency and then deny them
equal rights and fair treatment.
Human rights agencys also may not have these list or may not discriminate
against NSA targets.

28. Welfare agencys.
State of Washington welfare offices may not have an national security agency
intelligence person in the office or have one that comes and gose,that monitors
NSA targets and has the power to order who will get welfare and who will not get
it. also state welfare office will not take orders from out of state NSA will
not discriminate against an employee who is a NSA target.

29. Federal Agencys.
State of Washington Federal agencys within washington state may not have
nationals security agency on staff may not take direction from out of state NSA
and officials.May not do any business political,military civilian with national
security agency.Retired national security agency members may not do any business
in the state of washington with federal agencys in the state of washington.

Federal agencys may not have safe houses connected with the national security
agency and may not keep targets of this agency in social isolation.May not
detain forgien nationals also and keep in these house without legal
representation.May not keep Americans also in these safe house with all the same
stipulations may not keep any person in a federal facility in the state of
washington and use drug experimentation on them.

30. Military.

Military bases in the state of washington may not have members of the national security agency belonging to the base as a civilian or a military person.

Military bases may not have military person or civilians that visit schools and get targets of the national security agency out of school and also deny targets grants.

military bases may not have persons working out of base or who belong to the base military or civilian who visit corporations in a certain area and get national security agency targets out of thier jobs.

Military bases may not have persons who are military or civilian working out of the base visit apartment owners in a certain area and get national security agency targets out of thier apartments.

Military bases in the state of washington also may not be used to keep intelligence files on citizens by police intelligence units or by military intelligence units.

national security agency are not allowed to use servicemen for medical experimentation with the consent or without consent:

Military in the state of washington may not harrass a serviceman who is a national security agency target.

Military bases in the state of washington and the base commander may not take orders from out of state national security agency and also from retired national security agency within the state.

Monitoring devices used for defense may not be used on washington state citizens for monitoring phone conversations, facilitys and conversations in the home, opening the mail, holding mail and also not letting other mil be delivered, intercepting telegrams.

Military bases and those that run them may not keep and have a list of targets of the national security agency, may not give this list to other agencys out of state or in the state of Washington.

Drugs developed by the national security agency in fort meade MD by the navy and other lab that national security agency has may not be used on any citizen in the state of washington, on any serviceman in any Hospital, nursing home, retirement home, or by any private doctor.

31. Recruitment.
Illegal for the national security agency to advertise in the state of washington, to recruit in schools, business, private agencys.

32. liscensing bureau.
liscensing brueau may not discriminate against a person both an employee and

those who apply for drivers liscense,may not take orders from out of state NSA.

33.communications.
Telephones companys,telegraph co,computer systems, cannot have NSA on staff,may not violate privacy of Hospitals, nursing homes,retirement homes,private homes,in phone conversations or conversations in home,work places,violates the privacy act.

34.National Security agency employees.
Illegal in the state of washington for persons belonging to the national security agency to go from job to job replacing NSA targets, to go to business and sabatage the business that is a Nsa target or one that will not get rid of an employee who is a target.this is civilian National security agency and military NSA.persons.

Illegal in the state of washington for NSa to use those in prison who are coming out for black bag job,and other acts of violence against Nsa targets.

35.Social Security.
May not have on staff person who belong to the national security agency may not discriminate against a employee who is a target nor clients who are targets, may not erase a target records. may not take orders from out of state NSA.

36. Medical.
Doctors may not keep a list of national security agency targets, and deny them medical treatment,either by lying about condition, or not treating them.

Hospitals may not have a list of national security agency targets and deny them treatment and also lie about the condition of the patient.

Nurses,aides and any medical professional may not discriminate against a target of the national security agency in the state of washington may not harrass or use cruel and unusual treatment.

Hospitals,nursing homes,retirement home, may not have persons on staff in the state of washington who belong to the national security agency.

Nursing facilitys in the state of washington may not discriminate against a patient in thier facility, may not force this person to move that is a national security agency target

Directors of Health and Human services in the state of washington may not engage in blacklisting of persons who are targets of the national security agency,by sending surveryors to targets place of employment and threaten it with closure.

Medical boards in the state of washington may not have on it staff person who belong to the national security agency.

Hospitals in the state of washington may not have secreat files on patients or

employees.May not try out new drugs that the National security agency has developed on patients or employees.

state of washington medical boards of all persons working in the medical field may not keep closed files on any health care professional, may not have sealed files on any health care professional, all files must be open for public inspection.

37. Department of mental health.
Department of mental may not discriminate against a patient who is a target of the national security agency by denying them treatment.

Dept of mental health may not discriminate against an employee who is a target of the national security agency.

Dept of Mental Health may not use new drugs on patients who targets of the national security agency and may not use drugs that the national security agency has developed on persons who give thier consent and on persons who do not give thier consent.

national security agency members may not be employed in the field of mental health in the state of washington in any hospital or nursing facility or state agency or county or city.

Dept of mental health may not use psyicological torture nor may it take direction from outside of state national security agency for this tatic in order to study the effects of social isolation and also to use this same method to control and make a national security agency target impotent.

Physicological torture;

the threats to familys members that if support is given to the target jobs and other benefits will be lost.

The threats to those in places of employment to avoid target in order to break down target and loss of self esteem.

Persons who are trained in the methods of physicological torture may not train others in the state of washington to use on targets in prisons,schools places of employment,military in the state of washington.

38. State Agencys.
May not harrass and contact employers for the purpose of keeping a national security agency target out of a job,out of of school,out of an apartment.This applys to all city,county state,private institutions,and religious organizations,to all business and corporations.

May not keep files secreat on state employees may not keep files that are sealed to protect wrong doing by those persons belonging to the national security

agency.All medical files on those working in the health care professional must be open for public inspection.

state officials may not take orders from out of state national security agency officials.

       NEW SECTION. sec. 39 sections 1. threw 38 of this act are each added to chapter.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN E. MOORE,

    Plaintiff,

        v.

GEORGE W. BUSH, et al.,

    Defendant,

Civil Action No. 07-00107

**EXHIBIT N**

# National Security Agency whistleblowers: psychological abuse

**NSA Accused of Psychologically Abusing Whistleblowers**
**By Sherrie Gossett**
**CNSNews.com Staff Writer**
**January 25, 2006**

(CNSNews.com) - Five current and former National Security Agency (NSA) employees have told Cybercast News Service that the agency frequently retaliates against whistleblowers by falsely labeling them "delusional," "paranoid" or "psychotic."

The intimidation tactics are allegedly used to protect powerful superiors who might be incriminated by damaging information, the whistleblowers say. They also point to a climate of fear that now pervades the agency. Critics warn that because some employees blew the whistle on alleged foreign espionage and criminal activity, the "psychiatric abuse" and subsequent firings are undermining national security.

A spokesman for the NSA declined to comment about the allegations contained in this report.

The accusations of "Soviet-era tactics" are being made by former NSA intelligence analysts and action officers Russell D. Tice, Diane T. Ring, Thomas G. Reinbold, and a former employee who spoke on condition of anonymity. The allegations have been corroborated by a current NSA officer, who also insisted on anonymity, agreeing only to be referenced as "Agent X."

Tice, a former NSA intelligence analyst and action officer, first drew media attention in 2004 after the Pentagon investigated possible retaliation by the NSA against him.

The controversy began in early 2001, when Tice reported that a co-worker at the Defense Intelligence Agency (DIA) appeared to be engaged in espionage for China.

"I saw all the classic signs," said Tice, who identified the alleged spy to Cybercast News Service. The person's identity is not being published in this article for national security reasons.

When Tice transferred to the NSA in November 2002 he reported his concerns again, criticizing the FBI, which he labels "the Federal Buffoons and Imbeciles," for the agency's alleged incompetence. One of his emails was forwarded to NSA Security, which prompted the NSA, according to Tice, to order that he undergo a psychiatric evaluation. The NSA psychologist labeled him "paranoid" and "psychotic," Tice told Cybercast News Service.

That assessment, which Tice said was made by NSA forensic psychologist Dr. John Michael Schmidt, led to his security clearance being revoked and his firing.

All five whistleblowers name NSA psychologists as central players in what they allege is an ongoing abuse of authority by the NSA's Office of the General Counsel, the NSA Inspector General, the NSA internal security office and psychologists employed by the agency.

Tice's media profile quickly rose again on Jan. 10, when ABC News reported that he had been a source for the December *New York Times* article about a secret NSA surveillance program that was used to monitor the electronic communications of Americans suspected of contacts with terrorists.

Some leading Democrats charge that President Bush broke the law when he signed the secret order in 2002 authorizing the program, because he bypassed the Foreign Intelligence and Surveillance (FISA) court. The White House contends that the president has sufficient constitutional authority to order such intelligence-gathering, as well as additional powers granted by Congress three days after the Sept. 11, 2001, terrorist attacks.

Tice furnished Cybercast News Service with documents that appear to contradict the NSA's conclusion in his case. The news service verified the contents of the documents with the authors.

A letter dated Nov. 7, 2004, from clinical psychologist Dr. Evelyn Feleppa Adamo indicates that she found "no evidence" of the signs of the alleged mental disorders in Tice. On Oct. 15, 2004, licensed psychologist and family friend Dr. Sandra G. Rosswork wrote a letter indicating that she had never observed any

abnormal behavior by Tice and that he was "a solid, responsible, dependable and good natured person" who was "well-liked."

A letter from Employee Assistance Service (EAS) clinical psychologist Dr. William D. Charmak notes that Tice suffered "feelings of humiliation and despair" after losing his security clearance, but did not appear to manifest paranoid symptoms. Charmak did not return a telephone call seeking comment.

An earlier confidential psychological/psychiatric report from an NSA psychologist that Tice knows only as Dr. Bache was dated July 2, 2002 and indicated that "on test results there were no indications of any outstanding difficulties." The report acknowledged that Tice had a "somewhat rigid approach to situations." The NSA declined comment on the findings of any of their psychologists.

In endorsement letters written around the time Tice's security clearance was revoked, five retired NSA and intelligence officials who worked with Tice described him as "enthusiastic," "congenial," "an engaging associate," and a "scholar of high intellectual rigor." Tice was described as possessing "sound judgment," and being well suited to the "most demanding and sensitive intelligence operations." The letters praised him for his "unparalleled professionalism" and "uncommon commitment."

"This nonsense has to stop. It's like Soviet-era torture," said Tice. "These people are vicious and sadistic. They're destroying the lives of good people, and defrauding the public of good analysts and linguists"

For a long time those who had endured the alleged abuse "were too afraid or ashamed to come forward," Tice added.

### Pre-9/11 warning

Among those coming forward is a former NSA linguist who worked with the NSA for almost three decades. The former employee spoke on condition of anonymity as he is currently employed by another federal agency. He is referred in this article simply as "J."

"J" is a "hyperpolyglot" or a person who is fluent in an unusually high number of languages. Former colleagues described him as a brilliant man possessing critical skills that were "amazing."

"I believe the abuse is very widespread," said J. "The targeted person suddenly is described as 'not being a team player,' as 'disgruntled,' and then they're accused of all sorts of bizarre things. Soon they're sent to the psych people."

J first ran afoul of the process when his superiors disagreed with a report he and other agency linguists filed on Sept. 11, 1993. Their study of Arabic language messages and the flow of money out of Saudi Arabia to terrorist entities in other countries led them to conclude that Saudi extremists were plotting to attack America. "You could see, this was the pure rhetoric of Osama bin Laden and his group, the exact same group, and we had an early indication," J said.

"All of us in the group had this view of a burgeoning threat, and suddenly we were all trotted off to the office of security. Then came the call to report for a battery of psychological tests," said J.

J told Cybercast News Service that he was again summoned to undergo psychiatric evaluation after warning NSA that security measures should be taken to protect against the possibility that terrorists might try to fly airplanes into buildings.

As an example of what might happen, J said terrorists might try to fly a plane from the nearby Tipton air field in Ft. Meade, Md., into an NSA high-rise building. J said NSA officials described him as "obsessed" with the idea of a "kamikaze" threat due to the time he had spent in Japan. The month was May 2001, four months before the Sept. 11, 2001 terrorist attacks on the U.S.

A similar scenario ensued every time J's analysis countered conventional wisdom, provided a dissenting opinion or made someone feel that their job was being threatened. J said he soon developed an irregular heartbeat due to the stress of not knowing when he next would be called for another psychiatric test.

"I believe it was retaliation, but how do you prove that?" J said. He spent the last 10 years of his career at the NSA with no promotion or raise. During that time, another linguist with critical skills left out of disgust with what was happening, J added.

"Who was going to listen to us?" asked J. "Who could do anything anyway?

"I'm still afraid they're going to screw my life over," he said.

"They have long tentacles. I never even owned a computer because I know what they can do. Every keystroke can be picked up."

### Agent X and the 'underground network'

Agent X, a current NSA officer, confirmed the allegations and told Cybercast News Service that psychiatric abuse as a form of retaliation was "commonplace" at the agency.

"A lot of people who work there are going through the same thing. People live in fear here. They run it like some kind of Gestapo," Agent X said.

Those targeted are "yelled at, badgered and abused," X added. "These are really good people, who start to be labeled crazy, but they're telling the truth."

Agent X also alleged that the NSA plants false evidence in personnel files as part of the intimidation campaign.

The agency also maintains a "dirt database" of inconsequential but potentially embarrassing information on employees, gathered during routine clearance investigations, said Tice. The information is kept as a means of leverage, he alleged.

Agent X said that an "underground network" has developed to discuss these issues. "It's like the Nazis have taken over."

Cybercast News Service contacted the NSA on Jan. 17 about the allegations contained in this article, involving the security department, the NSA inspector general, the Office of the General Counsel and staff psychologists such as Schmidt.

Two days later, Don Weber, senior NSA media advisor responded. "At this time I have no information to provide; however, if that changes I will email you soonest. Thanks for the query," Weber stated.

## NSA Whistleblowers Were Allegedly Isolated, Intimidated
## By Sherrie Gossett
## CNSNews.com Staff Writer
## January 26, 2006

(CNSNews.com) - Whistleblowers who have stepped forward to accuse the National Security Agency of retaliating against them by falsely labeling them "paranoid," "delusional," or "psychotic," cover a range of political views. Russell D. Tice, a self-described conservative, believes President Bush should be impeached over the current controversy involving the NSA's domestic surveillance program. Another whistleblower, Diane Ring, is a staunch Bush supporter who supports the surveillance program.

Ring is a former NSA computer scientist who said she was ordered to undergo a psychiatric evaluation after she ran afoul of a colonel at the Pentagon. Her case differs from the others in that she was not initially a whistleblower, but believes the retaliation arose from a personal vendetta against her. The colonel had chastised Ring for missing a briefing. When Ring explained that she had been directed by her branch chief, who was her superior, to work on a classified program during the briefing period and that the directive took priority, the official reportedly "blew up."

Ring said she was first given a "management consult," instructing her to seek counseling then was pressed to see NSA forensic psychologist Dr. John Michael Schmidt. After she lodged a complaint about the alleged retaliation with the NSA inspector general, Ring said the agency moved to revoke her security clearance, "red-badging" her. "Red-badged" employees only have access to the corridors at the NSA.

"I had just received a 4.5 out of 5.0 job evaluation rating 3 months prior," Ring told Cybercast News Service.

According to Ring, her colleagues told her in the hallways at NSA that they had been ordered not to communicate with her. Ring said she was assigned to spend her days in a room full of other "red-badgers." She believes the isolation was one part of an intentional campaign to break her and drive her out of the NSA.

For eight months, the former action officer from the Pentagon read books and magazines. "They had these red-badgers spread out all over the place. Some were sent to pump gas in the motor pool and chauffeur people around," said Ring. "In our room, some people brought sleeping bags in and slept all day long. Others read. I would think that would incense the taxpaying public."

Soon after being isolated, Ring said she began losing sleep and was ordered to undergo more psychiatric evaluations

administered by Schmidt. Ring said Schmidt eventually reported that another doctor had diagnosed her with a "personality disorder," but according to Ring, she later produced a letter from that doctor who said he had never told Schmidt such a thing.

A July 21, 2005 letter from psychiatrist Dr. Lawrence Breslau, which Cybercast News Service authenticated, states about Ring: "On mental status examination including cognitive assessment she performs extremely well."

Like others in her position, Ring began to go to the NSA Employee Assistance Service (EAS) for confidential counseling about what she was going through. But a current NSA officer who spoke with Cybercast News Service on the condition of anonymity and is identified in this report as "Agent X," warned that NSA officials are able to obtain 'confidential' EAS records when they are attempting to retaliate against an employee.

"Their goal is to freak you out, to get inside your mind," X said.

Ring claims that NSA General Counsel Paul Caminos lied about her case before a judge, denying that he had sent an internal email forbidding anyone from supporting Ring. Ring said she was "floored" by Caminos' actions, comparing the process to being "shell-shocked."

"I served in Bosnia. We had mines going off all around us, all day long. That was nothing compared to this," Ring said.

She now plans to send a letter to the new NSA director, Lt. Gen. Keith B. Alexander, asking that he order an investigation of her case. "This is his time to shine," said Ring. "He can really clean house."

Like "J," the linguist whose account was detailed in Part 1 of this report, Ring believes that the problem at NSA involves only a few people. "The whole lot of them is corrupt though," Ring said. "There is zero integrity in the process. And zero accountability. "

### 'Doing a mental'

Former NSA officer Thomas G. Reinbold confirmed that the practice of "psychiatric abuse" inside the NSA is "very widespread."

"They call it 'doing a mental' on someone," Reinbold said, and it

has a "chilling effect" on other potential whistleblowers, he added. "They fear for their careers because they fear someone will write up bad [psychological] fitness reports on them."

Reinbold was labeled "paranoid" and "delusional" by Schmidt after he complained to an inspector general on Feb. 25, 1994, that the federal government was guilty of contract tampering. An evaluation conducted by Schmidt eight months earlier had concluded that Reinbold did not present a mental health or security risk, according to court documents.

Reinbold was working at the time as a contracting officer representative assigned to the Naval Security Group (NAVSECGRU) at Sugar Grove, W.Va.

NSA temporarily suspended his "Sensitive Compartmented Information" (SCI) security clearance, which is more exclusive than a "Top Secret" clearance and Reinbold said he was escorted from Sugar Grove by armed naval officers.

Reinbold accused the NSA of fabricating evidence in his personnel file in order to oust him. The phony evidence, Reinbold alleged, included that he was a danger to himself and others, and that he had said "if [he] was going down, [he] would take everyone with him." During this time, Reinbold also requested that Schmidt's earlier statements, labeling him "paranoid" and "delusional" be removed from his file.

An administrative hearing held on Sept. 7, 1995, found that the revocation of Reinbold's security clearance was unjustified and that the NSA should restore both his clearance and his job. However, Reinbold was not able to get the damaging information removed from his file. He later sued, but then was forced to retire because of his diabetes. During his career, Reinbold said, he received 26 commendations and awards as well as a medal for the strategic intelligence he provided during the first Persian Gulf War.

"I gave 29 years of my life to the intelligence community," Rienbold said. "They couldn't get me out the door fast enough. There are very good people, getting screwed and going through hell," he told Cybercast News Service.

Some of the whistleblowers plan to ask U.S. Sen. Barbara Mikulski (D-Md.) for help. While Diane Ring wants her job back, or at minimum, to be allowed to resign with her security

clearance intact, Tice believes there is no reason for optimism. "Our time is over," Tice said he told Ring. "But we can make a difference for those who come behind us," he added.

Cybercast News Service contacted the NSA on Jan. 17 about the allegations contained in this report, including those involving the security department, the NSA inspector general, the Office of the General Counsel and staff psychologists such as Schmidt. Two days later, Don Weber, senior NSA media advisor responded. "At this time I have no information to provide; however, if that changes, I will email you soonest. Thanks for the query," Weber stated.

Dr. Don Soeken, founder and director of Integrity International, a whistleblower advocacy group, supports the public stance taken by the whistleblowers. Soeken became a whistleblower himself while employed as a psychiatric caseworker for the U.S. Public Health Service in the 1970s. He told Cybercast News Service that he discovered the government employees sent to him with diagnoses of mental illness or imbalance were actually whistleblowers who had no mental problems. Soeken's superior backed his findings, which eventually led to hearings on Capitol Hill.

"When this retaliation first starts, there's a tendency by bosses to use code words like 'delusional,' 'paranoid' and 'disgruntled'" said Soeken. "Then they use psychiatric exams to destroy them. They kill the messenger and hope the PR spin will be bought by the public."

Tom Devine, legal director for the Government Accountability Project, a Washington D.C.-based non-profit advocacy group, told Cybercast News Service that "psychiatric retaliation" is a knee-jerk reaction against whistleblowers.

"It's a classic way to implement the first rule of retaliation: shift the spotlight from the message to the messenger. We call it the 'Smokescreen Syndrome.'" Superiors investigate and brand the whistleblower for anything ranging from financial irregularities, to family problems, sexual practices, bad driving records or even failure to return library books, Devine said. "It's a form of abuse of power."

Beth Daly, senior investigator for the Project on Government Oversight (POGO), said whistleblowers in the intelligence community have no real protection due to flaws in the

Whistleblower Protection Act. "You have to go through the inspector general or the director of the CIA to let them know if you're going to Congress and what you're going to disclose. And inspector generals are notorious for revealing who whistleblowers are," Daly said.

On Feb. 14, U.S. Rep. Christopher Shays (R-Conn.), chairman of the House National Security subcommittee, will begin hearings to investigate the allegations of security clearances being revoked as a form of retaliation. Vince Chase, an investigator with the subcommittee, told Cybercast News Service that three panels of witnesses would testify and that the focus would be on the lack of protections for national security agency whistleblowers.

Some intelligence agency whistleblowers had been skeptical about the proceedings, believing that their concerns would not be accurately represented by witnesses such as inspectors general. But the subcommittee has now invited Russell D. Tice to testify, as well as the organization to which he belongs, the National Security Whistleblowers Coalition (NSWBC).

Prof. William Weaver, senior advisor to NSWBC and a legal expert in governmental abuse, is expected to emphasize the lack of oversight and direct accountability. The Concerned Foreign Service Officers Coalition, an NSWBC partner, will be offering written testimony as well.

Former FBI language specialist Sibel Edmonds, president of the National Security Whistleblowers Coalition, praised the development in a letter sent Jan. 25 to supporters. "This shows once again that we may be powerless in pursuing our own individual cases and going against the monstrous government brick wall of abuse," Edmonds wrote, "but together, collectively, as a coalition of now 70+ (national security) whistleblowers, we have a voice, a mighty powerful one indeed."

Meanwhile, Agent X, Russell Tice and the other whistleblowers quoted in this report believe other former NSA employees might be better able now to come to terms with what happened. "They probably feel alone, but this shows they're not alone. There are a lot of people who this has happened to," Agent X said.

**This article is located on**

in the section on

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN E. MOORE,                          )
                                        )
        Plaintiff,                      )
                                        )
            v.                          )        Civil Action No. 07-00107
                                        )
GEORGE W. BUSH, et al.,                 )
                                        )
        Defendant,                      )
                                        )

**EXHIBIT  O**

1377 Tahoe Ave   Yucca Valley Ca  92284
Phone: 760 793-8653 | 760 364-3632

May 21 2007

Senator Dianne Feinstein
One Post Street, Suite 2450                                    Robin Burke
San Francisco, CA 94104                          cc:     Case Assistance Personnel
Phone: (415) 393-0707
Fax: (415) 393-0710

Dear Senator Feinstein

I am writing to urge investigation into criminal misconduct, rights violations and fraud that is occurring under a highly classified "Special Access Program" (SAP) initiated by the Executive Branch and Department of Defense. The highly classified program has former NSA Director Michael Hayden, Col. Geoffrey Ling of Defense Advanced Research Projects Agency (DARPA), William Heetderks and F.T. Hambrecht of the National Institutes of Health (NIH), and Defense contractor Alfred E. Mann (AEMF) developing implantable medical device technology for use in Defense and Intelligence applications.. The research efforts have been performed under waived/unacknowledged Special Access Program (SAP) classification and the "carved" mechanism removed the funding from the Defense budget effectively appearing as NIH and other contracts. According to Defense directive and policy, the "unacknowledged/waived" SAP classification eliminates the normal congressional reporting requirements, and I believe this program was initiated unlawfully without disclosure to Congress. In addition to Defense components named above, key personnel have been strategically appointed by the Bush Administration at various agencies allowing this program to continue in secrecy.

The technology being developed under this SAP includes submillimeter sized MEMS technology and non-ferrous materials to achieve a device size and construction which currently cannot be detected or localized by clinical medical personnel using available radiology techniques. Research efforts under this program have refined a technique for surreptitious cortical implantation using minimally invasive surgery. SAP personnel have demonstrated this technique in which retrograde amnesia properties inherent in Ketamine allow devices to be implanted without the consent or knowledge of the adversary or targeted subject. Research efforts have explored the use of this technology as a tactical weapon as well as an Intelligence tool. Under the SAP, a proprietary telemetry protocol has been developed that permits devices to be controlled and queried using bi-directional wireless data over a distance of many miles over FCC regulated RF spectrum. Most disturbing is the ability to use the devices to deliver Testosterone or any other pharmaceutical agent into the biological system of the subject. The application of this technology has transitioned from use as a tool against terrorism and is now focused on deployment for secret Intelligence operations and discrete strategic or political usage domestically. This recent shift to domestic use of the technology for political purposes and agenda has caused personnel affiliated with the SAP to question the motive and ethics of such use, but the secrecy of the program has such personnel bound to non-disclosure.

Senator Dianne Feinstein
Case Assistance Personnel
Page 2 of 12

When Russel Tice of the NSA attempted to disclose unlawful acts and rights violations being committed under Special Access to members of Congress, the NSA warned Tice that even members on the Intelligence subcommittee were not authorized to receive such highly classified information. It is clearly evident that this program is being concealed from Congress and is circumventing our Democratic system of checks and balances and separation of power. This technology, pursued for over a decade at the NIH/NINDS, has reached maturity and is being deployed secretly, unlawfully, and to the detriment of National Security and Democracy. The potential for abuse of this technology has been realized and is currently being exploited by the Executive branch. Immediate investigation is warranted and necessary.

I am in possession of significant direct evidence of felony criminal misconduct and rights violations occurring under this program and wish to come forward with full disclosure of facts. The evidence in my possession is substantial and includes:

1   Medical devices fabricated under Defense Special Access Program contract, and surgically removed by medical personnel following my involvement as a research subject.
2   Supporting medical records, documentation, pathology reports, and laboratory analysis of devices surgically recovered after implantation by SAP personnel.
3   Copies of contracts, quarterly progress reports (QPR's), research data, published papers, and documents including materials obtained under Freedom of Information Act (FOIA) provisions pertaining to the classified SAP efforts.
4   FCC License applications, FCC records and confidential disclosure to FCC Chairman Kevin Martin from the Mann Foundation regarding Mann's governmental contractual obligations.
5   Patent applications and drawings of implantable device intellectual property submitted by SAP contract personnel to the U.S. Patent and Trademark Office.
6   Court records and transcripts from civil proceedings in which SAP personnel unlawfully misused National Security and SAP provisions to alter the outcome of legal proceedings and further, committed perjury in order to avoid disclosing misconduct which occurred as part of SAP activities and to maintain secrecy.
7   Correspondence and vendor testimony outlining fraudulent reporting and misappropriation of grant monies and federal funding. This evidence clearly shows fraudulent reporting and waste.
8   Additional documentation and fact which clearly show a focused, willful effort by the Executive Branch and SAP personnel to suppress evidence, obstruct my whistleblower efforts, and the unlawful use of National Security and SAP provisions to conceal criminal misconduct and avoid litigation.

I am uncertain as to what powers are afforded to Case Assistance personnel, and the highly classified unacknowledged/waived status of the SAP may complicate disclosure to you. I will however attempt to provide useful information that is relevant and substantiated by fact to aid in your inquiry.

Senator Dianne Feinstein
Case Assistance Personnel
Page 3 of 12

The following information, combined with the articles of evidence listed above, provide basis and fact which warrant investigation and even subpoena if necessary. Please consider the following in determining the scope of your investigation:

1. **Failure to disclose the SAP to Congress as required.** On NIH contract #R01-HD39099-01 awarded to the Alfred Mann Institute, William Tang fails to disclose on his grant application a full-time appointment in Arlington as a DARPA program manager. I believe in this instance, the SAP "carved" mechanism allowed Defense research to occur under the auspices of an NIH/NICHD contract. I also believe that when Congress approved this NIH budget, the NICHD funds were earmarked for children's health issues, and the misuse of the funding for Defense technology and carved SAP research efforts constitutes misappropriation of federal funding and fraud. A copy of this grant application is enclosed as *Article 1*.

2. **FCC compliance, confidential disclosure to the FCC regarding Mann Foundation governmental contractual obligations for implantable device development, and FCC involvement.** Compliance with FCC regulations has been problematic for the Mann Foundation and conflicted with the secrecy of the Defense SAP. Mann Foundation personnel had to use FCC licenses obtained in the names of friends and family members in order to comply. In 2002, criminal research efforts by the Mann Foundation were attributed to these licenses and caused LAPD Detectives to investigate. SAP protections were invoked and caused the LAPD investigation to be abandoned, but a remedy was desired in order to maintain SAP secrecy. Following a visit to the White House by Alfred Mann, President Bush appointed Kevin J. Martin as Chairman of the FCC. Just weeks after Kevin Martin's appointment as Chairman, the Mann Foundation submitted a request for special use of spectrum, rule changes, and request for confidential treatment. This request was immediately granted and allows the Mann Foundation to operate using spectrum directly next to "government use only" allocations, allows encryption not previously permitted, circumvents the normal licensing process, and allows unlawful research efforts to continue anonymously and without accountability. Most disturbing is the FCC efforts to present the rule changes and special use of spectrum to the public as "medical technology". I am well versed in this technology and after close examination of documents obtained from the FCC, it is clearly evident that the changes being proposed and the special use of spectrum requested, is solely to accommodate the proprietary "Suspended Carrier" technology which is exclusive to the SAP submillimeter technology. The submillimeter devices developed under SAP are extremely unique, have no battery due to submillimeter size limitations, rely on RF Powering to charge a particle of tantalum as a capacitor, and as such, the requirements for telemetry differ substantially from typical medical devices which have adequate power supply.       *Continued..*

Senator Dianne Feinstein
Case Assistance Personnel
Page 4 of 12

The rule changes were made necessary by the unique requirements of the Defense/NSA submillimeter devices and have nothing to do with needs of the clinical medical industry. As a Biomedical Engineering student, former IEEE member and FCC licensed operator (call sign KI6JJN), I can attest to this as fact. Additionally, examination of all responses to the FCC request for comments shows that over 90% off the respondents are affiliated with the Mann Foundation, Dept. of Defense, or William Heetderks. This is not medical technology and for the FCC to present it to the public as such and request public comment as it did constitutes fraud. Additionally, the FCC removed complaints from public record which were filed in 2002 regarding unlawful use of spectrum by the Mann Foundation and it's President Joseph H. Schulman (call sign K6BWA). Most recently, the FCC has failed to respond appropriately to new complaints submitted in writing regarding criminal use of FCC regulated spectrum by SAP and Mann Foundation personnel. The bottom line is that following Alfred Mann's White House visit, Bush appointed a Chairman who is sympathetic to Bush Administration agenda and has caused the FCC to compromise their integrity and mandate. It is imperative that you obtain a non-redacted copy of the Mann request and investigate the issues addressed in the attached correspondence with Sandra Lyn Bailey at the FCC. I have attached my redacted copy of the Mann request obtained under FOIA provision (heavily redacted), copies of correspondence with Chairman Martin and Sandra Lyn Bailey, and related documentation as *Article 2*.

3. **The Department of Justice and Federal Bureau of Investigation has significantly obstructed justice and succumbed to pressure from the Executive Branch to turn a blind eye to SAP activities, unlawful or otherwise.** Agents at the FBI who eagerly initiated investigations and took possession of substantial evidence allowed their investigations to be compromised, and abandoned all investigative effort after SAP personnel invoked protections to avoid being prosecuted. Correspondence with Alberto Gonzales, James McAtamney (DOJ cabinet level, criminal division) and FBI personnel clearly shows that the FBI and DOJ criminally obstructed justice, denied equal protection of the law, and failed to enforce the law, despite having direct knowledge of SAP criminal activity and having jurisdiction over the crimes. It is apparent that investigations were compromised unlawfully. Correspondence with the DOJ and FBI are attached as *Article 3*.

4. **Unlawful use of SAP provisions to deny records requested under FOIA statute and failure to comply with FOIA statute as required by law.** SAP's initiate March 1st annually and on February 27th I had a pending, active FOIA request into the Defense Freedom of Information Office. This office mailed a letter to me that they incorrectly addressed, but had the right zip code to insure it would be postmarked. When the letter that they incorrectly

Senator Dianne Feinstein
Case Assistance Personnel
Page 5 of 12

addressed was returned "undeliverable", they used this as an excuse to completely close my FOIA request. No efforts were made to contact me using the cell phone number provided on all my correspondence. The enclosed documentation and correspondence clearly show that my FOIA request was unlawfully closed and suggests this was done to avoid initiating a March 1 SAP on a subject who is a requester of records. Further, record retention on SAP's is only 12 months and since my SAP request had been active for months with no compliance, the unlawful closure of the request has caused requested records to fall off the scope regarding record retention. Further, the Dept. of Commerce has clearly failed to comply with a FOIA request seeking materials on one single NIST/ATP award. This office has used grossly inflated cost estimates as financial disincentive in order to avoid release of records (payment of more than $5,500 for one contract was demanded, despite the fact the requester is a member of the media). Additionally, the NIH is struggling to comply with a FOIA request, however this is apparently due to removal of the requested records by the NSA/DoD, which is explained in the next section. Lastly, the DOJ, and FDA have both failed to provide a single record in response to FOIA requests. I have been forced to appeal all of these requests based on non-compliance. The failure to comply with FOIA in these instances is so significant and unlawful, it has been suggested that there is an Executive Order preventing release of the requested records because the records are related to this classified program. Something is very wrong here, as I have never encountered such obstructionism when requesting simple, broadly referenced materials from any federal agency. I have attached copies of the FOIA requests and correspondence as *__Article 4.__*

5.  **Death of a Research Subject covered up.** A 1995 research effort at the NIH "Laboratory of Neural Control" (NINCDS) by F.T. Hambrecht, William Heetderks, Edward Schmidt, M.J. Bak et al, titled "Feasibility of a visual prosthesis for the blind based on intracortical miscrostimulation of the visual cortex" (published Brain, Volume 119 pages 507-522) involved the use of a 42-year old research subject who died following the conclusion of research efforts. Evidence suggests that unlawful research efforts contributed to her death and that personnel affiliated with the project concealed aspects of their research efforts and covered up the death of this research subject.

    **a)** This study was initiated immediately following the refinement of "Suspended Carrier" telemetry protocol by Heetderks allowing research efforts to take place wirelessly even if the subject was __outside of the lab__.
    **b)** Documentation states that "all extradural components were removed according to patient informed protocol". Extradural means "outside the skull". Intradural components were left implanted after the "conclusion" of the study and suspended carrier allowed research efforts to continue even after the "conclusion" of the study.

**c)** When I requested records regarding this study, NIH FOIA Officers informed me that there was no record what so ever regarding this research project or this patient. No record existed at all. This study is cited in over 50 papers, by other research personnel, and in published medical journals. The research was performed in-house at the NIH by NIH personnel. Yet there is no record of this research.

**d)** The problems associated with this research effort caused a public statement to be issued by the NIH's Audrey Penn and an NIH decision to "abandon" further such efforts. Heetderks and Hambrecht were not about to give up however and a solution was to privatize the research through a series of private subcontracts issued to the private sector. Rather than perform further research in-house, Defense contractor Alfred E. Mann and Jet Propulsion Laboratory began working under contract awarded from Heetderks under NIH/NINDS funding.

I have enclosed my FOIA requests seeking information about the dead research subject and documentation regarding the death of this research subject, and material that references this research as *Article 5*.

6. **Misuse of National Security provisions to affect the outcome of civil and criminal judicial proceedings**. National Security and SAP provisions have been used unlawfully to avoid civil litigation, criminal prosecution, and to further an unlawful agenda. Consider the following: These provisions have been used unlawfully to have me declared a "vexatious litigant". Typically, one must file several frivolous suits in order to be declared a vexatious litigant, and even then, the declaration is typically one year in duration and covers the County originally filed in. SAP provisions were used to have me declared a vexatious litigant after filing only twice against Defense contractor Alfred E. Mann because of the sensitive nature of the allegations and the fear of disclosing these secrets. This ruling is for a duration of 10 years and the entire state where I reside. This is unlawful use of these provisions and was invoked solely to prevent any evidence in my possession from being introduced.

a) SAP personnel have engaged in SAP activities which have directly caused me to incur criminal charges, resulting in loss of income and future earning potential. Each of the criminal charges I have faced resulted directly from SAP activities and each have been dismissed in the interest of justice or due to lack of evidence. Although there have not been convictions, the arrests cause me to miss work, I have been denied jobs based on the arrests, and the arrests have allowed law enforcement to search through a safe containing hard drives containing evidence, recovered NSA medical devices and FOIA documentation pertinent to this case. These efforts have caused me to suffer losses of

evidence pertinent to this case. The most recent instance has me being arrested for "diversion of utility service" caused when SAP personnel employed a proprietary Defense computer technology to access my computer and evidence using existing residential home wiring. This technology employs a technique similar to the "syssec/getpass/screenblanker" technology software that could only be had by requesting the software on Defense letterhead in writing to the military base in Georgia. I have been lead to believe this technology capable of establishing a network connection to a users computer over existing residential electric wiring is related to Defense contractor MZM. Regardless, this recent instance of SAP activities has caused me to incur yet more criminal charges and I am maintaining that the secrecy of the program is preventing me from defending myself against the criminal charges. This recent and ongoing case is in Kern County CA. "East" district Ridgecrest #RM030493A

b) When I filed civil suit against Defense Contractor Alfred E. Mann in 2002 in Los Angeles Superior Court #LC061991 (Van Nuys Ca), I was falsely accused of crimes only days before ascheduled case status conference hearing, and because I was attorney in pro per, it caused me to miss the hearing and a default judgment was awarded for the Defendant without any evidence ever being introduced. Upon refilling the case, SAP provisions were used to change the court calendar without notice and when I showed up on the correct day of the hearing, I was told that the matter was heard the prior day and again, because I was not present, a "default judgment" was entered. Even though I was there on the correct day, the calendar error caused a ruling on the case and my only recourse was to refile. I could not refile because Mann went in, again with no notice or evidence ever being presented, and gained a ruling that declared me a "vexatious litigant". SAP provisions played a role in this and the NSA successfully prevented any of the volumous evidence in my possession from being introduced. They are now continuing to attempt to gain access to the evidence and cause me to suffer losses of evidence.

c) Gerald Loeb obtained both a temporary and a permanent restraining order against me without ever serving notice in a process which a "special visiting judge" was brought in. I have a transcript that seems absurdly fake in which no evidence was presented and about 3 lines of dialog resulted in issuance of said restraining order. The only thing I ever received via process serving is a copy of the permanent order after proceedings were over. The SAP/National Security provisions that brought in a "special" judge were invoked in order to prevent me from cross examining Loeb about classified material and introducing evidence that the NSA previously worked so hard at suppressing. This whole process was done unlawfully, without serving me notice. This was case # GS006425, filed March 22 2002, Los Angeles Superior Court, 300 E. Walnut, South Pasadena CA

d) After receiving a threatening phone call from DARPA personnel Chris Compel and sustaining repeated remote computer intrusions using proprietary Defense technology

causing me to suffer loss of evidence and corrupted system files which were preventing me from writing Congress and engaging in whistleblower efforts, I attempted to gain a restraining order against the Mann Foundation. Again, a "special" visiting judge named Barclay was brought in just for this special case. My evidence was compelling and volumous and included a signed statement from my Brother who fielded the call from DARPA personnel, record of Police reports documenting forced entry into my apartment, tampered electrical wiring, and computer log files showing remote intrusion efforts from USC university and IIT university (Loeb and Troyk). Further evidence was introduced that included phone call records and police log entries. This special judge denied my request for temporary orders and then willfully shortened the length of time making it impossible to serve the defendants notice of hearing for permanent orders. I was given 12 days, which was shorted to 10 days when the court spent the next two days trying to "figure out how we enter the special judges initials into our computer system". I specifically indicated on the legal form as required that time for process serving via US Mail was necessary. Cook County Illinois (where IIT is) Sheriff requires 15 days in order to facilitate process serving. 12 Days was not enough time and resulted in the case being dismissed. This was case #R-1502-CV-100275 through #R-1502-CV-100278, filed in Kern County "East" division of California Superior Court. Special Access provisions were also used to deny me evidence in this case. I had previously made several 911 calls resulting from unlawful SAP activities and requested copies of the dialog of these calls. Because I named SAP personnel by name and disclosed what they were doing, SAP provisions were used to deny me transcripts or audio and the Ridgecrest Police Department was gagged from disclosing details so they were forced to tell me in a written letter that the "recording device malfunctioned" during my calls. SAP provisions are being abused unlawfully!!

e) During my efforts to retain legal counsel, I have actually sat across the desk from legal personnel who were actively preparing civil filings for me when SAP personnel have phoned, threatened and intimidated the Attorney and discussed whether or not the Attorney did, or did not receive National Security Letters. At least three Attorneys have been intimidated into not helping me or abandoning their current efforts and this is certain, but my approximation of a real number is closer to 50 Attorneys being affected. The nature of NSL's and the accompanying gag order make it difficult to tell for sure.

Of further interest is how the classified nature of the program and desire of the Executive Branch to further this agenda has affected numerous federal agencies and has negatively impacted public policy, betrayed public trust and has completely circumvented the checks and balances of our Democratic system. It is evident that selected individuals who are sympathetic to this agenda have been appointed by the Bush Administration in key positions throughout the Federal Government at their respective agencies. These include:

Senator Dianne Feinstein
Case Assistance Personnel
Page 9 of 12

1   William Heetderks. Bush created the NIBIB in 2002 and appointed William Heetderks as Director of Extramural Research. In this position, Heetderks receives "carved" grant applications by Defense personnel in order to hide federal funding for these projects under the auspicies of "medical technology". Additionally, and more significantly, this position is permiting Heetderks to dictate and control who receives funding for radiology research. This is a huge conflict of interest as Heetderks is the most significant contributor of the NSA's submillimeter device technology, is one of the inventors of the telemetry protocol, and his funding efforts at the NIH suggest he is willfully directing funding to personnel and radiology projects which do not threaten to upset the current ability of devices to go undetected by clinical medical personnel. At minimum, the conflict of interest warrants the appointment of new personnel in this position and is necessary to avoid conflict and maintain impartiality.

2   Alberto Gonzales. The Department of Justice, under the Direction of Alberto Gonzales, and the FBI have allowed pressures from the Executive Branch to compromise criminal investigations of SAP personnel, have concealed the existence of initiated investigations which were abandoned due to SAP protections, have acted as accessory to criminal misconduct, are derelict in their duties and mandate, have direct knowledge of the program and have failed to act for political reasons.

3   Kevin J. Martin. Only weeks after Bush appointed Kevin Martin as Chairman of the FCC and following a visit to the White House by Defense contractor Alfred Mann, the Alfred Mann Foundation requested special treatment and rule changes allowing for "experimental" use of spectrum for implantable device communications pertaining to governmental contractual obligations. The proposed rule changes allowed Mann access to spectrum that resides next to "government use only" spectrum. Additionally, the Mann Foundation was allowed to circumvent the licensing process eliminating accountability for criminal SAP activities. In 2002, the Mann Foundation was held to the same licensing requirements as everyone else, and unlawful use of the spectrum by Mann Foundation personnel in 2002 caused them to be investigated by Detectives from the LAPD and FCC Enforcement. The FCC has also removed public record of the 2002 Mann Foundation misconduct.

4   Robert Greenberg. Robert Greenberg's research efforts in the university environment were partially funded by the Mann Foundation. Then Greenberg became Director of 510k medical device approvals at the FDA where he approved many applications for Alfred E. Mann. Greenberg then became CEO of Mann founded "Second Sight LLC". The previous Director of the FDA (Friedman) subsequently was named to Alfred Mann's Board of Directors. In addition to being a conflict of interest, there is another issue. The use of implantable medical devices deployed in secret Defense and Intelligence operations required changes to the FCC spectrum

Senator Dianne Feinstein
Case Assistance Personnel
Page 10 of 12

in order to accommodate the special needs of Suspended Carrier. The plan was to gain FDA approval for the technology and then push the requested changes through regulatory, FDA and FCC as "medical technology". The secrecy of the technology required that classified SAP personnel be involved with the regulatory process and this is why Greenberg was appointed at the FDA. The DoD and NSA did not want their "holy grail" of Intelligence technology to be scrutinized under the FDA "PMA" process, so special measures were implemented in an effort to push the technology through under 510k provisions that would only require Robert Greenberg's approval. The result is a conflict of interest, fraud, and compromised medical device approvals at the FDA, all being perpetrated so the NSA and DoD could deploy this technology domestically.

5    Michael Hayden. Michael Hayden is criminally abusing National Security protections to further an agenda, avoid criminal prosecution, civil litigation and continues to operate with complete disregard for the law and the United States Constitution. His recent appointment at the CIA is questionable. The use of implantable medical device technology for Defense and Intelligence operations is questionable, but his appointment to a civilian agency such as the CIA substantiates that this technology is being criminally misused domestically.

Some pertinent facts:

- The proprietary telemetry protocol developed exclusively for long range communications between implanted devices and outside world is called "Suspended Carrier", U.S. Patent #5,697,076.

- Gerald E. Loeb, surgically trained in the surreptitious implantation procedure, worked at the NIH Laboratory of Neural Control when they implanted the 42-year old research subject who later died. William Heetderks was Deputy Director of the Laboratory of Neural Control. Apparently F.T. Hambrecht was "Principal Investigator" of the tragic study.

- Following the death of the research subject, Loeb left the NIH and went to the private sector working for the Mann Foundation. One of the first efforts was to substantiate and quantify the ability to hide implanted devices from radiology personnel. This was dine in Canada with Dr. John Rossiter and funded by William Heetderks program.

- When Heetderks was at the NIH/NINDS, Loeb and Mann received their funding from the NINDS. Later, when Heetderks moved to the NIH/NICHD, Loeb and Mann received their funding from the NICHD. Then, when Bush created the NIBIB and put Heetderks in charge of radiology research funding, Loeb and Mann were under NIBIB contract that secretly involved

Senator Dianne Feinstein
Case Assistance Personnel
Page 11 of 12

    DARPA personnel and all the while focusing on submillimeter technology that would avoid detection by clinical radiology personnel.

- The Mann/Loeb funding from Heetderks involved military resources from the beginning. NASA Jet Propulsion Laboratory and the Tangs were involved as early as 1997 and perhaps as earlier. Alfred Mann has always been a Defense Contractor and his first federal contract came from the Dept of the Army for Tank weapons guidance.

- As FCC licensed operator call-sign KI6JJN and a Microsoft Certified A+ Technician, my RF packet capture and analysis suggests this program is using FCC regulated spectrum in the 216-225MHz range of spectrum, and additionally, SAP personnel are incorporating the satellite services of SES-Americom, a private contractor of satellite services based in MacLean VA. and headed by Retired Brigadier General Robert Tipton Osterthaler.

- The DARPA program of Col. Geoffrey Ling who is now also funding Gerald Loeb and Mann efforts has thrown over 20 million dollars into developing a prosthetic arm that is controlled by cortical electrodes implanted in the brain of the patient. The form letter campaign supporting Al Mann's FCC rule changes, engaged in by Defense personnel from the ARMY, Veterans Administration, DARPA, Defense contractors, vendors, as well as William Heetderks grant recipients, all cite that "unless the FCC approves these rule changes, thousands of returning soldiers and amputee's from the IRAQ conflict will be denied proper medical technology…" I urge you to investigate this as I know for a fact that this is not why they are requesting these rule changes. It is not reasonable to assume this, as a cortically controlled prosthetic is so complex and expensive, it is not an option for returning amputees from the IRAQ conflict. Second, even if it was an option, it would not be disclosed to these soldiers that the government personnel initiating the program would have a bi-directional data link established with the cortical electrodes no matter where their geographic location might be. Third, I can't imagine any soldier barring those suffering from Post War Traumatic Stress Syndrome, would opt to let government personnel place electrodes into the cortex of their brain just because they've lost a limb or mobility in a limb. The alternative treatments are a much less scary option.

- Paul Meadows, a long time employee of the Mann Foundation is receiving SBIR loans for "water research" and funding from Heetderks to perform implantable device research and is also acting as a "global watchdog" as President of IFESS, an annual consitorium on functional electrical stimulation. If any technology similar to what the NSA and DoD has is developed in another country, chances are high that it would be presented at IFESS and the Executive Branch would be notified immediately through Meadows because all IFESS submissions would

Senator Dianne Feinstein
Case Assistance Personnel
Page 12 of 12

be submitted through his office.

· The Executive Branch has setup a firewall of obstructionism to prevent any similar technology from proliferating in the United States. An example is when William House attempted to market a smaller, single channel cochlear implant. This is complex and I could devote pages to it, but the FDA used unfair categorization and absurd PMA/510k approval process to obstruct device development commercially, and when ambitious entrepreneurs overcame these hurdles they were faced with really unfair Medicare/Medicaide obstructionism. Further, an absurd amount of intellectual property, almost everything resulting from all of the Billions of dollars of research at the NIH/NINDS, has been given to Defense Contractor Alfred Mann. Hundreds of patents, and Mann's job is to sit on them to deter any commercial players from marketing the technology and deliver it from obscurity. The Executive Branch has played a heavy hand in interfering with the FDA approval process significantly obstructing some approvals while others affiliated with Case Western, the V.A., and Mann have literally sailed through regulatory without a hitch. The two offset however and create an "average" that appears vaguely normal. I assure there is something wrong at the FDA and the military is playing a role that is too influential and compromising the FDA mandate.

· Yardney Technical Products in Pennsylvania recently accused  the Alfred Mann Foundation of improper business practices and receiving preferential governmental treatment regarding a Defense contract bidding procedure that involved NIST/ATP, satellites and Argonne laboratory.

· Mann owned Quallion LLC recently had an antitrust filing to the DOJ and SEC disclosing the names and parties involved with a secret research venture that included Argonne National Laboratory and Technodyne. Materials under this project are being denied to me under FOIA request by the Dept. of Commerce and NIST. There is some very relevant secrets being harbored under this contract.

In closing, it is paramount that you investigate the fraud, abuse, and gross criminal misconduct taking place under this classified program. The information I have provided above clearly indicates that investigation is warranted and necessary. I am respectfully requesting that you act with the authority granted to you because my rights are being violated to eliminate all recourse. Your assistance is greatly needed. I thank you for taking the time to investigate these important matters.

Respectfully,


Dave Larson
1377 Tahoe Ave
Yucca Valley CA 92284
760 364-3632
760 793-8653                                        attachments:   Articles of Evidence, Notebook Binder

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN E. MOORE,                        )
                                      )
                                      )
            Plaintiff,                )
                                      )
                 v.                   )        Civil Action No. 07-00107
                                      )
GEORGE W. BUSH, et al.,               )
                                      )
            Defendant,                )
                                      )

**EXHIBIT  P**

Federal Communication Commission Complaint No. 08-C00022428

<div align="right">

John E. Moore
9 Pleasant View Circle
Daytona Beach, Florida.
32118-5511
(386) 761-8193
April 28, 2008

</div>

**DIRECTV**
P.O. box 6550
Greenwood Village,
CO. 80155-6550

Ref. Account Number 4577369. Reference to Service and Privacy Complaint.

Dear: Recipient.

    I am very upset as to the response to my request for customer service of Directv. For approximately fifteen years my wife and I always had nothing but phrase for Directv and the outstanding service that you have provided to our home.

    Now I will present our reason for canceling our contract with Directv. On April 7, 2008, I had reported a trouble call with our Surround Sound System, which its input is provided from the Directv satellite, as we had insurance for this type of occurrence. I was told that a technician will be at our home on Tuesday April 8, 2008. When the technician arrived, I informed him that I believe that there is no digital audio emitting from the Directv receiver. After twenty minutes or so, he informed me that my Surround Sound Receiver was not operating, which is the reason for no output from the speakers. I was not aware of how he came to that conclusion, since he did no testing or vidio audio options from the quick menu, which he never did access in my presence. After my doubtful conclusion that he presented, I told him that I would purchase a new Surround Sound Receive and that I would contact Directv if this problem still existed.

I then replaced the Surround Sound Receive with a new unit and the identical problem still existed. ($200.00 for replacement unit)

On April 18, 2008 I spoke with Directv and presented the technical people with the identical symptoms. I spoke with a person named Michelle, who presented herself as a technician. I gave her all the symptoms and information pertaining to this problem. And she insisted that my Surround Sound Receiver is not working. What she was insisting was that this new receiver was bad. As my patience was running thin by now.I requested Michelle let me talk to her Supervisor, whose name is Dan, (no last name due to security rules) again I presented the same information to him, and he presented the same response. He also noted to me that the Directv satellite receiver mod D12300, ser. B10AC7CF130971 has no digital audio output jack[1], which I am also enclosing a copy of.(pg.6) Also a test procedure which could have provided the proper information to diagnose the problem. (pg.7, 21)

After over two hundred dollars and three weeks with no Surround Sound , I have obtained Cable as our service provider. Our Surround Sound Receive is performing as it was designed to. With the proper input provided. (digital audio) If you could provide me the answers to how and why this unfortunate incident took place, I would be very appreciative.

Again we thank you for the wonderful service, which was provided by Directv.

[1] note: page 21, chapter 3. page7, chapter 1. page 6, chapter 1. directv receiver rear panel.

Sincerely,

John E. Moore

_____

# Form 2000B – Billing, Privacy, or Service Quality Complaint

**You may submit this form over the Internet at** http://www.fcc.gov/cgb/complaints.html, **by e-mail to** fccinfo@fcc.gov, **by fax to** 1-866-418-0232, **or by postal mail to:**

> Federal Communications Commission
> Consumer & Governmental Affairs Bureau
> Consumer Complaints
> 445 12th Street, SW
> Washington, D.C. 20554

In addition, you may submit your complaint over the telephone by calling 1-888-CALL-FCC or 1-888-TELL-FCC (TTY).  If you choose to submit your complaint over the telephone, an FCC customer service representative will fill out an electronic version of the form for you during your conversation.  If you have any questions, feel free to contact the FCC at 1-888-CALL-FCC or 1-888-TELL-FCC (TTY).

### FCC NOTICE REQUIRED BY THE PAPERWORK REDUCTION ACT AND THE PRIVACY ACT

The Federal Communications Commission is authorized under the Communications Act of 1934, as amended, to collect the personal information that we request in this form. This form is used for complaints that involve billing, privacy, or service quality.  The public reporting for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the required data, and completing and reviewing the collection of information.  If you have any comments on this burden estimate, or how we can improve the collection and reduce the burden it causes you, please write to the Federal Communications Commission, OMD-PERM, Paperwork Reduction Project (3060-0874), Washington, DC 20554.  We will also accept your comments regarding the Paperwork Reduction Act aspects of this collection via the Internet if you send them to PRA@fcc.gov.  PLEASE DO NOT SEND YOUR COMPLETED FORMS TO THIS ADDRESS.

Remember - You are not required to respond to a collection of information sponsored by the Federal government, and the government may not conduct or sponsor this collection, unless it displays a currently valid OMB control number or if we fail to provide you with this notice. This collection has been assigned an OMB control number of 3060-0874.

In addition, the information that consumers provide when filling out FCC Form 2000 is covered by the system of records notice, FCC/CGB-1, Informal Complaints and Inquiries File (Broadcast, Common Carrier, and Wireless Telecommunications Bureau Radio Services).  The Commission is authorized to request this information from consumers under 47 U.S.C. 206, 208, 301, 303, 309(e), 312, 362, 364, 386, 507, and 51; and 47 CFR 1.711 et seq.

Under this system of records notice, FCC/CGB-1, the FCC may disclose information that consumers provide as follows: when a record in this system involves a complaint against a common carrier, the complaint is forwarded to the defendant carrier who must, within a prescribed time frame, either satisfy the complaint or explain to the Commission and the complainant its failure to do so; where there is an indication of a violation or potential violation of a statute, regulation, rule, or order, records from this system may be referred to the appropriate Federal, state, or local agency responsible for investigating or prosecuting a violation or for enforcing or implementing the statute, rule, regulation, or order; a record from this system may be disclosed to a Federal agency, in response to its request, in connection with the hiring or retention of an employee, the issuance of a security clearance, the reporting of an investigation of an employee, the letting of a contract, or the issuance of a license, grant or other benefit; a record on an individual in this system of records may be disclosed, where pertinent, in any legal proceeding to which the Commission is a party before a court or administrative body; a record from this system of records may be disclosed to the Department of Justice or in a proceeding before a court or adjudicative body when: (a) the United States, the Commission, a component of the Commission, or, when represented by the government, an employee of the Commission is a party to litigation or anticipated litigation or has an interest in such litigation, and (b) the Commission determines that the disclosure is relevant or necessary to the litigation; a record on an individual in this system of records may be disclosed to a Congressional office in response to an inquiry the individual has made to the Congressional office; a record from this system of records may be disclosed to GSA and NARA for the purpose of records management inspections conducted under authority of 44 U.S.C. 2904 and 2906.  Such disclosure shall not be used to make a determination about individuals.

In each of these cases, the FCC will determine whether disclosure of the information in this system of records notice is compatible with the purpose for which the records were collected.  Furthermore, information in this system of records notice is available for public inspection after redaction of information that could identify the complainant or correspondent, i.e., name, address and/or telephone number.

**THE FOREGOING NOTICE IS REQUIRED BY THE PAPERWORK REDUCTION ACT OF 1995, PUBLIC LAW 104-13, OCTOBER 1, 1995, 44 U.S.C. SECTION 3507 AND THE PRIVACY ACT OF 1974, PUBLIC LAW 93-579, DECEMBER 31, 1974, 5 U.S.C. SECTION 552a(e)(3).**

September 2007



UNITED STATES OF AMERICA
**FEDERAL TRADE COMMISSION**
WASHINGTON. D.C. 20580

Consumer Response Center

May    28, 2008

John Moore
9 Pleasant View Cir
Daytona Beach, FL  32118

Re:  FTC Ref. No.  13915205

Dear John Moore:

Thank you for recent correspondence.  The Federal Trade Commission acts in the public
interest to stop business practices that violate the laws it enforces.  Letters from consumers and
businesses are very important to the work of the Commission.  They are often the first indication
of a problem in the marketplace and may provide the initial evidence to begin an investigation.
The Commission does not resolve individual complaints.  The Commission can, however, act
when it sees a pattern of possible violations developing.

The information you have provided will be recorded in our complaint retention system.
This computerized system enables us to identify questionable business practices that are
generating numerous complaints and may be in violation of the law.

Thank you for providing information that may be used to develop or support Commission
*enforcement initiatives.*

Sincerely yours,

Consumer Response Center

Enclosures:
1. Service Contracts (PRO-11)

## CABLE PROBLEMS WITH NEW SERVICE PROVIDER

June 25, 2008. Unit on/off randomly for five minutes.

June 27, 2008. 7:15 PM. baseball ticket out of service.

June 30, 2008. 10:00 PM cable video lost, no programming

July 3, 2008. lost control of remote, after five minutes return.

July 11, 2008. lost baseball ticket, 9:22 PM. July 13, 2008, informed cable.

July 13, 2008. technician arrived, informed me of a loose connection.

July 14, 2008. turned entertainment system on, loud audio blast from entertainment system. Twenty minutes later I had no picture and no sound. 9:30 AM reset receiver and system back to normal. Notified Bright House Network of problems encountered with system. Technician arrived, found nothing unusual with system.

# COMPROMISE OF TELEVISION SYSTEM

November 30, 2006

First remote casualty.........November 06, 2002.*
Second remote casualty......    "    02, 2003.*
Third remote casualty........August    07, 2003.*
Forth remote casualty........November 21, 2005.*
Fifth remote casualty........ March    27, 2006.*
Sixth remote casualty...... .April    06, 2006.*
Seventh remote casualty.....May    01, 2006.
Eight remote casualty........May    05, 2006.
Ninth remote casualty.......June    13, 2006.*
Tenth remote casualty.......June    16, 2006.*
Eleventh remote casualty...July    08, 2006.
Note: * denotes proof of purchase.

Note: There are two separate TV systems operating in our home.

March 20, 2006. 5:15pm no signal, other tv signal ok.
March 18, 2006 ch. 202,269,356,301 inoperable.
March 20, 2006. no tv reception at times listed, other time normal. 6:33am,6:55am,6:56am
        7:07am,7:12am,8:05pm,8:08pm
March 22, 2006. no tv reception at times listed, other times normal. 7:15am to 7:17am,
(ch.2). 8:00pm many ch. denote search for satellite, not possible. This is a go/no go satellite
System. 11:pm all ch. back to normal.
March 23, 2006. 6:56am no ch. 202,2,6 or 9. note on tv screen "replace card, no good"
removed card and reinserted and system reset. 5:15pm started picture interference signal.
Called Direct TV Co. with complaint. Next day, technician arrived and proceeded to a group
of coaxial connecters. Selected one and informed me that it was the problem one. Out of a
group of eight connectors, without observing the others. He told me he had repaired the
the connecter.
Note: this problem could not have produced the problems that were presented.
March 25, 2006. 6:55am, no signal. 7:40am tv signal ok.
March 26, 2006. 6:40am tv. remote inoperative, at 7:20am normal operation. From that
time forward, system operation was normal.

VIZIO 46 IN. TELEVISION



STAND-BY TELEVISION

SURROUND SOUND RECEIVER

ALLEGRO Vcr/Dvd

DIRECT TV RECEIVER

COMPLETE ENTERTAINMENT SYSTEM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
                                          )
JOHN E. MOORE,                            )
                                          )
                                          )
     Plaintiff,                           )
                                          )
            v.                            )     Civil Action No. 07-00107
                                          )
GEORGE W. BUSH, et al.,                   )
                                          )
     Defendant,                           )
                                          )
_____ _____)


**EXHIBIT  Q**

# United States Patent [19]

**Malech**

[11]  **3,951,134**

[45]  **Apr. 20, 1976**

[54]  **APPARATUS AND METHOD FOR REMOTELY MONITORING AND ALTERING BRAIN WAVES**

[75]  Inventor:  Robert G. Malech, Plainview, N.Y.

[73]  Assignee:  Dorne & Margolin Inc., Bohemia, N.Y.

[22]  Filed:  Aug. 5, 1974

[21]  Appl. No.: 494,518

[52]  U.S. Cl. ................................. 128/2.1 B
[51]  Int. Cl.² ................................. A61B 5/04
[58]  Field of Search ............... 128/1 C, 1 R, 2.1 R, 128/2.1 R, 419 R, 422 R, 420, 404, 2 R, 2 S, 2.05 R, 2.05 V, 2.05 F, 2.06 R; 340/248 A, 258 A, 258 B, 258 D, 229

[56]  **References Cited**
**UNITED STATES PATENTS**

| | | | |
|---|---|---|---|
| 2,860,627 | 11/1958 | Harden et al. | 128/2.1 B |
| 3,096,768 | 7/1963 | Griffith, Jr. | 128/420 |
| 3,233,450 | 2/1966 | Fry | 128/2.1 R |
| 3,483,860 | 12/1969 | Namerow | 128/2.05 F |
| 3,495,596 | 2/1970 | Condict | 128/1 C |
| 3,555,529 | 1/1971 | Brown et al. | 128/2.1 R |
| 3,773,049 | 11/1973 | Rabichow et al. | 128/1 C |
| 3,796,208 | 3/1974 | Bloice | 128/2 S |

*Primary Examiner*— William E. Kamm
*Attorney, Agent, or Firm*—Darby & Darby

[57]  **ABSTRACT**

Apparatus for and method of sensing brain waves at a position remote from a subject whereby electromagnetic signals of different frequencies are simultaneously transmitted to the brain of the subject in which the signals interfere with one another to yield a waveform which is modulated by the subject's brain waves. The interference waveform which is representative of the brain wave activity is re-transmitted by the brain to a receiver where it is demodulated and amplified. The demodulated waveform is then displayed for visual viewing and routed to a computer for further processing and analysis. The demodulated waveform also can be used to produce a compensating signal which is transmitted back to the brain to effect a desired change in electrical activity therein.

**11 Claims, 2 Drawing Figures**



US005270800A

# United States Patent [19]

## Sweet

[11] **Patent Number:** 5,270,800

[45] **Date of Patent:** Dec. 14, 1993

[54] **SUBLIMINAL MESSAGE GENERATOR**

[76] Inventor: **Robert L. Sweet**, 2385 Valleyview, Troy, Mich. 48098

[21] Appl. No.: 574,432

[22] Filed: **Aug. 28, 1990**

[51] Int. Cl.⁵ .................... H04N 7/08; H04N 5/40

[52] U.S. Cl. ...................................... 358/22; 358/142; 358/183

[58] Field of Search ........................ 358/141–142, 358/188, 183, 22

[56]    **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,278,676 | 10/1966 | Becker | 358/142 |
| 4,279,088 | 7/1981 | Hyre | 40/442 |
| 4,616,261 | 10/1986 | Crawford et al. | 358/181 |
| 4,692,118 | 9/1987 | Mould | 434/236 |
| 4,733,301 | 3/1988 | Wright | 358/181 |
| 4,734,037 | 3/1988 | McClure | 434/236 |
| 4,777,529 | 10/1988 | Schutz et al. | |
| 4,897,726 | 1/1989 | Morton et al. | 358/183 |
| 5,017,143 | 5/1989 | Backus | 358/183 |
| 5,027,208 | 6/1991 | Dwyer, Jr. et al. | 358/149 |

*Primary Examiner*—James J. Groody
*Assistant Examiner*—David E. Harvey
*Attorney, Agent, or Firm*—Krass & Young

[57]    **ABSTRACT**

A combined subliminal and supraliminal message generator for use with a television receiver permits complete control of subliminal messages and their manner of presentation. A video synchronization detector enables a video display generator to generate a video message signal corresponding to a received alphanumeric text message in synchronism with a received television signal. A video mixer selects either the received video signal or the video message signal for output. The messages produced by the video message generator are user selectable via a keyboard input. A message memory stores a plurality of alphanumeric text messages specified by user commands for use as subliminal messages. This message memory preferably includes a read only memory storing predetermined sets of alphanumeric text messages directed to differing topics. The sets of predetermined alphanumeric text messages preferably include several positive affirmations directed to the left brain and an equal number of positive affirmations directed to the right brain that are alternately presented subliminally. The left brain messages are presented in a linear text mode, while the right brain messages are presented in a three dimensional perspective mode. The user can control the length and spacing of the subliminal presentations to accommodate differing conscious thresholds. Alternative embodiments include a combined cable television converter and subliminal message generator, a combine television receiver and subliminal message generator and a computer capable of presenting subliminal messages.

**8 Claims, 8 Drawing Sheets**



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
                                    )
JOHN E. MOORE,                      )
                                    )
                                    )
        Plaintiff,                  )
                                    )
            v.                      )        Civil Action No. 07-00107
                                    )
GEORGE W. BUSH, et al.,             )
                                    )
        Defendant,                  )
                                    )
_____ _____)



**EXHIBIT  R**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
                                    )
JOHN E. MOORE,                      )
                                    )
                                    )
    Plaintiff,                      )
                                    )
        v.                          )        Civil Action No. 07-00107
                                    )
GEORGE W. BUSH, et al.,             )
                                    )
    Defendant,                      )
                                    )
_____ _____)


**<u>EXHIBIT  S</u>**

IN THE COUNTY COURT, IN AND FOR

VOLUSIA COUNTY, FLORIDA.

**STATE of FLORIDA**      )
                                 )
       Plaintiff,         )
                                 )
         v.            )     CITATION 8760-ESJ
                                 )
**JOHN E. MOORE, Pro Se**    )
                                 )
       Defendant,     )

On November 14, 2007 I was issued a Traffic Citation by the Daytona Beach Shores Police Department for a speeding violation, which to the best of my knowledge, I am not guilty of as charged.

In the following statements, I will provide this Court with logical and Legal reasons for a dismissal of said charge.

## ARGUMENT

A. Important that officer provide written proof at time of infraction of the distance and speed from the <u>Lidar</u> reading when issuing a speeding citation, for verification in traffic Court.

B. No visual view from approximately fifty feet south of Ocean West Boulevard to point of <u>alleged</u> infraction. 40 mile per hour posted speed. (marker reference)

C. Fifty six approximate feet off target (cosine effect) which could produce a ten percent error in reading of speed. (cosine effect) Rule: The greater the error, which is the function of the cosine of the angle. (measured speed = actual speed×cosine of angle.) Measured speed

error is the angle between the radar gun and the target vehicle or object.

D. There is <u>no thirty five mile north </u>posted speed anywhere in the 3000 block perimeter

of Peninsula Drive as stated by Issuing Police Officer of citation.

E. Of importance is an "S" curve on north approach to radar gun reading or cosine angle.

Not a fair distance for a radar lock in of speed, as this is a 30 MPH speed limit. (House lot

Marker no. 3064)

<div align="center">CONCLUSION</div>

**Part I.**

¶ 4 of 5 (b),(c). ¶ 2 of 5 (a). ¶ 1 of 1 (b). It is highly improbable that the police officer

while standing on the lawn near the golf course fence at that angle can obtain an accurate

reading of distance and speed from a <u>Laser Radar Beam</u> measuring approximately three

square feet and collect accurate legal data. A proper and accurate reading can only obtained

when standing and aiming radar parallel to an oncoming vehicle at a useable distance.

¶ 1 of 1, § (a). I was not provided written proof of reading obtained by Police Officer at

time of infraction. Why did the Police Officer claim a 35 MPH posted speed (north) in the

3000 block area when none exists? At House lot Marker no. 3064 a yellow sign is installed

on (south) lane, referring to "S" curve in road and 30 MPH approach in visual situate of

Police Officer. As photo evidence presents, as proceeding towards Police Officer in a

northerly direction, at a speed of forty miles per hour, as tested, would consume seven

seconds to arrive at the Police Officers location. It is highly unlikely that a true reading

and accurate fix could be obtainable. I find that there is no probable cause for this Citation.

<div align="center">2</div>

**Part II.**

I am also enclosing a copy of a motion being heard as part of a Law Suite at United States District Court for the District of Columbia, CA 1:07-cv-00107. I feel that a copy of this Motion for INJUNCTIVE RELIEF should be presented to this Court since the Volusia County Sheriff Department is a Defendant in this Federal Court and has jurisdiction over this geographical location where this alleged traffic violation was cited. ¶ 00058. Presented forthwith is another example of harassment. Daytona Beach Shores Police were writing this citation, a Florida Sheriff Association (FSA) vehicle slowed down as it approached, also other FSA incidence at 9:00 am as I left for Home Depot Store. FSA on Penninsula Drive at corner of our street. FSA at Home Depot parking lot as I arrived. At 12:15 pm I left for barber shop, FSA greeted me on Ridgewood Avenue as I drove to barber shop. On way home, was time of receipt of citation. Also as I was proceeding to Walgreens to have FSA photo. printed, FSA vehicle appeared at Ocean West Blvd. and Penninsula Ave.

**PART III.**

<div align="center">CLAIM FOR RELIEF</div>

Due to reasonable inferences produced by the Police Officer at the scene of the violation, that are truly unsubstantiated claims. As Defendant, I incorporate each and every fact presented as factual and truthful.

<div align="center">PRAY FOR RELIEF</div>

Defendant respectfully request that the Court reward Defendant relief due to the time and inconvenience generated by this unjust claim. And pray that the Court sits in agreement with this plea.

<div align="center">3</div>

WHEREFORE, Defendant John E Moore request that this Citation be dismissed.

dated; January 18, 2008.


Respectfully  submitted,


_____

John E. Moore Pro se
9 Pleasant View Circle
Daytona Beach, Florida
32118-5511
386-761-8193

# IN THE COUNTY COURT, IN AND FOR

## VOLUSIA COUNTY, FLORIDA

STATE OF FLORIDA

VS

JOHN E MOORE

9 PLEASANT VIEW CIR
DAYTONA BEACH, FL 32118-5511

USA

CITATION #:    8760ESJ

VIOLATION:    UNLAWFUL SPEED (REQUIRES
SPEEDS)

**IMPORTANT: PLEASE BRING THIS
NOTICE WITH YOU TO COURT**

## NOTICE

YOU ARE HEREBY NOTIFIED THAT THE ABOVE STYLED CASE IS SET FOR

**INFRACTION HEARING AT 01:00 PM ON 01/18/2008,**

BEFORE A CIVIL INFRACTION HEARING OFFICER OR COUNTY JUDGE, AT THE FOLLOWING ADDRESS:

**BEACH STREET
250 N. BEACH STREET
DAYTONA BEACH, FL 32114**

**COURT APPEARANCE IS NOT MANDATORY, HOWEVER, IN ORDER TO AVOID A SUSPENSION OF YOUR DRIVING PRIVILEGES
OR TO CLEAR A SUSPENSION YOU MUST EITHER APPEAR IN COURT ON THE DATE SET FORTH IN THIS NOTICE OR PAY
THE FINE AMOUNT OF $163.50 PLUS ANY LATE FEES (IF APPLICABLE) BY THAT DATE.**

COPIES HEREOF HAVE BEEN FURNISHED TO :

DEFENDANT:  JOHN E MOORE                                   BONDSMAN:
ATTORNEY:

THIS DECEMBER 31, 2007.

**DIANE M. MATOUSEK**
**CLERK, COUNTY COURT**
**VOLUSIA COUNTY, FLORIDA**

## MAKING A RECORD

Please be advised that the Court does not make a verbatim record of these proceedings. If you wish to have a record made, it is your responsibility to supply and
operate a tape recorder. If you choose to record a hearing, the original tape must be delivered to the clerk immediately after the hearing. If you wish to file an
appeal based on the record, it is your responsibility to have the tape transcribed by an official court reporter. You are responsible for payment of transcription
costs. (see Rule 6.460(b), Florida Rules of Traffic Court).

## ATTENTION: PERSONS WITH DISABILITIES

If you are a person with a disibility who needs an accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of
certain assistance. Please contact Court Administration at Ste. 300, Courthouse Annex, 125 East Orange Avenue, Daytona Beach, FL 32114; Telephone:
386-257-6096 within two (2) days of your receipt of this notice. If you are hearing impaired, call 1-800-955-8771; if you are voice impaired, call
1-800-955-8700. THIS IS NOT A COURT INFORMATION LINE.

# Diane M. Matousek

**CLERK OF THE CIRCUIT COURT**

Volusia County, Seventh Judicial Circuit

P.O. Box 6043

DeLand, Florida 32721-0043

## CITATION DISPOSITION

| | | | | |
|---|---|---|---|---|
| CASE #: | 2007 345591 TRCI | CITATION #: | 8760ESJ | CITATION TYPE: CIVIL TRAFFIC |
| VIOLATION DATE: 11/14/2007 | | FILING DATE: | 11/20/2007 | |
| VIOLATOR: | MOORE, JOHN E | | | |
| STATUTE: | 316.187 | | | |
| | UNLAWFUL SPEED (REQUIRES SPEEDS) | | | |

---

**CITATION STATUS:**  CLOSED                    **VIEW STATUS:**  PUBLIC

**VIOLATOR REQUIREMENTS**                       **REPORTING REQUIREMENTS**

**PAYMENT DATE:**                                **SENTENCE DATE:**  01/18/2008

**SCHOOL**                                       **PLEA:**  NO PLEA ENTERED

**ELECTED:**  NO                                 **VERDICT:**  DISMISSED

**TYPE:**                                        **SENTENCE:**  CASE DISMISSED

**COMPLETE BY:**                                 **FINE:**  $0.00

**COMPLETED ON:**                                **COST:**  $0.00

                                                 **TRIAL TYPE:**

                                                 **DRIVER LICENSE**

                                                 **SUSPENSION/REVOCATION**

                                                 **SUSPENSION LENGTH:**

                                                 **LICENSE RECEIVED:**  NO

                                                 **RE-EXAM:**  NO

                                                 **INTERLOCK LENGTH:**

Monday, February 04, 2008                                              9:32:04 AM



PHOTO 3

Notes from harassment log file page 176.

11:30 am wife Clara called, car would not start at Publix Market, Port Orange. Went to meet her with jumpers. Florida Sheriff Association (FSA) on way. When I arrived, (FSA) parked next to Clara, she was in vehicle. sat their the whole time that we were their.

We left for home to pick up jumper cables. (FSA) greeted us on our way back to car.

Two Port Orange Police vehicles were parked in parking lot as we arrived back at our car.

Could not keep motor running, had to have car towed to Pep Boys Auto.

Gray Suburban SUV pulled up beside us at stop light.


.com

Search Products    Go    *Call Toll-Free 800-504-5917*

Shop by Brand

Radar Guns Blog | Radar Guns Forum | How Radar Guns Work | Radar Guns Glossary | How to Buy | Recommended Resources

> Laser Radar (Lidar, Ladar) Facts

**Baseball Radar Guns**
**Softball Radar Guns**
**Golf Radar Guns**
**Tennis Radar Guns**
**Car Racing Radar Guns**
**Swing Radars**
**Archery Radars**
**RC Models Speed Guns**
**Radar Balls**
**Glove Radar**
**Paintball Radar**
**Sport Radar Gun Accessories**

**Traffic Radar Guns**
**Hand-Gun Police Radar Guns**
**In-Car Video Systems**
**Speed Trailers**
**Traffic Speed Displays & Signs**
**Police Radar Gun Accessories**

**Speed Detecting Rangefinders**
**Railroad Radar Guns**
**Fluid Surface Velocity**
**Traffic Information Displays**
**Fish Finders**
**Rangefinders**
**Police Binoculars**
**Police Spotting Scopes**
**Military Goggles**
**Tripods & Mounts**
**Portable Printers & Scanners**
**Batteries**

**View All Products**
**Brand List**
**Add To Favorites**
**Order Status**
**Best Price Guarantee**
**Volume Order Price Quote**
**Radar Guns Reviews**
**Radar Gun FAQ**

## Laser Radar (Lidar, Ladar) Facts

**LIDAR (Laser Radar, Ladar)** is an acronym for **Light Detection And Ranging.**

(b) According to scientific research, Lidar (laser radar, ladar) does not emit any harmful radiation. The **Lidar laser beam** shoots 280 pulses per second and at 1,000 feet the beam is 3 feet square. The **Laser Radar Beam** travels 186,282 miles per second and that is 1 foot per billionth of a second. You can see it is important to keep the beam on one spot on the target.          applies to **Lidar** in the same way it applies to          . In bad weather, **Lidar** can be used through the window in the Obstructed Mode.

(a) It is important that the police officer writes down the distance and the speed from the **Lidar** reading when issuing a speeding ticket, because such information would be used for verification purposes in traffic court. But

          can collect the above data to make the officer's task even easier.

          allows to **collect Traffic Speed Data** and generate an easy to read and analyze **Traffic Speed Survey Report.**

          - serial module which gathers speed data samples from          , Lidar,          and directly interfaces with a PC to provide **statistical data** in an easy to use format. Using

          you can generate and print a **Traffic Speed Survey Report** with all necessary **statistical data** in an easy to read format.          4-Megabit Memory's capacity is approximately 130,000 counts.

For more information on          and          , please, follow these links:

- 
- 
- 
- 
- 
- 
- 
- 
- 
- 
- 
- (          )
- 
- > **Laser Radar (Lidar, Ladar) Facts**

**Free UPS Ground Shipping**

**Police Radar Guns**
**Traffic Radar Guns**
**Radar Speed Trailers and Traffic Speed Displays**
**How Radar Guns Work**
**Radar Terms Glossary**

Copyright © 2005-2007 RadarGuns.com. All rights reserved.

http://www.radarguns.com/laser-radar-lidar-facts.html    11/29/200

much like a usually have shorter sample times (shorter detection range), wider beams, and sometimes less radiated power.

**(Q)**

**(A)** The can measure objects as small as a golf ball to as large as a truck. I have measured rain speed with the **Bushnell** (through a window from inside a dry structure).

**(Q)**

**(A)** Yes.

(a) **(Q)**

**(A)** Somewhat important. The less the **radar** is directly in front of or directly behind the target object, the lower the measured speed (the Cosine Effect). The error is directly proportional to the angle off the direction of the target object. An angle error of about 25 degrees equates to about a 10 percent error (reading low by 10%).

**(Q)**

**(A)** Unknown. Anyone targeted by a **radar** (probably) has nothing to worry about (the time and energy levels are just too small). Cellular phones are a greater concern, much more power transmitting close to users head (sometime for hours). Some have concerns about long term use (by **police**) of **police radars**.

**(Q)**

**(A)** It is possible but unlikely, and probably would not happen by accident.

**(Q)**

**(A)** **Radars** are calibrated in (and when they leave) the factory, after that the units are typically checked that they operate within design specifications (calibration check) once or twice per year.

**(Q)**

**(A)** Yes. **Radar** units may be used, under FCC Rules and Regulations Part 90, by anyone with a legitimate need to measure the speed of objects or vehicles.

**(Q)**

**(A)** By definition a jammer is intended to prevent a **radar** from obtaining a and/or spoof the radar by forcing a false reading.

**(Q)**

**(A)** **Microwave jamming** is against FCC Rules and Regulations, **laser radar jamming** is not illegal (except in Illinois and Tennessee as of July 2006).

**Antenna & Cord w/ Cigarette Lighter Adapter w/ FREE UPS**

**Sports Radar Speed Gun SR3600 with FREE UPS**

**Decatur GVP-D Genesis VersaPak Directional Radar Handheld Cordless Police Radar Gun w/ K-Band Directional Antenna & Faster Mode w/ FREE UPS**

**JUGSpeed JUGS Speed Cordless MPH and KMPH Radar Gun with FREE UPS**

**Sports Radar DT100 Detector Short Range Fixed Installation Baseball Pitching booths Hockey Golf nets w/ FREE UPS**

**(Q)**

**(A) Radar range** varies widely with **radar**, target (size/shape), and weather conditions. Maximum detection range can be as little as 100 feet, or greater than 1 mile.

( b ) **(Q)**
**(A)** The Cosine Effect is a **radar** measured speed error due to the angle between the **radar** and target vehicle or object.

**(Q)**
**(A)** The Cosine Effect causes a stationary radar to measure speeds low, the greater the angle the lower the measured speed. Moving mode **radar** may measure target speed HIGH in some situations.

**(Q)**
**(A)** The Cosine Effect angle (from the target vehicle's point of view) is the angle between the direction of the target vehicle and the radar. If the target vehicle is traveling directly toward (or away) from the radar, the Cosine Effect angle is 0 degrees (no error).

( c ) **(Q)**
**(A)** The greater the angle, the greater the error. The error is a function of the cosine of the angle, thus Cosine Effect error. Measured speed = actual speed multiplied by the cosine of the angle.

**(Q)**

**(A)** No. A            operating from a **moving vehicle** will measure the ground echo (the patrol car speed). The ground echo is huge compared to other moving vehicles. **Moving radars** are designed to distinguish the ground echo and the target vehicle echo.

**(Q)**

**(A)** Transmit power is the power delivered to the antenna. Antenna specifications (gain and efficiency) are required to determine the radiated power from power delivered to the antenna. Power Density is a measure of radiated power per area. Typically **radars** are specified in milliwatts per square centimeters (mW/square centimeter) at a specific range (usually 3 meters). The greater the range the lower the power density. ERIP (Effective Radiated Isotropic Power) or just ERP (Effective Radiated Power) also measures radiated power compared to a perfect isotropic radiator in Watts (W), milliwatts (mW), or dBm (decibels above or below 1 mW).

## More Radar Guns Related Articles:

- 
- 
-



rch Products          Go          Cr  Toll-Free 800-504-5917

Shop by Brand

Radar Guns Blog | Radar Guns Forum | How Radar Guns Work | Radar Guns Glossary | How to Buy | Recommended Resources

> Important Rules/ Facts about Radar

## Important Rules/ Facts about Radar



Free UPS Ground Shipping

### Inverse Square Rule

The **inverse square rule** states that the decrease in **strength of a radar signal** is inversely proportional to the square of the change in distance from the antenna.

### Contour Lines of Equal Sensitivity

The **contour lines of equal sensitivity** rule states that the strongest reflected signal is determined by the location of the target vehicle to the main power beam. To better understand contour lines of equal sensitivity it is helpful to review all **beam reflection rules**. The inverse square rule demonstrated that the distance from the            determined the strength of the reflected signal. We also learned from lines of equal sensitivity that two vehicles of equal size, located at an equal distance from the axis of the main beam, will reflect a radar signal equally. However, if two identical vehicles are positioned so that one vehicle is located directly along the main power axis and one vehicle is located at the edge of the            , the vehicle located on the main power axis will reflect the stronger signal.

### Beam Range Sensitivity

As mentioned earlier, the            will continue outward from the            for an indefinite distance. In reality the beam range as referred to in this manual is that distance where the **radar signal** may be reflected from an object and then accurately received by the **radar antenna**. All            specify the range of their            within these specifications. Nevertheless, the **radar range** will vary considerably due to several conditions. Atmospheric conditions such as rain, snow, and fog will decrease the effective **range of the beam** of energy. Terrain such as hills, curves, fences, and buildings will obviously affect the **radar signal**. Large volumes of traffic or stronger reflective signals may also reduce the effective range of the radar. Most modern            have a sensitivity adjustment to control the beam range.

**For more information on            and            , please, follow these links:**

- 
- 
- 
- 
- 
- 
- 
- 
-             (                              )
-          -

> Important Rules/ Facts about Radar

Copyright © 2005-2008 RadarGuns.com. All rights reserved.

Baseball Radar Guns
Softball Radar Guns
Golf Radar Guns
Tennis Radar Guns
Car Racing Radar Guns
Swing Radar
Archery Radars
RC Models Speed Guns
Radar Balls
Glove Radar
Paintball Radar
Sport Radar Gun Accessories

Traffic Radar Guns
Hand-Gun Police Radar Guns
In-Car Video Systems
Speed Trailers
Traffic Speed Displays & Signs
Police Radar Gun Accessories

Speed Detecting Rangefinders
Railroad Radar Guns
Fluid Surface Velocity
Traffic Information Displays
Fish Finders
Rangefinders
Police Binoculars
Police Spotting Scopes
Military Goggles
Tripods & Mounts
Portable Printers & Scanners
Batteries

View All Products
Brand List
Add To Favorites
Order Status
Best Price Guarantee
Volume Order Price Quote
Radar Guns Reviews
Radar Gun FAQ

Police Radar Guns
Traffic Radar Guns
Radar Speed Trailers and Traffic Speed Displays
How Radar Guns Work
Radar Terms Glossary

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN E. MOORE,                          )
                                        )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )        Civil Action No. 07-00107
                                        )
GEORGE W. BUSH, et al.,                 )
                                        )
        Defendant,                      )
                                        )

## DECLARATION OF PLAINTIFF v. F.B.I.

(1)  The purpose of this Declaration is to provide to Defendants (F.B.I.) undeniable

proof that what are presented here as **(Exhibits)** will produce without a reasonable doubt

the true facts of this travesty of Justice.

(2)  Federal Bureau of Investigation (F.B.I.) (FOIPA) file No. 190-BS-90887

(five pages) s**ee Exhibit A**

(3)  Federal Bureau of Investigation (F.B.I.) (FOIPA) file No. 190-BS-90887

(three pages) **see Exhibit B**

(4)  F.B.I. Rule Request Information as to (FOIPA) (one page) **see Exhibit C**

(5)  F.B.I. JFO (FOIPA) Statement. (one page) **see Exhibit D**

(6)  U. S. Department of Justice, U. S. Attorney, Middle District of Florida.

Rick I. Jancha. (nine pages) **see Exhibit E**

(7)  F.B.I. Daytona Beach, Florida. Special Agent in Charge. Chris Bonner.

(four pages) **see Exhibit F**

(8)  Office of Information and Privacy, U. S. Department of Justice. Case 03-0136.

(three pages) **see Exhibit G**

(9)  Motion request for Injunctive Relief. Doc. #30, ERRATA Doc. #32.

(thirteen pages) **see Exhibit H**

(10)  Motion request for Evidentiary Hearing. Doc. #18. John St. Clair Akwri.

(three pages) **see Exhibit I**

(11)  Motion filing of Discovery v. National Security Agency (NSA), Federal Bureau of

Investigation (FBI) and Volusia County Sheriff Department (VCS). p/o (collectively, the

"Government Defendants"). (ten pages) **see Exhibit J**

(12)  Evidence of more harassment from what has been established as (collectively, the

"Government Defendants"). (seven pages) **see Exhibit K**

(13)  Evidence of more harassment from what I refer to as (collectively, the "Government

Defendants"). (twelve pages) **see Exhibit L**

(14) Robert Mueller III. F.B.I. Request for inquiry as to misconduct allegations.

(seven pages) **see Exhibit M**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                )
                                )
JOHN E. MOORE,                  )
                                )
                                )
    Plaintiff,                  )
                                )
        v.                      )         Civil Action No. 07-00107
                                )
GEORGE W. BUSH, et al.,         )
                                )
    Defendant,                  )
                                )
_____)

**<u>EXHIBIT A</u>**

# EXIBIT "H"

Case No. 6:03-cv-1499-Orl-28-DAB

COVER PAGE + 6 Pages

Defendant: U.S. Department of Justice
　　　　　Federal Bureau of Investigation
　　　　　One Center Plaza
　　　　　Suite 600
　　　　　Boston, MA. 02108
　　　　　Agent in Charge: Frank M. Davis

Summons Server: Dependable Civil Process. Date of receipt 03-08-04.

Plaintiff: John E. Moore Pro Se.
　　　　　Contained material is Plaintiff statement of claims of entitlement of relief. Also
　　　　　See Ex. "H" Page one thru six for allegations and elements of complaint.



**U.S. Department of Justice**

**Federal Bureau of Investigation**

In Reply, Please Refer to
File No. 190-BS-90887

1 Center Plaza
Boston, MA  02108
617-742-5533
September 26, 2002

Mr. John E. Moore
9 Pleasant View Circle
Daytona Beach, FL  32118-5511

Dear Mr. Moore:

      This is in response to your Freedom of Information -
Privacy Acts (FOIPA) request dated September 5, 2002 for
information concerning yourself.

      Based on the information provided, a search of the
automated indices to the central records system maintained in
Boston has located one document consisting of two pages
responsive to your request.

      Enclosed is a copy of the one responsive document
referred to above.  Excisions have been made from these pages in
order to protect information exempt from disclosure pursuant to
the following subsections of Title 5, United States Code, Section
552 and 552a:  (j)(2) and (b)(7)(C).  See Form OPCA-16a,
enclosed, for an explanation of the exemptions.

      Notations have been made in the margins of the enclosed
pages indicating specific exemptions applied to excised portions
of the material.

      If you desire, you may submit an appeal from any denial
contained herein.  Appeals should be directed in writing to the
Co-Director, Office of Information and Privacy, United States
Department of Justice, Flag Building, Suite 570, Washington, DC
20530, within 60 days from receipt of this letter.  The envelope
and the letter should be clearly marked "Freedom of Information

Appeal."  Please cite the name of the office to which your
original request was directed.

                        Sincerely yours,


                        CHARLES S. PROUTY
                        Special Agent in Charge



                        By:
                        FRANK M. DAVIS
                        Chief Division Counsel



# FEDERAL BUREAU OF INVESTIGATION
## COMPLAINT/QUERY FORM

**(Please fill out completely)**    Date: _10 - 3 - 00_

Time: _10:40 AM_

NAME: _John E Moore_
ADDRESS: _126 SAND PEBBLE CIR_
CITY/STATE: _PORT ORANGE FL_
ZIP CODE: _32119_    TELEPHONE: ( ) _____
DATE OF BIRTH: _9 - ▓▓▓▓▓_
SOCIAL SECURITY NUMBER: _034 26 - ▓▓▓_

DESCRIPTION OF COMPLAINT/QUERY: _I WAS SET-UP BY LAW EFORCEMENT OFFICER (RETIRED) I HAVE BEEN HARRASED FOR 4 YEARS. I CANNOT GET ANY LEGAL HELP FROM LOCAL, COUNTY, OR STATE. I HAVE EVIDENCE_

b7C ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ _lives in_
▓▓▓▓▓▓▓▓▓ _is harassing Mr. Moore. Moore seems to be paranoid, his visit was to let The FBI know he is being watched in FLA._

_Copy in Complaint book_

Pg.4h

# FEDERAL BUREAU OF INVESTIGATION

Precedence:  ROUTINE                          Date:  rec'd @ C7 8/10/00

To:  BOSTON                    Attn:  C-7 SUPERVISOR
                                      C-7 ROTOR

From:  BOSTON
       COMPLAINT ROOM, SA/IA █████████

       Contact: ██████████  EXT. ████

Approved By: BURKETT JAMES D

Drafted By: ██████████ :mkm

Case ID #: BS 62-0

b7C

Title:  John E. Moore
        136 Sand Pebble Circle
        Port Orange, FLA

Synopsis:  Transmittal for personal visitor to the Complaint Room.

Details:  Attached to this communication is Reception Room form indicating captioned individual was a walk-in complainant to the Boston Division Complaint Room.  Please serialize into 62-0 for future retrieval.

♦♦

BS 62-0-24564

Pg.5h

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
                                        )
JOHN E. MOORE,                          )
                                        )
                                        )
        Plaintiff,                      )
                                        )
                v.                      )        Civil Action No. 07-00107
                                        )
GEORGE W. BUSH, et al.,                 )
                                        )
        Defendant,                      )
                                        )
_____ _____)

**EXHIBIT B**



**U.S. Department of Justice**

Federal Bureau of Investigation

In Reply, Please Refer to
File No. 190-BS-90887

1 Center Plaza
Boston, MA  02108
617-742-5533
September 26, 2002

Mr. John E. Moore
9 Pleasant View Circle
Daytona Beach, FL  32118-5511

Dear Mr. Moore:

This is in response to your Freedom of Information - Privacy Acts (FOIPA) request dated September 5, 2002 for information concerning yourself.

Based on the information provided, a search of the automated indices to the central records system maintained in Boston has located one document consisting of two pages responsive to your request.

Enclosed is a copy of the one responsive document referred to above.  Excisions have been made from these pages in order to protect information exempt from disclosure pursuant to the following subsections of Title 5, United States Code, Section 552 and 552a:  (j)(2) and (b)(7)(C).  See Form OPCA-16a, enclosed, for an explanation of the exemptions.

Notations have been made in the margins of the enclosed pages indicating specific exemptions applied to excised portions of the material.

If you desire, you may submit an appeal from any denial contained herein.  Appeals should be directed in writing to the Co-Director, Office of Information and Privacy, United States Department of Justice, Flag Building, Suite 570, Washington, DC 20530, within 60 days from receipt of this letter.  The envelope and the letter should be clearly marked "Freedom of Information

1 - Addressee
1 - Bureau
1 - Boston (190-BS-90887)
SSV/ssv
(3)

appeal." Please cite the name of the office to which your
original request was directed.

                         Sincerely yours,

                         CHARLES S. PROUTY
                         Special Agent in Charge


                    By:
                         FRANK M. DAVIS
                         Chief Division Counsel

2



# FEDERAL BUREAU OF INVESTIGATION
## COMPLAINT/QUERY FORM

**(Please fill out completely)**

Date: _10 - 3 - 80_

Time: _10:40 AM_

NAME: _John L. Moore_

ADDRESS: _126 SAND PEBLLO CIR._

CITY/STATE: _PORT ORANGE    FL_

ZIP CODE: _32119_    TELEPHONE: ( )

DATE OF BIRTH: ███████████

SOCIAL SECURITY NUMBER: ███████████

DESCRIPTION OF COMPLAINT/QUERY: _I WAS SET-UP BY LAW_

_EFORCEMENT OFFICER (RETIRED) I HAVE BEEN_

_HARRASED FOR 4 YEARS. I CANNOT GET_

_ANY LEGAL HELP FROM LOCAL, COUNTY,_

_OR STATE. I HAVE EVIDENCE_

████████████████████████ _lives in_

████████ _- is harassing Mr. Moore. Moore_

_seems to be paranoid, his visit was to let_

_the FBI know he is being watched in FLA._

_copy for_

_complaint_

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
                                              )
JOHN E. MOORE,                                )
                                              )
                                              )
        Plaintiff,                            )
                                              )
                v.                            )        Civil Action No. 07-00107
                                              )
GEORGE W. BUSH, et al.,                       )
                                              )
        Defendant,                            )
                                              )
_____  _____)

**EXHIBIT C**

In making your request you should be as specific as possible with regard to names, dates, places, events, subjects, etc. In addition, if you want records about a court case, you should provide the title of the case, the court in which the case was filed, and the nature of the case. If known, you should include any file designations or descriptions for the records that you want. You do not have to give a requested record's name or title, but the more specific you are about the records or types of records that you want, the more likely it will be that the Justice Department will be able to locate those records. For example, if you have been interviewed by a law enforcement component (such as the FBI) in connection with a law enforcement investigation and you wish to request a copy of the interview report, your listing of the date and location of the interview, and the name of the interviewing agent and subject of the investigation, if known, will be helpful to the component in determining where to search and in determining which records respond to your request. Additionally, you should be aware that Justice Department components ordinarily will use the date upon which they begin a record search as the "cut-off" date for determining the records that are responsive to a FOIA request.

In addition to the statements or information that have already been discussed, some components of the Justice Department require additional specific information in order to process a request for particular types of records. These special requirements are noted, where applicable, as part of the descriptions of components in *Section VIII*.

When a Justice Department component receives your FOIA request, it ordinarily will send you a letter acknowledging the request and assigning it an initial request number. If you do not provide the necessary information, the component will advise you of what additional information is required before further processing your request.

Under certain circumstances you may be entitled to receive more information under the Privacy Act of 1974 (a separate federal statute) than under the FOIA. Under the FOIA anyone can request access to any agency record. Privacy Act requests are more limited and can be made only (1) by U.S. citizens or aliens lawfully admitted for permanent U.S. residence, (2) who are seeking information about themselves, (3) which is in a system of records maintained under their names or other personal identifiers. Even if a request does not mention the Privacy Act, however, the Justice Department automatically treats requests as being made under both the FOIA and the Privacy Act whenever it is appropriate to do so. In this way, requesters receive the maximum amount of information available to them under the law.

## V. Response Times

Under the statute, all federal agencies are required to respond to a FOIA request within twenty business days, excluding Saturdays, Sundays, and legal holidays. This period does not begin until the request is actually received by the FOIA office of the Department of Justice component that maintains the records sought. An agency is not required to send out the releasable documents by the last business day; it can send you a letter informing you of its decision and then send out the documents within a reasonable time afterward.

Some components of the Justice Department, such as the FBI, INS, and DEA, receive thousands of requests each year. Many of these requests require a line-by-line review of hundreds and even thousands of pages of documents. Although the Justice Department makes every effort to respond to FOIA requests as promptly as possible, in some cases it simply cannot do so within the specified time period. This may be due either to the size of the

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
                                    )
JOHN E. MOORE,                      )
                                    )
                                    )
     Plaintiff,                     )
                                    )
          v.                        )        Civil Action No. 07-00107
                                    )
GEORGE W. BUSH, et al.,             )
                                    )
     Defendant,                     )
                                    )
_____   )


**EXHIBIT C**

## JFO FOIA/PRIVACY ACT REQUEST

(17)    According to the information available in the FBI's FOIPA Document Processing

System ("FDPS"), which is the FBI's repository for records regarding FOIA/Privacy Act requests,

plaintiff submitted a FOIA/Privacy Act request to the JFO.  Although we do not have a record of

when that request was received or the date of that request, we do know that a case was opened in

FDPS on February 3, 2003, and the FBI assigned FOIPA request number 972947 to this request.

The information in FDPS also indicates that the FBI advised plaintiff that no records responsive

to his request were located at the JFO.  There are no exhibits available which document this

request, because the file containing all documents related to the request was destroyed on April

15, 2007, pursuant to the routine record destruction policies at the JFO.

(18)    Plaintiff filed the Complaint in the present lawsuit in the United States District

Court for the District of Columbia on or about January 12, 2007.

(19)    On September 14, 2007, the FBI contacted DOJ OIP, which telephonically

confirmed that its office had no record of having received an appeal from plaintiff John E. Moore

in connection with his FBIHQ request.

## EXPLANATION OF THE FBI'S CENTRAL RECORDS SYSTEM

(20)    The Central Records System ("CRS") enables the FBI to maintain information

which it has acquired in the course of fulfilling its mandated law enforcement responsibilities.

The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and

other files compiled for law enforcement purposes.  CRS is organized into a numerical sequence

of files, called FBI "classifications," which are broken down according to subject matter.  The

subject matter of a file may correspond to an individual, organization, company, publication,

-5-



**U.S. Department of Justice**

Federal Bureau of Investigation

In Reply, Please Refer to
File No. JK 190-C1-970

7820 Arlington Expressway
Suite 200
Jacksonville, Florida  32211
February 5, 2003

John Edmond Moore
9 Pleasant View Cir.
Daytona Beach, FL 32118-5511

Re: Freedom of Information - Privacy Acts (FOIPA)

Dear Mr. Moore:

In response to the additional information you provided on December 10, 2002, a search was conducted of the manual and automated indices to the central records system maintained in the Jacksonville Office.  However, **no records** were located to indicate you have ever been of investigative interest to the Jacksonville Division of the FBI.

Although no records responsive to your FOIPA request were located in our search, we are required to inform you that you are entitled to file an administrative appeal if you so desire.  Appeals should be directed in writing to the Co-Director, Office of Information and Privacy, U.S. Department of Justice, Suite 570, Flag Building, Washington, D.C. 20530, within 60 days from receipt of this letter.  The envelope and the letter should be clearly marked "Information Appeal."

Sincerely yours,

William R. Falls
Special Agent in Charge

By:

R. Michael Perkins
Chief Division Counsel
Supervisory Special Agent

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN E. MOORE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 07-00107 |
| | ) |
| GEORGE W. BUSH, et al., | ) |
| | ) |
| Defendant, | ) |
| | ) |

**EXHIBIT E**

# EXIBIT "F"

Case No. 6:03-cv-1499-Orl-28-DAB

COVER PAGE + Six Pages + Four ref. pg.

Defendant: U.S. Department of Justice
        United States Attorney
        Middle District of Florida
        Rick L Jancha

Summons Server: Dependable Civil Process. Date of receipt 03-08-04.

Plaintiff: John E. Moore Pro Se.
        Contained material is Plaintiff statement of claims of entitlement of relief. Also
        See Ex. "F" pg.1f thru 6f for allegations and elements of complaint.

MIDDLE DISTRICT OF FLORIDA
CITIZEN COMPLAINT INTAKE FORM



CITIZEN'S NAME:

_John E Moore_

ADDRESS: _136 Sand Pebble Cir_

_Port Orange, Fl._

_32119-2698_

TELEPHONE: _904-761-8193_

_10-20-00_

The United States Attorney's Office is staffed by lawyers who represent the United States Government and various federal agencies. This office does not provide legal advice to private individuals. While we prosecute allegations of violations of federal criminal laws, this office does not conduct investigations independently of these agencies. Where appropriate, we will forward the information you have provided to the applicable agency. Please print a brief summary of your complaint or the information you wish to give. Be as specific as possible. Your information may be given to the appropriate state, local or federal agency for review and possible investigation. If necessary, they will contact you. You may complete the form here and leave it with the receptionist or take it with you and mail it to us at:

United States Attorney's Office
201 Federal Building          Phone: (407) 648-7500
80 North Hughey Avenue        Fax:    (407) 648-7643
Orlando, Florida 32801

Please be advised that the willful furnishing of false information to a federal agency may constitute a violation of federal criminal law, with penalties of five years imprisonment, a fine of $10,000 or both.

SUMMARY OF INFORMATION OR COMPLAINT:

_I AM FILING THIS COMPLAINT UNDER FEDERAL CRIMINAL_

_ENFORCEMENT "COLOR OF LAW" (INTENTIONAL FABRIC-_

_ATION OF EVIDENCE RESULTING IN A LOSS OF LIBERTY_

_TO ANOTHER) REF 18 U.S.C. 241, 242. THIS PERSON WHO_

Continue on the back

MY WIFE LOOKED UNDER THE KITCHEN SINK AND BOTH
PIPES WERE BROKEN. WATER WAS COMING FROM BOTH
OF THEM. THAT SUNDAY MORNING I HEARD MY NEIGHBORS
BURGLER ALARM GO OFF FOR ABOUT 3 SECCOUNDS. WHILE
THEY WERE AT CHURCH. WE NEVER SPOKE ABOUT THE
PROBLEM AGAIN. WE WERE NOT THAT FRIENDLY TO
BEGIN WITH. A FRIEND OF THE ACCUSED MENTIONED
TO ME THAT HE WAS A PRIVATE INVESTIGATOR.

        ON OR ABOUT 8/1/76 I WAS TRIMMING MY HEDGES
OUT FRONT OF MY HOME AND SAW THE ACCUSED DRIVE
BY WITH HIS HEAD ALL BANDAGED. HE LOOKED AT
ME AND THEN ACROSS TO MY NEIGHBORS HOME.
I PRESUMED THAT THE PERSON ACROSS THE STREET
WAS RESPONSIBLE FOR WHAT I JUST WITNESSED.
FROM THAT DAY ON MY LIFE AND MY WIFE'S LIFE
HAVE NEVER BEEN THE SAME. LAW ENFORCE-
MENT HAS GOTTEN MY FAMILY, MY FRIENDS
AND WORK. BASICLY OUR WHOLE LIVES. ALL
MY RECREATIONAL EQUIPMENT IS INOPERATIVE
AS I REPAIR ONE ARTICLE ANOTHER IS SOON
BROKEN. (WILL PROVIDE LIST) THIS PERSON HAS
SINCE MOVED BUT IS STILL IN THE LOCAL AREA
HE DRIVES BY WHEN MY WIFE IS OUT AROUND
OUR HOME. HE STILL HAS A FEW OF HIS FRIENDS
IN THE PARK WHO CONTINUE THEIR WORK OF
SPREADING HATE AND LIES.

IN CLOSING I HAVE OVER FIFTY PAGES OF DOCUMENTED PROOF INCLUDING WITNESSES OF THESE CRIMES. I HAVE A LIST OF ATTORNEYS AND OTHER PROFESSIONAL PEOPLE I HAVE CONTACTED PERTAINING TO THIS CASE, BUT NONE WERE INTERESTED IN REAL JUSTICE.

I HAVE OFFERED TO TAKE A POLY-GRAPH TEST AT MY OWN EXPENSE TO PROVE THAT I AM INNOCENT. I AM OF THE OPINION THAT NO ONE WANTS TO ADMIT TO THIS MISCARRIAGE OF JUSTICE ANOTHER FACT IS THAT MY HOME IS BUGGED MY PHONE IS TAPPED AND I HAVE LOCATERS IN MY CAR + TRUCK

I HOPE THAT YOUR OFFICE WILL USE ALL THE EVIDENCE THAT I HAVE TO PROVE MY INNOCENCE AND PROSECUTE THESE CRIMINALS.

FABRICATED THIS STORY TO HIS PIERS AND LATER THE
NEIGHBORS. WAS AT ONE TIME A DEPUTY SHERIFF FOR
VOLUSIA COUNTY, ON OR ABOUT 4/16/96 THE PORT ORANGE
BUILDING INSPECTOR CAME TO MY NEIGHBORS HOME ACROSS
THE STREET. HE HAD A SHEET OF PAPER NAMES OF PEOPLE
WHO RECENTLY MADE HOME IMPROVEMENTS TO THEIR
PROPERTY. AFTER CODE ENFORCEMENT LEFT, MY NEIGHBOR
ASKED ME WHO I THOUGHT MIGHT HAVE DONE THIS, I TOLD HIM
I DIDN'T WANT TO SAY. HIM AND HIS WIFE ASKED ME
AGAIN A FEW DAYS LATER, AND HE MENTIONED HE THOUGHT
IT WAS THE PERSON WHICH THIS COMPLAINT FORM IS ABOUT
AND HIS GIRL FRIEND AND ANOTHER FRIEND. AFTER
THINKING ABOUT FOR A MOMENT I TOLD HIM HE MIGHT BE
RIGHT THE FOLLOWING SATURDAY MORNING 6-21-96

CONT. ON NEXT PAGE

## OTHER AGENCIES:

    A. Have you consulted with any other agencies regarding this matter?

       Yes ✓   No_____

    B. If so, which ones?  FBI BOSTON, FBI MAITLAND

    C. What did they tell or advise you?
       FBI BOSTON SUGGESTED I PERSUE CASE IN FLORIDA
       FBI MAITLAND SUGGESTED I TALK TO SHERIFF DEPARTMENT
       (SPOKE TO RESOURCE PERSON)

Matter received by:_____

Action taken (Check One):

_____ 1. Matter sheet prepared and forwarded to the appropriate Supervisory AUSA.

_____ 2. Resolved problem no satisfaction of citizen.

_____ 3. Referred to appropriate agency.



Main Office
460 N. Tampa Street, Suite 3200
Tampa, Florida 33602
813 274-6000
813 274-6200 (Fax)

**U.S. Department of Justice**
*United States Attorney*
*Middle District of Florida*

Post Office Box 600
300 West Forsyth Street, Room 700
Jacksonville, Florida 32201
904 232-2682
904 232-2620 (Fax)

2110 First Street, Suite 3-137
Fort Myers, Florida 33901
941 337-7706
941 337-4985 (fax)

80 North Hughey Avenue, Room 201
Orlando, Florida 32801
407-648-7500
407-648-7643 (Fax)

*Reply to:* **Orlando, FL**

October 26, 2000

John E. Moore
136 Sand Pebble Circle
Port Orange, FL 32119-3698

> Re:    <u>Your Complaint</u>

Dear Mr. Moore:

This is to acknowledge receipt of your Complaint which was received in our Office (<u>via fax</u>) on October 20, 2000.

A review of this Complaint does not reveal any law enforcement activity that would potentially violate your civil rights. If you are having vandalism conducted at your home, the correct agency in Port Orange, Florida would be the Volusia County Sheriff's Department.

I am sorry that this Office cannot be of assistance to you.

With regards,

DONNA A. BUCELLA
United States Attorney

By:  Rick L. Jancha
Deputy Managing Assistant U.S. Attorney

November 25, 2000

My response to telcon of October 24, 2000 and ltr dated October 26,2000 from Attorney Rich Jancha. also my complaint form dated October 20, 2000, which my wife and I hand delivered to the Federal Building.

Attorney Jancha phoned me 10-24-00 at approximately 3:30 PM that I had no case. I reiterated to him that I was having a problem with the accused, law enforcement and a few of his selected friends. I basically pleaded with him to talk in person with him and furnish him with more evidence, he declined my request. He told me if I had a problem that I should contact the Port Orange Police. In his letter he suggested that I contact the Volusia County Sheriff Department.

After our conversation I started to take some notes. and the phone rang and no one was on the other end; which is not unusual in our home. The next day I cut my lawn and later told my wife that I planed on fertilizing the lawn. When I went out their their was a Port Orange Police car parked on my side walk lawn. The woman police officer was talking to the girl across the street.

Note: In answer to part A,B,C of complaint form
When I spoke briefly with the Federal Breau of Investigation in Boston, the agent told me to contact the F B I in Florida, because it was out of their jurisdiction. On my return to Florida I contacted the Maitland, Florida F.B.I. office. I tried to talk to an agent but spoke with a resource person, which was very disappointing. I started to tell her my problems with law enforcement and how this person lied to them about me and who he was, when she abruptly stood up and told me to write every thing down and contact the Volusia County Sheriff Department. I surly did not have the opertunity to state my case. She also stated that I should be talking to the F.B I. in Datona Beach.

Criminal Section Overview
U.S. Department of Justice
Civil Rights Division
Criminal Section

Overview
  HISTORY
  One of the oldest of the Civil Rights Division's units, the Criminal Section
  enforces laws that date to the post Civil War Reconstruction Era. Originally a
  part of the Criminal Division, the Criminal Section and its enforcement
  authority was moved to the Civil Rights Division when the CRD was created in
  1957. In the early years, the Division was organized geographically.
  Eventually, as more civil rights laws were passed, the Division reorganized
  into functional subject areas. The Criminal Section is unique within the
  Division, prosecuting criminal cases while the remainder of the Division
  handles civil matters.
  Some of the Criminal Section's earliest prosecutions involved the murder of
  minorities and civil rights workers in the South during the 1960's prior to
  desegregation. In 1968 Congress broadened the scope of protection afforded by
  civil rights statutes by passing a law that made it a crime to interfere by
  force or threat of force with certain rights (such as employment, housing, use
  of public facilities, etc.) because of someone's race, religion, color or
  national origin. These protections were increased even further twenty years
  later when Congress enacted a law (amended in 1996) making violent conduct
  against religious property and those exercising their religious beliefs a
  federal crime. Congress also made it a federal crime in 1994 to use violence
  to interfere with providers of reproductive health care. The cases handled by
  the Section have always been of great interest to the public and have
  sometimes become the subject of films, documentaries, books, and television
  programs.
  Some of the historically significant events in which the Criminal Section has
  been directly involved include investigations of the assassinations of Martin
  Luther King, Jr. and Medgar Evers, the fatal shootings by the National Guard
  at Kent State University, the deaths of three civil rights workers (Chaney,
  Goodman, and Schwerner) in Mississippi, and the police beating of Rodney King
  in Los Angeles.
  MISSION
  The Criminal Section prosecutes cases involving the violent interference with
  liberties and rights defined in the Constitution or federal law. The rights of
  both citizens and non-citizens are protected. In general, it is the use of
  force, threats, or intimidation that characterize a federal criminal violation
  of an individual's civil rights. Our cases often involve incidents that are
  invariably of intense public interest. While some violations may most
  appropriately be pursued by the federal Government, others can be addressed by
  either the federal Government or by state or local prosecutors. Our ultimate
  goal is to ensure that acts constituting federal criminal civil rights
  violations are sufficiently remedied, whether prosecuted federally or by local
  authorities.
  The types of acts that may involve violations of federal criminal civil rights
  laws are:
      HATE CRIMES (18 U.S.C. § 241, 18 U.S.C. § 245 and 42 U.S.C. § 3631) --
      Violent and intimidating acts of racial, ethnic and religious hatred that
      interfere with federally protected rights, such as housing, employment,
      voting, and public services.
      OFFICIAL MISCONDUCT (18 U.S.C. § 241, 18 U.S.C. § 242) -- Intentional acts
      by law enforcement officials who misuse their positions to unlawfully
      deprive individuals of constitutional rights, such as the right to be free

**EXPLANATION OF EXEMPTIONS**

SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

(b) (1)  (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy  and (B) are in fact properly classified pursuant to such Executive order;

(b) (2)  related solely to the internal personnel rules and practices of an agency;

(b) (3)  specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b) (4)  trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b) (5)  inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b) (6)  personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy,

(b) (7)  records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual;

(b) (8)  contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b) (9)  geological and geophysical information and data, including maps, concerning wells.

SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

(d) (5)  information compiled in reasonable anticipation of a civil action proceeding;

(j) (2)  material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k) (1)  information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k) (2)  investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k) (3)  material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k) (4)  required by statute to be maintained and used solely as statistical records;

(k) (5)  investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k) (6)  testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process;

(k) (7)  material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
                                        )
JOHN E. MOORE,                          )
                                        )
                                        )
     Plaintiff,                         )
                                        )
          v.                            )      Civil Action No. 07-00107
                                        )
GEORGE W. BUSH, et al.,                 )
                                        )
     Defendant,                         )
                                        )
_____ _____)


**<u>EXHIBIT F</u>**

September 5, 2002

**Federal Bureau of Investigation**
**444 Seabreeze Blvd.**
**Daytona Beach, FL.**
**32118**

**Re: Privacy Act and Freedom of Information Act Request for Access.**

**Dear: Agent in Charge.**

**This is a request under the Privacy Act of 1947 and the Freedom of Information Act.**

**I request a copy of any records about me maintained at your agency.**

**Enclosed is a notarized signature that will verify my identity.**

**I request that the information I seek be forwarded to me by U.S. Mail.**

**Thank you for your consideration of this request.**

| Sincerely, | Note: address prior |
|---|---|
| John E. Moore | to 07-01-01 |
| *John E Moore* | |
| 9 Pleasant View Cir. | 136 Sand Pebble Cir. |
| Daytona Beach, FL. | Port Orange, FL. |
| 32118-5511 | 32119-3698 |
| Phone: 386-761-8193 | |

Recv'd
16-1-02
unt
R.M. PERKINS

*This Page Must Also Be Returned*

State of Florida
County of Volusia

The foregoing instrument was acknowledged before me the 10 day of SEPT 20 0_
by John E Moore

*Amber A Nass*
Notary Public Signature
Printed Name of Notary

Amber A Nass
My Commission CC822797
Expires April 1, 2003

FL DL# M6004653533U

John E. Moore
9 Pleasant View Cir.
Daytona Beach, FL.
32118-5511
December 17, 2002

Federal Bureau of Investigation
444 Seabreeze Blvd.
Daytona Beach, FL.
32118

CC: U.S. Justice Department. F.O.I.A.  Case 03-0136

Ref. Case files: deliver dtd. 11-06-02

Dear Agent Bonner:

    I am writing this letter concerning our telcon dtd. 11-04-02, which we spoke of my providing your office a copy of my case files

pertaining to my claim of hate crimes and law enforcement. This is what my claim in this cover-up is all about.

    With the high standard of integrity that the Federal Bureau of Investigation holds in the justice system I am sure you and your office

are as eager as I to bring this case to a final conclusion.

    In closing, I am hopeful that you will reconsider meeting with me to discuss this long and arduous situation. I am an innocent victim as I believe your office is also a victim.

Note: This is my final request in this matter.

              Sincerely,

              John E. Moore

January 9, 2003

This is my involvement with Federal Bureau of Investigation, Daytona Beach FL. I contacted the Daytona Beach office first on 07-15-98 and spoke with an agent and explained to him that my wife and I were victims of hate crime. He then proceeded to ask me if I was Spanish or Black? I told him I was a White male and he proceeded to inform me I would be wasting mine and his time and that they only handle minority race type hate crimes.

This led me to my contacting the Boston office of the Federal Bureau of Investigation. (10-03-00) U.S. Dept of Justice case No. 03-0136.

I contacted the Daytona Beach Federal Bureau of Investigation office ref. ltr. dtd. 09-05-02. Went to office, spoke with Agent Bonner 10-10-02 in ref. no response to F.O.I.A. ltr. He said he forwarded it to main office Jacksonville, FL. Asked to keep copy of letter which I had. Asked what was the problem? I told him I have a case pending with the U.S. Justice Dept. and Federal Bureau of Investigation, Boston, MA. Pertaining to hate crime. He told me my problem was up north. Had received response from Jacksonville FL. office on 11-04-02. Mailed back F.O.I.A. questionnaire on 11-29-02.

Called Agent Bonner 11-04-02 to make available to him a copy of case file concerning U.S. Justice Dept. case 03-0136. He said fine. He was on speaker phone, he became loud and rude and asked what this is all about for the secound time and I told him I was a victem of hate crimes. He asked me who was doing it and I told him an ex-deputy sheriff. He asked me loud what his name was and I told him I would rather not continue this conversation on the phone. That day my wife and I drove out of our street on to Peninsula Dr. and were greeted by three sheriff cruisers which stayed with us for 1 mile.

On 11-06-02 files were left with agent at Daytona Beach F.B.I. office. Called D.A.B; F.B.I. office on 11-21-02, first spoke to secretary. conn. to Agent Bonner, no answer. Next time answer machine.

Called D.A.B; F.B.I. office on 11-22-02, first spoke with secretary, connected to Agent Bonner, no answer. Next time answer machine.

11-25-02, called Agent Bonner, left message,name and phone number. Asked if he would like to discuss case files that I left at his office on 11-06-02.

12-17-02, wrote letter requesting a meeting with him and cc. To U.S. Justice Department. Case no. 03-0136. Have not received a reply from Agent Bonner.

Note: On 10-11-00 I spoke with a F.B.I. Maitland FL. Resource Representative, and was told that their office could not help me and that the Daytona Beach FL. Office should be contacted.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN E. MOORE,               )
                             )
     Plaintiff,              )
                             )
          v.                 )       Civil Action No. 07-00107
                             )
GEORGE W. BUSH, et al.,      )
                             )
     Defendant,              )
                             )

**<u>EXHIBIT G</u>**

)                                    )

John E. Moore
9 pleasant View Cir.
Daytona Beach, FL.
32118-5511
386-761-8193
November 4, 2002


Office of Information and Privacy
United States Dept. of Justice
Flag Building, Suite 570
Washington, DC
20530

Ref: U.S. Dept of Justice Case 030136

Subj: Case files to support my claim of hate crimes and law
        enforcement support.


Dear Co Director:

        I am requesting that the enclosed case files be included in
ref. case no. 030136. Thank you for your consideration.

        Victim No. 1, On 06-16-00 had a meeting with Atty. Smith
A.C.L.U. Next day my sister found my mother on bedroom floor, and aunt
was found dead in rest home that she was at.
        Victim No. 2, On 05-28-97 Mr. Harry S. found dead in his
under shorts. (son Pete)
        Victim No. 3, On 03-03-00 Mr. Walter M. found dead in under
shorts by Mr. Benjamin G. Blood on face.
        Victim No. 4,  On 12-03-02 Mr. Joe K. found dead in under
shorts by apartment manager. Blood on face.
        Victim No. 5, On 07-14-98 Mr. Benjamin G. had attorney
against defendant.
        Victim No. 6, On 06-98 Mr. Walter B. had atty. against
Defendant

Victim No. 7, On 07-98 Mr. Walter B. took defendant to Court.

Victim No. 7,8 On 03-01-99 both Walter B. and Ludwig M. took defendant to court. Later did victory parade on our street

Victim No. 9, On approx. 08-08-96 had defendant beat-up. Made himself, [defendant] noticeable for two weeks after incident. Head was all bandaged from head injuries.

Note: Some names and address's left out due to confidentiality. Information will be provided in person. All but two victims were residence of Bear Foot Park, where my wife and I resided with these victims.

Victim No. 10, is me. First off I will not try to cover ground that is covered in my case folders. I will just try to influence you in granting me an interview in person, so that we can discuss this case in detail.

Financially, I reached the $100,000 loss in income early on. I am retired from the Federal Aviation Administration. (electronics) I was doing contract work for Raytheon Co. in Burlington Mass; before that eventful night in Delaware (Hampton Inn) which ended my career. (07-25-99)

In closing, I have said this many times that I will submit to a polygraph test on any statement made in this case file. I am a victim of character assassination

Sincerely Yours,

John E. Moore

Send Confirmation (Event Succeeded)

| | | | |
|---|---|---|---|
| Date: | 11/21/2002 | Time: | 10:19 AM |
| Pages: | 4 | Duration: | 1 min 21 sec |
| Recipient: | Priscilla Jones | Company: | United States Dept. of Justice |
| Fax Number: | 12025141009 | Subject: | |
| Type: | Fax | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN E. MOORE,                          )
                                        )
                                        )
                                        )
        Plaintiff,                      )
                                        )
            v.                          )        Civil Action No. 07-00107
                                        )
GEORGE W. BUSH, et al.,                 )
                                        )
        Defendant,                      )
                                        )
                                        )

**EXHIBIT H**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN E. MOORE,                          )
                                        )
      Plaintiff,                   )
                                        )
v.                                      )   CA. 1:07-cv-0107-(RMC)
                                        )
                                        )
GEORGE W. BUSH, ET AL.,                 )
                                        )
      Defendant                    )
                                        )
_____)

*Leave to file*
*Rosemary M Coley*
*11/20/07*

## PLAINTIFF JOHN E. MOORE " MOTION REQUEST FOR INJUNCTIVE RELIEF"

This request is in reference to CIVIL RULES **LCvR 65.1(c)** of the UNITED STATES DISTRICT COURT for the DISTRICT of COLUMBIA.  For reasons and explanations presented in my forthcoming statements

# RECEIVED

NOV 9 – 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN E. MOORE,                      )
                                    )
            Plaintiff,              )
                                    )
v.                                  )        CA. 1:07-cv-0107-(RMC)
                                    )
                                    )
GEORGE W. BUSH, ET AL.,             )
                                    )
            Defendant               )
                                    )
_____     )

PLAINTIFF JOHN E. MOORE " MOTION REQUEST
FOR INJUNCTIVE RELIEF"

This request is in reference to CIVIL RULES LCvR 65.1(c) of the UNITED STATES

DISTRICT COURT for the DISTRICT of COLUMBIA. For reasons and explanations

presented in my forthcoming statements

# RECEIVED

NOV 1 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## POINTS AND AUTHORITIES

This application for **Preliminary Injunctive Relief** is being requested by Plaintiff

John E Moore for relief from what I label as harassment from Defendants listed: National

Security Agency (NSA), Federal Bureau of Investigation (FBI) represented by COUNSEL

for the afore named Defendants, Michelle N. Johnson, United States Attorney's Office.

Volusia County Sheriff Department represented by COUNSEL for the afore named

Defendant, Joseph Edward Hartmen. I have excluded the other named Defendants in said

case, knowing that the above named agencies have the resources to commit this type of

intrusion.

### BACKGROUND (Bkground)

Due to the inappropriate interference by a selective few of the previously named

Defendants, I find it very inconvenient and next to impossible to prepare a proper and

informative claim for relief. Included is my Documented Motion of material facts which

will be accompanied by a separate concise statement of genuine issues setting forth a total

listing of all material and personal facts necessary to be litigated as to LCvR 65. (c)

1.(a) Control of communication, such as web. Communication and e-mail.
   (b) Telephone-in call and out call.
   (c) Vehicle and property, deliberate damage to:
   (d) Brainwave Technology Torture.
   (e) Heat/Air home system, one year old at time of incidence.
   (f) Unknown photo. Was not photographed by yours truly. (do not own this type of unit)
   (g) Unknown photos.
   (h) TV System Problems

2. Documentation of proof of listed articles and systems compromised. Page i and ii are an
   itemize listing of photos and of compromised items.

2

(a) Photo page 2,3,4,5,6,7-019,020. Photo page 8-022,024. Photo page 9,10,11-032,033. Photo page 13-038. Page 00061 thru. 00067.
(b) Page 00047 thru. 00049(a). Page 00068(a) thru. 00074.
(c) Page 00053(a),(b) 00054 thru. 00057, 00060. Page 00058 and 00059 Documented Sheriff.
(cc) Photo page 12-034,035,036. Photo page13-037
(d) Page 00053 Brainwave Torture by type number.
(dd) Page 00051 00053 Type Four Torture. Like Anesthesia Awareness.
(e) Photo Page 1-001,002,003. see notes page i.
(f) Photo page 7-021. Unknown.
(g) Photo page 11-031.In bedroom ceiling. Photo page 13-039. Above kitchen door.
(h) Page 00050. Television system compromise.

## STATEMENT OF MATERIAL FACTS (StmFacts)

1. (Bkground)¶ 2(a). Documentation of Harassment of Personal Computer (PC).

As presented in listed photographs. P.C. control is lost at all function levels of operation.

printer accessibility is nonexistent, shut down capability, not operational, must use power

off button, only possible way for turn off. Photo presentation is the only way to produce

and record evidence. Note: P.C. control, not only takes place in web mode of operation

but in local operation. Cannot print photographs from digital camera.

A. In the following text I am presenting sections of the Online Personal Privacy

Act of 2002, also HR 4678, Page 00061, that I feel my Rights were infringed upon.

SECTION 101-Collection, use or disclosure of personal identifiable information (pii).

SECTION 102-Notice and Consent requirements.

SECTION 103-Policy changes; Breach of Privacy.

SECTION 104-Exceptions; Disclosure for Law Enforcement or National Security

SECTION 106-Security.

SECTION 203-Action

SECTION 206-No Effect on other remedies.

SECTION 302-Application to Federal Agencies.

    B. Cyber  Security Enhancement Bill. 1030 (a)(2);  (RICO) statute. Pg. 00066

    C. The Privacy Protection Act. ("PPA"), 42 U.S.C. 2000aa. Pg. 00067.

2.  (Bkground)¶ 2(b). Documentation of telephone calls as presented on pages 00047

    thru. 00049, also updated list. 00049(a). This type of Harassment is indicative of a

    planed "setup" of caller ID, and speaking to a person that is not dialed but answered

    to that individual.

    A. Communication Act of 1934, amended, S704 (Sen. Nelson). Pg. 00068.

    Manipulation of "Caller Identification Information."

    B. Truth in caller ID Act of 2007. (HR. 251) Pg. 00069.

    C.  Unwarranted Intrusion. Docket 60-756. Appellate Court. Pg. 00070.

3.  (Bkground)¶ 2(c), 2(c)(c).

    A. (c) Billing receipts for damages to my wife's car over one year and a half.

    Note: Only used for local errands, Still has show room appearance.

    Model, KIA; total incidence nine. Total monetary damage to vehicle $4,109.04.

    B.  (c)(c) Photographs of flat tires. Four each, all in drive way,

    Two which were screws in side of tire.

4.  (Bkground)¶ 2(d), 2(d)(d).

    A. (d) Brainwave Torture Types by Number. Various time frame, day or

    night, mostly middle of the night.

B.  (d)(d) Brainwave Torture Type 4. Wake up for this type of torture 1:00 AM
to 5:00 AM, usual time frame. Usual time frame they conduct any of the eight
types of torture that I have experienced as listed, or any combination of. And
as this document describes, I am mentally alert but paralyzed, unable to speak
or move to get out of bed. As I lay in bed helpless to communicate, then
or later on this subject.

5.  (Bkground) ¶2(e).

Documentation of harassment of heat/air home system in our home. Digital
Thermostat can be programmed at the command of the operative. Met with
Technician from company. No problems were found with equipment. No
malfunctions were experienced after meeting. Photographs are true images
of data as it took place at the time. Note: Lower left reading (set time) 6:oo
am day operation,  temperature for day operation set at 77 degrees, top
right. Top left indicates present room temperature. Example: Photo. Pg. 1,
photo. 002, Request for 85 degrees room temperature was not done locally,
at our home.

6.  (Bkground)¶ 2(f).

Documentation of Photo. Pg. 7-021. Unknown identifiable photograph. This
photo; found on my digital camera was not taken by me. I have never seen
this article, nor is it identifiable by me.

7.  (Bkground)¶ 2(g).

Documentation of unknown devices attached to our bedroom ceiling

and above our kitchen door. The latter two are inserted into the door

frame. The physical dimensions are approximately .25 inch diameter x

.125 inch thickness. The first pair are located external of the ceiling.

8. (Bkground) ¶2 (h).

Documentation of television home system installed by Direct TV,

also list of remote replacement and the listed of time frame when items

were compromised. Could not perform any normal commands to

television unit. (batteries normal)

## ARGUMENT

When preparing case documents using Law Libraries such as Cornell Law Library

Thomas (Library), Tech Journal, Law Journal or U.S. Courts. gov as examples to gather

information pertaining to this case I am immediately interrupted as per photos presented

and described in detail, 1¶ (StmtFacts). Also what Laws are in effect or are in the process

of becoming Law. The photos, which I had previously presented and offered as evidence

is just a portion of the harassment and evidence that has taken place and perpetrated by these

named agencies. These intrusions alone have compromised my first and fourth amendment

rights. As noted (A) The on Line Privacy Act of 2000, I believe the named Defendants have

complete control of my personal and (none) private computer. (B) This Bill infuses citizen

protection agencies and Government law agencies from over zealous intrusion. (C) I don't

believe that their was an approval of the U.S. Justice department for these intrusions to

our privacy and home. ("PPI"), 42 U.S.C. 2000aa.

6

As introduced as Caller ID Manipulation, such as Direct TV presentation on video television screen, when a phone call is received, it is presented on our screen with the caller ID presented. Some instances it is shown and other time it is not. I was told by Direct TV that the on/off control of presentation of Caller ID is controlled at the home site. Which can be access from the menu index, for turn on/off caller ID presentation.

2 ¶ (StmFacts), (A) Is exactly what I previously provide as an example of, which the Law was infringed upon, which Senator B. Nelson Introduced (S.704). (B) Pages 00047 thru. 00050(a) are a prime reason for the Senate to adopt HR 251, HR 5126. Page 00050(a) is an updated list of non-identifiable phone calls to our home. Another example of unlawful intrusion or spoofing is my "FAX" line, which I am receiving voice calls on my home phone line on fax number. Each line is a dedicated voice or data (fax) line, and cannot receive both. The fax line is a two ring (short) space ring and normal time spacing between sequences, also fax number is a different number than phone voice number. (C) This is another example of what I feel I am a victim of intrusion through improper means. I present this example case to impress upon this Court that the Injustice that has taken place in this day and time. As Noted, 2 ¶(StmFacts), This is pure evidence of what can transpire when Law Enforcement and Homeland Security become partners in what I call " White Collar Hate Crime."

3 ¶ (StmFacts), 2(c), 2(c)(c) are self explanatory as the name given in my previous descriptive statement by name.

4 ¶ (StmFacts), Is one of the most compelling reasons for this complaint. A. is a detail description of the types of torture I have experienced as of now. I decided to break them down into types for classification and identification.

I plan on covering this topic in more detail in my SPICIFIC POINTS OF LAW AND AUTHORITY v. National Security Agency. B This is one of the cruelest forms of torture that can be intrude upon a fellow man and the medical description and example are true to form.

5 ¶ (StmFacts), Many times in the early hours my wife or I would awake up to above normal temperature and would have to reset temperature set back to original setting. This type of incident also took place with our electric oven. Quite frequently when our oven was used to bake, the food would be over baked or almost burnt. We put an external thermostat in the oven and after we found both were in unison .

6 ¶ (StmFacts), I presume this photograph represents bragging rights to their prowess of control to the privacy of my wife and  my  home.

7 ¶ (StmFacts), I believe as previously stated, that the probability of these articles are a type of amplifier used in the micro watt range. If not, just a plant. This is corroborative evidence in any event. It was put their for a reason.

8 ¶ (StmFacts), This is another example of the compromise of home personal electronics and harassment.

## CONCLUSION

1. It is beyond comprehension that the pain that can be inflicted on innocent citizens of America and what I call "White Collar Crime" inspired by hate. This is but a small part of my presentation in this STATEMENT OF POINTS AND AUTHORITIES.

# WELCOME TO THE ANESTHESIA AWARENESS WEBSITE

## From the Anesthesia Awareness President

Anesthesia awareness is the phenomenon of being mentally alert (and terrified) while supposedly under full general anesthesia. The patient is paralyzed, unable to speak, and totally helpless to communicate his/her awareness. Actual cutting pain may or may not be present.

Anesthesia awareness continues to be reported between 100-200 times daily in the United States, in addition to an unknown number worldwide. Researchers believe that anesthesia awareness is under-reported by 50%-100% and occurs between 4-6 times more often in pediatric surgeries. Until the consistent use of every possible precaution (both human and equipment) to avoid awareness becomes routine, and such precautions are something of which a patient can be absolutely assured, this Campaign will not rest.

There are many thorough, vigilant, and compassionate anesthesia professionals, and for that we should all be grateful! No one enters the field of medicine to hurt people. What needs to be changed is the attitude about the possibility of awareness occurring with

any patient, in believing and validating reports of patient awareness, and realizing the necessity for immediate treatment of the terror and mental sequelae of awareness..

Even more unrecognized is the extent and extremity of the devastating sequelae on victims. Post-traumatic Stress Disorder (PTSD) occurs in approximately 50% of awareness victims, and of that 50%, it is suspected that 80% may never get over the *trauma*. This Campaign wants to see prevention of, and compassionate and effective treament for victims, and to bring about universal *awareness of awareness!*

While I am only a layperson, not a trained medical, mental health or legal professional, through my work with the Anesthesia Awareness Campaign, I think it fair to say that I am considered *the* lay expert in the area of Anesthesia Awareness through personally speaking by phone with over 2900 victims of awareness and (continuing to do so on a daily basis). Prior to this website containing much of the information available from the Anesthesia Awareness Campaign, over 10,000 packets of information were sent out free of charge. I have been privileged to have been interviewed in just about every major media, including television, cable, radio, newspapers, magazines, and professional journals, both in the US and internationally. (See "History of the A/A Campaign.")

In addition to being a media contact, a victim advocate and listener/ advisor, I have been invited to speak to medical professionals both nationally and internationally in annual meetings, Grand Rounds, and civic presentations. The Anesthesia Awareness Campaign holds, unquestionably, the largest database of awareness victims in the world — professional or lay.

Our goal is to be a touchstone of helf and affirmation for victims of anesthesia awareness, a lightening rod into the anesthesia provider community, and a toold of education and empowerment to the public in general -- almost all of whom will have surgery at time or another!

I hope you will check back often to see what new information, publications, links, and pictures have been added. You can still call me at 703-437-7327 and/or e-mail at anesawareness@aol.com.

Carol Weihrer, President and Founder (and webmaster!)

## TYPES BY NUMBER OF BRAINWAVE TORTURE THAT I AM EXPERIENCING

1. Pins and needles to arms and legs, severe pain.

2. Eyes pin pinprick like feeling watering itch type feeling. Ears and nose tickle sensation.

3. Heart beat, skip beat, chest pain and adjusted heart rate.

4. Wake-up torture during the night. (sleep deprivation) body and mind tired. Note:

   See example. Page 00051, 00052.

5. Clicking sensation in head. Adjusting of rate of clicking.

6. Arms and shoulder weak. Trembling feeling.

7. Brain torture. Lots of pain, like head will implode.

8. High pitch tone. Sometimes continuous.

Note: These types of torture are controlled by time, time length, severity of gain induced

   for level of pain.

2. A response is forth coming to my OPPOSING POINTS AND AUTHORITIES to:

U.S. DEPARTMENT of JUSTICE. Reference:

> GEORGE W. BUSH, President of the United States, et al.
> BILL NELSON, United States Senator.

I will also respond to OPPOSING POINTS AND AUTHORITIES to:

U.S. DEPARTMENT of JUSTICE. Reference:

> FEDERAL BUREAU of INVESTIGATION,
> NATIONAL SECURITY AGENCY, when served.

3. As I prepare to submit this motion request for Injunctive Relief to this Court and to cease and desist from this form of harassment in the privacy of my own home and private property by the named Federal Defendants also Volusia County Sheriff Department.

4. Award such other relief as the Court deem just and proper.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _7th_ day of November, 2007.

Respectfully submitted,

John E Moore ProSe
9 Pleasant View Circle
Daytona Beach, FL.
32118-5511
(386-761-8193)

9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOHN E. MOORE, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) Civil Action No. 07-00107 |
|  | ) |
| GEORGE W. BUSH, et al., | ) |
|  | ) |
| Defendant, | ) |

**<u>EXHIBIT I</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOHN E. MOORE, | ) |
| | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 07-00107 |
| | ) |
| GEORGE W. BUSH, et al., | ) |
| | ) |
| Defendant, | ) |
| | ) |

**EXHIBIT J**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN E. MOORE,                )
                             )
              Plaintiff,      )
                             )
v.                           )         CA. No. 07-0107 (RMC)
                             )
GEORGE W. BUSH, et al        )
                             )
              Defendant,     )
                             )
_____  )

## PLAINTIFF MOTION FILING OF DISCOVERY
## NOT PREVIOUSLY ENTERED LCvR 52(b)

I would like to present some important facts pertaining to this Federal Bureau of Investigation (FBI) case. ID B.S. 62-0. Boston, Mass.

### BACKGROUND

I.     Falls Church Virginia is the geographical location where the National Security Agency (NSA/CSS) crypto training was administered at the time of my involvement. The term off campus was the term used in reference to Fort George E. Meade, MD. Central location of N.S.A. Some types of shipboard equipment which I was familiar with were KW-37 rcvr.data, KG-14 xmt.data and KY-8 voice scrambler. My specific responsibilities or title were I/O (input/output) crypto technician. To be more explicit, it was my responsibility to provide the proper inputs to the units and the outputs to their proper destination for completion of these classified circuits.

II.    In reference to F.B.I. complaint form case ID B.S. 62-0-24554. There are very distinct and important evidentiary words "blackened out," or completely deleted from our

# RECEIVED

MAY 2 1 2008

conversation. (a) first and last name of this ex Volusia County Deputy Sheriff, part of collectively, the "The Government Defendants." ¶ Dkt. #45. (b) he attended NSA/CSS off campus training. (c) he was part of a "nazi hate group." I informed this F.B.I. agent, also that I would present him a minimum of a half a dozen victim/witness names. Through all of this presentation to this agent, his only response, "I am sorry I cannot help." Again I submit, the "Government Defendants." ¶ Dkt. #45.

## ARGUMENT

I believe comp. ¶ Id.44 is one in the same person as ¶ II. Bckgrnd. Money talks. What relief was this? What I classified as a felon seeking and for what reason or crime was I the perpetrator of, what I see is a setup of my personal life. In August of 1996, he was on medical leave from Volusia County Sheriff Department and word was out in the neighborhood that this person was leaving for Falls Church Virginia. Fear was my only reaction, as I assumed what the possibilities could be, as I being familiar with the location name. I recalled that he saluted me as a nazi while being a neighbor of this person, most of the neighbors were uncomfortable in his presence. A short time after his return, I use the term "plugged in." [now it can be accomplished via physical or electronic means] ¶ Id. B.W.T. For the first two years, this B.W.T. consisted of tone type frequencies. I cannot make judgment on brain control at that time frame.

## CONCLUSION

Enclosed as part of motion evidence are copies of F.B.I. Complaint/Query form pg. 5, which is my claim of being harassed by this N.S.A. agent. The next line states that I am paranoid, pg. 6, is synopsis form, pg. 7,8 are copies of appeal no. 03-0136, request no. 968538. pg. 9 explanation of exemptions, ref. 5 U.S.C. § 552a (j)(2) no statement is presented to appease the plaintiff charges,

2

ref. U.S.C. § 552 (b)(7)(c) with my personnel privacy not only compromised, but

unwarranted invasion of. pg.10, F.B.I. Investigative Programs Civil Rights, of special

interest written on this document "Hate Crimes" and "Hate Crime Cases," I believe this

document should be deleted from the investigative program. I see this as an effrontery

to the Civil Liberties of Americans such as myself, an innocent victim, pg.11, F.B.I.

uses Holocaust to teach new agents. I do not believe this unnamed Boston Special Agent

of the F.B.I. had observed this document written by, then Director of the F.B.I. Louis J.

Freeh, which is my reason for including with this document.

## RELIEF

I am seeking judicial review in accordance with 5 U.S.C. § 552 (a) (4) (B)[1] and

5 U.S.C. § 552 (a) (4) (F)[2]

[1] On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters which a court accords substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B)

[2] Whenever the court orders the production of any agency records improperly withheld from the complainant and assesses against the United States reasonable attorney fees and other litigation costs, and the court additionally issues a written finding that the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding, the Special Counsel, shall promptly initiate a proceeding to determine whether disciplinary action is warranted against the officer or employee who was primarily responsible for the withholding. The Special Counsel, after investigation and consideration of the evidence submitted, shall submit his findings and recommendations to the administrative authority of the agency concerned and shall send copies of the findings and recommendations to the officer or employee or his representative. The administrative authority shall take the corrective action that the Special Counsel recommends.

I believe both afore mentioned agents, both F.B.I. and N.S.A. agents should be

investigated for their complacency in this cover up. Plaintiff will be filing a motion seeking

summary judgment as to the remaining defendants, National Security Agency and

U.S. Department of Justice.

Respectfully submitted,

John E. Moore Pro se
9 Pleasant View Circle
Daytona Beach, Florida.
32118-5511
(386) 761-8193



# FEDERAL BUREAU OF INVESTIGATION
## COMPLAINT/QUERY FORM

**(Please fill out completely)**

Date: _10 - 3   80_

Time: _10:40 AM_

NAME: _John E Moore_
ADDRESS: _136 SAND PEBBLE CIR_
CITY/STATE: _PORT ORANGE   FL_
ZIP CODE: _32119_          TELEPHONE: (    )
DATE OF BIRTH: _9-15-35_
SOCIAL SECURITY NUMBER: _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_

DESCRIPTION OF COMPLAINT/QUERY: _I WAS SET UP BY LAW_
_EFORCEMENT OFFICER (RETIRED) I HAVE BEEN_
_HARASSED FOR 4 YEARS. I CANNOT GET_
_ANY LEGAL HELP FROM LOCAL, COUNTY,_
_OR STATE. I HAVE EVIDENCE_ ▮▮▮▮▮▮▮▮▮ _lives in_
b7C ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ _is harassing Mr. Moore. Moore_
_seems to be paranoid, his visit was to let_
_the FBI know he is being watched in FLA._

_copy to complaint foot_

6

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE

**To:** BOSTON

**From:** BOSTON
COMPLAINT ROOM, SA/IA ████████████

Contact: ███████████ EXT. ████

**Approved By:** BURKETT JAMES D

**Drafted By:** ████████ mkm

**Case ID #:** BS 62-0

**Title:** John E. Moore
136 Sand Pebble Circle
Port Orange, Fla

**Date:** rec'd @
C7 8/10/00

**Attn:** C-7 SUPERVISOR
C-7 ROTOR

67C

**Synopsis:** Transmittal for personal visitor to the Complaint Room.

**Details:** Attached to this communication is Reception Room form indicating captioned individual was a walk-in complainant to the Boston Division Complaint Room. Please serialize into 62-0 for future retrieval.

♦♦

5

BS 62-0-24554



**U.S. Department of Justice**

Office of Information and Privacy

---

*Telephone: (202) 514-3642*                    *Washington, D.C. 20530*


Mr. John E. Moore                 Re:   Appeal No. 03-0136
9 Pleasant View Circle                  Request No. 968538
Daytona Beach, FL  32118-5511           RLH:ADW:BVE

Dear Mr. Moore:

    You appealed from the action of the Boston Field Office of the
Federal Bureau of Investigation on your request for access to records
concerning you.

    After carefully considering your appeal, I have decided to
affirm the FBI's action on your request.  Please be advised that the
Boston Field Office located only two pages of records responsive to
your request from one main file entitled Administrative Inquiry.

    These records are exempt from the access provision of the
Privacy Act of 1974 pursuant to 5 U.S.C. § 552a(j)(2).  See
28 C.F.R. § 16.96 (2002).  Because these records are not available to
you under the Privacy Act, your request has been reviewed under the
Freedom of Information Act in order to afford you the greatest
possible access to the records you requested.

    The FBI properly withheld from the pages released to you
certain information that is protected from disclosure under the
FOIA pursuant to 5 U.S.C. § 552(b)(7)(C).  This provision concerns
records or information compiled for law enforcement purposes, the
release of which could reasonably be expected to constitute an
unwarranted invasion of the personal privacy of third parties.  In
this instance, the FBI withheld the name of the FBI special agent who
met with you at the Boston Field Office and the name of a third party
not of investigative interest to the FBI.  I have determined that
this information is not appropriate for discretionary release.

    Further, I am returning the three folders of information you
included with your letter to this Office dated November 4, 2002.  For
your information, the function of the Office of Information and
Privacy is limited to the adjudication of appeals from the denials of
access to information pursuant to the FOIA and Privacy Act by
components of the Department of Justice.  The information contained
in the folders is unnecessary for the adjudication of your FOIA.

-2-

If you are dissatisfied with my action on your appeal, you may seek judicial review in accordance with 5 U.S.C. § 552(a)(4)(B).

Sincerely,

Richard L. Huff
Co-Director

## EXPLANATION OF EXEMPTIONS

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

(b) (1)  (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy  and (B) are in fact properly classified pursuant to such Executive order;

(b) (2)  related solely to the internal personnel rules and practices of an agency;

(b) (3)  specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the  matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b) (4)  trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b) (5)  inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b) (6)  personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b) (7)  records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to  a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforce- ment investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual;

(b) (8)  contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b) (9)  geological and geophysical information and data, including maps, concerning wells.

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

(d) (5)  information compiled in reasonable anticipation of a civil action proceeding;

(j) (2)  material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k) (1)  information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k) (2)  investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k) (3)  material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k) (4)  required by statute to be maintained and used solely as statistical records;

(k) (5)  investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k) (6)  testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process;

(k) (7)  material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

FBI/DOJ

9

# FEDERAL BUREAU OF INVESTIGATION

**SEARCH**

## Contact Us

- Your Local FBI Office
- Overseas Offices
- Submit a Crime Tip
- File an Internet Crime Complaint
- More Contacts

## Learn About Us

- Facts & Figures
- What We Investigate
- Intelligence
- Information Technology
- Fingerprints, Forensics & FBI Training
- Reports & Publications
- History
- More About Us

## Be Crime Smart

- Wanted by the FBI
- E-Scams & Warnings
- More Protections

## Use Our Resources

- For the News Media
- For Law Enforcement
- For Communities
- For Researchers

# Investigative Programs
# Civil Rights

The Federal Bureau of Investigation (FBI) is the primary federal agency responsible for investigating all allegations regarding violations of applicable federal civil rights laws. These laws are designed to protect the civil rights of all citizens and persons within United States territory. The mission of the FBI's Civil Rights Program is to enforce federal civil rights statutes and to ensure that the protected civil rights of all inhabitants are not abridged.

The FBI's Civil Rights Program consists of the following sub-programs:

- *Hate Crimes*
- *Color of Law/Police Misconduct*
- *Involuntary Servitude/Slavery (ISS)*
- *Freedom of Access to Clinic Entrances (FACE)*

The four sub-programs are administered by the Civil Rights Unit at FBI Headquarters. In addition to providing oversight to field investigations related to Color of Law/Police Misconduct and Hate Crime, the Civil Rights Unit also provides training to FBI New Agents, FBI field agents, National Academy attendees and other state/local police officers from around the country.

The FBI, pursuant to guidelines established in cooperation with the Department of Justice's (DOJ's) Civil Rights Division, requires each field office to initiate a civil rights investigation whenever information is received from any source not known to be unreliable. Though most complaints are received from the victim, witness or a third party related to the victim, a significant number of cases are initiated based on media reports, complaints from community interest groups, referrals from DOJ or the local United States Attorney's Office, and Congressional inquiries.

The FBI has the mission to investigate allegations of civil rights violations pursuant to federal statutes. Final prosecutive authority rests with DOJ's Civil Rights Division.

Civil Rights Home Page

Hate Crime

Hate Crime Cases

Color of Law

Freedom of Access to Clinic Entrances

Involuntary Servitude/Slavery

Federal Civil Rights Statutes

News and Issues

10

7-1-00  THE NEWS-JOURNAL  6A

# FBI uses Holocaust to teach new agents

**By MICHAEL J. SNIFFEN**
Of The Associated Press

WASHINGTON — The FBI has begun teaching its new agents how a failure by police to protect citizens rights helped produce the Holocaust in which 6 million Jews, as well as other minorities and political dissidents were murdered by the Nazis.

The training segment for agents-to-be at the FBI Academy began last month and was announced Friday by FBI Director Louis J. Freeh, Sara J. Bloomfield, director of the U.S. Holocaust Memorial Museum and Abraham H. Foxman, national director of the Anti-Defamation League.

"We do this early on in their training . . . to remind them of the horror and evil which can result from not just a government, but particularly law enforcement, abandoning its mission to protect people and becoming the engine of oppression," Freeh said.

The trainees are given a guided tour of the Holocaust Museum here and instruction about Adolf Hitler's use of the police in Germany in the 1930s and 1940s to round up Jews, political opponents and other targeted groups.

There is a classroom discussion and then trainees must write an essay on the question: "Of what relevance is this history to you as a human being and a law enforcement official?"

After the first session, a student wrote, "It has taught me that making sure our Constitution is strictly followed should be a number one priority throughout my career."

The topic of police complicity in the Holocaust has been a concern of Freeh's for some time. In 1994, over objections from the State Department and the U.S. ambassador to Poland, Freeh visited the Nazi death camp at Auschwitz during a European trip and gave a speech at Jagiellonian University in nearby Krakow, Poland, on the police role in Hitler's oppression.

Foxman applauded the FBI's commitment to "law enforcement's critical role as defenders of the Constitution and guardians of individual rights" and said the training "has tremendous potential to impact the next generation of law enforcement leadership."

11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
                                    )
JOHN E. MOORE,                      )
                                    )
                                    )
        Plaintiff,                  )
                                    )
            v.                      )       Civil Action No. 07-00107
                                    )
GEORGE W. BUSH, et al.,             )
                                    )
        Defendant,                  )
                                    )
_____ _____)


**EXHIBIT K**

Federal Communication Commission Complaint No. 08-C00022428

John E. Moore
9 Pleasant View Circle
Daytona Beach, Florida.
32118-5511
(386) 761-8193
April 28, 2008

**DIRECTV**
P.O. box 6550
Greenwood Village,
CO. 80155-6550

Ref. Account Number 4577369. Reference to Service and Privacy Complaint.

Dear: Recipient.

I am very upset as to the response to my request for customer service of Directv. For approximately fifteen years my wife and I always had nothing but phrase for Directv and the outstanding service that you have provided to our home.

Now I will present our reason for canceling our contract with Directv. On April 7, 2008, I had reported a trouble call with our Surround Sound System, which its input is provided from the Directv satellite, as we had insurance for this type of occurrence. I was told that a technician will be at our home on Tuesday April 8, 2008. When the technician arrived, I informed him that I believe that there is no digital audio emitting from the Directv receiver. After twenty minutes or so, he informed me that my Surround Sound Receiver was not operating, which is the reason for no output from the speakers. I was not aware of how he came to that conclusion, since he did no testing or vidio audio options from the quick menu, which he never did access in my presence. After my doubtful conclusion that he presented, I told him that I would purchase a new Surround Sound Receive and that I would contact Directv if this problem still existed.

I then replaced the Surround Sound Receive with a new unit and the identical problem still existed. ($200.00 for replacement unit)

On April 18, 2008 I spoke with Directv and presented the technical people with the identical symptoms. I spoke with a person named Michelle, who presented herself as a technician. I gave her all the symptoms and information pertaining to this problem. And she insisted that my Surround Sound Receiver is not working. What she was insisting was that this new receiver was bad. As my patience was running thin by now.I requested Michelle let me talk to her Supervisor, whose name is Dan, (no last name due to security rules) again I presented the same information to him, and he presented the same response. He also noted to me that the Directv satellite receiver mod D12300, ser. B10AC7CF130971 has no digital audio output jack[1], which I am also enclosing a copy of.(pg.6) Also a test procedure which could have provided the proper information to diagnose the problem. (pg.7, 21)

After over two hundred dollars and three weeks with no Surround Sound , I have obtained Cable as our service provider. Our Surround Sound Receive is performing as it was designed to. With the proper input provided. (digital audio) If you could provide me the answers to how and why this unfortunate incident took place, I would be very appreciative.

Again we thank you for the wonderful service, which was provided by Directv.


[1] note: page 21, chapter 3. page7, chapter 1. page 6, chapter 1. directv receiver rear panel.


Sincerely,

John E. Moore

_____

## Form 2000B – Billing, Privacy, or Service Quality Complaint

You may submit this form over the Internet at ............................................., by e-mail to ........................., by fax to 1-866-418-0232, or by postal mail to:

> Federal Communications Commission
> Consumer & Governmental Affairs Bureau
> Consumer Complaints
> 445 12th Street, SW
> Washington, D.C. 20554

In addition, you may submit your complaint over the telephone by calling 1-888-CALL-FCC or 1-888-TELL-FCC (TTY). If you choose to submit your complaint over the telephone, an FCC customer service representative will fill out an electronic version of the form for you during your conversation. If you have any questions, feel free to contact the FCC at 1-888-CALL-FCC or 1-888-TELL-FCC (TTY).

**FCC NOTICE REQUIRED BY THE PAPERWORK REDUCTION ACT AND THE PRIVACY ACT**

The Federal Communications Commission is authorized under the Communications Act of 1934, as amended, to collect the personal information that we request in this form. This form is used for complaints that involve billing, privacy, or service quality. The public reporting for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the required data, and completing and reviewing the collection of information. If you have any comments on this burden estimate, or how we can improve the collection and reduce the burden it causes you, please write to the Federal Communications Commission, OMD-PERM, Paperwork Reduction Project (3060-0874), Washington, DC 20554. We will also accept your comments regarding the Paperwork Reduction Act aspects of this collection via the Internet if you send them to ..................... PLEASE DO NOT SEND YOUR COMPLETED FORMS TO THIS ADDRESS.

Remember - You are not required to respond to a collection of information sponsored by the Federal government, and the government may not conduct or sponsor this collection, unless it displays a currently valid OMB control number or if we fail to provide you with this notice. This collection has been assigned an OMB control number of 3060-0874.

In addition, the information that consumers provide when filling out FCC Form 2000 is covered by the system of records notice, FCC/CGB-1, Informal Complaints and Inquiries File (Broadcast, Common Carrier, and Wireless Telecommunications Bureau Radio Services). The Commission is authorized to request this information from consumers under 47 U.S.C. 206, 208, 301, 303, 309(e), 312, 362, 364, 386, 507, and 51; and 47 CFR 1.711 et seq.

Under this system of records notice, FCC/CGB-1, the FCC may disclose information that consumers provide as follows: when a record in this system involves a complaint against a common carrier, the complaint is forwarded to the defendant carrier who must, within a prescribed time frame, either satisfy the complaint or explain to the Commission and the complainant its failure to do so; where there is an indication of a violation or potential violation of a statute, regulation, rule, or order, records from this system may be referred to the appropriate Federal, state, or local agency responsible for investigating or prosecuting a violation or for enforcing or implementing the statute, rule, regulation, or order; a record from this system may be disclosed to a Federal agency, in response to its request, in connection with the hiring or retention of an employee, the issuance of a security clearance, the reporting of an investigation of an employee, the letting of a contract, or the issuance of a license, grant or other benefit; a record on an individual in this system of records may be disclosed, where pertinent, in any legal proceeding to which the Commission is a party before a court or administrative body; a record from this system of records may be disclosed to the Department of Justice or in a proceeding before a court or adjudicative body when: (a) the United States, the Commission, a component of the Commission, or, when represented by the government, an employee of the Commission is a party to litigation or anticipated litigation or has an interest in such litigation, and (b) the Commission determines that the disclosure is relevant or necessary to the litigation; a record on an individual in this system of records may be disclosed to a Congressional office in response to an inquiry the individual has made to the Congressional office; a record from this system of records may be disclosed to GSA and NARA for the purpose of records management inspections conducted under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall not be used to make a determination about individuals.

In each of these cases, the FCC will determine whether disclosure of the information in this system of records notice is compatible with the purpose for which the records were collected. Furthermore, information in this system of records notice is available for public inspection after redaction of information that could identify the complainant or correspondent, i.e., name, address and/or telephone number.

**THE FOREGOING NOTICE IS REQUIRED BY THE PAPERWORK REDUCTION ACT OF 1995, PUBLIC LAW 104-13, OCTOBER 1, 1995, 44 U.S.C. SECTION 3507 AND THE PRIVACY ACT OF 1974, PUBLIC LAW 93-579, DECEMBER 31, 1974, 5 U.S.C. SECTION 552a(e)(3).**

September 2007



Consumer Response Center

UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D C  20580

May    28, 2008

John Moore
9 Pleasant View Cir
Daytona Beach, FL  32118

Re:  FTC Ref. No.  13915205

Dear John Moore:

Thank you for recent correspondence.  The Federal Trade Commission acts in the public interest to stop business practices that violate the laws it enforces.  Letters from consumers and businesses are very important to the work of the Commission.  They are often the first indication of a problem in the marketplace and may provide the initial evidence to begin an investigation. The Commission does not resolve individual complaints.  The Commission can, however, act when it sees a pattern of possible violations developing.

The information you have provided will be recorded in our complaint retention system. This computerized system enables us to identify questionable business practices that are generating numerous complaints and may be in violation of the law.

Thank you for providing information that may be used to develop or support Commission enforcement initiatives.

Sincerely yours,

Consumer Response Center

Enclosures:
1. Service Contracts (PRO-11)

# COMPROMISE OF TELEVISION SYSTEM

November 30, 2006

First remote casualty.........November 06, 2002.*
Second remote casualty......    "      02, 2003.*
Third remote casualty........August    07, 2003.*
Forth remote casualty........November 21, 2005.*
Fifth remote casualty........ March    27, 2006.*
Sixth remote casualty...... .April    06, 2006.*
Seventh remote casualty.....May    01, 2006.
Eight remote casualty........May    05, 2006.
Ninth remote casualty.......June    13, 2006.*
Tenth remote casualty.......June    16, 2006.*
Eleventh remote casualty...July    08, 2006.
Note: * denotes proof of purchase.

Note: There are two separate TV systems operating in our home.

March 20, 2006. 5:15pm no signal, other tv signal ok.
March 18, 2006 ch. 202,269,356,301 inoperable.
March 20, 2006. no tv reception at times listed, other time normal. 6:33am,6:55am,6:56am
            7:07am,7:12am,8:05pm,8:08pm
March 22, 2006. no tv reception at times listed, other times normal. 7:15am to 7:17am,
(ch.2). 8:00pm many ch. denote search for satellite, not possible. This is a go/no go satellite
System. 11:pm all ch. back to normal.
March 23, 2006. 6:56am no ch. 202,2,6 or 9. note on tv screen "replace card, no good"
removed  card and reinserted and system reset. 5:15pm started picture interference signal.
Called Direct TV Co. with complaint. Next day, technician arrived and proceeded to a group
of coaxial connecters. Selected one and informed me that it was the problem one. Out of a
group of eight connectors, without observing the others. He told me he had repaired the
the connecter.
Note: this problem could not have produced the problems that were presented.
March 25, 2006. 6:55am, no signal. 7:40am tv signal ok.
March 26, 2006. 6:40am tv. remote inoperative, at 7:20am normal operation. From that
time forward, system operation was normal.

## CABLE PROBLEMS WITH NEW SERVICE PROVIDER

June 25, 2008. Unit on/off randomly for five minutes.

June 27, 2008. 7:15 PM. baseball ticket out of service.

June 30, 2008. 10:00 PM cable video lost, no programming

July 3, 2008. lost control of remote, after five minutes return.

July 11, 2008. lost baseball ticket, 9:22 PM. July 13, 2008, informed cable.

July 13, 2008. technician arrived, informed me of a loose connection.

July 14, 2008. turned entertainment system on, loud audio blast from entertainment system. Twenty minutes later I had no picture and no sound. 9:30 AM reset receiver and system back to normal. Notified Bright House Network of problems encountered with system. Technician arrived, found nothing unusual with system.

VIZIO 46 IN. TELEVISION



STAND-BY TELEVISION

SURROUND SOUND RECEIVER

ALLEGRO Vcr/Dvd

DIRRECT TV RECEIVER

COMPLETE ENTERTAINMENT SYSTEM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                              )
                              )
JOHN E. MOORE,                )
                              )
                              )
        Plaintiff,            )
                              )
              v.              )          Civil Action No. 07-00107
                              )
GEORGE W. BUSH, et al.,       )
                              )
        Defendant,            )
                              )
_____ _____)
```

**EXHIBIT L**

IN THE COUNTY COURT, IN AND FOR

VOLUSIA COUNTY, FLORIDA.

| | | |
|---|---|---|
| **STATE of FLORIDA** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CITATION 8760-ESJ |
| | ) | |
| **JOHN E. MOORE, Pro Se** | ) | |
| | ) | |
| Defendant, | ) | |

On November 14, 2007 I was issued a Traffic Citation by the Daytona Beach Shores Police Department for a speeding violation, which to the best of my knowledge, I am not guilty of as charged.

In the following statements, I will provide this Court with logical and Legal reasons for a dismissal of said charge.

ARGUMENT

A. Important that officer provide written proof at time of infraction of the distance and speed from the Lidar reading when issuing a speeding citation, for verification in traffic Court.

B. No visual view from approximately fifty feet south of Ocean West Boulevard to point of alleged infraction. 40 mile per hour posted speed. (marker reference)

C. Fifty six approximate feet off target (cosine effect) which could produce a ten percent error in reading of speed. (cosine effect) Rule: The greater the error, which is the function of the cosine of the angle. (measured speed = actual speed×cosine of angle.) Measured speed

error is the angle between the radar gun and the target vehicle or object.

D. There is no thirty five mile north posted speed anywhere in the 3000 block perimeter

of Peninsula Drive as stated by Issuing Police Officer of citation.

E. Of importance is an "S" curve on north approach to radar gun reading or cosine angle.

Not a fair distance for a radar lock in of speed, as this is a 30 MPH speed limit. (House lot

Marker no. 3064)

<div align="center">CONCLUSION</div>

**Part I.**

¶ 4 of 5 (b),(c). ¶ 2 of 5 (a). ¶ 1 of 1 (b). It is highly improbable that the police officer

while standing on the lawn near the golf course fence at that angle can obtain an accurate

reading of distance and speed from a Laser Radar Beam measuring approximately three

square feet and collect accurate legal data. A proper and accurate reading can only obtained

when standing and aiming radar parallel to an oncoming vehicle at a useable distance.

¶ 1 of 1, § (a). I was not provided written proof of reading obtained by Police Officer at

time of infraction. Why did the Police Officer claim a 35 MPH posted speed (north) in the

3000 block area when none exists? At House lot Marker no. 3064 a yellow sign is installed

on (south) lane, referring to "S" curve in road and 30 MPH approach in visual situate of

Police Officer. As photo evidence presents, as proceeding towards Police Officer in a

northerly direction, at a speed of forty miles per hour, as tested, would consume seven

seconds to arrive at the Police Officers location. It is highly unlikely that a true reading

and accurate fix could be obtainable. I find that there is no probable cause for this Citation.

<div align="center">2</div>

**Part II.**

I am also enclosing a copy of a motion being heard as part of a Law Suite at United States District Court for the District of Columbia, CA 1:07-cv-00107. I feel that a copy of this Motion for INJUNCTIVE RELIEF should be presented to this Court since the Volusia County Sheriff Department is a Defendant in this Federal Court and has jurisdiction over this geographical location where this alleged traffic violation was cited. ¶ 00058. Presented forthwith is another example of harassment. Daytona Beach Shores Police were writing this citation, a Florida Sheriff Association (FSA) vehicle slowed down as it approached, also other FSA incidence at 9:00 am as I left for Home Depot Store. FSA on Penninsula Drive at corner of our street. FSA at Home Depot parking lot as I arrived. At 12:15 pm I left for barber shop, FSA greeted me on Ridgewood Avenue as I drove to barber shop. On way home, was time of receipt of citation. Also as I was proceeding to Walgreens to have FSA photo. printed, FSA vehicle appeared at Ocean West Blvd. and Penninsula Ave.

**PART III.**

<div align="center">CLAIM FOR RELIEF</div>

Due to reasonable inferences produced by the Police Officer at the scene of the violation, that are truly unsubstantiated claims. As Defendant, I incorporate each and every fact presented as factual and truthful.

<div align="center">PRAY FOR RELIEF</div>

Defendant respectfully request that the Court reward Defendant relief due to the time and inconvenience generated by this unjust claim. And pray that the Court sits in agreement with this plea.

<div align="center">3</div>

WHEREFORE, Defendant John E Moore request that this Citation be dismissed.

dated; January 18, 2008.

Respectfully  submitted,

_____

John E. Moore Pro se
9 Pleasant View Circle
Daytona Beach, Florida
32118-5511
386-761-8193

# IN THE COUNTY COURT, IN AND FOR

# VOLUSIA COUNTY, FLORIDA

STATE OF FLORIDA

VS

    JOHN E MOORE

    9 PLEASANT VIEW CIR
    DAYTONA BEACH, FL 32118-5511

    USA

CITATION #:    8760ESI

VIOLATION    UNLAWFUL SPEED (REQUIRES SPEEDS)

## IMPORTANT: PLEASE BRING THIS NOTICE WITH YOU TO COURT

## NOTICE

YOU ARE HEREBY NOTIFIED THAT THE ABOVE STYLED CASE IS SET FOR

**INFRACTION HEARING AT 01:00 PM ON 01/18/2008,**

BEFORE A CIVIL INFRACTION HEARING OFFICER OR COUNTY JUDGE, AT THE FOLLOWING ADDRESS.

**BEACH STREET**
**250 N. BEACH STREET**
**DAYTONA BEACH, FL 32114**

**COURT APPEARANCE IS NOT MANDATORY, HOWEVER, IN ORDER TO AVOID A SUSPENSION OF YOUR DRIVING PRIVILEGES OR TO CLEAR A SUSPENSION YOU MUST EITHER APPEAR IN COURT ON THE DATE SET FORTH IN THIS NOTICE OR PAY THE FINE AMOUNT OF $163.50 PLUS ANY LATE FEES (IF APPLICABLE) BY THAT DATE.**

COPIES HEREOF HAVE BEEN FURNISHED TO

**DEFENDANT:  JOHN E MOORE**
**ATTORNEY:**

BONDSMAN:

THIS DECEMBER 31, 2007

### DIANE M. MATOUSEK
**CLERK, COUNTY COURT**
**VOLUSIA COUNTY, FLORIDA**

## MAKING A RECORD

Please be advised that the Court does not make a verbatim record of these proceedings. If you wish to have a record made, it is your responsibility to supply and operate a tape recorder. If you choose to record a hearing, the original tape must be delivered to the clerk immediately after the hearing. If you wish to file an appeal based on the record, it is your responsibility to have the tape transcribed by an official court reporter. You are responsible for payment of transcription costs. (see Rule 6.460(b), Florida Rules of Traffic Court).

## ATTENTION: PERSONS WITH DISABILITIES

If you are a person with a disability who needs an accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Court Administration at Ste. 300, Courthouse Annex, 125 East Orange Avenue, Daytona Beach, FL 32114; Telephone: 386-257-6096 within two (2) days of your receipt of this notice. If you are hearing impaired, call 1-800-955-8771; if you are voice impaired, call 1-800-955-8700. THIS IS NOT A COURT INFORMATION LINE.

# Diane M. Matousek

## CLERK OF THE CIRCUIT COURT

Volusia County, Seventh Judicial Circuit

P O Box 6043

DeLand, Florida 32721-6043

## CITATION DISPOSITION

CASE #:            2007 345591 TRCI        CITATION #:        8760ESJ              CITATION TYPE: CIVIL TRAFFIC
VIOLATION DATE: 11/14/2007                 FILING DATE:       11/20/2007
VIOLATOR:          MOORE, JOHN E
STATUTE:           316.187
                   UNLAWFUL SPEED (REQUIRES SPEEDS)

---

**CITATION STATUS:**   CLOSED                          **VIEW STATUS:**   PUBLIC

**VIOLATOR REQUIREMENTS**                              **REPORTING REQUIREMENTS**

**PAYMENT DATE:**                                      **SENTENCE DATE:**  01/18/2008

                                                                **PLEA:**  NO PLEA ENTERED

**SCHOOL**                                                   **VERDICT:**  DISMISSED

**ELECTED:**  NO                                       **SENTENCE:**  CASE DISMISSED

**TYPE:**

                                                                **FINE:**  $0.00

**COMPLETE BY:**                                                **COST:**  $0.00

**COMPLETED ON:**                                      **TRIAL TYPE:**

                                                       **DRIVER LICENSE**

                                                       **SUSPENSION/REVOCATION**

                                                           **SUSPENSION LENGTH:**

                                                               **LICENSE RECEIVED:**  NO

                                                                     **RE-EXAM:**  NO

                                                       **INTERLOCK LENGTH:**

Monday, February 04, 2008                                                              9 32 04 AM



)                              )

Notes from harassment log file page 176.

11:30 am wife Clara called, car would not start at Publix Market, Port Orange. Went to

meet her with jumpers. Florida Sheriff Association (FSA) on way. When I arrived, (FSA)

parked next to Clara, she was in vehicle, sat their the whole time that we were their.

We left for home to pick up jumper cables. (FSA) greeted us on our way back to car.

Two Port Orange Police vehicles were parked in parking lot as we arrived back at our car.

Could not keep motor running, had to have car towed to Pep Boys Auto.

Gray Suburban SUV pulled up beside us at stop light.



Search Products                Go                **Call Toll-Free 800-504-5917**

Shop by Brand

Radar Guns Blog | Radar Guns Forum | How Radar Guns Work | Radar Guns Glossary | How to Buy | Recommended Resources

> Laser Radar (Lidar, Ladar) Facts

Baseball Radar Guns
Softball Radar Guns
Golf Radar Guns
Tennis Radar Guns
Car Racing Radar Guns
Swing Radars
Archery Radars
RC Models Speed Guns
Radar Balls
Glove Radar
Paintball Radar
Sport Radar Gun Accessories

Traffic Radar Guns
Hand-Gun Police Radar Guns
In-Car Video Systems
Speed Trailers
Traffic Speed Displays & Signs
Police Radar Gun Accessories

Speed Detecting Rangefinders
Railroad Radar Guns
Fluid Surface Velocity
Traffic Information Displays
Fish Finders
Rangefinders
Police Binoculars
Police Spotting Scopes
Military Goggles
Tripods & Mounts
Portable Printers & Scanners
Batteries

View All Products
Brand List
Add To Favorites
Order Status
Best Price Guarantee
Volume Order Price Quote
Radar Guns Reviews
Radar Gun FAQ

**Free UPS Ground Shipping**

Police Radar Guns
Traffic Radar Guns
Radar Speed Trailers and Traffic Speed Displays
How Radar Guns Work
Radar Terms Glossary

## Laser Radar (Lidar, Ladar) Facts

**LIDAR (Laser Radar, Ladar)** is an acronym for **Light Detection And Ranging.**

(b) According to scientific research, Lidar (laser radar, ladar) does not emit any harmful radiation. The **Lidar laser beam** shoots 280 pulses per second and at 1,000 feet the beam is 3 feet square. The **Laser Radar Beam** travels 186,282 miles per second and that is 1 foot per billionth of a second. You can see it is important to keep the beam on one spot on the target.                applies to **Lidar** in the same way it applies to      . In bad weather, **Lidar** can be used through the window in the Obstructed Mode.

(a) It is important that the police officer writes down the distance and the speed from the **Lidar** reading when issuing a speeding ticket, because such information would be used for verification purposes in traffic court. But

can collect the above data to make the officer's task even easier.

allows to **collect Traffic Speed Data** and generate an easy to read and analyze **Traffic Speed Survey Report.**      - serial module which gathers speed data samples from      , **Lidar,**      and directly interfaces with a PC to provide **statistical data** in an easy to use format. Using      you can generate and print a **Traffic Speed Survey Report** with all necessary **statistical data** in an easy to read format.      4-Megabit Memory's capacity is approximately 130,000 counts.

**For more information on**      and      , please, follow these links:

- 
- 
- 

- 
- 
- 
- 
- 

- 
-       (                                        )
-       -

> Laser Radar (Lidar, Ladar) Facts

Copyright © 2005-2007 RadarGuns com. All rights reserved.

http://www.radarguns.com/laser-radar-lidar-facts.html                                                11/29/200

much like a . usually have shorter sample times (shorter detection range), wider beams, and sometimes less radiated power

**(Q)**

**(A)** The can measure objects as small as a golf ball to as large as a truck. I have measured rain speed with the **Bushnell** (through a window from inside a dry structure).

**(Q)**

**(A)** Yes.

(a) **(Q)**

**(A)** Somewhat important. The less the **radar** is directly in front of or directly behind the target object, the lower the measured speed (the Cosine Effect). The error is directly proportional to the angle off the direction of the target object. An angle error of about 25 degrees equates to about a 10 percent error (reading low by 10%).

**(Q)**
**(A)** Unknown. Anyone targeted by a **radar** (probably) has nothing to worry about (the time and energy levels are just too small). Cellular phones are a greater concern, much more power transmitting close to users head (sometime for hours). Some have concerns about long term use (by **police**) of **police radars**.

**(Q)**
**(A)** It is possible but unlikely, and probably would not happen by accident.

**(Q)**
**(A)** **Radars** are calibrated in (and when they leave) the factory, after that the units are typically checked that they operate within design specifications (calibration check) once or twice per year.

**(Q)**
**(A)** Yes. **Radar** units may be used, under FCC Rules and Regulations Part 90, by anyone with a legitimate need to measure the speed of objects or vehicles.

**(Q)**
**(A)** By definition a jammer is intended to prevent a **radar** from obtaining a and/or spoof the radar by forcing a false reading.

**(Q)**
**(A)** **Microwave jamming** is against FCC Rules and Regulations, **laser radar jamming** is not illegal (except in Illinois and Tennessee as of July 2006).

Antenna & Cord w/ Cigarette Lighter Adapter w/ FREE UPS

Sports Radar Speed Gun SR3600 with FREE UPS

Decatur GVP-D Genesis VersaPak Directional Radar Handheld Cordless Police Radar Gun w/ K-Band Directional Antenna & Faster Mode w/ FREE UPS

JUGSpeed JUGS Speed Cordless MPH and KMPH Radar Gun with FREE UPS

Sports Radar DT100 Detector Short Range Fixed Installation Baseball Pitching booths Hockey Golf nets w/ FREE UPS

**(Q)**

**(A) Radar range** varies widely with **radar**, target (size/shape), and weather conditions. Maximum detection range can be as little as 100 feet, or greater than 1 mile.

(b)    **(Q)**

**(A)** The Cosine Effect is a **radar** measured speed error due to the angle between the **radar** and target vehicle or object.

**(Q)**

**(A)** The Cosine Effect causes a stationary radar to measure speeds low, the greater the angle the lower the measured speed. Moving mode **radar** may measure target speed HIGH in some situations.

**(Q)**

**(A)** The Cosine Effect angle (from the target vehicle's point of view) is the angle between the direction of the target vehicle and the radar. If the target vehicle is traveling directly toward (or away) from the radar, the Cosine Effect angle is 0 degrees (no error).

(c)    **(Q)**

**(A)** The greater the angle, the greater the error. The error is a function of the cosine of the angle, thus Cosine Effect error. Measured speed = actual speed multiplied by the cosine of the angle.

**(Q)**

**(A)** No. A                operating from a **moving vehicle** will measure the ground echo (the patrol car speed). The ground echo is huge compared to other moving vehicles. **Moving radars** are designed to distinguish the ground echo and the target vehicle echo.

**(Q)**

**(A)** Transmit power is the power delivered to the antenna. Antenna specifications (gain and efficiency) are required to determine the radiated power from power delivered to the antenna. Power Density is a measure of radiated power per area. Typically **radars** are specified in milliwatts per square centimeters (mW/square centimeter) at a specific range (usually 3 meters). The greater the range the lower the power density. ERIP (Effective Radiated Isotropic Power) or just ERP (Effective Radiated Power) also measures radiated power compared to a perfect isotropic radiator in Watts (W), milliwatts (mW), or dBm (decibels above or below 1 mW).

## More Radar Guns Related Articles:

- 
- 
-



Toll-Free 800-504-5917

.ch Products    Go
Shop by Brand

Radar Guns Blog | Radar Guns Forum | How Radar Guns Work | Radar Guns Glossary | How to Buy | Recommended Resources

> **Important Rules/ Facts about Radar**

## Important Rules/ Facts about Radar

### Inverse Square Rule
The **inverse square rule** states that the decrease in **strength of a radar signal** is inversely proportional to the square of the change in distance from the antenna.

### Contour Lines of Equal Sensitivity
The **contour lines of equal sensitivity** rule states that the strongest reflected signal is determined by the location of the target vehicle to the main power beam. To better understand contour lines of equal sensitivity it is helpful to review all **beam reflection rules**. The inverse square rule demonstrated that the distance from the            determined the strength of the reflected signal. We also learned from lines of equal sensitivity that two vehicles of equal size, located at an equal distance from the axis of the main beam, will reflect a radar signal equally. However, if two identical vehicles are positioned so that one vehicle is located directly along the main power axis and one vehicle is located at the edge of the            , the vehicle located on the main power axis will reflect the stronger signal.

### Beam Range Sensitivity
As mentioned earlier, the            will continue outward from the            for an indefinite distance. In reality the beam range as referred to in this manual is that distance where the **radar signal** may be reflected from an object and then accurately received by the **radar antenna**. All            specify the range of their            within these specifications. Nevertheless, the **radar range** will vary considerably due to several conditions. Atmospheric conditions such as rain, snow, and fog will decrease the effective **range of the beam** of energy. Terrain such as hills, curves fences, and buildings will obviously affect the **radar signal**. Large volumes of traffic or stronger reflective signals may also reduce the effective range of the radar. Most modern            have a sensitivity adjustment to control the beam range.

**For more information on            and            , please, follow these links:**



- 
- 
- 
- 
- 
- 
- 
- 
- 
- (            )
- 

> **Important Rules/ Facts about Radar**

Copyright © 2005-2008 RadarGuns com  All rights reserved.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                              )
                              )
JOHN E. MOORE,                )
                              )
                              )
        Plaintiff,            )
                              )
              v.              )          Civil Action No. 07-00107
                              )
GEORGE W. BUSH, et al.,       )
                              )
        Defendant,            )
                              )
_____ _____)


**EXHIBIT M**

DAVID A. LARSON
P.O. Box 773   Ridgecrest Ca  93556-0773
Phone: 760 793-8653

February 10 2007

Robert Mueller III
Federal Bureau of Investigation (FBI)
935 Pennsylvania Avenue, NW
Washington, D.C. 20535

Re: Written Allegation of Misconduct and Request for Inquiry

Please accept this letter as written notice of formal allegations of misconduct against Bakersfield
California FBI Agent Tony Sorenson. The nature of the misconduct constitutes denial of due process
in violation of the US Constitution, willful obstruction of justice, gross negligence in handling of
evidence which compromised chain of custody of said evidence, and this Agent also allowed his
investigation to be compromised by outside influences and engaged in "information warfare" tactics
that constitutes slander and character assassination of a reporting party and crime victim. The facts
detailing the misconduct are as follows:

1. On August 21st 2006, I spoke with Agent Sorenson by telephonic means from my residence in
   Ridgecrest CA and detailed ongoing criminal acts  by NIH & DARPA supported research
   personnel affiliated with the Alfred Mann Foundation. Because the criminal acts were
   significant and involved misappropriation of federal funding, assault, identity and data theft,
   civil rights violations as well as criminal use of FCC regulated spectrum, Agent Sorenson
   agreed to look at the supporting evidence in the case which was substantial in volume and
   extremely detailed. A meeting was set for October 5 2006.
2. On Thursday, October 5th 2006, my Girlfriend Brandi Baker and I drove to Bakersfield from our
   residence in Ridgecrest and met with Agent Sorenson in person at the FBI Office located at
   901 Tower Way. At this time, I turned over significant evidence and documentation pertinent to
   the case including an entire IDE hard drive from my computer. Personnel affiliated with the
   Mann Foundation and DARPA used proprietary software, hardware and technology (a
   variation of Posix Compliance to hide networked/symbolically linked drive letters and
   SYSSEC/GETPASS w/Screenblanker) only available through special provisions, to access my
   computer through ACPI/residential wiring and destroy evidence that was being compiled
   against the Alfred E. Mann Foundation and Colonel Geoffrey Ling of Defense Advanced
   Research Projects Agency. This little known network technique is sophisticated and is best
   diagnosed using the entire computer tower, however Agent Sorenson insisted that the hard
   drive alone would be sufficient. Agent Sorenson explained that the FBI personnel responsible
   for looking at the computer data was deployed in IRAQ for several weeks, but the evidence
   would be looked in a timely manner or as soon as the possible. The hard drive was turned over

*Continued...*

to him at this time along with other documents pertinent to the criminal acts.

3.  On September 8th 2006, I sent a package via USPS Priority Mail with Delivery Confirmation to Agent Sorenson. This package contained even more evidence pertinent to the Alfred E. Mann Foundation and DARPA personnel affiliated with the Mann Foundation government contractual work. In total, the evidence provided to Agent Sorenson includes the following:

   a) Copy of one of the NIH contracts awarded to  Mann Foundation research personnel. This contract showed that grant applications submitted to William Heetderks had Defense personnel failing to disclose their defense duties and commitment and was done in order to conceal or "carve" Defense involvement as part of a classified "Special Access Project". In short, Defense personnel took monies that were earmarked by Congress for the NICHD to cure Children's diseases and spent it on Defense and Intelligence technology.

   b) Additional documents authored by Mann Foundation or government personnel or government supported personnel which explicitly outlines the development of implantable medical device technology that is millimeter and submillimeter in size, is injected via syringe into target muscle and nerve, and relies on FCC regulated spectrum between 216 ~ 225MHz for long distance power and data transfer as well as back telemetry.

   c) A copy of the Alfred Mann Foundation request for confidential and special treatment submitted to the FCC which was obtained under FOIA provisions much of which was redacted and labeled as "sensitive" or secret and pertaining to Mann's governmental contractual obligations. The document outlines a proprietary telemetry protocol called "Suspended Carrier" and requests exemption from licensing requirements as well as other special treatment in order to perform "experimental" implantable medical device research related to Mann's governmental contractual obligations using 216 ~ 225 MHz as well as selected other frequencies up to 490MHz.

   d) Copies of numerous earlier complaints made in writing in 2002 to the FCC regarding criminal use of spectrum by Mann Foundation President Joseph H. Schulman (K6BWA) who was performing unethical and criminal research using 224.840MHz. A copy of the FCC's response to the FOIA request that indicated there was no record of any complaints made against Mann or Schulman on FCC record. The USPS Delivery Confirmations, fax confirmation sheets, and email records all prove delivery of numerous complaints to the FCC, however there is no record because the transmissions were all tampered with or removed by another federal agency.

   e) Physician documentation from several Hospitals documenting the surgical removal of recovered foreign bodies, subsequent Pathology reports describing the surgically recovered foreign bodies as being consistent with "mica", a material known to be used in biomedical implants due to it's Mri compatibility, durability, and biocompatibility, Physician requests seeking nuclear medicine consults to localize "submillimeter neural prosthesis devices", and other Physician documentation detailing numerous infections and inflammation resulting from the numerous residual/remaining devices. These remaining/residual devices continue to be used in a criminal manner by personnel affiliated

*Continued...*

with the Alfred E. Mann Foundation and their governmental contractual obligations.

f) Private 3rd party laboratory analysis performed using Energy Dispersive Spectroscopy (EDS) for materials characterization and identification of elemental composition. This EDS analysis identified recovered implantable devices as being constructed of Silicon (Si), the primary material used in the application specific integrated circuits (ASIC) used by the Alfred E. Mann Foundation during AWAM and MOSIS ASIC wafer runs.

g) Photos of the recovered devices showing obvious ASIC and MEMS construction and features as well as the epoxy coating used by the Mann Foundation for long-term biocompatibility of the devices.

h) Three US Patent Office filings and drawings submitted by the Mann Foundation and it's sister company Advanced Bionics which are compared to select photos of recovered devices. The photos of recovered devices are precise matches to the Mann Foundation patent submissions. The Patent submissions were made within only a few weeks of Gerald Loeb implanting the devices which were surgically recovered. These patent filings details devices which resemble the "submillimeter" work pertaining to their governmental contractual obligations and are much smaller than the commercially available "BION" device. The commercial "BION" device is enormous by comparison and is only partly related to their classified or "sensitive" governmental contract obligations.

i) Documentation citing a previous research project, in which a research subject, who was implanted with 38 electrodes in her visual cortex, later died following the conclusion of the research project. The research personnel left hardware implanted in the visual cortex and now there is no record whatsoever that the research ever occurred, or that the patient-volunteer ever existed. The facts in this project are as follows:

> I) The project was titled *"Feasability of a visual prosthesis for the blind based on intracortical microstimulation of the visual cortex",* was performed in-house in Bethesda by NIH personnel at the Laboratory of Neural Control (NINCDS) of which William Heetderks was Deputy Director and the project was headed by Fred T. Hambrecht, Martin Bak and Edward Schmidt.

> II) Documentation in my possession states that project was "frought with difficulties" "biocompatibility was an issue", "the patient died following the conclusion of the research project" and that "all extradural hardware was removed following patient informed protocol". The term "extradural" refers only to the hardware external the scalp and says nothing of the intracortical hardware that Hambrecht and Heetderks left implanted and which I believe caused her death.

> III) Two requests made by myself under FOIA provisions to the National Institutes of Health, requesting information about this project, have resulted in FOIA Officers stating that "no records responsive to the request have been located". Further discussions with personnel at the NIH confirm that there are literally no records existing, or have been removed by another agency due to

*Continued...*

National Security.

This project was performed in-house by NIH personnel, is referenced in numerous medical journals and papers including *"Brain, 119: 507-522 1996"*, is well documented, and the fact that these records "do not exist" confirm my allegations that research personnel at the NIH have been performing research under the auspices of "medical technology" that is in fact being performed under Special Access Project for the US Department of Defense for defense and Intelligence applications.

IV) Further confirming that this patient volunteer died at the hands of research personnel is the fact that the conclusion of this project was followed by a public statement made by NINDS Acting Director Audrey Penn that the NIH was officially abandoning any further research efforts involving intracortical electrodes because the NIH could "not guarantee patient volunteers the efficacy or safety" of such studies.

This patient had residual/remaining implanted devices following conclusion of the research project, died under suspicious circumstance, and now no record of the research exists. It is my belief that this patient died due to the malicious nature of the Defendants research efforts and that record of such was "swept under the rug".

j) Two (2) devices developed under Alfred Mann's governmental contractual obligations, and recovered from my person, were also provided to Agent Tony Sorenson. It was explicitly explained to Agent Sorenson that these devices were much smaller that the commercially publicized "BION" device of the Mann Foundation and microscopy was necessary to identify features due to the MEMS technology employed by the Mann Foundation and William and Tony Tang at JPL. These devices were provided for FBI analysis and I did not expect them to be returned. All of this was explicitly explained in talks and correspondence with Agent Sorenson.

k) A CD-ROM with approximately 1000+ photos of devices surgically recovered from my person. These devices number in the dozens and most remain cataloged and archived on lab slides for reference. These photos clearly show, even to the layman, that the devices are not biological, are semiconductor in nature, and warrant microscopic examination and detailed analysis in order to ascertain the identity of the devices.

4. On November 9th 2006, I sent a letter to Agent Sorenson informing him that my computer was compromised and evidence I was compiling against the Mann Foundation and Col. Geoffrey Ling of DARPA was compromised, and that this was hindering my efforts to prepare for our meeting. Additionally, this letter informed Agent Sorenson that my email communications were also being compromised and detailed an instance that just occurred the previous evening in which an email I sent to City Councilman Steve Morgan (who sits beside me on the Lion's Club Board of Directors), and which contained photos of horse-drawn buggies to be used in the Ridgecrest Christmas Parade, arrived in Councilman Morgan's inbox with pornography attached instead of the horse-drawn buggies. This was verified when Councilman Morgan phoned me and we compared what was sent in my Outbox. I later learned that job applications

*Continued...*

and resumes I had sent to potential employers was also similarly affected.

5. On December 1st 2006, I contacted Agent Sorenson and was told by Agent Sorenson that he could not help me. When I asked for an explanation, he stated "I can't discuss or disclose any details with you", when I stated that seemed suspicious and began to question him, he literally hung-up on me. This behavior seemed out of character for an FBI Agent and defied the working relationship Agent Sorenson and I had developed over the previous months. It is my opinion that Agent Sorenson allowed his investigation to be compromised or caved to pressure from an external agency. This is substantiated by his failure to offer a valid explanation for abandoning an investigation which is heavily supported by direct evidence and facts.

6. On December 9th 2006, I began experiencing problems with my broadband cable connection. Multiple calls to provider Mediacom all resulted in individuals identifying themselves as Mediacom personnel telling me that the problem was a "local outage" and would be corrected. This continued for 5 days until a local Medicom employee in a "Data Theft Response" vehicle knocked on my door and told me that an individual in another apartment had been accessing my cable account and that it was the second instance he had had to fix the problem. Upon questioning, he verified that there was never any local outage, and that my problem was due to the other apartment occupant. The Ridgecrest Police Department did not want to become involved in the situation and initially refused to take a report. Throughout a day and a half, I was being told by RPD Officers that cable or identity theft was "not a crime" and it was not until I made 4 calls and 2 visits complaining of this, did RPD Detective Mike Myers agree to make an actual police report. On December 21 2006, I called Mediacom Corporate headquarters and sought information regarding my account and why I was being told there was a local outage when in fact there was no local outage. I was told that despite the "Privacy Notice" that made records available to other consumers pursuant to the ECPA and Cable Privacy Act, my account was special and records were only being released to law enforcement. Based on the events that occurred, the discussion with Mediacom, and the fact that Police initially refused to take a report or ever question the individual identified by local Mediacom personnel as perpetrating federal crimes that constitute felony misconduct, I have a well founded belief that the FBI initiated investigations against me, and that simutaneously someone was accessing my broadband cable account perpetrating unknown crimes while my complaints of being unable to access the Internet were being met with false claims of a "local outage". This stinks of misconduct and set-up and the fact that I cannot get any cooperation from local law enforcement or the FBI substantiates my accusations of failure to provide equal protection of the law and denial of due process as entitled to citizens under the US Constitution. Details of this are provided in a statement provided to RPD Detective Myers as part of RPD Police report #06-4509.

7. On January 26th 2007, I received a call from Agent Sorenson who called me claiming he needed "an address to send all this evidence back to you because the address I tried was undeliverable." This shocked me and I asked Agent Sorenson to refrain from shipping the box anywhere and that I would contact him in the following days. I could not believe that Agent

*Continued...*

Sorenson would negligently ship this evidence to an undeliverable address because there are concerns with "chain of custody" and the evidence which included the IDE hard drive and other items were crucial evidence in this case.

8. Three days later on January 29th 2007, I again drove to the Bakersfield FBI Office to pick up the box of evidence that Sorenson had previously attempted to ship somewhere. I was told by a helpful individual that Sorenson was out, but that he called Sorenson and was told that the box I sought was on Sorenson's desk. I was given the box and saw that it had a shipping label on it with an address that I had not resided in in almost two years. This address was never given to Agent Sorenson, and appeared on none of the correspondence that was exchanged. First he shouldn't have shipped it. Second, if he did, he should have used the return address where I resided, the one on my letterhead, not the one on Robertson which was two years and two addresses ago. By shipping this evidence to an incorrect address without my authorization or instruction, Agent Sorenson caused the chain of custody to be compromised.

9. Upon returning from Bakersfield with the box of evidence on January 29th 2007, my girlfriend Brandi Lynn Baker informed me she received a phone call from Agent Tony Sorenson. She proceeded to tell me how he asked some very inappropriate questions and proceeded to slander my character and scare her away from continuing our relationship. I have no (none, zero) felony convictions, nor any drug convictions, and have never caused any person to sustain bodily injury. This is entirely uncalled for, is negligent and constitutes misconduct. This behavior is suspiciously similar to the efforts of "Informational Warfare" perpetrated by DARPA and personnel affiliated with the Alfred Mann Foundation. Ms. Baker has provided a written statement, attached.

To summarize, since I have had Physicians recover these devices from my person, have identified Gerald Loeb as being the individual who performed the implantation, have obtained copies of research contracts via FOI provisions that show misappropriation of federal funding, and uncovered the death of a research subject under questionable circumstance, I have been subject to every form of electronic and information warfare that these individuals possess including abuse of Special Access Project provisions, abuse of Patriot Act provisions used to violate my rights in a criminal manner that is both illegal and unconstitutional, and have learned that National Security letters have been served on other parties which have been used to slander and assail my character while simultaneously silencing the affected parties with a gag order. The abuses have caused me to suffer false allegations, false arrest and when I attempted to alert the FBI and present factual direct evidence, Agent Sorenson compounded the problem with even more rights violations and misconduct. The FBI and other federal agencies need to be reminded that they do not work for the Executive Branch of government! They work for the people who need them the most, and that is the Citizens of the United States of America. You are well aware of the problems I am describing and the instances above portray a clear picture of these abuses. I intend to take this agency to task on this one and am demanding explanation and corrective action. I look forward to your prompt reply.

Continued...

DAVID A. LARSON

Sincerely,


David A. Larson
P.O. Box 773
Ridgecrest CA 93556-0773
760 793-8653

cc:    W. Lee Rawls – Chief of Staff
       Candice M. Will – Office of Professional Responsibility
       David Gelios – Chief Agent, Bakersfield FBI
       James Burrus Jr. - Criminal Investigation Chief

Continued...